## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| QCE FINANCE LLC, *et al.*,[1] | ) | Case No. 14-_____ (   ) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

## DEBTORS' MOTION FOR ENTRY OF AN
## ORDER (I) AUTHORIZING THE DEBTORS TO PAY
## CERTAIN PREPETITION CLAIMS (A) ARISING UNDER
## THE PERISHABLE AGRICULTURE COMMODITIES ACT,
## (B) OF SHIPPERS, (C) ARISING UNDER BANKRUPTCY CODE SECTION
## 503(B)(9) AND (D) CLAIMS INCURRED IN CONNECTION WITH POSTPETITION
## DELIVERY OF GOODS AND SERVICES AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "***Debtors***") seek entry of an order (the "***Order***"), substantially in the form attached hereto as **Exhibit A**: (i) authorizing, but not directing, the Debtors, in their sole discretion, to pay, in the ordinary course of business as such claims come due: (a) all claims arising under the Perishable Agricultural Commodities Act of 1930 (as amended, modified, or supplemented from time to time, "***PACA***"), and any and all state statutes of similar effect, of PACA Vendors (as defined herein, whose claims shall be identified herein collectively as the "***PACA Claims***"); (b) prepetition claims of Shippers (as defined herein); (c) claims of vendors entitled to administrative expense priority status under section 503(b)(9) of title 11 of the United States Code (the "***Bankruptcy Code***") (collectively, the "***503(b)(9) Claimants***", whose claims shall be identified herein collectively as the "***503(b)(9) Claims***"); and

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: QCE Finance LLC (7897); American Food Distributors LLC (8099); National Marketing Fund Trust (4951); QAFT, Inc. (6947); QCE LLC (2969); QFA Royalties LLC (2402); QIP Holder LLC (2353); Quiz-CAN LLC (7714); Quizno's Canada Holding LLC (3220); Quiznos Global LLC (2772); Restaurant Realty LLC (8293); The Quizno's Master LLC (3148); The Quizno's Operating Company LLC (8945); The Regional Advertising Program Trust (2035); and TQSC II LLC (86831). The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 1001 17th Street, Suite 200, Denver, Colorado 80202.

(d) claims arising from the postpetition delivery of goods and rendering of services ordered prior to the Petition Date (as defined herein); and (ii) granting related relief.  In support of this motion, the Debtors submit the declaration of Stuart K. Mathis in support of the First Day Pleadings (the "***First Day Declaration***") and respectfully state as follows:

<u>JURISDICTION</u>

1.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are Bankruptcy Code sections 105(a), 363, 503(b), 507(a)(2), 1107(a) and 1108, Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***").

<u>BACKGROUND</u>

**A.  General Background**

4.      On the date hereof (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.  No official committees have been appointed or designated.

5.      A description of the Debtors' business and the reasons for filing these chapter 11 cases is set forth in the First Day Declaration filed contemporaneously herewith and incorporated by reference as if fully set forth herein.

### B. Specific Background

6.      As discussed herein, various third parties who provide goods and services to the Debtors, such as the PACA Vendors and Shippers, may be able to assert liens against the Debtors' assets.   In addition, due to the nature of the Debtors' business, certain vendors may have (a) 503(b)(9) Claims or (b) claims entitled to administrative expense priority under Bankruptcy Code section 503(b)(1)(A) (collectively, the "*503(b)(1) Claims*" and, holders of such claims, the "*503(b)(1) Claimants*") for the Debtors' undisputed obligations arising from prepetition purchase orders outstanding as of the Petition Date (collectively, the "*Purchase Orders*") for goods and services provided to the Debtors on or subsequent to the Petition Date.   It is critical to the Debtors' business operations that the Debtors and their franchisees continue to receive without disruption goods and services, as applicable, from the PACA Vendors, Shippers, 503(b)(9) Claimants and 503(b)(1) Claimants (collectively, the "*Trade Claimants*", whose claims shall be identified herein collectively as the "*Trade Claims*").   The Debtors believe that without the relief requested herein, many of these vendors will cease delivering goods and providing services to the Debtors.   Any such disruption would have a devastating effect on the Debtors' operations and their reorganization efforts.

### i.    PACA Claims

7.      To ensure that the Debtors and their franchisees continue to receive a constant supply of fresh fruits and vegetables postpetition, the Debtors seek authority, but not direction, in their sole discretion, to continue to pay PACA Claims to those vendors who supply the Debtors with fruits and vegetables (collectively, the "*PACA Vendors*") in the ordinary course of business and consistent with their historical practices in effect prior to the Petition Date.

8.      Congress enacted PACA to regulate the sale of "perishable agricultural commodities" and protect sellers of such commodities. *See* 7 U.S.C. § 499e(c)(2); 7 C.F.R. § 46.46(b); *see also*

*Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1067 (2d Cir. 1995). Under PACA, the term "perishable agricultural commodity" is generally defined as "fruits and fresh vegetables of every kind and character" "whether or not frozen or packed in ice." 7 U.S.C. § 499a(b)(4). PACA provides various protections to fresh fruit and vegetable sellers, including the establishment of a statutory constructive trust (the "*PACA Trust*"), consisting of a purchaser's entire inventory of food or other derivatives of perishable agricultural commodities, the product derived therefrom and the proceeds related to any sale of the commodities or products (collectively, the "*PACA Trust Assets*"). *See* 7 U.S.C. § 499e(c)(2); 7 C.F.R. § 46.46(b); *Bear Mountain Orchards, Inc.* v. *Mich-Kim, Inc.*, 623 F. 3d 163, 167 (3d Cir. 2010) ("The produce purchasers are require[d]... to hold sufficient PACA trust assets in trust to pay all suppliers.") (internal quotations and citation omitted). Assets subject to a PACA Trust are preserved as a non-segregated floating trust and may be commingled with non-trust assets. However, courts in this and other districts have consistently held that PACA Trust Assets are not property of a debtor's estate. *See Stanziale v. Rite Way Meat Packers, Inc. (In re CFP Liquidating Estate)*, 405 B.R. 694, 697 (Bankr. D. Del. 2009); *In re Long John Silver's Rests., Inc.*, 230 B.R. 29, 32 (Bankr. D. Del. 1999); *Morris Okun, Inc. v. Harry Zimmerman, Inc.*, 814 F. Supp. 346, 348 (S.D.N.Y. 1993).

9.      To preserve its rights as a trust beneficiary, PACA requires that certain procedural steps be taken by a seller of perishable agricultural commodities. Specifically, a PACA Vendor must provide written notice (a "*PACA Notice*") to the purchaser of such goods of its intent to preserve the benefits of the PACA Trust. *See Merrill Farms Corp. v. H.R. Hindle & Co. (In re Hindle & Co.)*, 149 B.R. 775, 785 (Bankr. E.D. Pa. 1993); *Debruyn Produce Co. v. Richmond Produce Co. (In re Richmond Produce Co.)*, 112 B.R. 364, 368 (Bankr. N.D. Cal. 1990). Written notice under PACA may be accomplished by either (a) including the statutorily-mandated language on the face of the

vendor's invoices or (b) providing written notice to the purchaser of the PACA goods within thirty (30) days after the time payment is due. Beneficiaries of a PACA Trust that adhere to the statutory notice requirements are entitled to prompt payment from the PACA Trust Assets ahead of secured and unsecured creditors of a debtor's estate. *See "R" Best Prod., Inc. v. 646 Corp.*, No. 00 Civ 8536 (HB), 2002 WL 31453909, at *1 (S.D.N.Y. Oct. 31, 2002). However, a PACA Vendor's failure to comply with the notice requirements renders its claim a general unsecured claim in a debtor's chapter 11 case. *See In re H.R.. Hindle*, 149 B.R. at 786.

10.    PACA's application is limited to sales to commission merchants, brokers, and dealers. 7 U.S.C. § 499e(c). "Dealer", as such term is defined in PACA, is "any person engaged in the business of buying or selling in wholesale or jobbing quantities, as defined by the Secretary, any perishable agricultural commodity in interstate or foreign commerce." 7 U.S.C. § 499a(b).

11.    The Debtors believe that a certain portion of the goods they purchase from vendors, either for their own restaurants or on behalf of the franchisees, may qualify as "perishable agricultural commodit[ies]" under PACA. As a result, provided that the PACA Vendors abide by the notice requirements of PACA, they will be eligible to assert PACA Claims[2] granting them priority head of all other secured and unsecured creditors in these chapter 11 cases. Accordingly, payment of PACA Claims at the outset of these chapter 11 cases will not prejudice or affect the amount available for distribution to other creditors of the Debtors. To ensure the continued,

---

[2]    Certain of the Debtors' vendors may also be eligible to assert claims under the Packers and Stockyards Act of 1921 as amended, 7 U.S.C. § 181 et seq. ("*PASA*"), which prescribes the conditions of operations for businesses dealing in livestock. PASA creates a statutory trust scheme which is virtually identical to PACA in respect of delivery of livestock and other eligible goods. See *In re W.L. Bradley Co.*, 75 B.R. 505, 509 (Bankr. E.D. Pa. 1987) ("The Legislative history expressly notes that the PACA Trust was modeled on the trust amendment to the Packers and Stockyards Act."). To the extent that any claims fall under PASA, the Debtors submit that it is in the best interests of the Debtors' estates, creditors and parties in interest to treat such claims in a manner identical to the claims of the PACA Vendors. Accordingly, for the purposes of the motion and any related orders, any claims arising under PACA shall also incorporate any claims arising under PASA.

uninterrupted supply of fresh produce, it is important that the Debtors be authorized to pay all valid PACA Claims in the ordinary course of business and consistent with their historical practices.

12.    As of the Petition Date, the Debtors estimate they owe PACA Vendors approximately $230,000 in the aggregate for PACA goods delivered prior to the Petition Date. The Debtors expect to be invoiced for substantially all of the amounts owed to PACA Vendors within twenty-one (21) days following the Petition Date.

### ii.    *Shipping Claims*

13.    The Debtors have carefully cultivated a reputation for dependability among their customers and franchisees and, accordingly, must maintain a reliable and efficient supply and distribution network during these chapter 11 cases. The Debtors' supply and delivery system depends upon the use of reputable common carriers, dedicated carriers, rail carriers, freight-forwarders, parcel carriers, and similar shippers and transporters (collectively, the "***Shippers***," whose claims shall be identified as the "***Shipping Claims***"), all of which may assert possessory liens on the Debtors' goods, merchandise or finished products in the Shippers' possession. The Shippers deliver goods that are essential to the Debtors' business to the Debtors, their restaurants or their third-party distribution centers. Such items include food, restaurant supplies and other goods necessary for the day-to-day operation of the Debtors' business. In the ordinary course of business, Shippers regularly have possession of the Debtors' food, restaurant supplies and other goods.

14.    To prevent immediate and irreparable harm to the Debtors' business, the Debtors seek authority to pay the Shipping Claims. If the Shipping Claims are not paid, the Shippers may assert possessory liens for transportation or storage costs, and refuse to deliver or release goods in their possession until their claims are satisfied and their liens released. Any significant disruption in the Debtors' supply chain could have a severe and adverse impact on the Debtors' franchise system, leaving franchisees without sufficient food, products and supplies to operate their business. As a

RLF1 10043320v.1

result, the Debtors may suffer, at a minimum, a significant loss of credibility, customer goodwill and revenue, thereby causing substantial and potentially irreparable harm to their business and reorganization efforts.

15.     The Debtors seek authority to only pay those Shipping Claims that they believe, in their business judgment, are necessary or appropriate.  The Debtors submit that the total amount to be paid to the Shippers on account of their prepetition claims is minimal compared to the direct and indirect losses the Debtors would suffer if a Shipper refused to deliver the Debtors' products.

16.     The Debtors estimate that, as of the Petition Date, an aggregate of approximately $150,000 in Shipping Claims may be outstanding.  The Debtors expect to be invoiced for substantially all of the amounts owed to Shippers within twenty-one (21) days following the Petition Date.

17.     As with the rest of the Trade Claims, to the extent that the Debtors make any payments with respect to any Shipping Claims, no such payment shall be deemed a waiver of the Debtors' rights to challenge the validity and amount of any such claim or the extent, validity, perfection or possible avoidance of any liens asserted by the Shippers.

### iii.     503(b)(9) Claims

18.     Certain vendors may be entitled to administrative expense priority under Bankruptcy Code section 503(b)(9) to the extent the Debtors received goods from a vendor, in the ordinary course of business, within the twenty-day period immediately preceding the Petition Date.  Because the Bankruptcy Code requires the Debtors to pay such claims in full to confirm a plan of reorganization, the payment of these 503(b)(9) Claims merely affects the timing of such payments, and not the amount.  Accordingly, the Debtors seek authority, but not direction, in their sole discretion, to pay the 503(b)(9) Claims in the ordinary course of business to the extent necessary to preserve the going concern value of the Debtors' chapter 11 estates.  As with the rest of the Trade

Claims, however, to extent that the Debtors make any payments with respect to such a claim, no such payment shall be deemed a waiver of the rights of the Debtors and their estates to contest the validity and amount of any such claim. The Debtors estimate that there are approximately $3.3 million in 503(b)(9) Claims that have accrued but remain unpaid as of the Petition Date. The Debtors expect to be invoiced for substantially all of the amount owed within twenty-one (21) days following the Petition Date.

   *iv.*  ***503(b)(1) Claims***

   19.  As of the Petition Date, the Debtors have certain prepetition purchase orders outstanding (collectively, the "***Purchase Orders***") with vendors for goods and services, for which the delivery has not yet occurred and will not occur until on or subsequent to the Petition Date. The delivery of such goods and services by the 503(b)(1) Claimants is essential to the uninterrupted operation of the Debtors' business. The Debtors believe that honoring the 503(b)(1) Claims is in the ordinary course of their business, and thus, Court approval to pay the 503(b)(1) Claimants is not required. As a result of the commencement of these chapter 11 cases, however, these vendors may perceive a risk that they will be treated as prepetition unsecured creditors for the cost of any shipments made or services provided pursuant to the Purchase Orders, and may refuse to deliver such goods or provide such services to the Debtors unless the Debtors issue substitute purchase orders postpetition or provide other assurances of payment, including requiring less favorable trade terms than the prepetition terms between the Debtors and the vendors. Alternatively, some 503(b)(1) Claimants may refuse to do business with the Debtors after the Petition Date due to the failure to honor the existing Purchase Orders, thereby forcing the Debtors to find alternate suppliers with less favorable trade terms. Additionally, requiring the Debtors to issue substitute purchase orders on a postpetition basis also would be administratively burdensome, time-consuming, and counterproductive to the Debtors' chapter 11 cases, and would inevitably lead to delays in the

Debtors' receipt of goods and services, ultimately resulting in the disruption of the Debtors' business.

20. Accordingly, in an abundance of caution and to prevent any disruption to the Debtors' operations, eliminate the administrative burden associated with issuing substitute Purchase Orders, and facilitate a smooth transition into chapter 11, the Debtors seek an order (a) granting administrative expense priority under Bankruptcy Code section 503(b)(1) to all of the Debtors' undisputed obligations arising from the acceptance of goods and services subject to Purchase Orders and (b) authorizing, but not directing, the Debtors, in their sole discretion, to satisfy such obligations in the ordinary course of business. As with the rest of the Trade Claims, however, to the extent that the Debtors make any payments with respect to any 503(b)(1) Claims, no such payment shall be deemed a waiver of the rights of the Debtors and their estates to contest the validity and amount of such claims.

### C. Proposed Terms of Payment of Trade Claims

21. Subject to the terms set forth herein, the Debtors request authority, but not direction, to condition the payment of the Trade Claims on the written agreement of individual Trade Claimants to continue to provide goods and services, as applicable, to the Debtors during the pendency of these chapter 11 cases on the most favorable terms that were in effect during the 120 days before the Petition Date (the "*Historical Trade Terms*"), unless otherwise waived by the Debtors. The Debtors reserve the right to negotiate trade terms (the "*Negotiated Trade Terms*") with any Trade Claimant demanding terms less favorable to the Debtors (to the extent the Debtors determine such terms are necessary to procure essential goods or services or are otherwise in the best interests of the Debtors' estates and creditors). The agreement between the Debtors and the particular Trade Claimant (each, a "*Trade Agreement*"), once agreed to and accepted by the Trade Claimant, shall be a legally binding contractual arrangement between the parties governing the

commercial trade relationship.  The Debtors seek authority to enter into Trade Agreements, if and at the time they determine in their business judgment that such an agreement is necessary to their postpetition operations.  The Debtors also explicitly seek authority to pay the Trade Claims in the event that no Trade Agreement has been reached, if the Debtors determine, in their business judgment, that failure to pay Trade Claims is likely to result in irreparable harm to the Debtors' business operations or that a Trade Agreement is unnecessary or not available.

22.    In the event that any Trade Claimant that has received payment for its Trade Claims refuses to continue to provide goods and services, as applicable, on the Historical Trade Terms or the Negotiated Trade Terms following receipt of payment of its Trade Claim, the Debtors seek authority, without further order of the Court, to declare that the provisional payments made to the Trade Claimant on account of its Trade Claim be deemed to have been in payment of the then-outstanding postpetition obligations owed to such Trade Claimant.  In such an instance, the previously paid Trade Claim of the applicable Trade Claimant shall be reinstated as a Trade Claim in the amount deemed by the Debtors to have been in payment of any then-outstanding postpetition claims of such Trade Claimant.  To the extent that the payments made to the Trade Claimant on account of the previously paid Trade Claims exceed the postpetition amounts then owed to such Trade Claimant, the Debtors and their estates reserve all right to recover such payments.  In short, the Debtors seek to return the parties to their respective positions in the event the Trade Claimant refuses to supply goods and/or services to the Debtors on Historical Trade Terms or Negotiated Trade Terms following receipt of payment on account of its Trade Claim.

23.    The Debtors further request that any Trade Claimant who accepts payment from the Debtors on account of a Trade Claim, shall be deemed to have agreed to the terms and provisions of the Order and shall be deemed to have waived, to the extent so paid, any and all prepetition claims,

of whatever type, kind or priority, against the Debtors, their properties and estates, their directors officers and members and any funds and other property held in trust by the Debtors that do not constitute "property of the estate" under Bankruptcy Code section 541.

## RELIEF REQUESTED

24.     By this motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors, in their sole discretion, to pay the PACA Claims, Shipping Claims, 503(b)(9) Claims and 503(b)(1) Claims.

## SUPPORTING AUTHORITY

### A. Payment of the PACA Claims and the Shipping Claims is Justified Under Bankruptcy Code Section 363(b) and Warranted Under the Doctrine of Necessity

25.     Courts generally acknowledge that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business' going-concern value. *In re Motor Coach Indus. Int'l Inc.,* 2009 WL 330993, *at 2 n.5 (Bankr. D. Del. Feb. 10, 2009) ("The 'doctrine of necessity' or 'necessity of payment' doctrine is a general rubric for the proposition that a court can authorize the payment of prepetition claims if such payment is essential to the continued operation of the debtor."); *In re Just for Feet, Inc.,* 242 B.R. 821, 824-25 (Bankr. D. Del. 1999) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the debtor's business); *see also In re Ionosphere Clubs, Inc.,* 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); *Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.),* 29 B.R. 391, 398 (S.D.N.Y. 1983) (granting the debtor the authority to pay prepetition claims of suppliers who were potential lien claimants). When

authorizing payments of certain prepetition obligations, courts have relied upon several legal theories rooted in Bankruptcy Code sections 363(b) and 105(a).

26.     Pursuant to Bankruptcy Code sections 1107(a) and 1108, debtors in possession are fiduciaries holding the bankruptcy estate and operating the business for the benefit of creditors and, if the value justifies, the equity owners. *See, e.g., In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).   Consistent with such fiduciary duties, courts have authorized payment of prepetition obligations under Bankruptcy Code section 363(b) where a sound business purpose exists for doing so. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification).   Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *CoServ*, 273 B.R. at 497.

27.     Courts have also authorized payment of prepetition claims in appropriate circumstances under Bankruptcy Code section 105(a).   Section 105(a), which codifies the inherent equitable powers of the bankruptcy court, empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).   Under section 105(a), courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business and, in particular, where nonpayment of a prepetition obligation would trigger a withholding of goods or services essential to the debtors' business reorganization plan. *See In re Just for Feet, Inc.*, 242 B.R. at 825; *In re Ionosphere Clubs*, 98 B.R. at 177 (finding that section 105 empowers bankruptcy courts to authorize payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).   Specifically, the Court may use its power under section 105(a) to authorize payment of

prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (confirming doctrine of necessity, *i.e.*, whether payment is essential to continued operation of debtor's business, is the applicable standard in the Third Circuit for enabling the court to authorize payment of prepetition claims prior to confirmation of reorganization plan); *In re UNR Indus.*, 143 B.R. 506, 520 (Bankr. N.D. Ill. 1992) (permitting the debtor to pay prepetition claims of suppliers or employees whose continued cooperation is essential to the debtors' successful reorganization).

28.     Indeed, the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981), holding that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id.* (stating courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or materials essential to the conduct of the business until their pre-reorganization claims have been paid"); *In re Just for Feet*, 242 B.R. at 824–25 (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to continued operation of business); *Columbia Gas Sys., Inc.*, 171 B.R. at 191–92 (same).

29.     The necessity of payment doctrine is designed to foster the rehabilitation of a debtor in reorganization cases, which courts have recognized is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs*, 98 B.R. at 176; *In re Just For Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization."); *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396

(Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code", but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to Chapter 11 process").

30.    The Debtors submit that the relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.  Specifically, the authority, but not direction, to satisfy the PACA Claims and Shipping Claims in the initial days of these chapter 11 cases without disrupting the Debtors' business operations will send a clear signal to the marketplace, including key suppliers and customers, that the Debtors are willing and able to conduct business as usual during these chapter 11 cases.

31.    The Debtors' operations also require the seamless coordination of a multitude of unrelated third-parties at every stage in the supply chain.  Collectively, the Debtors' supply chain ensures that the Debtors and their franchisees receive all of the food, products, and supplies necessary to operate their business and provide their customers with the high-quality food expected under the "Quiznos" brand.  Any significant disruption in the Debtors' supply chain, such as a vendor halting delivery of certain necessary goods and/or services, could result in the Debtors not having sufficient food, products and supplies to operate their business.  Given the highly-competitive

submarine sandwich and quick-service restaurant markets, such a result could be detrimental to the Debtors' business and significantly impair their restructuring efforts.

32.    Moreover, Shippers may be entitled under applicable non-bankruptcy law to assert certain possessory liens on the Debtors' goods, merchandise or finished products in their possession (notwithstanding the automatic stay under Bankruptcy Code section 362) in an attempt to secure payment of their prepetition claim. As described above, under Bankruptcy Code section 362(b)(3), the act of perfecting such liens, to the extent consistent with Bankruptcy Code section 546(b), is expressly excluded from the automatic stay.[3] As a result, the Debtors anticipate that certain of the Shippers may assert and/or perfect liens, refuse to turn over goods in their possession or stop performing their ongoing obligations. Even absent a valid lien, to the extent any of these vendors have possession of the Debtors' inbound inventory or outbound products, mere possession or retention could severely disrupt the Debtors' operations.

**B. Payment of Allowed PACA Claims in the Ordinary Course of Business is Warranted**

33.    The Court should authorize the prompt and full payment of the PACA Claims. As discussed above, assets governed by PACA do not constitute property of the Debtors' estates. *See Tom Lange Co. v. Kornblum & Co. (In re Kornblum & Co),* 81 F.3d 280, 284 (2d Cir. 1995); *In re Long John Silver's Rests., Inc.,* 230 B.R. 29, 32 (Bankr. D. Del. 1999); *Morris Okun, Inc. v. Harry Zimmerman, Inc.,* 814 F.Supp. 346, 348 (S.D.N.Y. 1993). As a result, the distribution of assets to PACA Vendors falls outside the Bankruptcy Code's priority scheme, and such claimants are entitled to payment from the PACA Trust ahead of the Debtors' other creditors. *See, e.g., In re Magic Rests., Inc.,* 205 F.3d 108, 110 (3d Cir. 2000); *Consumers Produce Co., Inc.* v. *Volante Wholesale Produce, Inc.,* 16 F.3d 1374, 1377-78 (3d Cir. 1994). Moreover, the disposition of PACA Trust Assets is

---

[3]    *See* 11 U.S.C. § 546(b)(1)(A) (a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection").

subject to the jurisdiction of the bankruptcy court. *See, e.g., Bear Mountain Orchards, Inc. v. Mich-Kim, Inc.*, 623 F.3d 163, 167 (3d Cir. 2010); *Monterey Mushrooms, Inc. v. Carolina Produce Distribs. (In re Carolina Produce Distrib.)*, 110 B.R. 207, 209 (W.D.N.C. 1990); *Allied Growers Co-Op, Inc. v. United Fruit and Produce Co. (In re United Fruit Produce Co.,)*, 86 B.R. 14, 16 (Bankr. D. Conn. 1988). Accordingly, the relief requested herein with respect to the payment of the PACA Claims does not prejudice the Debtors' creditors or any party in interest in the chapter 11 cases.

34.    Furthermore, payment of allowed PACA Claims will inure to the benefit of the Debtors' estates by preserving goodwill between the Debtors and the PACA Vendors. Any delays in satisfying amounts owed to PACA Vendors could adversely affect the Debtors' and their franchisees' abilities to obtain fresh produce, thereby undercutting the Debtors' reorganization prospects. Failing to pay allowed PACA Claims in the ordinary course of business could subject the Debtors to numerous claims and adversary proceedings, including motions by PACA Vendors for relief from the automatic stay and/or injunctive relief, which would result in the unnecessary expenditure of time, effort and money by the Debtors.

35.    Lastly, in certain circumstances, officers or directors of a corporate entity who are in a position to control trust assets but breach the fiduciary duty to preserve those assets may be held personally liable under PACA. *See Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 282-283 (9th Cir. 1997); *see also Golman-Hayden Co., v. Fresh Source Produce Inc.*, 217 F.3d 348, 350 (5th Cir. 2000) (court will require (a) whether the individual's involvement with the corporation was sufficient to establish legal responsibility and (b) whether the individual, in failing to exercise any appreciable oversight of the corporation's management, breached a fiduciary duty owed to PACA creditors, to determine personal liability). Thus, to the extent that any valid obligations arising under

PACA remain unsatisfied by the Debtors, the Debtors' officers and directors may be subject to lawsuits during the pendency of these chapter 11 cases. Any such lawsuit (and ensuing potential liability) would distract the Debtors and their officers and directors in their efforts to implement a successful reorganization strategy and, moreover, could lead to the assertion of substantial indemnification claims under the Debtors' governing documents, employment agreements and applicable laws to the detriment of all of the Debtors' stakeholders.

36.    Courts in this and other districts routinely grant similar relief with respect to the treatment of PACA Claims. *See, e.g., In re Amicus Wind Down Corp.* (f/k/a *Friendly Ice Cream Corp.*), No. 11-13167 (KG) (Bankr. D. Del. Oct. 6, 2011), Docket No. 57; *In re Perkins & Marie Callender's Inc.*, No. 11-11795 (KG) (Bankr. D. Del. June 14, 2011), Docket No. 43; *In re Harry & David Holdings, Inc.*, No. 11-10884 (MFW) (Bankr. D. Del. April. 26, 2011), Docket No. 211; *In re CB Holding Corp.,* No. 10-13683 (MFW) (Bankr. D. Del. Jan. 10, 2011), Docket No. 419; *In re Great Atl. & Pac. Tea Co.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 12, 2010), Docket No. 500; *In re Uno Rest. Holdings Corp.*, No. 10-10209 (MG) (Bankr. S.D.N.Y. Jan. 20, 2010), Docket No. 36; *In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS) (Bankr. D. Del. July 13, 2009), Docket No. 206; *In re Buffets Holdings, Inc.*, No. 08-10141 (MFW) (Bankr. D. Del. Feb. 13, 2008), Docket No. 285.[4]

### C.  The Court Should Allow the Debtors to Pay the 503(b)(9) Claims in the Ordinary Course of Business

37.    As noted above, certain vendors may be entitled to request an administrative expense priority claim under Bankruptcy Code section 503(b)(9) to the extent the Debtors received goods, in the ordinary course of business, within the twenty-day period immediately prior to the Petition Date. Because such claims are entitled to priority status under Bankruptcy Code section 503(b)(9), the

---

[4]    Due to the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed co-counsel.

Debtors must pay the claims in full to confirm a plan of reorganization. *See* 11 U.S.C. § 1129(a)(9)(A) (requiring payment in full of claims entitled to priority). Although Bankruptcy Code section 503(b)(9) does not specify a time for payment of these expenses, bankruptcy courts have the discretion to allow for distributions to administrative claimants prior to confirmation if the debtor has the ability to pay and there is a need to pay. Indeed, nothing in the Bankruptcy Code prohibits the Debtors from paying such claims sooner if they choose to do so, or this Court from exercising its discretion to authorize the postpetition payment of such obligations prior to confirmation of a chapter 11 plan. Thus, payment of claims arising under section 503(b)(9) affects the timing, but not the amount, of such payment. As a result, the Debtors respectfully submit that they should have the authority (but not the direction) to pay such claims, in the ordinary course of business, during the pendency of the chapter 11 cases, to the extent necessary to preserve the going concern value of the chapter 11 estates.

38. Since the enactment of Bankruptcy Code section 503(b)(9), courts in this jurisdiction have exercised their discretion and have authorized the payment of prepetition claims under Bankruptcy Code section 503(b)(9) at the outset of a chapter 11 case. *See, e.g., In re Perkins & Marie Callender's Inc.*, Case No. 11-11795 (KG) (Bankr. D. Del. June 14, 2011), Docket No. 43. Indeed, in granting a request for similar relief, at least one judge in this District asked an objecting United States Trustee, "[a]rguably, would you agree that the debtor would be able to pay the 503(b)(9) claims without Court approval?" Transcript of Hearing Held on Oct. 31, 2006, at 24:14-16, *In re Dura Auto.*, No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) Docket No. 74 (approving payment of claims under section 503(b)(9) as part of "first day" relief).

**D.  Paying the PACA Claims, Shipping Claims and 503(b)(9) Claims Now Will Not Affect Creditor Recoveries**

39.     The relief requested herein will not affect the recovery of creditors in these chapter 11 cases.  As stated above, assets governed by PACA do not constitute property of the Debtors' estates.  Holders of PACA Claims are entitled to payment from the PACA Trust ahead of the Debtors' other creditors.  The Debtors' requested relief affects only the timing of the PACA Claims payment, and will not prejudice the recovery of other creditors.  Additionally, in instances where the amounts owed to a Shipper is less than the value of the goods that could be held to secure a Shipping Claim, the Shipper is arguably a fully-secured creditor of the Debtors' estates to the extent of the value of the goods that it holds.  As discussed above, to confirm a chapter 11 plan, the Bankruptcy Code requires payment in full of the 503(b)(9) Claims as administrative claims.  In such instances, payment now only provides the PACA Claimants, Shippers and 503(b)(9) Claimants with what they would be entitled to receive under a plan of reorganization, only without any interest costs that might otherwise accrue during these chapter 11 cases.  Accordingly, payment to such Claimants at the outset of these cases will not affect recoveries to other creditors under any chapter 11 plan, and instead, solely impacts the timing of these payments.

**E.  The Court Should Confirm that the Claims Arising out of the Purchase Orders are Administrative Expense Claims and Payment of Such Claims is Appropriate**

40.     Pursuant to Bankruptcy Code section 503(b)(1)(A), obligations that arise in connection with the postpetition delivery of goods and services, including goods ordered prepetition, are, by definition, administrative expenses because they benefit the estate postpetition.  Although the Debtors believe that they therefore have the authority to make payment for any goods received postpetition (irrespective of the time the orders were first placed) in the ordinary course of their business, confirmation of that authority is appropriate and necessary in the instant case.  The requested relief will provide these critical parties with the necessary assurance that their valid

postpetition claims will be given administrative expense priority status, and that they will continue to be paid by the Debtors in the ordinary course consistent with the historical trade practices in effect as of the Petition Date. Furthermore, any attempt by the 503(b)(1) Claimants to interrupt goods in transit will create unanticipated supply shortages that will be harmful to the going concern value of the Debtors' business.

41.    Absent the relief requested herein, the Debtors may be required to expend substantial time and resources convincing the 503(b)(9) Claimants of the Debtors' authority to make certain payments, reissuing Purchase Orders and/or establishing the Debtors' right to retain the goods supplied under the Purchase Orders. The disruption to the continuous and timely flow of the goods and services necessary to operate the Debtors' business could hinder the Debtors' operations and subject them to tremendous expense, all to the detriment of the Debtors' stakeholders. Accordingly, the Debtors submit that the Court should confirm the administrative expense priority status of claims arising out of the Purchase Orders and should authorize, but not direct, the Debtors, in their sole discretion, to pay the amounts outstanding thereunder in the ordinary course of business.

## CAUSE EXISTS TO AUTHORIZE THE DEBTORS' FINANCIAL INSTITUTIONS TO HONOR CHECKS AND ELECTRONIC FUND TRANSFERS

42.    The Debtors have sufficient funds to remit the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to debtor in possession financing. Also, under the Debtors' existing cash management system, the Debtors have made arrangements to identify checks or wire transfer requests as relating to an authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently and the Court should authorize all applicable financial

institutions, when requested by the Debtors, to receive, process, honor and pay any and all checks or wire transfer requests in respect of the relief requested herein.

## THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

43.     For a debtor to obtain relief to make pre-plan payments within 21 days of the Petition Date, it must establish that making such payments satisfies the requirements mandated by Bankruptcy Rule 6003—namely, the relief requested is necessary to avoid "immediate and irreparable harm." Fed. R. Bankr. P. 6003. If a debtor's prospect of reorganizing is threatened, or swift diminution in value of the debtor's estate is likely, absent the granting of the requested relief, immediate and irreparable harm likely exists. *See In re WorldSpace, Inc.*, No. 08–12412 (PJW), 2008 WL 8153639, at *2 (Bankr. D. Del. Oct. 20, 2008) (granting emergency motions for postpetition financing, adequate protection and modification of the stay where the court found that the relief was necessary to avoid irreparable harm to the debtors and their estates because such relief was essential for the continued operations of the debtors' business); *In re New World Pasta Co.*, No. 04–02817 (MDF), 2004 WL 5651052, at *5 (Bankr. M.D. Pa. July 9, 2004) (same); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (finding that "immediate and irreparable harm" exists where loss of the business threatens the ability to reorganize).

44.     As discussed above, the continuity and viability of the Debtors' business operations depends heavily on the uninterrupted delivery of essential food, products and supplies. The failure of any vendor to deliver essential food, products or supplies or to render services to the Debtors would have immediate and detrimental consequences to the Debtors' business and would decrease value to the detriment and prejudice of all of the Debtors' stakeholders. The Debtors cannot risk even the perception that their or their franchisees' restaurants will offer anything but the highest level of food and beverage quality and quantity for the duration of these chapter 11 cases. Moreover, it is the Debtors' business judgment that continuation of their positive relationship with the Trade

Claimants is critical to their continued operations and greatly increases the likelihood of a successful reorganization. Accordingly, the Debtors respectfully submit that the relief requested herein is necessary to avoid immediate and irreparable harm and, therefore, Bankruptcy Rule 6003 is satisfied.

### SATISFACTION OF BANKRUPTCY RULE 6004(a) AND 6004(h)

45.    For the reasons described above, the immediate payment of the Trade Claims is essential to prevent potentially irreparable damage to the Debtors' operations, value and ability to reorganize. Accordingly, given the nature of the relief requested herein, the Debtors respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a) and of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent that either applies.

### NOTICE

46.    Notice of this motion has been provided to the following parties, or, in lieu thereof, their counsel: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities on the Consolidated List of Creditors Holding the 35 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Milbank Tweed Hadley & McCloy LLP, as counsel to the Consenting First Lien Lenders, Attn: Thomas R. Kreller and David B. Zolkin; (d) Morris Nichols Arsht & Tunnell LLP, as local counsel to the Consenting First Lien Lenders, Attn: Robert J. Dehney; (e) O'Melveny & Myers LLP, as counsel to Avenue Capital Management II, L.P. and its affiliates, Attn: John J. Rapisardi and Joseph Zujkowski; (f) Skadden Arps Slate Meagher & Flom LLP, as counsel to Fortress Investment Group and its affiliates, Attn: Van C. Durrer, II; (g) Kasowitz Benson Torres & Friedman LLP, as counsel to Vectra Bank Colorado, National Association, Attn: Adam L. Shiff and Matthew B. Stein; and (h) all parties entitled to notice pursuant to Local

Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

RLF1 10043320v.1

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter an order granting the relief requested herein and such other and further relief as may be just, proper and equitable.

Wilmington, Delaware
Date: March 14 , 2014

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Lee E. Kaufman (No. 4877)
Amanda Steele (No. 5530)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

– and –

AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff (*pro hac vice* admission pending)
Philip C. Dublin (*pro hac vice* admission pending)
Jason P. Rubin (*pro hac vice* admission pending)
Ashleigh L. Blaylock (*pro hac vice* admission pending)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

## Exhibit A

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| QCE FINANCE LLC, *et al.*,[1] | ) | Case No. 14-_____ ( ) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | Re: Docket No. [____] |

### ORDER (I) AUTHORIZING THE DEBTORS TO
### PAY CERTAIN PREPETITION CLAIMS (A) ARISING
### UNDER THE PERISHABLE AGRICULTURE COMMODITIES ACT,
### (B) OF SHIPPERS, (C) ARISING UNDER BANKRUPTCY CODE SECTION
### 503(B)(9) AND (D) CLAIMS INCURRED IN CONNECTION WITH POSTPETITION
### DELIVERY OF GOODS AND SERVICES AND (II) GRANTING RELATED RELIEF

Upon the motion (the "***Motion***")[2] of the above-captioned debtors and debtors in possession (collectively, the "***Debtors***"), for entry of an order (this "***Order***") (i) authorizing, but not directing, the Debtors to pay (a) the PACA Claims, (b) the Shipping Claims, (c) the 503(b)(9) Claims and (d) the 503(b)(1) Claims, in the ordinary course of business as such clams come due and (ii) authorizing the financial institutions, when requested by the Debtors, to receive, possess, honor and pay all checks presented for payment and electronic payment requests related to the Trade Claims, all as set forth more fully in the Motion; and upon the First Day Declaration; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that the relief requested in the Motion is in the best interests of the

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: QCE Finance LLC (7897); American Food Distributors LLC (8099); National Marketing Fund Trust (4951); QAFT, Inc. (6947); QCE LLC (2969); QFA Royalties LLC (2402); QIP Holder LLC (2353); Quiz-CAN LLC (7714); Quizno's Canada Holding LLC (3220); Quiznos Global LLC (2772); Restaurant Realty LLC (8293); The Quizno's Master LLC (3148); The Quizno's Operating Company LLC (8945); The Regional Advertising Program Trust (2035); and TQSC II LLC (8683). The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 1001 17th Street, Suite 200, Denver, Colorado 80202.

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

Debtors' estates, their creditors, and all other parties in interest; and the Debtors having provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances and no other or further notice need be provided; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "***Hearing***"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and the Court having found that the relief requested in the Motion is necessary to prevent immediate and irreparable harm; and upon all of the proceedings had before the Court; after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED**:

1.      The Motion is granted as set forth herein.

2.      The Debtors are authorized, but not directed, in their sole discretion, to pay or otherwise satisfy all valid PACA Claims in the ordinary course of business in the aggregate amount not to exceed $230,000.

3.      Any PACA Vendor who accepts payment from the Debtors in satisfaction of its valid PACA Claim will be deemed to have waived any and all claims of whatever type, kind, or priority against the Debtors, their property, their estates and any PACA Trust Assets, but only to the extent that payment has been received by such PACA Vendor on account of its PACA Claim.

4.      Nothing in the Motion or this Order shall impair the Debtors' right to contest the validity or amount of any PACA Claim that may be asserted, and all of the Debtors' rights with respect thereto are hereby reserved.

5.      The Debtors are authorized, but not directed, in their sole discretion, to pay or otherwise satisfy in the ordinary course of business all valid Shipping Claims in an aggregate amount not to exceed $150,000.

6.      The Debtors are authorized, but not directed, in their sole discretion, to pay or otherwise satisfy in the ordinary course of business all valid 503(b)(9) Claims in an aggregate amount not to exceed $3,382,000.

7.      All undisputed amounts relating to the Purchase Orders are hereby deemed postpetition administrative expense claims pursuant to Bankruptcy Code section 503(b)(1) and the Debtors are authorized, but not directed, in their sole discretion, to pay such amounts in the ordinary course of business consistent with the parties' historical trade practices in effect prior to the Petition Date.

8.      The Debtors are authorized, but not directed, to enter into Trade Agreements and to condition the payment of the Trade Claims upon execution of such agreements by the individual Trade Claimants to continue to provide goods and services, as applicable, to the Debtors during the pendency of these chapter 11 cases on the Historical Trade Terms or the Negotiated Trade Terms; *provided, however*, that the Debtors' inability to enter into a Trade Agreement shall not preclude the Debtors from paying a Trade Claim when, in the exercise of the Debtors' business judgment, such payment is necessary to the Debtors' operations and is in the best interests of their estates and creditors.

9.      In the event that any Trade Claimant that has received payment for its Trade Claim refuses to continue to provide goods and services, as applicable, on the Historical Trade Terms or the Negotiated Trade Terms  following receipt of payment of its Trade Claim, the Debtors may, in their sole discretion and without further order of the Court, declare that the provisional payments made to the Trade Claimant on account of its Trade Claim be deemed to have been in payment of the then-outstanding postpetition obligations owed to such Trade Claimant. In such an instance, the previously paid Trade Claim of the applicable Trade Claimant shall be reinstated as a Trade Claim

in the amount deemed by the Debtors to have been in payment of any then-outstanding postpetition claims of such Trade Claimant.  To the extent that the payments made to the Trade Claimant on account of the previously paid Trade Claims exceed the postpetition amounts then owed to such Trade Claimant, all rights of the Debtors and their estates to recover such payments shall be reserved.

10.    The Debtors are authorized, but not directed, to issue postpetition checks or to effect postpetition fund transfer requests in replacement of any checks or fund transfer requests that are dishonored as a consequence of the chapter 11 cases with respect to the payments approved by this Court hereunder.

11.    The banks and financial institutions on which checks were drawn or electronic payment requests were made in payment of the obligations approved herein are authorized and directed, when requested by the Debtors, to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as being approved by this Order.

12.    Nothing herein shall prohibit the Debtors from seeking Court authority to increase the prepetition amounts authorized to be paid herein.

13.    Nothing in the Motion or this Order, nor as a result of any payment made pursuant to this Order, shall be deemed or construed as an admission as to the validity or priority of any claim or lien against the Debtors, an approval or assumption of any agreement, contract or lease pursuant to Bankruptcy Code section 365 or a waiver of the of the Debtors, or shall impair the Debtors' ability, to contest the validity and amount of any payment made pursuant to this Order.

14.    The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.

15.     Notice of the Motion as provided herein shall be deemed good and sufficient and such notice satisfies the requirements of Bankruptcy Rule 6004(a) and the Local Rules.

16.     Notwithstanding the possible applicability of Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

17.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

18.     The Court retains jurisdiction with respect to all matters arising from or related to the interpretation or implementation of this Order.

Wilmington, Delaware  
Date: _____, 2014                        _____  
                                                United States Bankruptcy Judge