## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| QCE FINANCE LLC, *et al.*, [1] | ) | Case No. 14-_____ (   ) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

### DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING AND TO USE CASH COLLATERAL; (B) GRANTING PRIMING LIENS AND PROVIDING SUPERPRIORITY CLAIMS; (C) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; AND (D) PRESCRIBING THE FORM AND MANNER OF NOTICE AND SETTING THE TIME FOR THE FINAL HEARING

The above-captioned debtors and debtors in possession (collectively, the "***Debtors***"), respectfully state as follows:

### CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001

1.      By this motion and for the reasons set forth below, the Debtors seek entry of (a) an interim order substantially in the form attached hereto as **Exhibit A** (the "***Interim Order***") (i) authorizing the Debtors to (A) obtain postpetition senior secured financing, (B) utilize cash collateral, (C) grant priming liens, priority liens, and superpriority claims to the DIP Lenders (as defined below), and (D) grant adequate protection to the First Lien Lenders and Vectra (each as defined below), (ii) scheduling a hearing to consider the relief requested herein on a final basis (the "***Final Hearing***"), and (iii) granting related relief; and (b) an order granting the relief

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  QCE Finance LLC (7897); American Food Distributors LLC (8099); Quiznos Global LLC (2772); QCE LLC (2969); QFA Royalties LLC (2402); QIP Holder LLC (2353); Quiz-CAN LLC (7714); Quizno's Canada Holding LLC (3220); QAFT, Inc. (6947); Restaurant Realty LLC (8293); The Quizno's Master LLC (3148); The Quizno's Operating Company LLC (8945); National Marketing Fund Trust (4951); The Regional Advertising Program Trust (2035); and TQSC II LLC (8683).  The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 1001 17th Street, Suite 200, Denver, Colorado 80202.

requested herein on a final basis (the "***Final Order***," and together with the Interim Order, the "***DIP Orders***").[2]

2.      Pending the Final Hearing and entry of the Final Order, the Debtors respectfully request that the debtor in possession financing (the "***DIP Facility***") be approved on an interim basis pursuant to the terms of the Superpriority Senior Secured Debtor-In-Possession Credit Agreement, in substantially the form attached to the Interim Order as **Exhibit 1** (the "***DIP Credit Agreement***").  As required by Bankruptcy Rules 4001(b) and 4001(c) and Local Rule 4001-2, the following is a summary of the material terms of the DIP Credit Agreement and the Interim Order:[3]

| | |
|---|---|
| **Borrower:**<br><br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)* | QCE LLC (the "***Borrower***" or "***QCE***").<br><br>(*See* pp. 1 and 2 (definition of "Borrower") of the DIP Credit Agreement; ¶ E(i)(1) (definition of "Borrower") of the Interim Order) |
| **Guarantors:**<br><br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)* | QCE Finance LLC ("***Holdco***") and each subsidiary of Holdco that is a Debtor in these chapter 11 cases and non-Debtor subsidiaries, QCE Gift Card LLC and Quizmark LLC (collectively, the "***Guarantors***," and together with the Borrower, the "***Obligors***").<br><br>(*See* pp. 14 (definition of "Loan Parties), 26 (definition of "Non-Debtor Subsidiary Loan Party") and 21 (definition of "Subsidiary Loan Party") of the DIP Credit Agreement; p. 1 n.3 (definition of "Non-Debtor Subsidiary Loan Party") of the Interim Order) |
| **DIP Agent:**<br><br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)* | Wilmington Trust, National Association (the "***DIP Agent***").<br><br>(*See* p. 1 of the DIP Credit Agreement; ¶ (i) of the Interim Order) |

---

[2]    The Debtors will provide a proposed Final Order to the Court, the Office of the United States Trustee for the District of Delaware (the "***U.S. Trustee***"), and all parties in interest upon appropriate notice in advance of the Final Hearing.

[3]    Unless otherwise indicated, capitalized terms used and not defined in the below chart shall have the meanings set forth elsewhere in this motion or in the DIP Credit Agreement.  The summaries and descriptions of the terms and conditions of the DIP Credit Agreement and the Interim Order set forth in this motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such.  The summaries and descriptions are qualified in their entirety by the DIP Credit Agreement and the Interim Order.  In the event that there is a conflict between this motion and the DIP Credit Agreement or the Interim Order, the DIP Credit Agreement or the Interim Order, as applicable, shall control in all respects.

| | |
|---|---|
| **DIP Lenders:**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Each entity listed Schedule 2.01 of the DIP Credit Agreement and/or its respective affiliates or designees (collectively, the "***DIP Lenders***"); provided that no affiliate of any Obligor shall become a DIP Lender.<br><br>(*See* p. 13 (definition of "Lender") of the DIP Credit Agreement; ¶ (i) (definition of "DIP Lenders") of the Interim Order) |
| **DIP Facility:**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br>*Del. Bankr. L.R. 4001-2(a)(ii)* | The DIP Facility and all instruments and documents executed at any time in connection therewith, shall be referred to collectively as the "***DIP Loan Documents***."<br><br>A superpriority, priming, delayed draw term loan facility in an aggregate principal amount of $15,000,000 (the "***DIP Loan***" or "***Commitment***").  Amounts paid or prepaid under the DIP Loan may not be reborrowed.<br><br>(*See* p. 14 (definition of "Loan Commitment") of the DIP Credit Agreement) |
| **Use of Proceeds & Cash Collateral:**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)(ii) and (iii)*<br>*Del. Bankr. L.R. 4001-2(a)(ii)* | Upon entry of the Interim Order, the proceeds of the DIP Facility shall be used by the Borrower for working capital purposes in accordance with the Budget.  Following entry of the Interim Order, the proceeds of the DIP Loans shall be applied by the Borrower in accordance with the Budget to (A) to pay for the fees, costs and expenses owing to the Administrative Agent and the DIP Lenders and Consenting First Lien Lenders in accordance with the DIP Loan Documents, (B) to fund ongoing working capital requirements of the Borrower and its Subsidiaries including, without limitation, payment of the administrative expenses of the kind specified in Bankruptcy Code section 503(b) incurred in the ordinary course of business of the Borrower or otherwise approved by the Bankruptcy Court (and not otherwise prohibited under the DIP Credit Agreement), (C) to pay amounts owing on the Obligations as provided herein and for general corporate purposes, and (D) to pay administration costs of the chapter 11 cases and prepetition claims or amounts approved by the Court.<br><br>No portion of the Obligors' cash collateral and other cash (collectively, the "***Cash Collateral***"), including any Cash Collateral securing the liens under the Vectra Credit Facility, the DIP Facility, the DIP Collateral or the Carve-Out (as defined below) may be used to finance any action or challenge of any kind or nature adverse to the interests of (i) the DIP Agent, the DIP Lenders, the First Lien Agent or the First Lien Lenders or their respective rights and remedies under DIP Loan Documents, the Interim Order, the Final Order or the First Lien Credit Agreement and all instruments and documents executed at any time in connection therewith (the "***First Lien Credit Documents***"), (ii) the Second Lien Agent, Second Lien Lenders or their respective rights and remedies under the Interim Order, the Final order, or the Second Lien Credit Agreement and all instruments and documents executed at any time in connection therewith (the "***Second Lien Credit Documents***", and together with the First Lien Credit Documents, the "***Prepetition Credit Documents***") or (iii) Vectra or its rights and remedies under the Interim Order, the Final Order or the Vectra Credit Agreement and all instruments and documents executed at any time in connection therewith (the "***Vectra Credit Documents***").<br><br>No more than an aggregate of $25,000 of the Cash Collateral, including any Cash Collateral securing the liens under the Vectra Credit Facility, the DIP Facility, the DIP Collateral or the Carve-Out may be used by any statutory committee of unsecured creditors appointed in the chapter 11 cases to investigate the validity, enforceability or priority of the obligations under (i) the Prepetition Credit Documents, or the liens securing the Prepetition Indebtedness (the "***Prepetition Liens***"), or investigate any claims and defenses or other causes of action against the Prepetition Agents and the Prepetition Lenders or (ii) the Vectra Credit Documents or the liens securing the obligations under the Vectra Credit Agreement (the "***Vectra Liens***").<br><br>(*See* §§3.12 and 6.12 of the DIP Credit Agreement; ¶¶ F(v) and 31 of the Interim Order) |

| | |
|---|---|
| **Interim Availability:**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br>*Del. Bankr. L.R. 4001-2(a)(ii)* | After entry of the Interim Order, $10 million (the "***Interim Facility***") shall be drawn, subject to the terms of the DIP Loan Documents and in accordance with the Budget (as defined below).<br><br>(*See* §2.01 of the DIP Credit Agreement; ¶ 4 of the Interim Order) |
| **Full Availability:** | Upon the Court's entry of the final order approving the DIP Facility, an additional $5 million, for a total loan of $15 million ("***Full Availability***") shall be available, subject to compliance with the terms, conditions and covenants described in the DIP Loan Documents and in accordance with the Budget.<br><br>(*See* §2.01 of the DIP Credit Agreement) |
| **Budgets:**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br>*Del. Bankr. L.R. 4001-2(a)(ii)* | By no later than the Petition Date, the Borrower will provide the DIP Agents and DIP Lenders with a 13-week statement of sources and uses of the Obligors for the next 13 weeks, broken down by week, including the anticipated uses of the DIP Facility for such period (the "***Initial Budget***"). At the end of each 4-week period covered in a Budget (as defined below), the Borrower will deliver an updated 13-week statement of sources and uses for the next 13 week period (each a "***Subsequent Budget***", collectively with the Initial Budget, "***Budgets***" and each, individually, a "***Budget***"). Each period covered by a Budget shall be referred to as a "***Budget Period***".<br><br>(*See* §5.13 of the DIP Credit Agreement) |
| **Priority and Liens/ Ranking/Security /Collateral:**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(i)*<br>*Del. Bankr. L.R. 4001-2(a)(i)(D) and (G), 4001-2(a)(ii)* | **Collateral.** "***DIP Collateral***" shall mean any and all assets of the Obligors, unless otherwise agreed by the Required DIP Lenders.<br><br>**Priority/Collateral.**<br><br>(a)   Each of Holdco and the Borrower, on behalf of itself and on behalf of each Subsidiary Loan Party, hereby covenants, represents and warrants that, subject to the Carve-Out, upon entry of the Interim Order (and the Final Order, as applicable) and the execution of the DIP Credit Agreement, the Obligations of the Borrower and the other Loan Parties:<br><br>(i)   pursuant to Bankruptcy Code section 364(c)(1) , shall at all times constitute joint and several Superpriority Claims in the Cases;<br><br>(ii)   pursuant to Bankruptcy Code section 364(c)(2) , shall at all times be secured by a perfected first priority security interest and Lien on all Collateral of such Loan Party to the extent that such Collateral is not subject to (A) valid, perfected and non-avoidable Liens as of the Petition Date or (B) Avoidance Actions (it being understood that notwithstanding such exclusion of Avoidance Actions, upon entry of the Final Order, to the extent approved by the Bankruptcy Court, such Lien shall attach to any proceeds of successful Avoidance Actions including, without limitation, assets as to which Liens are avoided);<br><br>(iii) pursuant to Bankruptcy Code section 364(c)(3) , shall at all times be secured by a perfected junior security interest and Lien on all Collateral of such Loan Party to the extent that such Collateral is subject to valid, perfected and unavoidable Liens that were in existence immediately prior to the Petition Date, or to valid and unavoidable Liens that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b) (in each case other than Liens that secure the Pre-Petition First Lien Indebtedness, which existing Liens will be primed by the Liens described in clause |

(iv) below); and

(iv) pursuant to Bankruptcy Code section 364(d) , shall at all times be secured by a perfected first priority priming security interest and Lien on all Collateral of such Loan Party (the "***Priming Liens***") to the extent that such Collateral is subject to the existing Liens that secure the Pre-Petition First Lien Indebtedness (or is subject to Liens securing the Pre-Petition Second Lien Indebtedness immediately prior to the Petition Date) or to a valid and enforceable right of setoff by any lender party to the First Lien Credit Agreement (collectively, the "***Primed Liens***").

(b)  The Priming Liens (x) are senior in all respects to the interests in such property of the lenders under the Prepetition Credit Documents and (y) also prime any Liens granted after the Petition Date to provide adequate protection in respect of any of the Primed Liens.   The Primed Liens shall be primed by and made subject and subordinate to the perfected first priority senior Liens to be granted to the Administrative Agent, which senior priming Liens in favor of the Administrative Agent shall also prime any Liens granted after the commencement of the Cases to provide adequate protection in respect of any of the Primed Liens, but shall not prime Liens, if any, to which the Primed Liens are subject at the time of the commencement of the Cases.  For the avoidance of doubt, the Priming Liens shall not prime the Liens on Collateral securing the Vectra Indebtedness.

(c)  All of the Liens described herein shall be effective and perfected on the Interim Order Entry Date.

The Obligors' obligations to the DIP Lenders and the liens and superpriority claims granted as provided in clauses (a) through (b) above shall be subject in each case only to a carve-out (the "***Carve-Out***") which shall be the sum total of (i) all statutory fees payable to the clerk of the Bankruptcy Court or the U.S. Trustee pursuant to 28 U.S.C. § 1930; (ii) allowed professional fees, expenses and disbursements incurred prior to the Termination Declaration Date (as defined below), regardless of when allowed, by professionals of the estate retained by final order of the Court (which order has not been vacated or stayed, unless the stay has been vacated), including professionals of the Obligors employed under Bankruptcy Code sections 327, 328 or 363 ("***Estate Professionals***") and professionals of the official committee of unsecured creditors (the "***Creditors Committee Professionals***") (including the reimbursement of expenses allowed by the Court incurred by Creditors Committee members in the performance of their duties, but excluding fees and expenses of third party professionals employed by such members); and (iii) the allowed and unpaid professional fees, expenses and disbursements incurred on or after the date the DIP Agent declares a termination on the ability of the Obligors to use any Cash Collateral derived solely from the proceeds of the DIP Collateral (and the earliest date any such declaration is made shall be referred to herein as the "***Termination Declaration Date***") under Bankruptcy Code sections 327 or 1103(a), in the aggregate, solely with respect to this subsection (iii), not to exceed $500,000 for Estate Professionals and Creditors Committee Professionals.

(*See* §2.21 of the DIP Credit Agreement and p. 3 (definition of "Carve-Out Expenses") of the DIP Credit Agreement; ¶¶ F(ii), 6, 7 and 30(a) (definition of "Carve Out") of the Interim Order)

| | |
|---|---|
| **Adequate Protection (First Lien Lenders and Second Lien Lenders):**<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)(iv),* | **Senior Adequate Protection**.<br><br>(a)  <u>Senior Adequate Protection Liens</u>.   Pursuant to Bankruptcy Code sections 361, 363(e), and 364(d), as adequate protection of the interests of the First Lien Agent and the First Lien Lenders in the Prepetition Collateral against any diminution in the value of their interests in the Prepetition Collateral on account of the granting of the DIP Liens (including Cash Collateral) resulting from the Obligors' use, sale, or lease (or other decline in value) of such collateral, the imposition of the automatic stay, the priming of the First Lien Agent's and the First Lien Lenders' Liens on the Prepetition |

| | |
|---|---|
| *4001(c)(1)(B)(ii)* | Collateral, and the subordination to the Carve-Out (collectively, and solely to the extent of any such diminution in value, the "***Diminution in Value***") the Obligors hereby grant to the First Lien Agent, for the benefit of itself and the First Lien Lenders, continuing valid, binding, enforceable, and perfected postpetition security interests in and liens on the DIP Collateral (the "***Senior Adequate Protection Liens***") junior only to the DIP Liens and the Carve-Out and, with respect to adequate protection liens on the Vectra Collateral, the Vectra Liens.<br><br>(b)  Senior Superpriority Claim.  As further adequate protection of the interests of the First Lien Agent and the First Lien Lenders in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral on account of the granting of the DIP Liens, the Obligors' use of Cash Collateral, the use, sale, or lease of any other Prepetition Collateral, and the imposition of the automatic stay, the First Lien Agent and the First Lien Lenders are each hereby granted as and to the extent provided by Bankruptcy Code section 507(b) an allowed superpriority administrative expense claim in each of the chapter 11 cases and any successor cases in connection therewith, junior only to the DIP Claims and the Carve-Out (the "***Senior Superpriority Claims***").<br><br>(*See* pp. 5-6 of the DIP Term Sheet; ¶¶ G(i), 12 and 13 of Interim Order) |
| **Adequate Protection (Vectra):** | Adequate protection payments to Vectra Bank Colorado, National Association ("***Vectra***") with respect to the Vectra Credit Agreement, in the amount of (i) weekly payments of $150,000 (which amount shall reduce the amount outstanding under the Vectra Credit Agreement), plus (ii) interest payments, at the existing rate under the Vectra Credit Agreement, on a monthly basis and (iii) payment of Vectra's reasonable fees and expenses in accordance with the Vectra Credit Agreement, such adequate protection payments to be made exclusively with cash collateral of the Marketing Trusts and not from proceeds of the DIP Facility or cash collateral of the other Debtors.<br><br>All intercompany liens of the Obligors, if any (other than any liens securing the First Lien Facility), will be subject to the Carve-Out and contractually subordinated to the DIP Facility and to the Senior Adequate Protection Liens on terms satisfactory to the Required DIP Lenders.<br><br>¶¶ G(ii) and 14 of the Interim Order |
| **Closing Date:** | The date on or about the Interim Order Entry Date on which the specified portion of the commitment is made available for borrowings under the DIP Facility (the "***Closing Date***"), which shall be no later than two business days after the Interim Order Entry Date, subject to satisfaction (or waiver by the Required DIP Lenders) of the applicable conditions precedent set forth in the DIP Credit Agreement/DIP Term Sheet.<br><br>(*See* §§4.01 and 4.02 of the DIP Credit Agreement) |
| **DIP Maturity Date:**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B) Del. Bankr. L.R. 4001-2(a)(ii)* | The maturity date of the DIP Facility (the "***Maturity Date***") will be (and all loans and obligations under the DIP Facility shall be repaid in full in cash on) the earliest of: (i) the date which is 30 days following the Interim Order Entry Date if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (ii) 120 days after the Interim Facility Closing Date, (iii) the earlier of the effective date and the date of the substantial consummation (as defined in Bankruptcy Code section 1101(2) ), in each case, of a Plan of Reorganization that has been confirmed by an order of the Court, (iv) the date the Court orders the conversion of any of the chapter 11 cases to a chapter 7 case, and (v) the date on which all DIP Loans and other Obligations shall become due and payable in accordance with the terms of the DIP Credit Agreement and the other DIP Loan Documents.<br><br>(*See* p. 10 (definition of "Final Maturity Date") of the DIP Credit Agreement; ¶ 23 (definition |

| | |
|---|---|
| | of "Maturity Date") of Interim Order) |
| **Interest Rate:**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B) Del. Bankr. L.R.4001-2(a)(ii)* | The outstanding Obligations shall bear interest at a rate equal to 15% per annum.<br><br>(*See* §2.13(a) of the DIP Credit Agreement) |
| **Default Interest Rate:**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B) Del. Bankr. L.R. 4001-2(a)(ii)* | During the continuance of an Event of Default (as defined below), the loans and all other outstanding obligations will bear interest at an additional 2% per annum above the interest rate otherwise applicable.<br><br>(*See* §2.13(c) of the DIP Credit Agreement) |
| **Fees:**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Commitment Fee (as defined in the DIP Credit Agreement) in an amount equal to 3% of the Commitment, payable to each DIP Lender according to its pro rata share of the Commitment on the Closing Date.  Agency Fees (as defined in the DIP Credit Agreement) in an amount as agreed with the DIP Agent.  All such fees are non-refundable under all circumstances.<br><br>(*See* §2.12(c) of the DIP Credit Agreement) |
| **Conditions to DIP Closing:**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B) Del. Bankr. L.R. 4001-2(a)(ii)* | The effectiveness of the DIP Facility and the obligation of each Lender to make DIP Loans is subject to certain conditions, including the following, which are included by way of example and are more fully set forth at pages 6-7 of the DIP Term Sheet:<br><br>(a) Execution and delivery by the Obligors of the DIP Loan Documents evidencing the loans made and to be made under the DIP Facility.<br><br>(b) The DIP Lenders shall have received the Initial Budget, which Initial Budget shall be in form and substance satisfactory to the Required DIP Lenders in their sole discretion.<br><br>(c) The Court shall have entered the Interim Order.<br><br>(d) The DIP Lenders subject thereto and the DIP Agent shall have received all documentation and other information reasonably requested by them to allow compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.<br><br>(e) All necessary governmental and third party consents and approvals shall have been obtained.<br><br>(*See* §§ 4.01, 4.02 and 4.03 of the DIP Credit Agreement) |
| **Prepayments** | The DIP Loan Documents shall contain the mandatory prepayments (other than from excess cash flow) made by the Obligors under the First Lien Credit Agreement, modified as appropriate to reflect the commencement of the chapter 11 cases and such other mandatory prepayments as the Required DIP Lenders (as defined below) shall require, including without limitation: (i) asset sales, (ii) insurance proceeds, (iii) incurrence of indebtedness and (iv) issuance of equity.<br><br>Optional prepayment permitted without penalty or premium. |

| | |
|---|---|
| | (*See* §2.11 of the DIP Credit Agreement) |
| **Events of Default:**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)*<br>*Del. Bankr. L.R. 4001-2(a)(ii)* | The DIP Credit Agreement contains events of default ("***Events of Default***"), including, but not limited to, and as more fully set forth in Article VII of the DIP Credit Agreement, the following: (a) the Final Order Entry Date has not occurred within 30 days after the Interim Order Entry Date; (b) any of the chapter 11 cases is dismissed or converted to a chapter 7 case; (c) any Obligor files a motion in the chapter 11 cases without the express written consent of the Required DIP Lenders to obtain additional financing from a party other than DIP Lenders under Bankruptcy Code section 364(d) or to use cash collateral of a DIP Lender under Bankruptcy section 363(c) that does not contemplate repayment of the DIP Facility and the obligations under the First Lien Credit Agreement in full in cash; (d) any Obligor files a motion seeking, or the Court enters an order (i) approving payment of any prepetition claim other than (x) as provided for in a "first day order" and included in the Budget or (y) otherwise consented to by the Required DIP Lenders in writing, (ii) granting relief from the automatic stay applicable under Bankruptcy Code section 362 to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $500,000 in the aggregate or to permit other actions that would have a material adverse effect on the Obligor or their estates, or (iii) approving any settlement or other stipulation not approved by the Required DIP Lenders and not included in the Budget with any secured creditor of any Obligor providing for payments as adequate protection or otherwise to such secured creditor; (e) any DIP Order is amended, supplemented, stayed, reversed, vacated or otherwise modified (or any Obligor shall apply for authority to do so) without the written consent of the Required DIP Lenders, or any DIP Order shall cease to be in full force and effect; (f) any Obligor fails to comply with the terms and conditions of any DIP Order in any material respect; (g) a trustee, examiner with expanded powers or receiver shall be appointed or designated in any of the chapter 11 cases; (h) entry of an order by the Court terminating or modifying the exclusive right of any Obligor to file a chapter 11 plan pursuant to Bankruptcy Code section 1121 without the prior written consent of the Required DIP Lenders, which consent will not be unreasonably withheld; (i) the Obligors support any other person's opposition of any motion made to the Court by the DIP Lenders seeking confirmation of the amount of the DIP Lenders' claim or the validity and enforceability of the Liens in favor of the DIP Agent; (j) (1) the Obligors shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Court or any other writing to another party in interest executed by or on behalf of the Obligors) any other person's motion to, disallow in whole or in part the DIP Lenders' claim in respect of the obligations under the DIP Loan Documents or to challenge the validity and enforceability of the Liens in favor of the DIP Agent or contest any material provision of any DIP Document, (2) such Liens and/or superpriority claims shall otherwise cease to be valid, perfected and enforceable in all respects or (3) any material provision of any DIP Document shall cease to be effective; (k) any judgments which are in the aggregate in excess of $500,000 as to any postpetition obligation shall be rendered against any of the Obligors and the enforcement thereof shall not be stayed; (l) (A) the Obligors or any of their subsidiaries shall file any pleading or proceeding reasonably expected to result in a material impairment of the rights or interests of the DIP Lenders or (B) entry of an order of the Court with respect to any pleading or proceeding brought by any other person which results in such material impairment of the rights or interests of the DIP Lenders; (m) any Obligor shall fail to promptly execute and deliver to the DIP Agent any agreement, financing statement, trademark filing, copyright filing, mortgages, notices of lien or similar instruments or other documents that the DIP Agent or the Required DIP Lenders may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens created in favor of the DIP Agent; (n) the Plan of Reorganization is amended, supplemented or otherwise modified without the prior written consent of the Required DIP Lenders, which consent will not be unreasonably withheld; (o) the Plan of Reorganization is withdrawn without the prior written consent of the Required DIP Lenders; (p) the Confirmation Order or the Plan of Reorganization is not in form or substance satisfactory to the Required DIP Lenders; (q) the Confirmation Order is not entered by the Court on or before 11:59 p.m. prevailing Eastern Time on the date that is 80 calendar days after the Petition Date, or such later date to which the |

| | |
|---|---|
| | Required DIP Lenders have consented in writing; (r) the Confirmation Order is amended, supplemented, reversed, vacated or otherwise modified without the prior written consent of the Required DIP Lenders, which consent will not be unreasonably withheld; (s) the Plan Effective Date shall not have occurred on or before 11:59 prevailing Eastern Time on the date that is 100 calendar days after the Petition Date, or such later date to which the Required DIP Lenders have consented in writing; (t) the occurrence of a default under or termination of the Restructuring Support Agreement.<br><br>(*See* §7.01 of the DIP Credit Agreement; ¶ 24 of Interim Order) |
| **Voting:** | The vote of DIP Lenders holding more than 50 % of the aggregate undrawn commitments and outstanding DIP Loans (the "***Required DIP Lenders***") shall be required to amend, waive or modify the DIP Facility.<br><br>(*See* p. 20 (definition of "Required Lenders") of the DIP Credit Agreement) |
| **Governing Law**: | State of New York, except as governed by the Bankruptcy Code.<br><br>(*See* §9.15 of the DIP Credit Agreement) |

## PROVISIONS TO BE HIGHLIGHTED PURSUANT TO LOCAL RULE 4001-2

3.      The Debtors believe the following provisions of the DIP Credit Agreement must be highlighted pursuant to Local Rule 4001-2:[4]

(a)      Cross Collateralization (Local Rule 4001-2(a)(i)(A)).  Not applicable.

(b)      Binding the Estate to Validity, Perfection, or Amount of Secured Debt (Local Rule 4001-2(a)(i)(B)).  Article 9.23 of the DIP Credit Agreement and paragraph E(v) of the Interim Order provides that the DIP Lenders and the DIP Agent will receive customary releases from causes of action related to or arising out of the First Lien Credit Agreement or the DIP Loans.  Article 6.12 of the DIP Credit Agreement provides for a fund of up to an aggregate of $25,000 to investigate the validity, enforceability or priority of (i) the obligations under the Prepetition Credit Documents or the Vectra Credit Documents, (ii) the Prepetition Liens or the Vectra Liens, or (iii) any claims or defenses or other causes of action against the Prepetition Agents, the Prepetition Lenders or Vectra.

(c)      Waiver of Rights Under Section 506(c) (Local Rule 4001-2(a)(i)(C)).  Effective as of entry of the Final Order, the Debtors waive the ability to surcharge against the DIP Agent, the DIP Lenders, the First Lien Agent or the First Lien Lenders or Vectra, or any of their respective claims, the DIP Collateral, the First Lien Collateral, or Vectra Collateral, as applicable, pursuant to Bankruptcy Code sections 105 or 506(c), or otherwise, without the prior written consent, as applicable, of the Required Lenders, the First

---

[4]      Additional extraordinary provisions not specifically covered by Del. Bankr. L.R. 4001-2 are highlighted in the Concise Statement, *supra*.

Lien Agent, the First Lien Lenders or Vectra, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders. *See* Interim Order, ¶ 34.

(d)     <u>Liens on Avoidance Actions (Local Rule 4001-2(a)(i)(D))</u>.  The DIP Lenders shall receive first priority, valid, perfected and enforceable liens on all Avoidance Actions pursuant only to the Final Order but shall not be granted such liens pursuant to the Interim Order.  *See* DIP Credit Agreement, §2.21(a)(ii); Interim Order, ¶ 6.

(e)     <u>Provisions that Deem Prepetition Debt to be Postpetition Debt (Local Rule 4001-2(a)(i)(E))</u>.  Not applicable.

(f)     <u>Provisions that Provide Disparate Treatment of Professionals Retained by a Creditors' Committee (Local Rule 4001-2(a)(i)(F))</u>.  The DIP Credit Agreement contains no provisions that provide for disparate treatment for professionals retained by a committee with respect to the Carve-Out. After the occurrence of the Termination Declaration Date under the DIP Loan Documents, the DIP Credit Agreement provides for the payment of allowed and unpaid professional fees and expenses incurred by the Debtors and a committee after the occurrence of the Termination Declaration not in excess of $500,000, in the aggregate (plus all unpaid professional fees and expenses allowed by this Court that were incurred prior to the occurrence of the Termination Declaration).  *See* DIP Credit Agreement, p. 3 definition of "***Carve-Out Expenses***"; Interim Order, ¶ 30(a) definition of "***Carve Out***").

(g)     <u>Provisions that Prime Secured Liens without the Consent of the Lienholder (Local Rule 4001-2(a)(i)(G))</u>.  Pursuant to Bankruptcy Code section 364(d)(1), the DIP Lenders shall have valid, continuing, enforceable, fully perfected, non-avoidable, first-priority priming liens on and security interests in the DIP Collateral senior in all respects to the liens and security interests securing the Prepetition Facilities (defined below), but subject, subordinate and junior to the Carve-Out, the Vectra Liens and, with respect to liens granted pursuant to Bankruptcy Code sections 364(c)(2), (c)(3) and (d), other Permitted Liens.  *See* DIP Credit Agreement §2.21(a); Interim Order, ¶ 6.

(h)     <u>Provisions that Seek to Affect the Court's Power to Consider the Equities of the Case (Local Rule 4001-2(a)(i)(H))</u>.  Not applicable.

## **JURISDICTION**

4.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The bases for the relief requested herein are sections 105(a), 361, 362, 363, 364 and 507 of the United States Code (the "***Bankruptcy Code***") Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***").

## BACKGROUND

7.      On the date hereof (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.  No official committees have been appointed or designated.

8.      A description of the Debtors' business and the reasons for filing these chapter 11 cases is set forth in the Declaration of Stuart K. Mathis in Support of First Day Pleadings (the "***First Day Declaration***") filed contemporaneously herewith and incorporated by reference as if fully set forth herein.

## SUMMARY OF THE DEBTORS' PREPETITION CAPITAL STRUCTURE

9.      As of the date hereof, the Debtors have funded debt facilities in place with a face amount of approximately $625 million, including a:  (a) $452 million term loan (the "***First Lien Credit Facility***") (pursuant to, as amended, the "***First Lien Credit Agreement***"); (b) $139 million term loan (the "***Second Lien Credit Facility***" and, together with the First Lien Credit Facility, the "***Prepetition Facilities***") (pursuant to, as amended, the "***Second Lien Credit Agreement***")

and (c) $10 million secured term loan facility (the "***Vectra Credit Facility***") (pursuant to, as amended from time to time, the "***Vectra Credit Agreement***").

### A.      The First Lien Credit Agreement

10.      On January 24, 2012, the Debtors entered into the First Lien Credit Agreement with Holdco, the lenders party thereto (the "***First Lien Lenders***"), Wilmington Trust, National Association, as successor administrative agent (the "***First Lien Agent***"), Deutsche Bank Securities Inc., as syndication agent, and Credit Suisse Securities (USA) LLC, Wachovia Bank, N.A., and BNP Paribas Securities Corp., as co-documentation agents.  The obligations under the First Lien Credit Agreement are guaranteed by non-Debtor Quiz-DIA and each of the Debtors, except for QAFT Inc., ("***QAFT***"), the National Marketing Fund Trust and The Regional Advertising Program Trust, and are secured by substantially all assets of Quiz-DIA and the Debtors (with the exception of the assets of QAFT, The National Marketing Fund Trust and The Regional Advertising Program Trust) (collectively, the "***First Lien Collateral***" or "***Prepetition Collateral***").  As of March 11, 2014, the total principal amount outstanding under the First Lien Credit Agreement is $444,695,086.92.

11.      Pursuant to that certain Forbearance Agreement to Amended and Restated Credit Agreement, dated as of December 2, 2013, and as most recently amended as of March 10, 2014 (the "***First Lien Forbearance Agreement***"), the First Lien Agent and the lenders under the First Lien Credit Agreement have agreed to forbear until March 31, 2014 from exercising certain of their default-related rights and remedies against the Debtors with respect to certain events of default.

### B.      The Second Lien Credit Agreement

12.      On January 24, 2012, the Debtors entered into the Second Lien Credit Agreement with Holdco, the lenders party thereto (the "***Second Lien Lenders***" and, together with the First

Lien Lenders, the "***Prepetition Lenders***"), and U.S. Bank National Association, as administrative agent (the "***Second Lien Agent***", and together with the First Lien Agent, the "***Prepetition Agents***").  The Second Lien Credit Agreement is guaranteed by the same guarantors under the First Lien Credit Agreement and is secured by a second lien on the Prepetition Collateral.  As of March 11, 2014, the total principal amount outstanding under the Second Lien Credit Agreement is $173,828,686.23.

13.     Pursuant to that certain Forbearance Agreement to Credit Agreement, dated as of January 24, 2014, and as most recently amended on March 10, 2014, the Second Lien Agent and the lenders under the Second Lien Credit Agreement have agreed to forbear until March 31, 2014 from exercising certain of their default-related rights and remedies against the Debtors with respect to certain events of default.

**C.     Intercreditor Agreement**

14.     On January 24, 2012, QCE entered into an Intercreditor Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "***Intercreditor Agreement***"), with the First Lien Agent, the Second Lien Agent and certain other entities that may become party thereto from time to time.  The Intercreditor Agreement, among other things, provides that the Second Lien Agent and Second Lien Lenders have liens and security interests subordinate to the liens and security interests of the First Lien Lenders.  The Intercreditor Agreement also governs and limits:  (a) the rights and remedies of the Second Lien Agent and Second Lien Lenders so long as obligations under the First Lien Credit Agreement remain outstanding; and (b) the Second Lien Lenders' ability to challenge or contest the validity or priority of Liens under the First Lien Credit Agreement.

**D.**     **Vectra Credit Agreement**

15.     On September 26, 2007, the Marketing Fund Trusts entered into the Vectra Credit Agreement.  The maximum credit extended under the Vectra Credit Agreement was initially the lesser of $20 million and a borrowing base equal to 75.0% of the aggregate National and Regional Advertising Fees (as defined in the Vectra Credit Agreement) for the most recent nine calendar month period.  The obligations under the Vectra Credit Agreement are secured by substantially all assets of the Marketing Fund Trusts (the "*Vectra Collateral*") and are guaranteed by QCE.

16.     On January 31, 2013, QAFT entered into the fifth amendment and extension of the term of the Vectra Credit Agreement.  The maximum amount of credit available under the Vectra Credit Agreement was the lesser of (a) $10 million and (b) a borrowing base equal to 100% of the aggregate National and Regional Advertising Fees for the most recent six calendar month period commencing six months after the closing date of the Vectra Credit Agreement. The Vectra Credit Agreement was set to terminate on December 31, 2013.  Pursuant to the Forbearance Agreement and Amendment to Credit Agreement, dated as of November 29, 2013, and as most recently amended as of February 28, 2014, Vectra has agreed to forbear until the earlier of (a) March 31, 2014 and (b) the termination of the First Lien Forbearance Agreement, from exercising certain of its default-related rights and remedies against QAFT with respect to certain events of default.  As of the Petition Date, the amount outstanding under the Vectra Credit Agreement was $7,351,872.27 plus accrued and unpaid interest.

## SOLICITATION OF PRE-PACKAGED CHAPTER 11 PLAN

17.     As discussed in the First Day Declaration, the Debtors engaged in months of good faith, arm's length negotiations with, among others, Oaktree Capital Management L.P and Caspian Capital LP, and each of their respective controlled affiliates, managed accounts or funds

(the "***Consenting First Lien Lenders***") that are holders of claims arising under the First Lien Credit Agreement ("***First Lien Facility Claims***") and the Consenting Avenue and Fortress Entities[5], and their respective advisors, regarding the terms of a potential restructuring of the Debtors' obligations under the Prepetition Facilities. Those negotiations culminated in global compromise embodied in a restructuring support agreement, dated March 11. 2014 (the "***Restructuring Support Agreement***"). More recently, the Debtors have also engaged in negotiations with Vectra, with respect to the potential restructuring of the indebtedness under the Market Fund Trusts Credit Agreement.

18.      Under the terms of the Restructuring Support Agreement, the Debtors agreed to file, and the other parties to the Restructuring Support Agreement agreed to support and vote for, the Plan. Pursuant to the Plan, *inter alia*, (a) the Debtors will reduce their total secured debt obligations by over $400 million, (b) the Reorganized Debtors' will have access to $25 million of incremental funding that will enable them to support their go-forward business needs, (c) the Debtors will satisfy the First Lien Lenders with a combination of consideration consisting of a new $200 million credit facility and equity in reorganized Holdco ("***Reorganized Holdco***"), (d) the Debtors will satisfy the claims of Vectra, as the lender under the Vectra Credit Agreement through an amended agreement that will ultimately provide for Vectra's repayment in full, and (e) satisfy the claims of the Debtors' unsecured creditors, at the option of unsecured creditors with allowed claims, through either the proceeds from the litigation against certain former officers, members and related parties of the Debtors' or equity in Reorganized Holdco.

---

[5]      "***Consenting Avenue and Fortress Entities***" means (i) certain controlled affiliates, managed accounts or funds of Avenue Capital Management II, L.P. that are holders of claims against or interests in the Debtors (as Second Lien Lenders and existing equity holders of the Debtors) (collectively, "***Avenue***") and (ii) certain controlled affiliates, managed accounts or funds of Fortress Investment Group that are holders of claims against or interests in the Debtors (as Second Lien Lenders and existing equity holders of the Debtors) (collectively, "***Fortress***").

19.     On March 11, 2014, the Debtors began the solicitation of votes to accept or reject their proposed Plan.  The Debtors have received the requisite acceptances of the Plan, and, pursuant to the Restructuring Support Agreement, are requesting that the Court confirm the Plan within eighty (80) days of the Petition Date.  Solely in connection with the Plan, the Consenting First Lien Lenders offered to provide the DIP Facility, which is the focus of the instant motion.  Given the Debtors' current cash position, the DIP Facility is vital to the Debtors' ability to maintain operations pending confirmation of the Plan.

## THE DEBTORS' LIQUIDITY NEEDS

20.     As more fully discussed in the First Day Declaration, a number of factors have contributed to the Debtors' decision to pursue a restructuring through the chapter 11 process, including, *inter alia*, (i) the current economic environment surrounding the quick service restaurant industry, (ii) the Debtors' unsustainable capital structure; and (iii) the effect on the Debtors' business of the conduct by certain former officers, board members and related parties of the Debtors in connection with the Debtors' efforts to restructure in 2012.  As a result of the foregoing, the Debtors' financial position has deteriorated significantly since 2012.

21.     The Debtors' financial condition has significantly constrained their ability to access traditional sources of liquidity.  As a result, the Debtors' business operations have been considerably stressed, including the Debtors' relationships with key third party vendors and suppliers that are crucial for operations.  Due to the demands inherent in the highly competitive fast casual restaurant industry, the Debtors rely on suppliers and vendors to deliver goods promptly and to navigate logistics associated with the Debtors' and franchisees' operations.  With the increasing publicity surrounding the Debtors' inability to service their debt obligations and their impending need to restructure, the Debtors' vendors have restricted the credit they provide to the Debtors and the goods and services they are prepared to supply.  In attempting to

maintain the functionality of their supply chain and meet vendors' and suppliers' payment demands, the Debtors' liquidity has deteriorated significantly in the weeks leading up to the Petition Date. As a result, the Debtors already have experienced supply interruptions.

22. Absent an immediate infusion of liquidity, the Debtors are likely to experience further suspensions or sustained limitations to their business operations that ultimately would have a disastrous effect on the Debtors' operations and the value of the Debtors' business as a whole. The Debtors' inability to maintain and stabilize their business operations will likely result in additional restaurant closures, and further decline in revenues.

## ENTRY INTO THE DIP FACILITY

23. Simultaneous with their discussions with their key stakeholders regarding a consensual restructuring, the Debtors, with the assistance of their advisors, began assessing potential financing options for a restructuring. As part of the process, the Debtors' financial advisor, Lazard Asset Management ("*Lazard*"), approached approximately five (5) potential lenders, comprising a cross-section of traditional and non-traditional lenders capable of providing the requisite financing to the Debtors, to provide such parties with general background regarding the Debtors' business, and to determine whether such parties had an interest in providing the prospective financing. None of the contacted parties requested confidentiality agreements or additional information regarding the Debtors' financing needs and each indicated that they were not interested in offering financing to the Debtors.

24. Contemporaneously, as part of the restructuring proposal made by the Consenting First Lien Lenders regarding a comprehensive balance sheet restructuring, the Consenting First Lien Lenders offered to provide the DIP Facility on the terms described herein and in the DIP Loan Documents. Accordingly, on a parallel path with their efforts to obtain alternative

postpetition financing, the Debtors and their advisors engaged in good faith, arm's length negotiations with the Consenting First Lien Lenders regarding the DIP Facility.

25.    Importantly, because the Debtors' obligations under the Prepetition Credit Documents are secured by substantially all of the Debtors' assets, the Debtors had only two potential options with respect to the prospect of obtaining postpetition financing from a lender or lender group other than the Consenting First Lien Lenders:  (a) find a lender willing to extend postpetition financing with priority junior to that of the Prepetition Lenders or (b) obtain postpetition financing that primed the liens of the Prepetition Lenders without such parties' consent.  Given the status of the capital markets at the time and the Debtors' imminent liquidity needs, the Debtors and Lazard concluded that any proposal for postpetition financing (other than the proposal of the Consenting First Lien Lenders) in all likelihood would have contemplated a non-consensual priming lien on substantially all of the Debtors' assets, and thus would not have contemplated (x) unsecured credit allowable as an administrative expense under section Bankruptcy Code section 503(b)(1), (y) credit secured by liens junior to the Prepetition Lenders' liens or (z) credit secured by liens equal to the Prepetition Lenders' liens.  Any attempt to prime the liens of Prepetition Lenders would have required a potentially prolonged and costly litigation at the outset of these chapter 11 cases at a time when the Debtors' liquidity needs are dire.  Additionally, the Debtors, together with their advisors, believed that the attendant litigation risk regarding the outcome of any priming fight was considerable and, if unsuccessful, would likely jeopardize the Debtors' operations and ability to restructure.

26.    Accordingly, in the sound exercise of their business judgment (as evidenced by, *inter alia*, absence of third party interest in providing alternative financing to the Debtors), the Debtors determined that the DIP Facility from the Consenting First Lien Lenders was the only

viable financing option under the circumstances.  Indeed, in light of the Debtors' need for near instantaneous liquidity and use of Cash Collateral, the Consenting First Lien Lenders' familiarity with the Debtors' business and operations and their provision of the DIP Facility as part of the Debtors' consensual restructuring, entry into the DIP Facility is in the best interest of the Debtors' their estates and their creditors.

27.     QCE, in its capacity as Borrower, each of the Guarantors under the DIP Facility, the DIP Lenders, and the DIP Agent (collectively, the "***Loan Parties***") engaged in extensive, good faith, arm's length negotiations with respect to the terms and conditions of the postpetition financing.  The result of these negotiations is the proposed DIP Facility, including the form of the DIP Credit Agreement.

## **RELIEF REQUESTED**

28.     The Debtors request the entry of the Interim Order, substantially in the form attached hereto as **Exhibit A**, and the Final Order which, without limitation:

(a)     Authorize the Debtors to execute, enter into, deliver, and incur obligations under (i) the DIP Credit Agreement, in substantially the form attached to the Interim Order as Exhibit A (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and the Interim Order) and (ii) any related documents required to be delivered by or in connection with the DIP Credit Agreement, and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

(b)     Authorize the Debtors to use the proceeds of the DIP Facility as expressly provided in the DIP Loan Documents and consistent with the Budget to (i) pay (a) all fees due to the DIP Lenders as provided under the DIP Facility and (b) administration costs of the chapter 11 cases and prepetition claims or amounts approved by the Court, (ii) provide working capital for the Debtors, including postpetition ordinary course operating expenses, and (iii) provide funding for other general corporate purposes of the Debtors;

(c)     Grant the DIP Lenders (i) pursuant to Bankruptcy Code section 364(c)(1), joint and several superpriority administrative expense claim status in the chapter 11 cases, which claims in respect of the DIP Facility shall be

superior to all other claims; (ii) pursuant to Bankruptcy Code section 364(c)(2), a first priority lien on all unencumbered assets of the Debtors and their estates (now or hereafter acquired and all proceeds thereof); (iii) pursuant to Bankruptcy Code sections 364(c)(3), a junior lien on all encumbered assets of the Debtors excluding the liens pursuant to the Prepetition Facilities (now or hereafter acquired, and all proceeds thereof); (iv) pursuant to Bankruptcy Code section 364(d), a first priority priming lien on all assets of the Debtors and their estates (now or hereafter acquired and all proceeds thereof) that were subject to a lien securing the Prepetition Facilities (which, for the avoidance of doubt, does not include the Vectra Credit Facility) as of the Petition Date;[6]

(d)     Grant adequate protection to the First Lien Lenders and Vectra;

(e)     Authorize the Debtors to use, in accordance with the Budget, any Cash Collateral (as that term is defined in Bankruptcy Code section 363(a)) in which the First Lien Lenders and Vectra have an interest, and grant certain protections to the First Lien Lenders and Vectra with respect to, *inter alia*, use of their Cash Collateral in accordance with the Budget and the use (to the extent of any diminution in value) of their other collateral;

(f)     Modify the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Interim Order;

(g)     Authorize, (1) upon entry of the Interim Order, the Borrower to borrow, and the Guarantors to guarantee, an aggregate principal amount not to exceed $10 million (plus interest, costs, fees and other expenses and amounts provided for in the DIP Credit Agreement) at any time outstanding prior to entry of the Final Order and (2) upon entry of the Final Order, the Borrower to borrow, and the Guarantors to guarantee, an aggregate principal amount not to exceed an additional $5 million (plus interest, costs, fees and other expenses and amounts provided for in the DIP Credit Agreement) for a total loan of $15 million, pursuant to the terms and conditions set forth in the DIP Credit Agreement; and

(h)     Schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "***Final Hearing***") as soon as practicable and within twenty (20) days of entry of the Interim Order for this Court to consider and enter a final order authorizing and approving on a final basis the relief requested in the motion.

---

[6]     For the avoidance of doubt, and as set forth in the Interim Order, the liens and claims granted to the DIP Lenders with respect to the Marketing Fund Trusts shall be junior in priority and subject to the rights, claims and liens of Vectra as agent under the Vectra Credit Facility.

## SUPPORTING AUTHORITY

29.     Approval of the DIP Facility and the use of Cash Collateral will enable the Debtors to fund their current and ongoing operating expenses, including postpetition wages and salaries, utilities, taxes, and vendor costs.  Absent the requisite financing, the Debtors' operations would come to an immediate halt, resulting in irreparable harm to their business, their going concern value, and ultimately, their ability to reorganize successfully.  The Debtors do not have sufficient available sources of working capital or cash to fund the chapter 11 cases and continue the operation of their business without accessing the DIP Facility and using Cash Collateral.  The Debtors' continuing viability and their ability to maximize the value of their estates for the benefit of their creditors thus depends heavily upon the expeditious approval of the DIP Facility, use of the Cash Collateral and the related actions requested herein.  As a result of, among other things, the Debtors' financial condition and prepetition capital structure, the Debtors have been unable to obtain alternative sources of cash or credit in the form of unsecured credit allowable under Bankruptcy Code section 503(b)(1).

30.     Importantly, the DIP Facility will provide the liquidity and resources needed to allow the Debtors to operate in the ordinary course while obtaining confirmation of the Plan.  As described above, the Debtors solicited the Plan before the Petition Date and received overwhelming support.  The availability of credit under the DIP Facility will instill much needed confidence in the Debtors' employees, vendors, and customers, thereby greatly enhancing the likelihood that the Debtors will continue to receive the support of their key constituents throughout the pendency of these chapter 11 cases.  Accordingly, the timely approval of the relief requested herein is imperative.

A.      **The Debtors Satisfy the Requirements for Obtaining Credit Pursuant to Bankruptcy Code Section 364(c)**

31.      The Debtors propose to obtain financing under the DIP Facility by providing security interests and other liens as set forth above pursuant to Bankruptcy Code section 364(c). To obtain postpetition credit, the statute requires the court to make a finding, after notice and a hearing, that the debtors in possession are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c); *In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (denying  motion for authorization to enter into postpetition credit facility where debtors could not prove that they were unable to obtain unsecured credit allowable as an administrative expense); *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (obtaining secured credit under Bankruptcy Code section 364(c) requires debtor to prove that it was unable to obtain unsecured credit pursuant to Bankruptcy Code section 364(b)).   Indeed, section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. *See In re YL West 87th Holdings I LLC*, 423 B.R. 421,441 (Bankr. S.D.N.Y. Jan. 13, 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under Bankruptcy Code sections 364(a) and (b)); *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Banker. E.D. Pa. 1987) (secured credit under Bankruptcy Code section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

32.      Courts have articulated a three-part test to determine whether a debtor is entitled to financing under Bankruptcy Code section 364(c).  Specifically, courts look to whether:

(a)      the debtor is unable to obtain unsecured credit under Bankruptcy Code section 364(b), *i.e.*, by allowing a lender only an administrative claim;

    (b)        the credit transaction is necessary to preserve the assets of the estate; and

    (c)        the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See In re L.A. Dodgers LLC, 457 B.R. at 312; see also In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (citing In re Crouse Grp., Inc., 71 B.R. at 549); Norris Square Civic Ass'n v. St. Mary Hosp. (In re St. Mary Hosp.), 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); In re Ames Dep't Stores, 115 B.R. at 37-39.*

### *(i)     The Debtors Could Not Obtain Unsecured Financing*

33.     A debtor needs only demonstrate by a good faith effort that credit was not available without the protections afforded to potential lenders by Bankruptcy Code section 364(c).  *In re YL West 87th Holdings I LLC*, 423 B.R. at 441 ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing"); *In re Gen. Growth Props., Inc.*, 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009) (debtor has an obligation to make "reasonable efforts, under the circumstances ... to obtain [unsecured financing], in the ordinary course of business or otherwise"); *In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *8 (Bankr. S.D.N.Y. June 16, 2008) (noting that debtor must show that it was unable to "reasonably" obtain credit from an alternative source).

34.     As set forth in the Hart Declaration[7], in the weeks before the commencement of these chapter 11 cases, the Debtors explored alternative financing from a number of potential lenders and from a variety of financial institutions.  Before the Petition Date, the Debtors and their financial advisor, Lazard, surveyed various sources of prospective postpetition financing.

---

[7]    In support of this motion, the Debtors have filed, contemporaneously herewith, the Declaration of Matthew J. Hart in Support of the Debtors' Motion for Interim and Final Orders (A) Authorizing Debtors to Obtain Postpetition Financing and to Use Cash Collateral; (B) Granting Priming Liens and Providing Superpriority Claims; (C) Granting Adequate Protection to Prepetition Secured Parties; and (D) Prescribing the Form and Manner of Notice and Setting the Time for the Final Hearing (the "**Hart Declaration**").

Indeed, the Debtors, with the help of their advisors, contacted five (5) potential lenders, none of which were willing to provide postpetition financing to the Debtors.  Accordingly and in light of the status of the capital markets and the Debtors' imminent liquidity needs, the Debtors, with their advisors, determined that the DIP Facility is the only viable financing option available at this time.  For the foregoing reasons, the requirements of Bankruptcy Code section 364(c) are satisfied here since alternative credit on more favorable terms was unavailable to the Debtors.

> *(ii)*     ***The DIP Facility is Necessary to Preserve Estate Assets and is an Exercise of the Debtor's Sound Business Judgment***

35.     A debtor's decision to enter into a postpetition lending facility under Bankruptcy Code section 364 is governed by the business judgment standard.  *See, e.g., Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *see also U.S. Bank Trust Nat'l Ass'n v. Am. Airlines, Inc. (In re AMR Corp.)*, 485 B.R. 279, 288 (Bankr. S.D.N.Y. 2013) ("In determining whether to approve a debtor's request under Section 364, a Court must examine whether the relief requested is an appropriate exercise of the debtor's business judgment."); *A&K Endowment, Inc. v. Gen. Growth Props. Inc. (In re Gen. Growth Props., Inc.)*, 423 B.R. 716, 725 (S.D.N.Y. 2010) (finding that DIP financing benefitted estate and reflected an exercise of the debtors' prudent business judgment); *Ames Dep't Stores*, 115 B.R. at 38 (noting that other decisions under section 364 find that financing reflects a debtor's business judgment). Generally, the business judgment standard requires that, absent evidence to the contrary, a debtor in possession is afforded discretion to act with regard to business decision-making.  *See In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("[D]iscretion to act with regard to business planning activities is at the heart of the debtor's power.") (citations omitted).

36.     As this Court has found, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Dura Auto. Sys., Inc.*, No. 06-11202, 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (quoting In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006)).* "More exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). The Debtors' decision to enter into the DIP Facility satisfies this standard.

37.     Consistent with this authority, the Debtors' decision to enter into the DIP Facility is the culmination of the Debtors' good faith efforts to procure the best available financing under the circumstances. Ultimately, the Debtors determined that entry into the DIP Facility is the best option available to them and entry of the DIP Orders is in the best interests of the Debtors, their estates and their stakeholders. As discussed above, the DIP Facility is necessary to preserve the value of the Debtors' estates for the time needed to confirm the Plan and exit chapter 11 protection. Specifically, and as set forth in the First Day Declaration, the Debtors have an urgent need to obtain access to the DIP Facility to, *inter alia*, continue the operation of their business in an orderly manner, maintain business relationships with vendors, suppliers and customers, pay their employees and satisfy other working capital and operational needs – each of which is vital to preserving and maintaining the Debtors' going concern value. The inability to meet payments to vendors, pay employees and satisfy customers would impair, if not destroy, the Debtors' prospects for reorganization.

38.    The Debtors respectfully submit that their decision to enter into the proposed DIP Credit Agreement is an exercise of their sound business judgment that should be approved by the Court.   The Debtors' management took the steps they deemed necessary and exercised their sound business judgment in negotiating the DIP Facility.   The Debtors' management and board of directors ultimately concluded that the DIP Facility will provide immediate access to capital to pay vendors and employees, replenish the Debtors' cash balances and stabilize operations. Indeed, approval of the DIP Facility is a key component of the restructuring process outlined in the Restructuring Support Agreement and endorsed by Avenue and Fortress.

39.    Accordingly, for all of the foregoing reasons, the Debtors submit that entry into the DIP Facility is in the best interests of the Debtors' creditors, is necessary to preserve the value of their estates for the benefit of all stakeholders and is an exercise of the Debtors' sound business judgment.

### (iii)    The DIP Facility Terms are Fair, within the Range of Reasonableness and Appropriate Under the Circumstances

40.    In determining whether the terms of a debtor's proposed postpetition financing arrangement are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender.   *See In re Farmland Indus., Inc.*, 294 B.R. 855, 885-89 (Bankr. W.D. Mo. 2003) (finding that terms of postpetition financing were reasonable when taken in context and relative circumstances of the parties were considered); *see also Unsecured Creditors Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. of Escanaba (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 364-65 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization); *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009), Hr'g Tr. 737:6-14 (finding a postpetition lender's desire to ensure that it is repaid, to make money on interest and fees and to protect prepetition positions

understandable and acceptable motivations in negotiating a deal).   When judged from the foregoing perspective, the terms of the DIP Facility are fair, within the range of reasonableness, and appropriate under the circumstances.

41.   The DIP Facility provides the Debtors with the liquidity they need to operate their business during the chapter 11 cases, thus facilitating the reorganization process and enabling the Debtors to restructure their balance sheet.   As discussed more fully above, the Debtors made concerted, good-faith efforts to obtain credit on the most favorable terms available in the market. Specifically, the Debtors, with the help of Lazard, analyzed a series of debtor in possession credit facilities in other recent cases of a similar size and determined that the terms of the DIP Facility fell within the range of terms provided in those other cases.   Against this backdrop, the Debtors and their advisors carefully evaluated the proposed financing offered by the DIP Facility and engaged in good faith, arm's-length negotiations with the DIP Lenders.   Ultimately, as discussed above, the Debtors, exercising their sound business judgment, agreed to the DIP Facility as the proposal best suited to the Debtors' needs.

42.   The various fees and charges associated with obtaining the DIP Facility, including the fees payable in connection therewith, are within the range of reasonableness.   Courts recognize that payment of lender fees may be necessary to obtain postpetition financing and often approve payment of such fees.   *See, e.g., Resolution Trust Corp. v. Official Creditors' Comm. (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 316-19 (B.A.P. 9th Cir. 1992) (approving financing facility that included a lender "enhancement fee"); *see also In re Korea Chosun Daily Times, Inc.*, 337 B.R. 773, 783 (Bankr. E.D.N.Y. 2005) (noting that postpetition financing arrangement may provide for payment of a commitment fee even if the financing arrangement is not consummated).

43.     The terms of the DIP Facility also are fair and reasonable because they do not deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases.  Instead, the proposed DIP Facility and the Interim Order provide that the security interests and administrative expense claims granted to the DIP Lenders are subject to the Carve-Out.  In *Ames Dep't Stores*, the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel.  *Ames Dep't Stores*, 115 B.R. at 40; *see also Gen. Growth*, 412 B.R. at 136–37.

44.     Accordingly, the Debtors respectfully submit that the terms of the DIP Facility are fair, within the range of reasonableness and appropriate under the circumstances, and the DIP Agent and the DIP Lenders should be accorded the benefits of Bankruptcy Code section 364(e) in respect of such facility.

**B.      Financing Pursuant to Bankruptcy Code Section 364(d) is Appropriate**

45.     If a debtor is unable to obtain credit solely under the provisions of Bankruptcy Code section 364(c), the debtor may obtain credit by a senior or equal lien on property of the estate that is already subject to a lien.  See 11 U.S.C. § 364(d).  The Bankruptcy Code authorizes a debtor in possession to grant superpriority senior secured priming liens if:  (i) the debtor is unable to obtain financing without granting such liens, and (ii) the interests of the secured creditors whose liens are being primed by the postpetition financing are adequately protected. See 11 U.S.C. §§ 364(d)(1)(A) & (B).

> *(i)      The Debtors Are Unable to Obtain Financing Solely Under Bankruptcy Code Section 364(c)*

46.     Under Bankruptcy Code section 364(d)(1)(A), the adequacy of a debtors' efforts to obtain postpetition financing is a case-specific inquiry.  Courts generally have found that a

debtor's good-faith efforts to seek credit from other sources is sufficient to carry this burden, however.  *See In re Snowshoe Co.*, 789 F.2d at 1088 (recognizing "there is no duty to seek credit from every possible lender"); *In re 425 Cent. Park Ave. Corp.*, 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (noting that while "[s]ection 364(d)(1) does not require the debtor to seek alternative financing from every possible lender," it "must make an effort to obtain credit without priming a senior lien").

47.    As described in the Hart Declaration, the Debtors and their advisors engaged in rigorous, arm's length negotiations that produced the best available financing option under the circumstances.  The Consenting First Lien Lenders were not willing, and indeed no alternative lender was willing, to commit to postpetition financing on an unsecured or junior secured basis and instead require priming liens pursuant to Bankruptcy Code section 364(d)(1).  The Debtors wanted to avoid a costly and damaging priming fight between an outside lender and the Debtors' prepetition secured creditors.  In the present case, the Consenting First Lien Lenders expressly consent to the granting of DIP Liens senior in priority to the Prepetition Liens.  Additionally, the Intercreditor Agreement among the Debtors' prepetition secured creditors preclude Second Lien Lenders from objecting to the proposed DIP Facility or the adequate protection to be provided in connection therewith.  Additionally, the Second Lien Lenders acknowledged in the Restructuring Support Agreement that their claims are fully unsecured.  As a result, the Second Lien Lenders are not entitled to adequate protection.  By obtaining postpetition financing from the Consenting First Lien Lenders, the Debtors made use of the restrictions contained in the Intercreditor Agreements to facilitate a smoother restructuring and avoid any disputes with their secured stakeholders over the terms of the adequate protection that is being proposed.

*(ii)    The Debtors' Proposed Use of Cash Collateral and Adequate Protection is Appropriate*

48.    The Bankruptcy Code does not explicitly define "adequate protection." Bankruptcy Code section 361 suggests, however, that adequate protection may be provided by (i) periodic cash payments to the extent that there is a decrease in the lien holder's interest in the property, (ii) providing additional or replacement liens or (iii) other relief resulting in the realization of the "indubitable equivalent" of the lien holder's interest in the property.  The third possibility is regarded as a "catch-all" provision, affording courts discretion, on a case-specific basis, to determine what level of protection is appropriate to provide a secured party.  *See Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case.").  In *Swedeland*, the Third Circuit pointedly noted that the purpose of adequate protection "is to insure that the creditor receives the value for which he bargained prebankruptcy," and "should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been postpetition superpriority financing." *In re Swedeland*, 16 F.3d at 564; *see also Shaw Indus., Inc. v. First Nat'l Bank of PA (In re Shaw Indus., Inc.)*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) ("The purpose of providing 'adequate protection' is to insure that a secured creditor receives in value essentially what he bargained for."); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (noting that the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted), *rev'd on other grounds*, 89 B.R. 336 (S.D.N.Y. 1988).  Adequacy, held the Third Circuit, "depends directly on how effectively it compensates the secured creditor for loss of value"

caused by the priming lien granted to the new lender. *In re Swedeland*, 16 F.3d at 564 (quoting *In re Am. Mariner Inds., Inc.*, 734 F.2d 426, 435 (9th Cir. 1984)).

49.     The First Lien Lenders have consented to the priming of the Prepetition Liens and have agreed to the Debtors' use of Cash Collateral and the Debtors' entry into the DIP Credit Agreement in consideration for the adequate protection proposed by this motion. *See Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) (stating that lenders' consent to the imposition of a priming lien "relieved the debtor of having to demonstrate that the [lienholders] were adequately protected").

50.     In accordance with Bankruptcy Code section 364(d) and consistent with the purposes underlying the provision of adequate protection, the proposed DIP Orders provide the First Lien Lenders with adequate protection (as set forth in detail above) to protect the First Lien Lenders from any diminution in value of their interest is the Prepetition Collateral during the pendency of the Debtors' chapter 11 cases and to avoid needless litigation with such parties. The proposed adequate protection as set forth herein is justified to protect the First Lien Lenders resulting from the priming of their liens and the imposition of the automatic stay. Accordingly, the Court should permit the Debtors to prime the liens securing the obligations under the Prepetition Facilities in connection with the proposed DIP Facility, as the requirements of Bankruptcy Code section 364(d) have been satisfied.

## C.     Authority to Use Cash Collateral and Provide Adequate Protection Should be Granted

51.     Bankruptcy Code section 363(c)(2) provides that a debtor may not use, sell or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. §363(c)(2). The requisite Prepetition Lenders and

Vectra have consented to the use of Cash Collateral in accordance with the terms set forth in the proposed Interim Order and the proposed Final Order.

52.     Bankruptcy Code section 363(e) provides that "on request of an entity that has an interest in property . . . to be used, sold or leased, by the trustee, the court . . . shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  Although the Bankruptcy Code does not define "adequate protection," Bankruptcy Code section 361 sets forth a non-exclusive list of examples as to how adequate protection may be provided, including cash payments and replacement liens.  *See Resolution Trust corp. v. Swedeland Dev. Gr., Inc. (In re Swedeland Dev. Gr., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).   The determination of what constitutes adequate protection is made on a case-by-case basis.  *See Swedeland*, 16 F.3d at 563.   The purpose of adequate protection is to preserve a secured creditor's position and to protect the secured creditor from diminution of the value of its interest in collateral during the bankruptcy process.  *See Beker Indus.*, 58 B.R. at 736; *see also In re Ledgmere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990).

53.     The Debtors submit that their request to use Cash Collateral also should be approved, as the First Lien Lenders and Vectra have consented thereto, provided the requested adequate protection and other relief is granted.[8]  Pursuant to the Intercreditor Agreement, this consent by the First Lien Lenders binds Second Lien Lenders.  Absent the ability to use Cash Collateral, the Debtors would be deprived of a significant source of liquidity, which would imperil the restructuring process and the Debtors' ability to reorganize.

---

[8]   Notwithstanding anything to the contrary herein, and as set forth in the Interim Order, the Marketing Fund Trusts' Cash Collateral shall be used to make payments other than to Vectra required by the Vectra Credit Agreement or to the Marketing Fund Trusts' ordinary course creditors until such time as the amount outstanding under the Vectra Credit Agreement has been repaid in full.

54.    Further, to protect the First Lien Lenders and Vectra from any diminution in value of their interest in the Cash Collateral during the pendency of the Debtors' chapter 11 cases and avoid needless litigation with such parties, the Debtors have agreed to the proposed adequate protection discussed above.  This adequate protection is justified to protect the First Lien Lenders and Vectra from any diminution in the value of their interest in the Prepetition Collateral and Vectra Collateral, respectively, resulting from the use of Cash Collateral and the imposition of the automatic stay.

**D.**    **The Automatic Stay Should be Modified on a Limited Basis**

55.    The relief requested herein contemplates a modification of the automatic stay pursuant to Bankruptcy Code section 362 to (a) permit the DIP Obligors to grant the security interests, liens, and superpriority claims described above with respect to the DIP Agent, the DIP Lenders, and the First Lien Lenders, as the case may be, and to perform such acts as may be reasonably requested to assure the perfection and priority of such security interests and liens and (b) implement the terms of the proposed DIP Orders.  In the Debtors' business judgment, the stay modification requested herein is fair and reasonable under the circumstances.

**E.**    **Approval of the DIP Facility on an Interim Basis is Necessary to Prevent Immediate and Irreparable Harm**

56.    Bankruptcy Rules 4001(b) and (c)(2) provide that a final hearing on a motion to obtain credit pursuant to Bankruptcy Code section 364 may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, a bankruptcy court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.  *See* Fed. R. Bankr. P. 4001(c)(2).

57.     Bankruptcy Rule 6003 provides that to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may grant certain forms of relief during the twenty-one (21) days immediately following the filing date.   Fed. R. Bankr. P. 6003.   As described above, through the chapter 11 cases, the Debtors are seeking the expeditious and efficient implementation of their pre-packaged Plan.   Immediate and irreparable harm would result if the relief requested herein is not granted on an interim basis. As described in detail above and in the First Day Declaration, the Debtors have an immediate need to obtain access to liquidity under the DIP Facility in order to, among other things, continue the operation of their business, maintain business relationships with vendors, suppliers and customers, make payroll, and satisfy other working capital and operational needs.   Funding each of these expenditures is necessary to the Debtors' ability to preserve and maintain their going-concern value for the benefit of all parties in interest.   In addition, a failure to receive interim financing and use of Cash Collateral will result in the instantaneous evaporation of the Debtors' remaining liquidity. Such a result would jeopardize the Debtors' ability to consummate the restructuring contemplated by the Plan.   The Debtors, therefore, submit that the relief requested in this motion is necessary on an interim basis to avoid immediate and irreparable harm to the Debtors, as described herein, and that Bankruptcy Rule 6003 has been satisfied.

58.     The Debtors request that the Court authorize the Debtors, on an interim basis pending the Final Hearing, to borrow under the DIP Facility in an amount up to $10,000,000, subject to the Budget.   As discussed above, this relief will enable the Debtors to operate their business in a manner that will permit them to preserve and maximize value and thereby avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

59.     The importance of a debtor's ability to procure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this District.  *See, e.g., In re AbitbiBowater, Inc.*, No. 09-11296 (KJC) (Bankr. D. Del. Apr. 17, 2009), Docket No. 64 (authorizing debtors to obtain postpetition financing on an interim basis); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006), Docket No. 88 (authorizing debtors to obtain postpetition financing on an interim basis); *In re Exide Techs.*, No. 02-11125 (KJC) (Bankr. D. Del. Apr. 17, 2002), Docket No. 36 (authorizing debtors to obtain postpetition financing on an interim basis).

## REQUEST FOR A FINAL HEARING

60.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors respectfully request that the Court set a date and time for the Final Hearing that will allow the Court to consider and enter the Final Order approving the relief sought in this motion no later than twenty (20) days after the date of entry of the Interim Order, as required under the DIP Credit Agreement.

## WAIVER OF BANKRUPTCY RULES 6004(H) AND LOCAL RULE 9013-1(M).

61.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).

62.     Pursuant to Local Rule 9013-1(m), requests for relief on less than seven (7) days' notice and prior to the earlier of the creditors' committee formation meeting or the 11 U.S.C. § 341 meeting of creditors are "confined to matters of a genuinely emergent nature required to preserve the assets of the estate and to maintain ongoing business operations and such other matters as the Court may determine appropriate." Local Rule 9013-1(m)(ii).

63.     As set forth above, without access to capital, the continued operation of the Debtors' business would be nearly impossible, resulting in serious and irreparable harm to the Debtors and their estates.    Accordingly, the Debtors submit that they have satisfied the requirements of Local Rule 9013-1(m) to support immediate authority to access the requested capital under the DIP Facility.

## NOTICE

64.     Notice of this motion has been provided to the following parties, or, in lieu thereof, their counsel:  (a) the Office of the United States Trustee for the District of Delaware; (b) the entities on the Consolidated List of Creditors Holding the 35 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Milbank Tweed Hadley & McCloy LLP, as counsel to the Consenting First Lien Lenders, Attn:  Thomas R. Kreller and David B. Zolkin; (d) Morris Nichols Arsht & Tunnell LLP, as local counsel to the Consenting First Lien Lenders, Attn:    Robert J. Dehney; (e) O'Melveny & Myers LLP, as counsel to Avenue Capital Management II, L.P. and its affiliates, Attn:    John J. Rapisardi and Joseph Zujkowski; (f) Skadden Arps Slate Meagher & Flom LLP, as counsel to Fortress Investment Group and its affiliates, Attn:  Van C. Durrer, II; (g) Kasowitz Benson Torres & Friedman LLP, as counsel to Vectra Bank Colorado, National Association, Attn:  Adam L. Shiff and Matthew B. Stein; and (h) all parties entitled to notice pursuant to Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court (a) enter the Interim Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein; (b) schedule the Final Hearing; (c) after the Final Hearing, enter a Final Order substantially in the form of the Interim Order and as filed with the Court before the Final Hearing; and (d) grant such other and further relief as is just, proper and equitable.

Wilmington, Delaware
Date: March 14, 2014

**RICHARDS LAYTON & FINGER P.A.**
Mark D. Collins (No. 2981)
Amanda R. Steele (No. 5530)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 654-7700
Facsimile: (302) 651-7701

– and –

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira S. Dizengoff (*pro hac vice* admission pending)
Philip C. Dublin (*pro hac vice* admission pending)
Jason P. Rubin (*pro hac vice* admission pending)
Ashleigh L. Blaylock (*pro hac vice* admission pending)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

## Exhibit A

**Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| QCE FINANCE LLC, *et al.*, [1] | ) | Case No. 14-_____ ( ) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362,
363, 364, AND 507 (1) APPROVING POSTPETITION FINANCING,
(II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING
LIENS AND PROVIDING SUPER-PRIORITY ADMINISTRATIVE EXPENSE
STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING
AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING**

Upon the motion (the "***DIP Motion***")[2] of the above-captioned debtors and debtors in possession (collectively, the "***Debtors***")[3] pursuant to Bankruptcy Code sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507, Bankruptcy Rules 2002, 4001 and 9014, and Local Rule 4001-2, seeking entry of an interim order (this "***Interim Order***") *inter alia*:

(i)     authorizing the Debtors to obtain secured postpetition financing on a super-priority basis (the "***DIP Facility***") pursuant to the terms and conditions of that certain Debtor In Possession Credit Agreement (as amended, supplemented, restated, or otherwise modified from time to time, the "***DIP Agreement***") by and among Borrower, Parent, and the lenders from time to time party thereto (collectively, the "***DIP Lenders***"), and Wilmington Trust, National

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  QCE Finance LLC (7897); American Food Distributors LLC (8099); Quiznos Global LLC (2772); QCE LLC (2969); QFA Royalties LLC (2402); QIP Holder LLC (2353); Quiz-CAN LLC (7714); Quizno's Canada Holding LLC (3220); QAFT, Inc. (6947); Restaurant Realty LLC (8293); The Quizno's Master LLC (3148); The Quizno's Operating Company LLC (8945); National Marketing Fund Trust (4951); The Regional Advertising Program Trust (2035); and TQSC II LLC (8683).  The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 1001 17th Street, Suite 200, Denver, Colorado 80202.

[2]     Capitalized terms used, but not defined herein, shall have the meaning ascribed to them in the DIP Motion or the DIP Agreement.

[3]     Two of the Guarantors, Quizmark LLC and QCE Gift Card LLC (each a "***Non-Debtor Subsidary Loan Party***" and, collectively with the Debtors, the "***DIP Obligors***") are not Debtors.

Association, as administrative agent (in such capacity, the "***DIP Agent***"), substantially in the form of **Exhibit 1** annexed hereto;

(ii)     authorizing the Debtors to execute and deliver the DIP Agreement and the other related credit documents (the "***DIP Documents***") by and among the Debtors, the Non-Debtor Subsidiary Loan Parties and the DIP Agent, and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)     granting the DIP Facility and all obligations owing thereunder and under the DIP Documents to the DIP Agent and the DIP Lenders (collectively, and including all "***Obligations***" as described in the DIP Agreement, the "***DIP Obligations***") allowed super-priority administrative expense claim status in each of the Cases and any Successor Cases (as defined herein);

(iv)     granting to the DIP Agent, for the benefit of itself and the DIP Lenders, automatically perfected security interests in and liens upon all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral," as defined in Bankruptcy Code section 363(a), which security interests and liens shall be subject to the priorities set forth herein;

(v)     authorizing and directing the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents and this Interim Order as such become due, including, without limitation, closing fees and the reasonable fees and disbursements of the attorneys, advisers, accountants, and other consultants of the DIP Agent and the DIP Lenders, all to the extent provided in and in accordance with the terms of the DIP Documents;

(vi)     authorizing the use of Cash Collateral of (a) the Prepetition First Lien Agent and the Prepetition First Lien Lenders under the Prepetition First Lien Credit Documents (each as

defined herein) and (b) Vectra Bank Colorado, National Association ("*Vectra*") under that certain Credit Agreement, dated as of September 26, 2007 (as amended prior to the date hereof, the "*Vectra Credit Agreement*"), and providing adequate protection to (x) the Prepetition First Lien Agent and Prepetition First Lien Lenders and (y) Vectra for any Diminution in Value of their interests in the Prepetition First Lien Collateral and Vectra Collateral (defined below) securing the Vectra Liens (defined below), respectively, including the Cash Collateral (each as defined herein);

(vii)    vacating and modifying the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order, as limited pursuant hereto; and

(viii)    scheduling a final hearing (the "*Final Hearing*") to consider the relief requested in the DIP Motion and approving the form of notice with respect to the Final Hearing,

The Court having considered the DIP Motion, First Day Declaration, the exhibits attached thereto, the DIP Documents, and the evidence submitted at the interim hearing held on March ___, 2014 (the "*Interim Hearing*"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001(b), (c), and (d), and 9014; and the Interim Hearing to consider the interim relief requested in the DIP Motion having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that granting the interim relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' business; and it further appearing that the Debtors are unable to obtain

either unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code section 503(b)(1) or secured credit secured by a lien on property of the estate that is not otherwise subject to a lien under Bankruptcy Code section 364(c)(2) or secured by a junior lien on property of the estate that is subject to a lien pursuant to Bankruptcy Code section 364(c)(3); and adequate protection being provided on account of the interests in and liens on the property of the estates on which liens are to be granted; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTORS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.      *Petition Date.*  On March ___, 2014 (the "***Petition Date***"), each of the Debtors filed a separate voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "***Court***") commencing these Cases.

B.      *Debtors in Possession*.  The Debtors are continuing in the management and operation of their businesses and properties as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.  No trustee or examiner has been appointed in these Cases.

C.      *Jurisdiction and Venue*.  This Court has jurisdiction over these proceedings and over the persons and property affected hereby, pursuant to 28 U.S.C. §§ 157(b) and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirmed their consent pursuant to rule 9013-1(f) of the Local Bankruptcy Rules to the entry of a final order by the Court in connection with the DIP Motion to the extent that it is later determined that the Court, absent consent of the parties,

cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue for the Cases and proceedings on the DIP Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

        D.      *Committee Formation*.  As of the date hereof, the United States Trustee (the "***U.S. Trustee***") has not appointed any statutory committee of unsecured creditors in these Cases pursuant to Bankruptcy Code section 1102 ( "***Creditors Committee***").

        E.      *The Debtors' Stipulations*.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of a Creditors Committee as set forth in paragraph 32 hereof, the Debtors (on behalf of and for themselves) admit, stipulate, acknowledge, and agree that (collectively, paragraphs E(i) through E(vii) hereof shall be referred to herein as the "***Debtors' Stipulations***"):

        (i)      *Prepetition Facilities and Vectra Facility.*

        (1) Pursuant to that certain Amended and Restated Credit Agreement, dated as of January 24, 2012, among QCE LLC (the "*Borrower*"), as borrower, QCE Finance LLC ("***Parent***" or "***Holdco***"), as a guarantor, the lenders party thereto from time to time (the "***Prepetition First Lien Lenders***") and Wilmington Trust, National Association, as successor administrative agent to Goldman Sachs Credit Partners L.P. (the "***Prepetition First Lien Agent***") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "***Prepetition First Lien Credit Agreement***").  The  Prepetition First Lien Lenders provided term loans to or for the benefit of the Prepetition Obligors (the "***Prepetition First Lien Facility***").  The Prepetition First Lien Credit Agreement and all instruments and documents executed at any time in connection therewith, shall be referred to collectively as the "***Prepetition First Lien Credit Documents***".

(2) Pursuant to that certain Credit Agreement, dated as of January 24, 2012, among the Borrower, as borrower, Holdco, the lenders party thereto from time to time (the "***Prepetition Second Lien Lenders***" and, collectively with the Prepetition First Lien Lenders, the "***Prepetition Lenders***") and U.S. Bank, National Association, as administrative agent (the "***Prepetition Second Lien Agent***" and, together with the Prepetition First Lien Agent, the "***Prepetition Agents***") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "***Prepetition Second Lien Credit Agreement***"), the Prepetition Second Lien Lenders provided term loans to or for the benefit of the Borrower (the "***Prepetition Second Lien Facility***" and together with the Prepetition First Lien Loan Facility, the "***Prepetition Facilities***").  The Prepetition Second Lien Credit Agreement and all instruments and documents executed at any time in connection therewith, shall be referred to collectively as the "***Prepetition Second Lien Credit Documents***" and together with the Prepetition First Lien Credit Documents, the "***Prepetition Credit Documents***."

(3) Pursuant to the Vectra Credit Agreement, Vectra provided a $10 million secured revolving loan facility (the "***Vectra Credit Facility***") to the Marketing Fund Trusts.  The Vectra Credit Facility and all instruments and documents executed at any time in connection therewith, shall be referred to collectively as the "***Vectra Credit Documents***."

(ii)    *Prepetition Obligations and Vectra Obligations.*

(1) The Prepetition First Lien Facility provided the Borrower with, *inter alia*, term loans in the aggregate principal amount of $452,615,864.52.  As of the Petition Date, the outstanding principal amount owed by the Prepetition Obligors under the Prepetition First Lien Credit Agreement was no less than $444,695,086.92, plus amounts, if any, unpaid, incurred,

or accrued prior to the Petition Date in accordance with the Prepetition First Lien Credit Documents, unpaid principal, accrued and unpaid interest, any fees of the Prepetition First Lien Agent, fees, expenses, and disbursements (including, without limitation, attorneys' fees, related expenses, and disbursements), indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations pursuant to the Prepetition First Lien Credit Documents, including all "Obligations" as described in the Prepetition First Lien Credit Agreement (collectively, the "***Prepetition First Lien Obligations***").

(2) The Prepetition Second Lien Facility provided the Borrower with, *inter alia*, term loans in the aggregate principal amount of $139,193,235.59. As of the Petition Date, the outstanding principal amount owed by the Prepetition Obligors under the Prepetition Second Lien Credit Agreement was no less than $173,828,686.23, plus amounts, if any, paid, incurred, or accrued prior to the Petition Date in accordance with the Prepetition Second Lien Credit Documents, unpaid principal, accrued and unpaid interest, any fees of the Prepetition Second Lien Agent, fees, expenses, and disbursements (including, without limitation, attorneys' fees, related expenses, and disbursements), indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations pursuant to the Prepetition Second Lien Credit Documents, including all "Obligations" as described in the Prepetition Second Lien Credit Agreement (collectively, the "***Prepetition Second Lien Obligations***" and, together with the Prepetition First Lien Obligations, the "***Prepetition Obligations***").

(3) The Vectra Credit Agreement, as amended, provides the Marketing Fund Trusts with revolving loans in the aggregate principal amount of $10,000,000. As of the Petition Date, the outstanding principal amount owed by the Marketing Fund Trusts under the Vectra Credit Agreement was no less than $7,351,872.27, plus amounts, if any, paid, incurred, or accrued prior to the Petition Date in accordance with the Vectra Credit Documents, unpaid principal, accrued and unpaid interest, any fees of Vectra, fees, expenses, and disbursements (including, without limitation, attorneys' fees, related expenses, and disbursements), indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations pursuant to the Vectra Credit Documents (collectively, the "***Vectra Obligations***").

        (iii)     *Prepetition Collateral and Vectra Collateral.*

(1) To secure the Prepetition First Lien Obligations, the Borrower, Parent and the subsidiaries of Borrower that were guarantors (collectively with Parent, the "***Prepetition Guarantors***" and, collectively with Borrower, the "***Prepetition Obligors***")[4] granted to the Prepetition First Lien Lenders first-priority security interests in and liens (the "***Prepetition First Liens***") on substantially all of the assets of the Prepetition Obligors (as described in the Prepetition First Lien Credit Documents, the "***Prepetition First Lien Collateral***").

(2) The Prepetition Second Lien Obligations are secured by second-priority security interests in and liens (the "***Prepetition Second Liens***" and, together with the Prepetition First Liens, the "***Prepetition Liens***") on the Prepetition First Lien Collateral (as

---

[4] Each of the Debtors is a Prepetition Obligor except for Debtors National Marketing Fund Trust and Regional Advertising Trusts (collectively, the "***Marketing Fund Trusts***"). Quiz-DIA LLC is a non-Debtor affiliate of the Debtors and is a guarantor of the Prepetition First Lien Credit Documents.

described in the Prepetition Second Lien Credit Documents, the "***Prepetition Second Lien Collateral***" or, the "***Prepetition Collateral***").

(3) The Vectra Obligations are secured by first-priority security interests in and liens (the "***Vectra Liens***") on substantially all assets of the Marketing Fund Trusts (as described in the Vectra Credit Documents, the "***Vectra Collateral***").

(iv)    *The Prepetition Liens and Vectra Liens.*  The (1) Prepetition Liens on the Prepetition Collateral and (2) Vectra Liens on the Vectra Collateral were perfected as of the Petition Date.

(v)    *Validity of the Prepetition and Vectra Liens, Claims, and Obligations.* After consultation with their attorneys and financial advisors, but subject to the provisions of paragraph 32 hereof, the Debtors, the Prepetition Agents and Vectra acknowledge and agree that: (a) (i) the Prepetition Liens and (ii) Vectra Liens are valid, binding, enforceable, non-avoidable, and perfected; (b) as of the Petition Date, (i) the Prepetition Liens had priority over any and all other liens on the Prepetition Collateral, subject only to certain liens otherwise permitted by the Prepetition Credit Documents (to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Liens as of the Petition Date, the "***Permitted Liens***")[5] and (ii) the Vectra Liens had priority over any and all other liens on the Vectra Collateral subject only to certain liens otherwise permitted by the Vectra Credit Documents (to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Vectra Liens as of the Petition Date), (c) (i) the Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition

---

[5]    Nothing herein shall constitute a finding or ruling by this Court that any such Permitted Liens are valid, senior, perfected, and non-avoidable.  Moreover, nothing shall prejudice the rights of any party in interest including, but not limited to, the Debtors, the DIP Agent, the DIP Lender, the Prepetition First Lien Agent, the Prepetition First Lien Lenders, Vectra and the Creditors Committee, if appointed, to challenge the validity, priority, perfection or extent of any such Permitted Lien and/or security interest.

Obligors, enforceable in accordance with the terms of the Prepetition Credit Documents and (ii) the Vectra Obligations constitute legal, valid, binding, and non-avoidable obligations of the Marketing Fund Trusts, enforceable in accordance with the terms of the Vectra Credit Documents, (as to (c)(i) and (ii), other than in respect of the stay of enforcement arising from Bankruptcy Code section 362); (f) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the (i) Prepetition Liens or the Prepetition Obligations or (ii) Vectra Liens or the Vectra Obligations exist, and no portion of the (x) Prepetition Liens or the Prepetition Obligations or (y) Vectra Liens or Vectra Obligations is subject to any challenge or defense, including, without limitation, avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (g) the Debtors and their estates and Quiz-DIA have no offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against any of the Prepetition Agents, the Prepetition Lenders or Vectra arising out of, based upon, or related to the Prepetition Credit Documents or the Vectra Credit Documents, respectively; (h) the Debtors and Quiz-DIA each have waived, discharged, and released any right they may have to challenge any of the (i) Prepetition Obligations or (ii) Vectra Obligations and the security for these obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action against the Prepetition Agents, the Prepetition Lenders or Vectra; and (i) any payments made on account of the (x) Prepetition Obligations to or for the benefit of the Prepetition Agents or the Prepetition Lenders prior to the Petition Date were on account of amounts in respect of which the Prepetition Agents and the Prepetition Lenders were secured, were payments out of the Prepetition Agents' and the Prepetition Lenders' Prepetition Collateral and (y) Vectra Obligations to of for the benefit of

Vectra prior to the Petition Date were on account of amounts in respect of which Vectra was secured, were payments out of the Vectra Collateral, and such payments described in (i)(x) and (y) did not diminish any property otherwise available for distribution to unsecured creditors.

(vi)     *Cash Collateral.*

(1) All of the Debtors' cash (other than the cash of the Marketing Fund Trusts), including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition First Lien Collateral, constitutes the Cash Collateral of the Prepetition First Lien Agent and the Prepetition First Lien Lenders.

(2) All of the Marketing Fund Trusts' cash, including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Marketing Fund Trusts Collateral, constitutes the Cash Collateral of Vectra as lender under the Vectra Credit Agreement.

(vii)     *Default by the Debtors*.  The Debtors acknowledge and stipulate that the Prepetition Obligors are in default of their debts and obligations under the Prepetition Credit Documents and the Vectra Credit Agreement.

F.     <u>*Findings Regarding Postpetition Financing*</u>.

(i)     *Request for Postpetition Financing*.   The Debtors seek authority to (a) enter into the DIP Facility on the terms described herein and in the DIP Documents, and (b) use Cash Collateral on the terms described herein to administer their Cases and fund their operations.   At the Final Hearing, the Debtors will seek final approval of the proposed postpetition financing arrangements and use of Cash Collateral arrangements pursuant to a proposed final order (the "***Final Order***"), which shall be in form and substance acceptable to the DIP Agent, the Prepetition First Lien Agent, and as to provisions that directly affect it, Vectra

and notice of which Final Hearing and Final Order will be provided in accordance with this Interim Order.

(ii)   *Priming of Prepetition Liens*.  The priming of all prepetition liens against assets of the Debtors (except for those expressly excluded by this Interim Order or the DIP Documents), including the Prepetition First Liens, under Bankruptcy Code section 364(d), as contemplated by the DIP Facility and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses for the benefit of the estates and their creditors.  The Prepetition First Lien Agent and the Prepetition First Lien Lenders are entitled to receive adequate protection as set forth in this Interim Order, pursuant to Bankruptcy Code sections 361, 363, and 364, for any diminution in the value of their interest in the Prepetition First Lien Collateral (including Cash Collateral) resulting from the DIP Obligors' use, sale, or lease (or other decline in value) of such collateral, the imposition of the automatic stay, the priming of the Prepetition First Liens on the Prepetition First Lien Collateral, and the subordination to the Carve Out (collectively, and solely to the extent of any such diminution in value, the "***Diminution in Value***").

(iii)   *Need for Postpetition Financing and Use of Cash Collateral.*  The Debtors' need to use Cash Collateral on an interim basis and to obtain credit on an interim basis pursuant to the DIP Facility is immediate and critical in order to enable the Debtors to continue operations and to administer and preserve the value of their estates.  The ability of the Debtors to finance their operations, maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and otherwise finance their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral, the absence of either of which would immediately and irreparably harm the Debtors, their estates, and their

creditors, and the consensual, prepackaged plan of reorganization (the "***Prepackaged Plan***") that is now on file with the Bankruptcy Court.  The Debtors do not have sufficient available sources of working capital and financing to operate their business or maintain their properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral.

(iv)    *No Credit Available on More Favorable Terms.*    Given their current financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility.  The Debtors have been unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  The Debtors have also been unable to obtain credit: (a) having priority over that of administrative expenses of the kind specified in Bankruptcy Code sections 503(b), 507(a), and 507(b); (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Financing on a postpetition basis is not otherwise available without granting the DIP Agent, for the benefit of itself and the DIP Lenders: (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth in paragraph 7 hereof, (2) superiority claims and liens, and (3) the other protections set forth in this Interim Order.

(v)    *Use of Proceeds of the DIP Facility.*    As a condition to entry into the DIP Agreement, the extension of credit under the DIP Facility and the authorization to use Cash Collateral, the Debtors have agreed, that proceeds of the DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of the DIP Documents and in accordance with the Approved Budget (as defined in the DIP Agreement and as the same may be modified

from time to time consistent with the terms of the DIP Documents, the "**Budget**"), including, without limitation: (i) to provide working capital for the Debtors, (ii) for other general corporate purposes of the Debtors, and (iii) to pay (a) administration costs of the Cases and prepetition claims or amounts approved by the Bankruptcy Court, (b) all fees and expenses due to the DIP Agent and DIP Lenders and the Consenting First Lien Lenders as provided under the DIP Facility and (c) all fees and expenses due pursuant to the Restructuring Support Agreement.

G.     *Adequate Protection.*

(i)     The Prepetition First Lien Agent, for the benefit of itself and the Prepetition First Lien Lenders, are entitled to receive adequate protection to the extent of any Diminution in Value of their interest in the Prepetition First Lien Collateral (including Cash Collateral). Pursuant to Bankruptcy Code sections 361, 363, and 507(b), as adequate protection: (i) the Prepetition First Lien Agent, for the benefit of itself and the Prepetition First Lien Lenders, will receive the Adequate Protection Liens and DIP Super-Priority Claims (as defined below), which Liens and Claims shall be junior and subordinate in all respects to the Vectra Liens (defined below). In addition to the foregoing adequate protection, the Prepetition First Lien Agents and those Prepetition First Lien Lenders that are also DIP Lenders will be reimbursed by the Debtors in the ordinary course of business for all outstanding prepetition and postpetition fees and expenses that they have incurred, including, without limitation, any legal, financial advisory and other professionals or consultancy fees and expenses incurred by them in connection with the Prepetition First Lien Facility. Such adequate protection payments are not to be made with Cash Collateral of of the Marketing Fund Trusts unless and until the Vecta Claim is indefeasibly paid in full in cash.

(ii)     Vectra, is entitled to receive adequate protection to the extent of any Diminution in Value of its interest in the collateral securing the obligations under the Vectra Credit Agreement (defined below) (including Cash Collateral).   Pursuant to Bankruptcy Code sections 361, 363, and 507(b), as adequate protection Vectra will receive: (i) weekly payments of $150,000, plus (ii) interest payments, at the existing rate under the Vectra Credit Agreement, on a monthly basis and (iii) payment of Vectra's reasonable fees and expenses in accordance with the Vectra Credit Agreement (including, without limitation, attorneys' fees, related expenses, and disbursements), such adequate protection payments to be made exclusively with Cash Collateral of the Marketing Fund Trusts and not from proceeds of the DIP Facility or Cash Collateral of the other Debtors.

H.     *Sections 506(c) and 552(b)*.   In light of the subordination of (i) the DIP Agent's and the DIP Lenders' Liens and super-priority claims to the Carve Out, and (ii) the Prepetition First Liens and super-priority claims to the Carve Out and the DIP Liens (a) the Prepetition First Lien Agent and the Prepetition First Lien Lenders are entitled to, subject to entry of a Final Order, a waiver of any "equities of the case" claims under Bankruptcy Code section 552(b), and (b) subject to entry of a Final Order, the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, and the Prepetition First Lien Lenders are each entitled to a waiver of the provisions of Bankruptcy Code section 506(c).

I.     *Good Faith of the DIP Agent and the DIP Lenders*.

(i)     *Willingness to Provide Financing.*   The DIP Lenders have indicated a willingness to provide financing to the Debtors subject to: (a) the entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility and the DIP Documents; and (c) entry of findings by this Court that such financing is essential to the Debtors'

estates, that the DIP Agent and the DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Agent's and DIP Lenders' claims, super-priority claims, security interests and liens, and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided in Bankruptcy Code section 364(e) and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this Interim Order or any other order.

(ii)     *Business Judgment and Good Faith Pursuant to Section 364(e)*.   The terms and conditions of the DIP Facility and the DIP Documents, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.  The DIP Facility and the use of Cash Collateral were negotiated in good faith and at arms' length among the DIP Obligors, the DIP Agent, the DIP Lenders, certain of the Prepetition First Lien Lenders and Vectra.  Use of Cash Collateral and credit to be extended under the DIP Facility and this Interim Order shall be deemed to have been so allowed, advanced, made, used, or extended in good faith, and for valid business purposes and uses, within the meaning of Bankruptcy Code section 364(e), and the DIP Agent, the DIP Lenders and Vectra are therefore entitled to the protection and benefits of Bankruptcy Code section 364(e) and this Interim Order.

J.     *Good Cause; Immediate Entry*.   The relief requested in the Motion is necessary, essential and appropriate, and is in the best interests of and will benefit the Debtors, their estates, and their creditors and equity holders, as its implementation will, *inter alia*, provide the Debtors with the necessary liquidity to (a) minimize the disruption to the Debtors' business and ongoing operations, including in connection with the Plan, (b) preserve and maximize the value of the

Debtors' estates for the benefit of all the Debtors' creditors and equity holders, and (c) avoid immediate and irreparable harm to the Debtors, their estates, their creditors and equity holders, their businesses, their employees, and their assets.  Thus, sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

K.      _Notice_. Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, email, overnight courier, or hand delivery, to certain parties in interest, or, in lieu thereof, to their counsel, if known, including:   (i) the United States Trustee for the District of Delaware; (ii) the United States Attorney for the District of Delaware; (iii) the parties included on the Debtors' list of thirty-five (35) largest unsecured creditors on a consolidated basis; (iv) counsel to  the Prepetition First Lien Agent; (v) all persons or entities known to the Debtors that have asserted a lien or interest in any of the DIP Collateral; (vi) counsel to the DIP Agent; (vii) counsel to the DIP Lenders; (viii) counsel to Avenue Capital LLC and its affiliates; (ix) counsel to Fortress Investment Group and its affiliates; and (x) counsel to Vectra.  The parties have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in this Interim Order.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.      Interim Financing Approved. On an interim basis, the DIP Motion is granted, the Interim Financing (as defined herein) is authorized and approved, and the use of Cash Collateral is authorized, in each case subject to the terms and conditions set forth in this Interim Order.

2.    <u>Objections Overruled</u>.  All objections to the Interim Financing or entry of the Interim Order, if any, to the extent not withdrawn or resolved, are hereby overruled.

**DIP Facility Authorization**

3.    <u>Authorization of the DIP Financing</u>.  The Interim Financing (as defined below) is hereby approved.  The DIP Obligors are expressly and immediately authorized, empowered, and directed to execute and deliver the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all instruments and documents which may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Documents.  The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, fees, expenses, and other amounts described in the DIP Documents and all other documents comprising the DIP Facility as such become due and without need to obtain further Court approval, including, without limitation, closing fees, and the reasonable fees and disbursements of the attorneys, advisors, accountants, and other consultants, and the reasonable legal fees and expenses of the DIP Agent and the DIP Lenders.  All collections and proceeds, whether ordinary course or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents.  Upon execution and delivery, the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.

4.    <u>Authorization to Borrow</u>.  Until the DIP Maturity Date (as defined herein), and subject to the terms and conditions set forth in the DIP Documents, DIP Facility, and this Interim Order, and in order to prevent immediate and irreparable harm to the Debtors' estates, the Debtors are hereby authorized to draw from the DIP Facility up to $10,000,000 pursuant to this

Interim Order (the "**Interim Financing**").  Any further borrowings under the DIP Facility will be subject to the entry of the Final Order.

5.      DIP Obligations.  The DIP Obligations shall be enforceable against the Debtors, their estates, and any successors thereto, including, without limitation, any trustee appointed in the Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**"); *provided, however*, the DIP Obligations shall not be paid from the Marketing Fund Trusts until the Vectra Claim is indefeasibly paid in full in cash.  The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease on the DIP Maturity Date, except as provided in paragraph 11 herein.

6.      Postpetition Liens.  In order to secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to Bankruptcy Code sections 361, 362, 364(c)(2), 364(c)(3), and 364(d), subject only to the Permitted Liens, including, for the avoidance of doubt the Vectra Liens, and the Carve Out, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens (collectively, the "**DIP Liens**") upon all personal property, real property, assets, and rights of the DIP Obligors, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof, whether tangible or intangible, including, without limitation, (a) all personal and fixture property of every kind and nature, including all goods (including inventory, equipment, and any accessions thereto); (b) all instruments, including promissory notes; (c) all documents, including, if applicable, electronic documents; (d) all accounts, receivables and receivables records; (e) all books and records; (f) all chattel paper, whether tangible or electronic; (g) all deposit accounts;

(h) all letters of credit and letter of credit rights, whether or not the letter of credit is evidenced by a writing; (i) all commercial tort claims; (j) all securities and all other investment property; (k) all intellectual property; (1) all supporting obligations; (m) all money and any other contract rights or rights to the payment of money; (n) all insurance claims and proceeds; (o) all extracted collateral; (p) all equipment; (q) all inventory; (r) all general intangibles, including all payment intangibles; (s) the proceeds of any avoidance actions brought pursuant to Bankruptcy Code section 549 to recover any postpetition transfer of collateral; (t) subject to entry of the Final Order, the proceeds of any other claims or actions under chapter 5 of the Bankruptcy Code (subparagraphs (s) -(t), collectively, the "*Avoidance Actions*"); (u) subject to the entry of a Final Order, the Borrower's rights under Bankruptcy Code section 506(c), other than against the DIP Lenders, and the proceeds thereof; and (v) the Prepetition First Lien Collateral. (collectively, the "*DIP Collateral*").

7.    <u>DIP Lien Priority</u>. The DIP Liens securing the DIP Obligations are valid, binding, continuing, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Collateral, except that the DIP Liens shall be junior only to (i) Permitted Liens, (ii) the Carve Out and (iii) with respect to the DIP Collateral owned by the Marketing Fund Trusts, the Vectra Liens.    Pursuant to Bankruptcy Code section 364(d), the DIP Liens shall be senior to the Prepetition Liens and the Adequate Protection Liens (as defined herein) with respect to all DIP Collateral.  For purposes of this Interim Order, it shall be an Event of Default if, other than as set forth herein, the DIP Liens shall be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the

dismissal of any of the Cases or Successor Cases.  No lien or interest avoided and preserved for the benefit of the estate pursuant to Bankruptcy Code section 551 shall be *pari passu* with or senior to the DIP Liens.

8.    <u>DIP Super[6]-Priority Claims</u>.  Upon entry of this Interim Order, the DIP Agent and the DIP Lenders are hereby granted, pursuant to Bankruptcy Code section 364(c)(1), an allowed super-priority administrative expense claim in each of the Cases and any Successor Cases (collectively, the "***DIP Super-Priority Claim***") for all DIP Obligations: (a) except as set forth herein, with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114, and any other provision of the Bankruptcy Code, as provided under Bankruptcy Code section 364(c)(1); and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.  Notwithstanding the foregoing, the DIP Super-Priority Claim shall be subject to the Carve Out and with respect to the Estates of the Marketing Fund Trusts, the Vectra Claim.  The allowed DIP Super-Priority Claim shall be payable from and have recourse to all pre- and postpetition property of the Debtors and all proceeds thereof, including, upon entry of a Final Order, any proceeds or property recovered in connection with the pursuit of Avoidance Actions; *provided, however*, that the DIP Agent and the DIP Lenders agree that the

---

[6]    The claim arising as a result of the Marketing Fund Trusts' obligations to Vectra, as agent under the Vectra Credit Agreement, that are secured by the Vectra Liens shall hereafter be referred to as the "***Vectra Claim***."

DIP Super-Priority Claim shall not be paid from the Marketing Fund Trusts until the Vectra Claim is indefeasibly paid in full in cash.

9.      <u>No Obligations to Extend Credit</u>.  The DIP Agent and the DIP Lenders shall have no obligation to make any loan or advance under the DIP Documents, unless all of the conditions precedent to the making of such extension of credit under the DIP Documents and this Interim Order have been satisfied in full or waived by the DIP Agent in its sole discretion.

10.     <u>Use of DIP Facility Proceeds</u>.  From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order, the DIP Documents, and in compliance with the Budget, subject to the permitted variances set forth in the DIP Documents.  Immediately upon entry of the Interim Order, the Debtors are authorized to draw upon the DIP Facility subject to the terms and conditions of this Interim Order and the DIP Documents.

**Authorization to Use Cash Collateral**

11.     <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Interim Order, the DIP Facility, and the DIP Documents, and in accordance with the Budget, the Debtors are authorized to use Cash Collateral until the DIP Maturity Date.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates or by a Non-Debtor Subsidiary Loan Party, outside the ordinary course of business, or any Debtor's or a Non-Debtor Subsidiary Loan Party's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the DIP Facility, the DIP Documents, and in accordance with the Budget, subject to the permitted variances set forth in the DIP Documents. Notwithstanding the foregoing or anything to the contrary herein, the Cash Collateral of the Marketing Fund Trusts shall not be used for any purpose other than to make required payments under the Vectra Credit Agreement, to make adequate protection payments set forth in this order

or to make payments to the Marketing Fund Trusts ordinary course trade vendors and creditors in accordance with past practices until the Vectra Claim has been indefeasibly paid in full in cash.

        12.    <u>Adequate Protection Liens</u>.

        (a)    <u>Adequate Protection Liens</u>.  Pursuant to Bankruptcy Code sections 361, 363(e), and 364(d), as adequate protection of the interests of the Prepetition First Lien Agent and the Prepetition First Lien Lenders in the Prepetition First Lien Collateral against any Diminution in Value of such interests in the Prepetition First Lien Collateral on account of the granting of the DIP Liens, the Debtors' use of Cash Collateral and sale, lease or use of other Prepetition First Lien Collateral, and the imposition of the automatic stay, the Debtors hereby grant to the Prepetition First Lien Agent, for the benefit of itself and the Prepetition First Lien Lenders, continuing valid, binding, enforceable, and perfected postpetition security interests in and liens on the DIP Collateral (the "***Adequate Protection Liens***") to the extent of any Diminution in Value.

        (b)    <u>Priority of Adequate Protection Liens</u>.

        (i)    The Adequate Protection Liens shall be junior only to: (A) Permitted Prior Liens (B) the Carve Out, (C) the DIP Liens and (D) the Vectra Liens.  The Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the DIP Collateral,

        (ii)    For purposes of this Interim Order, it shall be an Event of Default if, except as provided herein, the Adequate Protection Liens shall be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases. No lien or

interest avoided and preserved for the benefit of the estate pursuant to Bankruptcy Code section 551 shall be *pari passu* with or senior to the Prepetition Liens or the Adequate Protection Liens,

(iii)    The Adequate Protection Liens shall be subject to the reservation of rights set forth in paragraph 32 of this Interim Order.

13.    Adequate Protection Super-Priority Claims.

(a)    Adequate Protection Super-Priority Claim.    As further adequate protection of the interests of the Prepetition First Lien Agent and the Prepetition First Lien Lenders in the Prepetition First Lien Collateral against any Diminution in Value of such interests in the Prepetition First Lien Collateral on account of the granting of the DIP Liens, the DIP Obligors' use of Cash Collateral, the use, sale, or lease of any other Prepetition First Lien Collateral, and the imposition of the automatic stay, the Prepetition First Lien Agent and the Prepetition First Lien Lenders are each hereby granted as and to the extent provided by Bankruptcy Code section 507(b) an allowed super-priority administrative expense claim in each of the Cases and any Successor Cases (the "***Adequate Protection Super-Priority Claim***").

(b)    Priority of the Adequate Protection Super-Priority Claims. Except as set forth herein, the Adequate Protection Super-Priority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114; *provided. however*, that: the Adequate Protection Super-Priority Claim shall be (A) subject to the reservation of rights set forth in paragrah 32 of

this Interim Order and (B) junior to (i) the DIP Super-Priority Claim; (ii) the Carve Out; and (iii) the Vectra Claim and shall not be paid from the Marketing Fund Trusts until the Vectra Claim is indefeasibly paid in full in cash.

14.     <u>Vectra Adequate Protection</u>.  As adequate protection for any Diminution in Value of the collateral securing the Vectra Claim, Vectra, in its capacity as administrative agent under the Vectra Credit Agreement, shall be entitled to payments from the Marketing Fund Trusts as follows: (a) weekly payments of $150,000 (which shall reduce outstanding amount of the Vectra Claim), plus (b) interest payments, at the existing rate under the Vectra Credit Agreement, on a monthly basis and (c) payment of Vectra's reasonable fees and expenses in accordance with the Vectra Credit Agreement, such adequate protection payments to be made exclusively with Cash Collateral of the Marketing Fund Trusts, and not from proceeds of the DIP Facility or Cash Collateral of the other Debtors.

15.     <u>Reimbursement of Fees and Expenses of Prepetition First Lien Agent and Prepetition Lenders</u>.  The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the reasonable unpaid prepetition and postpetition fees and disbursements of the Prepetition First Lien Agent, including any fees of the attorneys, advisors, accountants, and other consultants of the Prepetition First Lien Agent, those Prepetition First Lien Lenders that are also DIP Lenders and, subject to the restrictions set forth in paragraph G.(ii) above, Vectra, including any fees of its attorneys.  Any payment to any such party shall be made within seven (7) business days following such party's delivery of an invoice to the Debtors or their bankruptcy counsel.  Failure to make such payments shall be an Event of Default (or a Vectra Event of Default, as the case may be) under this Order.

16.   <u>Credit Bidding</u>.   Subject to, and effective upon entry of, the Final Order, as additional adequate protection, (i) the Prepetition First Lien Agent (on behalf of the First Lien Lenders), acting at the direction of the Prepetition First Lien Lenders to the extent provided for under the Prepetition First Lien Credit Documents, and subject to the rights of the DIP Agent, shall have the right to "credit bid" the amount of the Prepetition First Lien Obligations in connection with any sale of the Prepetition First Lien Collateral including without limitation, any sale pursuant to Bankruptcy Code section 363 or included as part of any plan of reorganization subject to confirmation under Bankruptcy Code section 1129(b) and (ii) Vectra, to the extent provided for under the Vectra Credit Agreement, shall have the right to "credit bid" the amount of the Vectra Claim in connection with any sale of the Vectra Collateral owned by the Marketing Fund Trusts, including without limitation, any sale pursuant to Bankruptcy Code section 363 or included as part of any plan of reorganization subject to confirmation under Bankruptcy Code section 1129(b).

**Provisions Common to DIP Financing**
**and Use of Cash Collateral Authorizations**

17.   <u>Amendments of the DIP Documents</u>.   The Debtors, the DIP Agent, and the DIP Lenders are hereby authorized to implement, in accordance with the terms of the DIP Documents, any nonmaterial modifications (including, without limitation, any change to the number or composition of the DIP Lenders) of the DIP Documents without further order of this Court, or any other modifications to the DIP Documents; *provided, however*, that subject to entry of a Final Order, notice of any material modification or amendment to the DIP Documents shall be provided to counsel for a Creditors Committee, if appointed in these Cases, the Prepetition First Lien Agent, Vectra, Avenue, Fortress and the U.S. Trustee, each of whom shall have five (5) days from the date of such notice within which to object, in writing, to such modification or

amendment.  If any party timely objects to any material modification or amendment to the DIP Documents, such modification or amendment shall only be permitted pursuant to an order of this Court.  The foregoing shall be without prejudice to the Debtors' right to seek approval from the Court of a material modification on an expedited basis.

18.     Budget Maintenance.  The Budget and any modification or amendment thereof shall be in form and substance reasonably acceptable to the Required Lenders (as defined in the DIP Agreement) and approved by the Required Lenders in their reasonable discretion.  The Budget may be amended or modified in writing from time to time only with the written consent of the Required Lenders in their reasonable discretion.  A copy of the Budget shall also be provided to Vectra.

19.     Modification of the Automatic Stay.  The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to:  (a) permit the Debtors to grant the DIP Liens, the Adequate Protection Liens, the DIP Super-Priority Claim, and the Adequate Protection Super-Priority Claim; (b) permit the Debtors to perform such acts as the DIP Agent, the DIP Lenders, or the Prepetition First Lien Agent may request in their sole discretion to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agent, the DIP Lenders and the Prepetition First Lien Agent and the Prepetition First Lien Lenders under the DIP Documents, the DIP Facility, and this Interim Order, and Vectra under this Interim Order; and (d) authorize the Debtors to pay and the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, those Prepetition First Lien Lenders that are DIP Lenders, and Vectra to retain and apply payments made in accordance with the terms of this Interim Order.

20.    <u>Perfection of DIP Liens and Adequate Protection Liens</u>.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document, which may otherwise be required under the law or regulation of any jurisdiction, or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Adequate Protection Liens, or to entitle the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, and the Prepetition First Lien Lenders to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent and each of the Prepetition First Lien Agent are authorized to file, as each, in its sole discretion deems necessary, such financing statements, mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and the Adequate Protection Liens, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the Adequate Protection Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Agent and the Prepetition First Lien Agent all such financing statements, mortgages, notices, and other documents as the DIP Agent or the Prepetition First Lien Agent may request.  The DIP Agent and the Prepetition First Lien Agent, each in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instrument.

21.      <u>Proceeds of Subsequent Financing</u>.  If the Debtors, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in these Cases or any Successor Cases, shall obtain credit or incur debt in violation of the DIP Documents at any time prior to the indefeasible repayment in full of the DIP Facility and the termination of the DIP Agent's and the DIP Lenders' obligation to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to any or all of the Debtors, the Debtors' estates and the Non-Debtor Subsidiary Loan Parties, and such facilities are secured by any DIP Collateral, then cash proceeds derived from such credit or debt shall be used to the extent necessary to indefeasibly repay in full the DIP Obligations.

22.      <u>Maintenance of DIP Collateral</u>.  Until the indefeasible payment in full of all DIP Obligations and all Prepetition First Lien Obligations and the termination of the DIP Agent's and the DIP Lenders' obligation to extend credit under the DIP Facility, the Debtors shall:  (a) insure the DIP Collateral as required under the DIP Facility or the Prepetition Facilities, as applicable; and (b) maintain the cash management system in effect as of the Petition Date, as modified by any order that may be entered by the Court, to which each of the DIP Agent and Vectra (to the extent Vectra's rights are adversely affected) has first agreed, or as otherwise required by the DIP Documents..

23.      <u>DIP Maturity Date</u>.  Subject to the DIP Agreement, borrowings under the DIP Facility shall be repaid in full, and the commitment to fund the DIP Facility shall terminate, on the earliest to occur (the "***DIP Maturity Date***") of: (i) 120 days from the Closing Date, (ii) the earlier of the effective date and the date of the substantial consummation of a plan of reorganization ("***Plan***") in the Cases that has been confirmed by an order of the Bankruptcy Court and to which the First Lien Prepetition Lenders that are DIP Lenders have consented, (iii)

the date the Bankruptcy Court orders the conversion of any of the Cases to a chapter 7 case, (iv) the acceleration of the loans or termination of the commitments under the DIP Facility, including, without limitation, as a result of the occurrence of an Event of Default and (v) the date that is 30 days after entry of this Interim Order if the Final Order has not been entered by such date.

24.     <u>Events of Default</u>.   The occurrence of an "Event of Default" under the DIP Documents shall constitute an Event of Default under this Interim Order, unless waived in writing by the Required Lenders.  Failure of the Debtors to comply with obligations to Vectra under the terms of this Interim Order, which failure remains uncured for a period of five (5) business days after receipt of written notice by Vectra to the Debtors of such failure, shall constitute a "***Vectra Event of Default***", unless waived in writitng by Vectra.

25.     <u>Rights and Remedies upon Event of Default</u>.  Immediately upon the occurrence of an Event of Default, (i) the DIP Agent may declare (1) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (2) the termination, reduction, or restriction of any further commitment to extend credit to the DIP Obligors to the extent any such commitment remains, and (3) the termination of the DIP Agreement and any other DIP Document as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations; and (ii) the DIP Agent and the Prepetition First Lien Agent may declare a termination, reduction, or restriction on the ability of the DIP Obligors' ability to use any Cash Collateral derived solely from the proceeds of the DIP Collateral (any such declaration, shall be referred to herein as "***Termination Declaration***").  The Termination Declaration shall be given by facsimile (or other electronic means) to counsel to the Debtors, counsel to Avenue, counsel to Fortress, counsel to Vectra, respective counsel to any Creditors

Committee and the U.S. Trustee (and the earliest date any such Termination Declaration is made shall be referred to herein as the "***Termination Declaration Date***").   Any automatic stay otherwise applicable to the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, and the Prepetition First Lien Lenders is hereby modified so that five (5) business days after the Termination Declaration Date (the "***Remedies Notice Period***"), (A) the DIP Agent and the DIP Lenders shall be entitled to exercise their rights and remedies in accordance with the DIP Documents and this Interim Order and shall be permitted to satisfy the DIP Super-Priority Claim and the DIP Liens, subject to the Carve Out and, with respect to the Marketing Fund Trusts, the Vectra Liens and the Vectra Claim, and (B) to the extent any Prepetition First Lien Obligations remain outstanding, the Prepetition First Lien Agent and Prepetition First Lien Lenders shall be entitled to exercise their rights and remedies to satisfy the Prepetition First Lien Obligations, the DIP Super-Priority Claim, and the Adequate Protection Liens, subject to the Carve Out and, with respect to the Marketing Fund Trusts, the Vectra Liens and the Vectra Claim.   During the Remedies Notice Period, the Debtors and/or any Creditors Committee shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court solely for the purpose of contesting whether an Event of Default has occurred, and the DIP Obligors waive their right to, and shall not be entitled to seek from the Court relief, including, without limitation, under Bankruptcy Code section 105, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Agent, on behalf of the DIP Lenders, set forth in this Interim Order or the DIP Documents.   Unless the Court determines during the Remedies Notice Period that an Event of Default has not occurred, the automatic stay, as to all of the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, and the Prepetition First Lien Lenders, shall automatically be terminated at the end of the Remedies Notice Period without further notice or

order.  Upon expiration of the Remedies Notice Period, the DIP Agent and the Prepetition First Lien Agent shall be permitted to exercise all remedies set forth herein, in the DIP Agreement, the DIP Documents, the Prepetition First Lien Credit Documents, and as otherwise available at law without further order or application or motion to the Court, and without restriction or restraint by any stay under Bankruptcy Code sections 362 or 105, or otherwise, against the enforcement of the liens and security interest or any other rights and remedies granted to any of the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, and the Prepetition First Lien Lenders pursuant to the DIP Agreement, the DIP Documents, the Prepetition First Lien Credit Documents, or this Interim Order.  Upon the occurrence of a Vectra Event of Default, Vectra may declare a termination, reduction, or restriction on the ability of the Debtors to use any Cash Collateral derived solely from the Vectra Collateral ("***Vectra Termination Declaration***").  The Vectra Termination Declaration shall be given by facsimile (or other electronic means) to counsel to the Debtors, counsel to the DIP Agent, counsel to the Prepetition First Lien Agent counsel to Avenue, counsel to Fortress, respective counsel to any Creditors Committee and the U.S. Trustee (and the earliest date any such Termination Declaration is made shall be referred to herein as the "***Vectra Termination Declaration Date***").   Any automatic stay otherwise applicable to Vectra is hereby modified so that five (5) business days after the Vectra Termination Declaration Date, Vectra may terminate, reduce, or restrict the ability of the Debtors to use any Cash Collateral derived solely from the Vectra Collateral.  Notwithstanding anything else in this Interim Order, the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent or the Prepetition First Lien Lenders may not recover from the Cash Collateral of the Marketing Fund Trusts on account of any Event of Default, under this Interim Order, the DIP Documents,

or the Prepetition First Lien Credit Documents, until the Vectra Claim has been paid indefeasibly in full in cash.

26. <u>Good Faith Under Bankruptcy Code Section 364(e); No Modification or Stay of This Interim Order</u>.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with Bankruptcy Code section 364(e), in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, each of the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent and the Prepetition First Lien Lenders are entitled to the protections provided in Bankruptcy Code section 364(e).  Any liens or claims granted to the DIP Agent and the DIP Lenders hereunder arising prior to the effective date of any such modification, amendment, or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

27. <u>DIP and Other Expenses</u>.  The Debtors are authorized and directed to pay all reasonable out-of-pocket expenses of the DIP Agent and the DIP Lenders in connection with the DIP Facility, as provided in the DIP Documents, whether or not the transactions contemplated hereby are consummated, including, without limitation, legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and indemnification and reimbursement of fees and expenses.  Payment of all such fees and expenses shall not be subject to allowance by the Court, *provided, however*, that such payments shall be subject to the restrictions on the use of Cash Collateral set forth in this Interim Order, including, but not limited to, paragraph 11 and that the Court shall have jurisdiction to determine any dispute concerning such fees and expenses subject to the terms of this Interim Order.  The

Debtors shall pay the reasonable and documented fees and expenses provided for in this paragraph 27 within ten (10) days following receipt of invoices therefor by the Debtors, the counsel for the Creditors' Committee (if any) and the U.S. Trustee, *provided* that, upon any objection to the reasonableness of such fees, the Debtors shall pay all amounts that are not the subject of such objection within the ten (10) day period and shall pay the balance following the resolution of such objection or upon an order of the Court.

28.     <u>Proofs of Claim</u>.   Subject to entry of the Final Order, the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, the Prepetition First Lien Lenders and Vectra will not be required to file proofs of claim in any of the Cases or Successor Cases for any claim allowed herein.   Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases to the contrary, the Prepetition First Lien Agent, on behalf of itself and the Prepetition First Lien Lenders, is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in each of the Cases or Successor Cases for any claim allowed herein.   Any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases shall not apply to the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, the Prepetition First Lien Lenders or Vectra.

29.     <u>Rights of Access and Information</u>.   Without limiting the rights of access and information afforded the DIP Agent and the DIP Lenders under the DIP Documents, the DIP Obligors shall be, and hereby are, required to afford representatives, agents, and/or employees of the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent and Vectra, reasonable access to the DIP Obligors' premises and their books and records in accordance with the DIP Documents, the Prepetition First Lien Credit Documents and the Vectra Credit Documents, as

applicable, and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.   In addition, the Debtors authorize their independent certified public accountants, financial advisors, investment bankers, and consultants to cooperate, consult with, and provide to the DIP Agent all such information as may be reasonably requested with respect to the business, results of operations, and financial condition of any DIP Obligor.

      30.    Carve Out.

      (a)    Carve Out.  The Debtors' obligations to the DIP Lenders and the liens and Super-Priority Claims granted as provided herein shall be subject in each case only to a carve out (the "***Carve Out***") which shall equal the sum total of (i) all statutory fees payable to the clerk of the Bankruptcy Court or the United States Trustee pursuant to 28 U.S.C. § 1930; (ii) allowed professionals fees, expenses and disbursements incurred prior to the Termination Declaration Date, regardless of when allowed, by (x) professionals of the estates retained by final order of the Court (which order has not been vacated or stayed, unless the stay has been vacated), including professionals of the Debtors employed under Bankruptcy Code sections 327, 328 or 363 ("***Estate Professionals***") and (y) professionals of a Creditors' Committee, if any   (including the reimbursement of expenses allowed by the Bankruptcy Court incurred by a Creditors Committee member in the performance of its duties, but excluding fees and expenses of third party professionals employed by such members and, together with the Estate Professionals, the "***Case Professionals***"); and (iii) the allowed and unpaid professional fees, expenses and disbursements incurred on or after the date the Termination Declaration Date under Bankruptcy Code section 327 or 1103(a), in the aggregate not to exceed $500,000 for Case Professionals.

(b)     <u>Payment of Professional Fees</u>.   Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Case Professionals or shall affect the right of the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent,   the Prepetition First Lien Lenders and/or Vectra to object to the allowance and payment of such fees and expenses.   The DIP Agent and the DIP Lenders shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Case Professionals incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate in any way the DIP Agent or the DIP Lenders to pay compensation to or to reimburse expenses of any Case Professional, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(c)     <u>Payment of Carve Out After Termination Declaration Date</u>.   Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any allowed fees of Case Professionals (exclusive of the application of any retainers by any of the Case Professionals) incurred on or after the occurrence of the Termination Declaration Date shall permanently reduce the applicable Carve Out on a dollar-for-dollar basis.   Any funding of the Carve Out shall be added to and made a part of the DIP Obligations and secured by the DIP Collateral and otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

31.     <u>Limitations on the DIP Facility, the DIP Collateral, the Cash Collateral, and the Carve Out</u>.  The DIP Facility, the DIP Collateral, the Cash Collateral, and the Carve Out may not be used in connection with: (a) subject to the Debtors' right to seek an emergency hearing pursuant to paragraph 23 above, preventing, hindering, or delaying any of the DIP Agent's, the

DIP Lenders', the Prepetition First Lien Agent's, or the Prepetition First Lien Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred; (b) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral without the consent of the Required Lenders; (c) for any purpose that is prohibited under the Bankruptcy Code, this Order or the DIP Documents; (d) the funding or payment in any way of any adversary action, suit, arbitration, proceeding, application, motion or other litigation or challenge of any type adverse to the interest of any or all of the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, the Prepetition First Lien Lenders, the Second Lien Agent, the Second Lien Lenders or Vectra or their respective rights and remedies under the DIP Documents, the Interim Order, the Final Order, the Prepetition First Lien Credit Documents, the Prepetition Second Lien Credit Documents or Vectra Credit Agreement, as applicable; (e) except as expressly required by the DIP Documents, the Interim Order or the Final Order, for the payment of fees, expenses, interest or principal under the Prepetition First Lien Credit Documents; and (f) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Agent acting at the direction of the Required Lenders; *provided, however*, that the Carve Out and such collateral proceeds and loans under the DIP Documents may be used for allowed fees and expenses, in an amount not to exceed $25,000 in the aggregate, incurred solely by the Creditors Committee, if appointed, in investigating the validity, enforceability, perfection, priority, or extent of the Prepetition Obligations and Prepetition Liens and Vectra Obligations and Vectra Liens during the Challenge Period (as defined herein).

32.     <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>. Nothing in this Interim Order or the DIP Documents shall prejudice the rights of a Creditors

Committee, if appointed, to seek to object to or to challenge the findings, the Debtors'
Stipulations, or any other stipulations herein, including, but not limited to, those in relation to:
(a) the validity, extent, priority, or perfection of the mortgage, security interests, and liens of
(i) the Prepetition First Lien Agent with respect to the Prepetition First Lien Collateral, (ii) the
Prepetition Second Lien Agent with respect to the Prepetition Second Lien Collateral or
(iii) Vectra with respect to the Vectra Collateral; or (b) the validity, allowability, priority, fully-
secured status, or amount of (i) the Prepetition First Lien Obligations, (ii) the Prepetition Second
Lien Obligations or (iii) the Vectra Obligations (any of the foregoing, a "***Challenge***").   A
Creditors Committee, if appointed, must commence, as appropriate, without limitation, any claim
against the Prepetition Agents, a Prepetition Lender or Vectra in the nature of a setoff,
counterclaim, or defense to the Prepetition Obligations or Vectra Obligations, through counsel to
the Creditors Committee, by the earlier of (i) seventy-five (75) calendar days following the date
of entry of this Interim Order or (ii) the date by which the Court enters an order confirming any
plan of reorganization (the "***Challenge Period***").   The Challenge Period identified in (i) and (ii)
above may be extended by order of the Court after notice and a hearing.   Upon the expiration of
such Challenge Period, to the extent not otherwise waived or barred:   (A) any and all such
challenges and objections by any party (including, without limitation, a Creditors Committee,
any chapter 11 trustee, and/or any examiner appointed in these Cases, and any chapter 7 trustee
and/or examiner appointed in any Successor Case), shall be deemed to be forever waived and
barred; (B) all of the Debtors' Stipulations, waivers, releases, affirmations, and other stipulations
as to the priority, extent, and validity of the Prepetition Agents, the Prepetition Lenders' or
Vectra's claims, liens, and interests of any nature, under the Prepetition Credit Documents or
Vectra Credit Documents, as applicable or otherwise incorporated or set forth in this Interim

Order, shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy estates, and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases; and (C) without further order of the Court, the Prepetition Obligations and Vectra Obligations shall be allowed in full for all purposes in connection with these Cases and any Successor Cases.  Upon a successful challenge brought pursuant to this paragraph, the Court may fashion any appropriate remedy.  For the avoidance of doubt, if the Creditors Committee determines that there exist a Challenge with respect to the Prepetition Lenders or Vectra, the Creditors Committee must file a motion or other action seeking standing to pursue such Challenge, and shall have only until the expiration of the Challenge Period to file an objection or otherwise initiate an appropriate action setting forth the basis of the Challenge after successfully seeking standing to pursue such Challenge.  Nothing herein shall or shall be deemed to confer standing on the Creditors Committee or any other party to initiate any action with respect to a Challenge.

33.     <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

34.     <u>Section 506(c) Claims</u>.  Subject to entry of a Final Order, no costs or expenses of administration, which have been or may be incurred in the Cases at any time, shall be charged against the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent or the Prepetition First Lien Lenders or Vectra, or any of their respective claims, the DIP Collateral, or the Prepetition First Lien Collateral pursuant to Bankruptcy Code sections 105 or 506(c), or otherwise, without the prior written consent, as applicable, of the Required Lenders, the Prepetition First Lien Agent

or the Prepetition First Lien Lenders, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

35.   <u>No Marshaling/Application of Proceeds</u>.  Subject to entry of a Final Order, the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, and the Prepetition First Lien Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition First Lien Collateral, as the case may be, and proceeds shall be received and applied pursuant to the terms of the DIP Credit Documents notwithstanding any other agreement or provision to the contrary, *provided, however*, that nothing herein shall impair the rights of the DIP Agent or DIP Lenders with respect to the DIP Collateral; *provided*, *further*, *however*, that with respect to the assets of the Marketing Fund Trusts, any proceeds of the Vectra Collateral shall only be applied to the Vectra Obligations pursuant to the terms of the Vectra Credit Documents unless and until the Vectra Obligations have been  indefeasibly paid in full in cash.

36.   <u>Section 552(b)</u>.  Subject to entry of a Final Order, the Prepetition First Lien Agent, the Prepetition First Lien Lenders and Vectra shall each be entitled to all of the rights and benefits of Bankruptcy Code section 552(b), and the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to the Prepetition First Lien Agent, any Prepetition First Lien Lender or Vectra, with respect to the proceeds, product, offspring, or profits of any of the Prepetition First Lien Collateral or the Vectra Collateral, as applicable.

37.   <u>Joint and Several Liability</u>.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the DIP Obligors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Facility and the DIP Documents; *provided*, *however*,

that only the Marketing Fund Trusts shall be liable for payments to be made to Vectra pursuant to this Interim Order.

38.    <u>Discharge Waiver</u>.  The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of Bankruptcy Code section 1141(d), unless the DIP Obligations have been indefeasibly paid in full in cash on or before the effective date of a confirmed plan of reorganization.  None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the indefeasible payment in full in cash, on or prior to the earliest to occur of the effective date of such plan and the DIP Maturity Date, of all DIP Obligations.

39.    <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not impair or constitute a waiver, expressly or implicitly, of,:  (a) the DIP Agent's the DIP Lenders', the Prepetition First Lien Agent's, and the Prepetition First Lien Lenders' and Vectra's rights to seek any other or supplemental relief, including additional adequate protection, in respect of the Debtors and their assets; (b) any of the rights of any of the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, the Prepetition First Lien Lenders and/or Vectra under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of Bankruptcy Code section 362, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of Bankruptcy Code section 1121, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Agent, the DIP Lenders, the Prepetition First

Lien Agent, the Prepetition First Lien Lenders and Vectra. The consent of the Prepetition First Lien Agent and Prepetition First Lien Lenders to the priming of the Prepetition First Lien Agent's liens on the Prepetition First Lien Collateral by the DIP Liens and the Carve Out (a) is limited to the DIP Loans and the Carve Out and (b) does not constitute, and shall not be construed as constituting, an acknowledgement or stipulation by the Prepetition First Lien Agent or the Prepetition First Lien Lenders that, absent such consent, their interests in the Prepetition First Lien Collateral would be adequately protected pursuant to this Order. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', a Creditors Committee, if appointed, or any other party in interest's right to oppose any of the relief requested in accordance with the first sentence of this paragraph except as expressly set forth in this Interim Order.

40.    No Waiver by Failure to Seek Relief.  The delay by or failure of the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, any Prepetition First Lien Lender or Vectra to seek relief or otherwise exercise their respective rights and remedies, as applicable, under this Interim Order, the DIP Documents, the Prepetition First Lien Credit Documents, the Vectra Credit Agreement or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Debtors, the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, the Prepetition First Lien Lenders, Vectra, a Creditors Committee, if appointed, or any party in interest.

41.    Binding Effect of Interim Order.  Immediately upon execution by this Court, the terms and provision of this Interim Order shall be become valid and binding upon and inure to the benefit of the Debtors, the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, the

Prepetition First Lien Lenders, Vectra, all other creditors of any of the Debtors, a Creditors Committee, if appointed, or any other court-appointed committee appointed in the Cases, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

42.   <u>No Modification of Interim Order</u>.   Until and unless the DIP Obligations have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility have been terminated, but subject to the express protections afforded Vectra, the Vectra Liens and the Vectra Claim by this Interim Order, an Event of Default shall occur if the Debtors seek or consent to, directly or indirectly: (a) without the prior written consent of the Required Lenders,  (i) any modification, stay, vacatur, or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Bankruptcy Code sections 503(b), 507(a), 507(b), or, subject to the entry of the Final Order, Bankruptcy Code 506(c)) in any of the Cases or Successor Cases, equal or superior to the DIP Super-Priority Claim, or Adequate Protection Super-Priority Claim, other than the Carve Out (or, with respect to the Marketing Fund Trusts, the Vectra Claim); (b) without the prior written consent of the Required Lenders and the Prepetition First Lien Agent, for any order allowing use of Cash Collateral (other than as permitted during the Remedies Notice Period) resulting from DIP Collateral or Prepetition First Lien Collateral; (c) without the prior written consent of the Required Lenders, any lien on any of the DIP Collateral with priority equal or superior to the

DIP Liens, except as specifically provided in the DIP Documents; (d) without the prior written consent of the Prepetition First Lien Agent, any lien on any of the DIP Collateral with priority equal or superior to the Prepetition First Liens, or the Adequate Protection Liens; or (e) without the prior written consent of Vectra, (i) any modification, stay, vacatur, or amendment to this Interim Order to the extent that the foregoing adversely affects Vectra's rights hereunder; (ii) any lien on any of the Vectra Collateral with priority equal or superior to the Vectra Liens, (iii) for any order allowing use of Cash Collateral resulting from Vectra Collateral (other than as expressly permitted in this Interim Order), (iv) a priority claim for any administrative expense or unsecured claim against the Marketing Fund Trusts (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Bankruptcy Code sections 503(b), 507(a), 507(b), or, subject to the entry of the Final Order, Bankruptcy Code 506(c)) in any of the Marketing Fund Trusts Cases or Marketing Fund Trusts Successor Cases, equal or superior to the Vectra Claim.  No such consent shall be implied by any other action, inaction, or acquiescence, as applicable, of the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent,  the Prepetition First Lien Lenders or Vectra.

43.    <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered; (a) confirming any plan of reorganization in any of the Cases; (b) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases or Successor Cases.  The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the DIP Agent, the DIP Lenders, the Prepetition First Lien Agent, the Prepetition First Lien Lenders, the Second Lien Agent, the Second Lien Lenders and Vectra

pursuant to this Interim Order and/or the DIP Documents, notwithstanding the entry of any such order, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until, in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP Documents and this Interim Order, have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility are terminated.  In addition, the terms and provisions of this Interim Order shall continue in full force and effect for the benefit of the Prepetition First Lien Agent, the Prepetition First Lien Lenders and Vectra notwithstanding the repayment in full of or termination of the DIP Obligations.

44.    Order Governs.  In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents, the provisions of this Interim Order shall govern.

45.    Final Hearing.  The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for _____, 2014 at _____ before the Honorable _____, United States Bankruptcy Judge, in Courtroom ___ at the United States Bankruptcy Court for the District of Delaware.  On or before _____, 2014, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "***Final Hearing Notice***"), together with copies of this Interim Order and the DIP Motion, on:  (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; and (c) counsel for the Creditors Committee, if any.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on _____, 2014 at 4:00 p.m.

(Prevailing Eastern Time), which objections shall be served so as to be received on or before such date by:  (i) counsel to the Debtors, (a) Akin, Gump, Strauss, Hauer & Feld LLP; Attn: Ira S. Dizengoff and Philip C. Dublin, and (b) Richards Layton & Finger LLP; Attn: Mark D. Collins and Amanda Steele; (ii) counsel for the DIP Agent and the Prepetition First Lien Agent, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036, attn.: Mark R. Somerstein; (iii) counsel to the DIP Lenders: (a) Milbank Tweed Hadley & McCoy LLP; Attn: Thomas R. Kreller and David B. Zolkin and (b) Morris, Nichols, Arsht & Tunnell LLP; Attn: Robert J. Dehney; (iv) counsel to Vectra: Kasowitz Benson Torres & Friedman LLP; Attn: Adam L. Shiff and Matthew B. Stein; (v) counsel to Avenue Capital LLC and its affiliates, O'Melveny & Myers LLP, Attn:   John J. Rapisardi and Joseph Zujkowski; (vi) counsel to Fortress Investment Group and its affiliates, Skadden Arps Slate Meagher & Flom LLP, Attn: Van C. Durrer, II; (vii) counsel to the Creditors Committee, if any; and (viii) the U.S. Trustee.

46.     *Nunc Pro Tunc* Effect of This Interim Order.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

47.     Retention of Jurisdiction.  The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Dated: March ___, 2014
Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

**DIP Credit Agreement**

**FILING VERSION**

$15,000,000

DEBTOR IN POSSESSION
CREDIT AGREEMENT

Dated as of [_____], 2014

Among

QCE FINANCE LLC,

QCE LLC,
as Borrower,

THE LENDERS PARTY HERETO and

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Administrative Agent

_____

# TABLE OF CONTENTS

<u>Page</u>

ARTICLE I Definitions ...................................................................................................1

    SECTION 1.01    Defined Terms ....................................................................1
    SECTION 1.02    Terms Generally...............................................................22
    SECTION 1.03    Effectuation of Transactions ..........................................23

ARTICLE II *The Credits* ...............................................................................................23

    SECTION 2.01    Commitments...................................................................23
    SECTION 2.02    Loans and Borrowings .....................................................24
    SECTION 2.03    Requests for Borrowings..................................................24
    SECTION 2.04    [Intentionally Omitted.] ..................................................24
    SECTION 2.05    [Intentionally Omitted.] ..................................................24
    SECTION 2.06    Funding of Borrowings ...................................................24
    SECTION 2.07    [Intentionally Omitted] ...................................................25
    SECTION 2.08    Termination and Reduction of Commitments...................25
    SECTION 2.09    Evidence of Debt.............................................................25
    SECTION 2.10    [Intentionally Omitted] ...................................................26
    SECTION 2.11    Prepayment of Loans .......................................................26
    SECTION 2.12    Fees ................................................................................27
    SECTION 2.13    Interest............................................................................27
    SECTION 2.14    [Intentionally Omitted] ...................................................28
    SECTION 2.15    Increased Costs ...............................................................28
    SECTION 2.16    [Intentionally Omitted] ...................................................28
    SECTION 2.17    Taxes ..............................................................................29
    SECTION 2.18    Payments Generally; Pro Rata Treatment; Sharing of Set-offs ...............31
    SECTION 2.19    Mitigation Obligations; Replacement of Lenders.....................................33
    SECTION 2.20    No Discharge; Survival of Claim.....................................34
    SECTION 2.21    Priority and Liens Applicable to Loan Parties ..........................................34

ARTICLE III *Representations and Warranties* ..............................................................36

    SECTION 3.01    Organization; Powers.......................................................36
    SECTION 3.02    Authorization ..................................................................36
    SECTION 3.03    Enforceability..................................................................37
    SECTION 3.04    Governmental Approvals..................................................37
    SECTION 3.05    Financial Statements ........................................................37
    SECTION 3.06    No Material Adverse Effect..............................................38
    SECTION 3.07    Title to Properties; Possession Under Leases ...........................................38
    SECTION 3.08    Subsidiaries.....................................................................38

SECTION 3.09    Litigation; Compliance with Laws..............................................................39
SECTION 3.10    Federal Reserve Regulations.....................................................................39
SECTION 3.11    Investment Company Act; Public Utility Holding Company Act .............39
SECTION 3.12    Use of Proceeds.........................................................................................39
SECTION 3.13    Tax Returns................................................................................................40
SECTION 3.14    No Material Misstatements .......................................................................40
SECTION 3.15    Employee Benefit Plans .............................................................................41
SECTION 3.16    Environmental Matters...............................................................................41
SECTION 3.17    Security Documents ...................................................................................42
SECTION 3.18    Real Property and Leased Premises ..........................................................42
SECTION 3.19    Appointment of Trustee or Examiner; Liquidation ...................................42
SECTION 3.20    Labor Matters..............................................................................................42
SECTION 3.21    Insurance.....................................................................................................43
SECTION 3.22    Patriot Act ..................................................................................................43

ARTICLE IV *Conditions of Lending*..................................................................................43

SECTION 4.01    Conditions to Interim Facility....................................................................43
SECTION 4.02    Conditions to Final Facility .......................................................................46
SECTION 4.03    Conditions to Each Loan............................................................................46

ARTICLE V *Affirmative Covenants* ...................................................................................47

SECTION 5.01    Existence; Businesses and Properties ........................................................47
SECTION 5.02    Insurance.....................................................................................................48
SECTION 5.03    Taxes...........................................................................................................48
SECTION 5.04    Financial Statements, Reports, etc .............................................................49
SECTION 5.05    Litigation and Other Notices......................................................................52
SECTION 5.06    Compliance with Laws ...............................................................................52
SECTION 5.07    Maintaining Records; Access to Properties and Inspections .....................52
SECTION 5.08    Use of Proceeds..........................................................................................52
SECTION 5.09    Compliance with Environmental Laws.......................................................52
SECTION 5.10    Further Assurances; Mortgages .................................................................53
SECTION 5.11    Fiscal Year; Accounting ............................................................................55
SECTION 5.12    Cash Management Systems ........................................................................55
SECTION 5.13    Budget; Variance Reports ..........................................................................55

ARTICLE VI *Negative Covenants* ......................................................................................56

SECTION 6.01    Indebtedness................................................................................................56
SECTION 6.02    Liens............................................................................................................58
SECTION 6.03    Sale and Lease-Back Transactions.............................................................60
SECTION 6.04    Investments, Loans and Advances .............................................................60
SECTION 6.05    Mergers, Consolidations, Sales of Assets and Acquisitions......................62
SECTION 6.06    Dividends and Distributions ......................................................................64

SECTION 6.07   Transactions with Affiliates ........................................................................64
SECTION 6.08   Business of Holdco, the Borrower and the Subsidiaries ...........................66
SECTION 6.09   Limitation on Modifications of Indebtedness; Modifications of
Certificate of Incorporation, By-Laws and Certain Other
Agreements;  etc .....................................................................................67
SECTION 6.10   Financial Covenant ...................................................................................69
SECTION 6.11   Orders; Administrative Priority; Lien Priority; Payment of Claims ..........69
SECTION 6.12   Use of Cash Collateral .............................................................................69

ARTICLE VII *Events of Default* ......................................................................................70

SECTION 7.01   Events of Default .....................................................................................70

ARTICLE VIII *The Administrative Agent* .......................................................................75

SECTION 8.01   Appointment .............................................................................................75
SECTION 8.02   Delegation of Duties ................................................................................76
SECTION 8.03   Exculpatory Provisions ............................................................................76
SECTION 8.04   Reliance by Administrative Agent ............................................................77
SECTION 8.05   Notice of Default ......................................................................................77
SECTION 8.06   Non-Reliance on the Administrative Agent and Other Lenders ...............77
SECTION 8.07   Indemnification ........................................................................................78
SECTION 8.08   Agent in Its Individual Capacity ..............................................................78
SECTION 8.09   Successor Administrative Agent ..............................................................78
SECTION 8.10   [Intentionally Omitted] .............................................................................79
SECTION 8.11   Withholding Tax .......................................................................................79
SECTION 8.12   Administrative Agent Authorized Actions ...............................................79
SECTION 8.13   Administrative Agent May File Proofs of Claim .......................................79

ARTICLE IX *Miscellaneous* ...........................................................................................80

SECTION 9.01   Notices .....................................................................................................80
SECTION 9.02   Survival of Agreement .............................................................................81
SECTION 9.03   Binding Effect ..........................................................................................81
SECTION 9.04   Successors and Assigns ............................................................................81
SECTION 9.05   Expenses; Indemnity ................................................................................85
SECTION 9.06   Right of Set-off ........................................................................................88
SECTION 9.07   Applicable Law ........................................................................................88
SECTION 9.08   Waivers; Amendment ...............................................................................88
SECTION 9.09   Interest Rate Limitation ...........................................................................90
SECTION 9.10   Entire Agreement .....................................................................................90
SECTION 9.11   WAIVER OF JURY TRIAL .....................................................................90
SECTION 9.12   Severability ..............................................................................................91
SECTION 9.13   Counterparts .............................................................................................91
SECTION 9.14   Headings ..................................................................................................91

SECTION 9.15    Jurisdiction; Consent to Service of Process ...............................................91
SECTION 9.16    Confidentiality ....................................................................................................92
SECTION 9.17    Release of Liens and Guarantees ...............................................................93
SECTION 9.18    USA Patriot Act ...................................................................................................93
SECTION 9.19    Marshalling; Payments Set Aside ...............................................................93
SECTION 9.20    Independence of Covenants .......................................................................93
SECTION 9.21    Obligations Several; Independent Nature of Lenders' Rights ..................94
SECTION 9.22    Electronic Execution of Assignments ......................................................94
SECTION 9.23    Releases and Validation of Pre-Petition Debt and Liens .........................94
SECTION 9.24    No Fiduciary Duty ...................................................................................................95

<u>Exhibits and Schedules</u>

| | |
|---|---|
| Exhibit A | Form of Assignment and Acceptance |
| Exhibit B | Form of Administrative Questionnaire |
| Exhibit C | Form of Borrowing Request |
| Exhibit D | Form of Collateral Agreement |
| Exhibit E | Form of Initial Approved Budget |
| Exhibit F | Form of Monthly Report |
| | |
| Schedule 2.01 | Loan Commitments and Notice Information |
| Schedule 3.04 | Governmental Approvals |
| Schedule 3.07(b) | Possession under Leases |
| Schedule 3.08(a) | Subsidiaries |
| Schedule 3.18 | Material Real Property |
| Schedule 3.21 | Insurance |
| Schedule 4.03 | Litigation |
| Schedule 6.01 | Indebtedness |
| Schedule 6.02(a) | Liens |
| Schedule 6.04 | Investments |
| Schedule 6.07 | Transactions with Affiliates |

DEBTOR IN POSSESSION CREDIT AGREEMENT dated as of [_____], 2014 (this "<u>Agreement</u>"), among QCE LLC, a Delaware limited liability company (the "<u>Borrower</u>"),  QCE FINANCE LLC, a Delaware limited liability company ("<u>Holdco</u>"), the LENDERS party hereto from time to time and WILMINGTON TRUST, NATIONAL ASSOCIATION ("<u>Wilmington Trust</u>"), as administrative agent (in such capacity, the "<u>Administrative Agent</u>").

## RECITALS

WHEREAS, on March [__], 2014, Holdco, the Borrower and each of the Subsidiary Loan Parties (collectively, the "<u>Debtors</u>" and each, a "<u>Debtor</u>") filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware (together with any other court having jurisdiction over the Cases from time to time, the "<u>Bankruptcy Court</u>") initiating their respective cases that are pending under Chapter 11 of the Bankruptcy Code (the cases of the Borrower and the Subsidiary Loan Parties, each a "<u>Case</u>" and collectively, the "<u>Cases</u>") and have continued in the possession of their assets and in the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested the Lenders to make post-petition loans and advances to the Borrower consisting of a credit facility in an aggregate principal amount not to exceed $15,000,000 at any time outstanding, provided that until the Final Order (as hereinafter defined) shall have been entered by the Bankruptcy Court, no loans or advances under the credit facility shall be made, other than interim loans in an aggregate principal amount not to exceed $10,000,000.

WHEREAS, the Lenders have severally, and not jointly, agreed to extend such credit to the Borrower subject to the terms and conditions hereinafter set forth herein;

Accordingly, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

### Definitions

SECTION 1.01    <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the meanings specified below:

"<u>Administrative Agent</u>" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"<u>Administrative Agent Fees</u>" shall have the meaning assigned to such term in Section 2.12(d).

"<u>Administrative Questionnaire</u>" shall mean an Administrative Questionnaire in the form of Exhibit B.

"Affiliate" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified; provided, however, neither the Administrative Agent nor any Lender shall be deemed to be an Affiliate of any Loan Party by virtue of its execution of this Agreement.

"Agreement" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Approved Budget" shall have the meaning assigned to such term in Section 5.13.

"Approved Fund" shall have the meaning assigned to such term in Section 9.04(b).

"ASC" shall mean the Accounting Standards Codification.

"Assignee" shall have them meaning assigned to such term in Section 9.04(b).

"Assignment and Acceptance" shall mean an assignment and acceptance entered into by a Lender and an assignee, and accepted by the Administrative Agent and the Borrower (if required by such assignment and acceptance), in the form of Exhibit A or such other form as shall be approved by the Administrative Agent.

"Avoidance Actions" means all claims and causes of action arising under Sections 502(d), 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code and any proceeds therefrom.

"Bankruptcy Code" shall mean Title 11 of the United States Code, as amended, or any similar federal or state law for the relief of debtors.

"Bankruptcy Court" shall have the meaning specified in the Recitals..

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States of America, or any successor thereto.

"Board of Directors" shall mean, with respect to any person, (i) in the case of any corporation, the board of directors of such person, (ii) in the case of any limited liability company, the board of managers of such person, (iii) in the case of any partnership, the Board of Directors of the general partner of such person and (iv) in any other case, the functional equivalent of the foregoing, or, in each case, any duly authorized committee of such body.

"Borrower" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Borrowing" shall mean a group of Loans made on a single date.

"Borrowing Minimum" shall mean $1.0 million.

"Borrowing Multiple" shall mean $500,000.

"Borrowing Request" shall mean a request by a Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit C.

"Business Day" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or Minneapolis, Minnesota are authorized or required by law or other governmental action to remain closed.

"Capital Lease Obligations" of any person shall mean the obligations of such person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such person under GAAP and, for purposes hereof, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Carve-Out Expenses" means

(i)      all statutory fees payable to the clerk of the Bankruptcy Court or the United States Trustee pursuant to 28 U.S.C. § 1930;

(ii)      allowed professional fees, expenses and disbursements incurred prior to the Termination Declaration Date (regardless of when allowed) by professionals of the estate retained in the Cases by order of the Bankruptcy Court (which order has not been vacated or stayed, unless the stay has been vacated), including professionals of the Borrower employed under Sections 327, 328 or 363 of the Bankruptcy Code ("Estate Professionals") and professionals of any statutory committee of unsecured creditors appointed in the Cases (the "Creditors Committee Professionals") (including the reimbursement of expenses allowed by the Bankruptcy Court incurred by a member of the creditors committee in the performance of their duties, but excluding fees and expenses of third party professionals employed by such members); and

(iii)      the allowed and unpaid professional fees, expenses and disbursements incurred on or after the Termination Declaration Date under Sections 327 or 1103(a) of the Bankruptcy Code, solely with respect to this clause (iii), not to exceed $500,000 in the aggregate for Estate Professionals and Creditors Committee Professionals.

"Case" or "Cases" shall have the meaning specified in the Recitals.

"Cash Collateral" shall have the meaning assigned to such term in the Interim Order.

A "Change in Control" shall mean:

(a)      the acquisition of record ownership or direct beneficial ownership (i.e., excluding indirect beneficial ownership through intermediate entities by any Person which is the subject of clause (b) and (c) below) by any person other than Holdco of any Equity Interests in the Borrower,

(b)     the failure by the Permitted Investors to beneficially own, directly or indirectly, Equity Interests of Holdco representing at least 50% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests in Holdco, or

(c)     occupation of a majority of the seats (other than vacant seats) on the board of managers (or equivalent governing body) of Holdco, by Persons who were not nominated or appointed by such board of managers (or equivalent governing body) or by the Permitted Investors, directly or indirectly (including pursuant to any agreement among equity holders of Holdco or any other Parent Entity).

"Change in Law" shall mean (a) the adoption of any law, rule or regulation after the Interim Facility Closing Date, (b) any change in law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Interim Facility Closing Date or (c) compliance by any Lender (or, for purposes of Section 2.15(b), by any Lending Office of such Lender or by such Lender's holding company, if any) with any written request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Interim Facility Closing Date.  For the avoidance of doubt, all requests, rules, guidelines or directives concerning liquidity and capital adequacy issued by any United States regulatory authority (i) under or in connection with the implementation of the Dodd-Frank Wall Street Reform and Consumer Protection Act and (ii) in connection with the implementation of the recommendations of the Bank for International Settlements or the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority), regardless of the date adopted, issued, promulgated or implemented shall be a Change in Law for purposes of Section 2.15.

"Charges" shall have the meaning assigned to such term in Section 9.09.

"Closing Date" shall mean either the Interim Facility Closing Date or the Final Facility Closing Date, as applicable.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" shall mean all the "Collateral" as defined in any Security Document, any other property upon which a Lien is purported to be created by the Orders or any additional orders of the Bankruptcy Court under the Cases and shall also include the Mortgaged Properties, if any.

"Collateral Agreement" shall mean the Guarantee and Collateral Agreement, as amended, supplemented or otherwise modified from time to time, in the form of Exhibit D, among Holdco, the Borrower, each Subsidiary Loan Party and the Administrative Agent.

"Collateral and Guarantee Requirement" shall mean the requirement that:

(a)     on the Interim Facility Closing Date, the Administrative Agent shall have received (I) from Holdco, the Borrower and each Subsidiary Loan Party, a counterpart of the Collateral Agreement duly executed and delivered on behalf of such

person and (II) an Acknowledgment and Consent in the form attached to the Collateral Agreement, executed and delivered by each issuer of Pledged Collateral (as defined in the Collateral Agreement), if any, that is a Subsidiary that is not a Loan Party;

(b) on the Interim Facility Closing Date or as otherwise provided in the Collateral Agreement, the Administrative Agent shall have received (I) a pledge of all the issued and outstanding Equity Interests of (A) the Borrower and (B) each Domestic Subsidiary (other than a Domestic Subsidiary of a Foreign Subsidiary) owned on the Interim Facility Closing Date directly by or on behalf of the Borrower or any Subsidiary Loan Party; (II) a pledge of 65% of the outstanding voting Equity Interests of each "first tier" Foreign Subsidiary directly owned by Holdco, the Borrower or a Subsidiary Loan Party; and (III) all certificates or other instruments (if any) representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank;

(c) on the Interim Facility Closing Date, all Indebtedness having, in the case of each instance of Indebtedness, an aggregate principal amount in excess of $500,000 (other than (i) intercompany current liabilities incurred in the ordinary course of business in connection with the cash management operations of Holdco and its Subsidiaries or (ii) to the extent that a pledge of such promissory note or instrument would violate applicable law) that is owing to any Loan Party shall be evidenced by a promissory note or an instrument and shall have been pledged pursuant to the Collateral Agreement, and the Administrative Agent shall have received all such promissory notes or instruments, together with note powers or other instruments of transfer with respect thereto endorsed in blank;

(d) in the case of any person that becomes a Subsidiary Loan Party after the Interim Facility Closing Date, the Administrative Agent shall have received a supplement to the Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Subsidiary Loan Party;

(e) in the case of any person that becomes a "first tier" Foreign Subsidiary directly owned by Holdco, the Borrower or a Subsidiary Loan Party after the Interim Facility Closing Date, the Administrative Agent shall have received promptly following such person becoming such a Foreign Subsidiary (unless the Required Lenders shall otherwise agree) a Foreign Pledge Agreement, duly executed and delivered on behalf of such Foreign Subsidiary and the direct parent company of such Foreign Subsidiary;

(f) after the Interim Facility Closing Date, (A) all the outstanding Equity Interests of any person that becomes a Subsidiary Loan Party after the Interim Facility Closing Date, (B) all the Equity Interests of Borrower issued after the Interim Facility Closing Date and (C) all other Equity Interests of any other Subsidiary that are acquired by a Loan Party after the Interim Facility Closing Date, shall have been pledged pursuant to the Collateral Agreement (provided that in no event shall more than 65% of the issued and outstanding voting Equity Interests of any "first tier" Foreign Subsidiary directly owned by such Loan Party be pledged to secure Obligations of any Loan Party,

and in no event shall any of the issued and outstanding Equity Interests of any Foreign Subsidiary that is not a "first tier" Foreign Subsidiary be pledged to secure Obligations of any Loan Party), and the Administrative Agent shall have received all certificates or other instruments (if any) representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank;

(g)    except as disclosed on <u>Schedule 3.04</u> or as otherwise contemplated by any Security Document, all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Required Lenders to be filed, registered or recorded to create the Liens intended to be created by the Security Documents (in each case, including any supplements thereto) and perfect such Liens to the extent required by, and with the priority required by, the Security Documents, shall have been filed, registered or recorded or delivered to the Administrative Agent for filing, registration or the recording concurrently with, or promptly following, the execution and delivery of each such Security Document; provided that, as set forth in the Orders, no filings, registrations or recordings shall be necessary or required to create valid and perfected and unavoidable security interests in, and Liens upon, the Collateral to secure the Obligations hereunder; and

(h)    except as disclosed on <u>Schedule 3.04</u> or as otherwise contemplated by any Security Document (and other than any consents or approvals of which the failure to obtain could not reasonably be expected to materially adversely affect the validity or enforceability of any Security Document or the rights and remedies of the Administrative Agent and the Lenders thereunder), the Required Lenders (or their counsel) shall have received evidence reasonably satisfactory to the Required Lenders that each Loan Party shall have obtained all consents and approvals required to be obtained by it in connection with (i) the execution and delivery of all Security Documents (or supplements thereto) to which it is a party and the granting by it of the Liens thereunder and (ii) the performance of its obligations thereunder.

"<u>Combined</u>" shall mean "consolidated" as such term is defined by GAAP, but excluding the Marketing Fund Trusts and the Persons that are trustees thereof and any Unrestricted Subsidiary and excluding the effect of FASB ASC Topic 810, *Consolidation* (to the extent applicable) with respect to any franchise, franchisee, area director, master franchisee, system supplier, other related or similar interests and reasonable expansions and extensions thereof (i) acquired by any Person (other than Holdco, a Subsidiary, the Borrower or any other Person in which Holdco, the Borrower or a Subsidiary owns (directly or indirectly) an Equity Interest) from any other Person or (ii) otherwise established and maintained by any Person (other than Holdco, a Subsidiary, the Borrower or any other Person in which Holdco, the Borrower or a Subsidiary owns (directly or indirectly) an Equity Interest).

"<u>Commitment</u>" shall mean with respect to any Lender, such Lender's Loan Commitment.

"<u>Conduit Lender</u>" shall mean any special purpose corporation organized and administered by any Lender for the purpose of making Loans otherwise required to be made by

such Lender and designated by such Lender in a written instrument; provided, that the designation by any Lender of a Conduit Lender shall not relieve the designating Lender of any of its obligations to fund a Loan under this Agreement if, for any reason, its Conduit Lender fails to fund any such Loan, and the designating Lender (and not the Conduit Lender) shall have the sole right and responsibility to deliver all consents and waivers required or requested under this Agreement with respect to its Conduit Lender, and provided, further, that no Conduit Lender shall (a) be entitled to receive any greater amount pursuant to Section 2.15, 2.17 or 9.05 than the designating Lender would have been entitled to receive in respect of the extensions of credit made by such Conduit Lender or (b) be deemed to have any Commitment.

"Consenting First Lien Lenders" shall mean funds and accounts managed by each of (i) Oaktree Capital Management LP, (ii) MSD Capital LP and (iii) Caspian Capital LP.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and "Controlling" and "Controlled" shall have meanings correlative thereto.

"Creditors Committee Professionals" shall have the meaning assigned to such term in the definition of "Carve-Out Expenses".

"Debtor" or "Debtors" shall have the meaning specified in the Recitals.

"Default" shall mean any event or condition that upon notice, lapse of time or both would constitute an Event of Default.

"Defaulting Lender" shall mean any Lender with respect to which a Lender Default is in effect.

"Disinterested Director" shall mean, with respect to any Person and transaction, a member of the board of managers (or equivalent governing body) of such Person who does not have any material direct or indirect financial interest in or with respect to such transaction.

"Dollars" or "$" shall mean lawful money of the United States of America.

"Domestic Subsidiary" shall mean any Subsidiary that is not a Foreign Subsidiary.

"environment" shall mean ambient and indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources such as flora and fauna, the workplace or as otherwise defined in any Environmental Law.

"Environmental Laws" shall mean all applicable laws (including common law), rules, regulations, codes, ordinances, orders, decrees or judgments, promulgated or entered into by or with any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the generation, management, Release or threatened Release of,

or actual or alleged exposure to, any Hazardous Materials or to occupational health and safety (to the extent relating to the environment or Hazardous Materials).

"Equity Interests" of any person shall mean any and all shares, interests, participations or other equivalents of or interests in (however designated) equity of such person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with Holdco, the Borrower or a Subsidiary, is treated as a single employer under Section 414(b) or (c) of the Code, or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" shall mean (a) any Reportable Event; (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, the failure to make by its due date a required installment under Section 412(m) of the Code with respect to any Plan or the failure to make any required contribution to a Multiemployer Plan; (d) the incurrence by Holdco, the Borrower, a Subsidiary or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by Holdco, the Borrower, a Subsidiary or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (f) the incurrence by Holdco, the Borrower, a Subsidiary or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by Holdco, the Borrower, a Subsidiary or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from Holdco, the Borrower, a Subsidiary or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Estate Professionals" shall have the meaning assigned to such term in the definition of "Carve-Out Expenses".

"Event of Default" shall have the meaning assigned to such term in Section 7.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time and any successor statute.

"Excluded Indebtedness" shall mean all Indebtedness permitted to be incurred under Section 6.01.

"Excluded Taxes" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income Taxes imposed on (or measured by) its net income and franchise Taxes imposed by the United States of America (or any political subdivision thereof) or the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located or any other jurisdiction as a result of such recipient having a present or former connection with such jurisdiction (including by engaging in a trade or business in such jurisdiction for Tax purposes) other than a connection arising solely from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, or enforced, any Loan Document, (b) any branch profits Tax or any similar Tax that is imposed by any jurisdiction described in clause (a) above, (c) in the case of a Lender making a Loan to the Borrower, any withholding Tax imposed by the United States that (x) is in effect and would apply to amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment at the time such Lender acquires such interest in the Loan or Commitment (or designates a new Lending Office) except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from a Loan Party with respect to any withholding Tax pursuant to Section 2.17(a) or Section 2.17(c) or (y) is attributable to such Lender's failure to comply with Section 2.17(e) or (f) with respect to such Loan, and (d) any withholding Tax imposed by the United States under FATCA.

"Exclusivity Period" shall have the meaning assigned to such term in Section 7.01.

"FASB" shall mean the Financial Accounting Standards Board.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

"Federal Funds Effective Rate" shall mean, for any day the rate per annum (expressed, as a decimal, rounded upwards, if necessary, to the next higher 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, (i) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to Administrative Agent on such day on such transactions as determined by Administrative Agent.

"Fee Letter" shall mean that certain Fee Letter dated [_____], 2014 by and between the Borrower and Wilmington Trust.

"Fees" shall mean the commitment fee described in Section 2.12(c) and the Administrative Agent Fees.

"Final Facility Closing Date" means the first Business Day of the satisfaction, or waiver in accordance with Section 9.08, of the conditions set forth in Section 4.02.

"Final Maturity Date" means the date which is the earliest of (i) the date which is 45 days following the Interim Order Entry Date if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (ii) 120 days after the Interim Facility Closing Date, (iii) the earlier of the effective date and the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code), in each case, of a Reorganization Plan that has been confirmed by an order of the Bankruptcy Court, (iv) the date the Bankruptcy Court orders the conversion of any of the Cases to a Chapter 7 case, and (v) the date on which all Loans and other Obligations shall become due and payable in accordance with the terms of this Agreement and the other Loan Documents.

"Final Order" shall mean an order of the Bankruptcy Court in substantially the form of the Interim Order (with only such modifications thereto as are satisfactory in form and substance to the Required Lenders).

"Final Order Entry Date" means the date that the Final Order is entered by the Bankruptcy Court in the Cases.

"Financial Officer" of any person shall mean the Chief Financial Officer, principal accounting officer, Treasurer, Assistant Treasurer or Controller of such person.

"Foreign Lender" shall mean any Lender that is not a United States person within the meaning of Section 7701(a)(30) of the Code.

"Foreign Pledge Agreement" shall mean a pledge agreement with respect to the Pledged Collateral that constitutes Equity Interests of a "first tier" Foreign Subsidiary, in form and substance reasonably satisfactory to the Required Lenders; provided that in no event shall more than 65% of the issued and outstanding voting Equity Interests of such Foreign Subsidiary be pledged to secure Obligations of any Loan Party.

"Foreign Subsidiary" shall mean any Subsidiary that is incorporated or organized under the laws of any jurisdiction other than the United States of America, any State thereof or the District of Columbia.

"GAAP" shall mean generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis, subject to the provisions of Section 1.02.

"Governmental Authority" shall mean any federal, state, local or foreign court or governmental agency, authority, instrumentality or regulatory or legislative body or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"Guarantee" of or by any person (the "guarantor") shall mean (a) any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep well, to purchase assets, goods, securities or services, to take-or-pay or otherwise) or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, (iv) entered into for the purpose of assuring in any other manner the holders of such Indebtedness or other obligation of the payment thereof or to protect such holders against loss in respect thereof (in whole or in part) or (v) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation, or (b) any Lien on any assets of the guarantor securing any Indebtedness (or any existing right, contingent or otherwise, of the holder of Indebtedness to be secured by such a Lien) of any other person, whether or not such Indebtedness or other obligation is assumed by the guarantor; provided, however, that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Interim Facility Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement.

"guarantor" shall have the meaning assigned to such term in the definition of the term "Guarantee".

"Hazardous Materials" shall mean all pollutants, contaminants, wastes, chemicals, materials, substances and constituents of any nature which are subject to regulation by any Governmental Authority or which would reasonably be likely to give rise to liability under any Environmental Law, including, without limitation, explosive or radioactive substances or petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls or radon gas.

"Holdco" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Indebtedness" of any person shall mean, without duplication, (a) all obligations of such person for borrowed money, (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments to the extent the same would appear as a liability on a balance sheet prepared in accordance with GAAP, (c) all obligations of such person under conditional sale or other title retention agreements relating to property or assets purchased by such person, (d) all obligations of such person issued or assumed as the deferred purchase price of property or services (other than current intercompany liabilities (but not any refinancings, extensions, renewals or replacements thereof) incurred in the ordinary course of business and maturing within 365 days after the incurrence thereof), to the extent that the same would be required to be shown as a long term liability on a balance sheet prepared in accordance with

GAAP, (e) all Guarantees by such person of Indebtedness of others, (f) all Capital Lease Obligations of such person, (g) all payments that such person would have to make in the event of an early termination, on the date Indebtedness of such person is being determined, in respect of outstanding Swap Agreements, (h) the principal component of all obligations, contingent or otherwise, of such person as an account party in respect of letters of credit and (i) the principal component of all obligations of such person in respect of bankers' acceptances. The Indebtedness of any person shall include the Indebtedness of any partnership in which such person is a general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness expressly limits the liability of such person in respect thereof. The Indebtedness of Holdco, the Borrower and the Subsidiaries shall exclude (i) accrued expenses and accounts and trade payables, (ii) liabilities under vendor agreements to the extent such indebtedness may be satisfied through non-cash means such as purchase volume earnings credits, (iii) reserves for deferred income taxes and (iv) unsecured liabilities under Long Term Incentive Compensation Programs and stock appreciation right programs.

"Indemnified Taxes" shall mean all Taxes other than (i) Excluded Taxes and (ii) Other Taxes.

"Indemnitee" shall have the meaning assigned to such term in Section 9.05(b).

"Information" shall have the meaning assigned to such term in Section 3.14(a).

"Initial Approved Budget" shall mean a detailed statement of sources and uses of cash for the Borrower, Holdco and the Subsidiary Loan Parties on a weekly basis for the following 13 calendar weeks, including the anticipated uses of the Loans for each week during such period. As used herein, "Initial Approved Budget" shall refer to the budget delivered to the Lenders on or prior to the Interim Facility Closing Date in the form of Exhibit E, which shall cover the 13 weeks commencing with the week that includes the Petition Date.

"Interest Payment Date" shall mean the last Business Day of each month, commencing [_____], 2014, and the Final Maturity Date.

"Interim Facility Closing Date" means the first Business Day of the satisfaction, or waiver in accordance with Section 9.08, of the conditions set forth in Section 4.01.

"Interim Loan" means a Loan made by a Lender to the Borrower pursuant to Section 2.01(i) on the Interim Facility Closing Date.

"Interim Loan Commitment" means the commitment of a Lender to make or otherwise fund a Loan on the Interim Facility Closing Date and "Interim Loan Commitments" means such commitments of all Lenders in the aggregate. The amount of each Lender's Interim Loan Commitment, if any, is set forth on Schedule 2.01 or in the applicable Assignment Agreement, subject to any termination or reduction pursuant to the terms and conditions hereof.

"Interim Order" means an interim order of the Bankruptcy Court (a) authorizing the borrowing of the Loans in the full amount of the Commitments, (b) approving the transactions contemplated by this Agreement, (c) granting the Superpriority Claims and Liens in Section 2.21 and (d) covering other customary matters.

"Interim Order Entry Date" means the date that the Interim Order is entered by the Bankruptcy Court in the Cases.

"Investment" shall have the meaning assigned to such term in Section 6.04.

"Joint Venture" shall mean a joint venture or similar arrangement, whether in corporate, partnership or other legal form which is not a Subsidiary but in which the Borrower or any Subsidiary owns or controls any Equity Interests; provided, in no event shall any corporate Subsidiary of any Person be considered to be a Joint Venture to which such Person is a party.

"Junior Capital" means any Qualified Capital Stock of Holdco or the Borrower and any Junior Indebtedness.

"Junior Indebtedness" means unsecured Indebtedness of Holdco or the Borrower that (a) is expressly subordinated to the prior payment in full in cash of the Obligations (and any related Guarantees) on terms reasonably satisfactory to the Required Lenders (it being understood that customary high yield subordination terms prevailing at the time of determination shall be deemed to be so satisfactory), (b) provides, in the case of Indebtedness of Holdco, that interest in respect of such Indebtedness shall not be payable in cash (except at the option of the Borrower) until the date that is 91 days after the Final Maturity Date, (c) has a final maturity date that is not earlier than the date that is 91 days after the Final Maturity Date and has no scheduled payments of principal thereon (including pursuant to a sinking fund obligation) or mandatory redemption obligations (other than pursuant to customary provisions relating to redemption or repurchase upon change of control or sale of assets) with respect thereto prior to such final maturity date, and (d) in respect of which no Subsidiary of the Borrower that is not an obligor under the Loan Documents is an obligor.

"Lender" shall mean each financial institution listed on Schedule 2.01 (other than any such person that has ceased to be a party hereto pursuant to an Assignment and Acceptance in accordance with Section 9.04), as well as any person that becomes a "Lender" hereunder in accordance with Section 9.04.

"Lender Default" shall mean (i) the refusal (which has not been retracted) of a Lender to make available its portion of any Borrowing (in each case, when required to be made available or funded in accordance with the terms hereof), or (ii) a Lender having notified in writing the Borrower and/or the Administrative Agent that it does not intend to comply with its obligations under Section 2.06.

"Lending Office" shall mean, as to any Lender, the applicable branch, office or Affiliate of such Lender designated by such Lender to make Loans.

"Lien" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, hypothecation, pledge, encumbrance, charge or security interest in or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities (other than securities representing an interest in a joint venture that is not a Subsidiary), any purchase option, call or

similar right of a third party with respect to such securities to the extent having an effect equivalent to that of a security interest in such securities.

"Loan Commitment" means the commitment of a Lender to make or otherwise fund a Loan and "Loan Commitments" means such commitments of all Lenders in the aggregate. The amount of each Lender's Loan Commitment, if any, is set forth on Schedule 2.01 or in the applicable Assignment and Acceptance, subject to any termination or reduction pursuant to the terms and conditions hereof.  The aggregate amount of the Loan Commitments as of the Interim Facility Closing Date is $15,000,000.

"Loan Documents" shall mean this Agreement, the Security Documents and any Note issued under Section 2.09(e), any amendments and waivers to any of the foregoing, and solely for the purposes of Sections 4.03(f) and 7.01(c) hereof, the Fee Letter.

"Loan Parties" shall mean Holdco, the Borrower and the Subsidiary Loan Parties.

"Loan" shall mean a loan made by a Lender pursuant to Section 2.01.

"Local Time" shall mean New York City time.

"Long Term Incentive Compensation Programs" shall mean The Quizno's Master LLC Key Management Wealth Building Program, The Quizno's Master LLC Amended Director, Advisor and Executive SAR and Deferred Compensation Plan, The Quizno's Corporation Deferred Bonus Plan, Quiz "k" Savings Plan, The Quiznos Consolidated Employee Benefit Plan, QCE Incentive LLC Unit Option Plan and other programs consistent with past practices of the Borrower and its Subsidiaries or approved in good faith by the Board of Directors of Holdco.

"Management Group" shall mean the group consisting of the directors, managers, executive officers and other management personnel of the Borrower and Holdco, as the case may be, on the Interim Facility Closing Date together with (a) any new directors or managers whose election or whose nomination for election, was approved, by a vote of a majority of such directors or managers then still in office who were either directors or managers on the Interim Facility Closing Date or whose election or nomination was previously so approved (or approved by the Permitted Investors, directly or indirectly) and (b) executive officers and other management personnel of the Borrower or Holdco, as the case may be, hired at a time when the directors or managers on the Interim Facility Closing Date, together with the directors or managers so approved, constituted a majority of the directors or managers of the Borrower or Holdco, as the case may be, or whose hiring was approved by the Permitted Investors, directly or indirectly.

"Margin Stock" shall have the meaning assigned to such term in Regulation U.

"Marketing Fund Trusts" shall mean the collective reference to (a) the Regional Advertising Program Trust and (b) the National Marketing Fund Trust.

"Material Adverse Effect" shall mean a material adverse effect on and/or material adverse developments with respect to (i) the business, operations, properties, assets, condition (financial or otherwise) or prospects of Holdco, the Borrower and its Subsidiaries taken as a

whole, except as previously disclosed in writing to the Lenders and except for the commencement of the Cases and the effects that customarily result from the commencement of chapter 11 cases; (ii) the ability of any Loan Party to fully and timely perform its Obligations; (iii) the legality, validity, binding effect or enforceability against a Loan Party of a Loan Document to which it is a party; (iv) the validity, perfection or priority of any Lien in favor of the Administrative Agent for the benefit of the Lenders on any of the Collateral with an aggregate fair market value in excess of $500,000 since the date hereof, and (v) the rights, remedies and benefits available to, or conferred upon, the Administrative Agent, any Lender or any Secured Party under any Loan Document.

"Material Indebtedness" shall mean Indebtedness (other than Loans) of any one or more of Holdco, the Borrower or any Subsidiary in an aggregate principal amount exceeding $1,000,000.

"Maximum Rate" shall have the meaning assigned to such term in Section 9.09.

"Moody's" shall mean Moody's Investors Service, Inc.

"Mortgaged Properties" shall mean the owned real properties of the Loan Parties encumbered by a Mortgage pursuant to Section 5.10.

"Mortgages" shall have the meaning assigned to such term in Section 5.10.

"Multiemployer Plan" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which the Borrower, Holdco or any Subsidiary or any ERISA Affiliate (other than one considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Code Section 414) is making or accruing an obligation to make contributions, or has within any of the preceding six plan years made or accrued an obligation to make contributions.

"National Marketing Fund Trust" shall mean the trust created pursuant to a Declaration of Trust dated April 11, 1997, as amended March 1, 1999, as restated effective as of June 17, 2005, as amended effective December 21, 2005, as the same may be amended or modified from time to time in accordance with its terms.

"Net Proceeds" shall mean:

(a)    an amount equal to 100% of the cash proceeds actually received by Holdco, the Borrower or any of their Subsidiaries (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise and including casualty insurance settlements and condemnation awards, but only as and when received) from any loss, damage, destruction or condemnation of, or any sale, transfer or other disposition (including any sale and leaseback of assets and any mortgage or lease of real property) to any person of any asset or assets of Holdco, the Borrower or any Subsidiary (other than those pursuant to Section 6.05(a), (b), (c), (e), (f), (h), (j), (k), (m) or (o)), net of (i) attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, required debt payments and required payments of other

obligations relating to the applicable asset (other than pursuant hereto) as required by the Bankruptcy Court, other customary expenses and brokerage, consultant and other customary fees actually incurred in connection therewith and (ii) Taxes paid or payable as a result thereof), in the case of each of (i) and (ii) above, to the extent approved by the Bankruptcy Court if such approval is necessary pursuant to the Bankruptcy Code, and

(b)      an amount equal to 100% of the cash proceeds from the incurrence, issuance or sale by the Borrower or any of its Subsidiaries of any Indebtedness (other than Excluded Indebtedness), net of all taxes and fees (including investment banking fees), commissions, costs and other expenses, in each case incurred in connection with such issuance or sale.

For purposes of calculating the amount of Net Proceeds, fees, commissions and other costs and expenses payable to Holdco or the Borrower or any Affiliate of either of them shall be disregarded.

"Non-Consenting Lender" shall have the meaning assigned to such term in Section 2.19(c).

"Non-Debtor Subsidiary" shall mean each Non-Debtor Subsidiary Loan Party and any other Subsidiary of Holdco or the Borrower that is not a Debtor.

"Non-Debtor Subsidiary Loan Party" shall mean (i) Quizmark LLC and (ii) QCE Gift Card LLC.

"Note" shall have the meaning assigned to such term in Section 2.09(d).

"Obligations" shall mean all amounts owing to the Administrative Agent or any Lender pursuant to the terms of this Agreement or any other Loan Document.

"Orders" means, collectively, the Interim Order and the Final Order.

"Other Taxes" shall mean any and all present or future stamp, court, recording, filing or documentary Taxes or any other excise, sales, transfer or property Taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, the Loan Documents, and any and all interest and penalties related thereto.

"Parent Entity" shall mean any of (i) Holdco and (ii) any other Person of which Holdco is a Wholly Owned Subsidiary.

"Participant" shall have the meaning assigned to such term in Section 9.04(c).

"Participant Register" shall have the meaning assigned to such term in Section 9.04(c).

"PBGC" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Investments" shall mean:

(a)    direct obligations of the United States of America or any member of the European Union or any agency thereof or obligations guaranteed by the United States of America or any member of the European Union or any agency thereof, in each case with maturities not exceeding two years;

(b)    time deposit accounts, certificates of deposit and money market deposits maturing within 180 days of the date of acquisition thereof issued by a bank or trust company that is organized under the laws of the United States of America, any state thereof or any foreign country recognized by the United States of America having capital, surplus and undivided profits in excess of $250.0 million and whose long-term debt, or whose parent holding company's long-term debt, is rated A (or such similar equivalent rating or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act);

(c)    repurchase obligations with a term of not more than 180 days for underlying securities of the types described in clause (a) above entered into with a bank meeting the qualifications described in clause (b) above;

(d)    commercial paper, maturing not more than one year after the date of acquisition, issued by a corporation organized and in existence under the laws of the United States of America or any foreign country recognized by the United States of America with a rating at the time as of which any investment therein is made of P-2 (or higher) according to Moody's, or A-l (or higher) according to S&P;

(e)    securities with maturities of two years or less from the date of acquisition issued or fully guaranteed by any State, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least A by S&P or A by Moody's;

(f)    shares of mutual funds whose investment guidelines restrict 95% of such funds' investments to those satisfying the provisions of clauses (a) through (e) above;

(g)    money market funds that (i) comply with the criteria set forth in Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000.0 million; and

(h)    other short-term investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in investments of a type analogous to the foregoing.

"Permitted Investors" shall mean (i) Avenue Capital Group, Fortress Investment Group, LLC and their respective Affiliates and (ii) the members of the Management Group.

"Permitted Refinancing Indebtedness" shall mean any Indebtedness issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease

or refund (collectively, to "Refinance"), the Indebtedness being Refinanced (or previous refinancings thereof constituting Permitted Refinancing Indebtedness); provided that (a) the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so Refinanced (plus unpaid accrued interest and premium thereon and underwriting discounts, fees, commissions and expenses, associated with such Permitted Refinancing Indebtedness), (b) the final maturity date of such Permitted Refinancing Indebtedness is no earlier than the final maturity date of the Indebtedness being refinanced, (c) if the Indebtedness being Refinanced is by its terms subordinated in right of payment to the Obligations under this Agreement, such Permitted Refinancing Indebtedness shall be subordinated in right of payment to such Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being Refinanced, (d) no Permitted Refinancing Indebtedness shall have obligors or contingent obligors that were not obligors or contingent obligors (and would not have been required to become obligors or contingent obligors) in respect of the Indebtedness being Refinanced and (e) if the Indebtedness being Refinanced is (or would have been required to be) secured by any collateral (whether equally and ratably with, or junior to, the Secured Parties or otherwise), such Permitted Refinancing Indebtedness may be secured by such collateral (including in respect of working capital facilities of Foreign Subsidiaries or Permitted Refinancing Indebtedness in respect thereof otherwise permitted under this Agreement only, any collateral pursuant to after-acquired property clauses to the extent any such collateral secured the Indebtedness being Refinanced) on terms no less favorable to the Secured Parties than those contained in the documentation governing the Indebtedness being Refinanced; and provided further, that Indebtedness in effect on the Interim Facility Closing Date (including the Pre-Petition Indebtedness and the Vectra Indebtedness) shall not be permitted to be Refinanced hereunder.

"Permitted Variance Amount" shall mean (i) for the first week of any Test Period, $1,000,000, (ii) for the first two weeks of any Test Period, $750,000 in the aggregate, (iii) for the first three weeks of any Test Period, $500,000 in the aggregate and (iv) for the four weeks of any Test Period, $500,000 in the aggregate.

"Person" or "person" shall mean any natural person, corporation, business trust, joint venture, association, company, partnership, limited liability company, individual or family trust, or other organization (whether or not a legal entity), or any government or any agency or political subdivision thereof.

"Petition Date" shall mean March [__], 2014.

"Plan" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code and in respect of which Holdco, the Borrower, any Subsidiary or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Pledged Collateral" shall have the meaning assigned to such term in the Collateral Agreement.

"Pre-Petition Credit Agreements" shall mean the Pre-Petition First Lien Credit Agreement and the Pre-Petition Second Lien Credit Agreement.

"Pre-Petition First Lien Credit Agreement" shall mean that certain Amended and Restated Credit Agreement, dated as of January 24, 2012, by and among the Borrower, Holdco, the lenders party thereto and Wilmington Trust, National Association, as administrative agent, as amended, supplemented (including pursuant to forbearance agreements) or otherwise modified prior to the Petition Date and including all exhibits and other ancillary documentation in respect thereof.

"Pre-Petition First Lien Indebtedness" shall mean Indebtedness under the Pre-Petition First Lien Credit Agreement.

"Pre-Petition Indebtedness" shall mean Indebtedness under each Pre-Petition Credit Agreement.

"Pre-Petition Second Lien Credit Agreement" shall mean that certain Credit Agreement, dated as of January 24, 2012, by and among the Borrower, Holdco, the lenders party thereto and U.S. Bank, National Association, as administrative agent, as amended, supplemented (including pursuant to forbearance agreements) or otherwise modified prior to the Petition Date and including all exhibits and other ancillary documentation in respect thereof.

"Pre-Petition Second Lien Indebtedness" shall mean Indebtedness under the Pre-Petition Second Lien Credit Agreement.

"primary obligor" shall have the meaning assigned to such term in the definition of the term "Guarantee".

"Qualified Capital Stock" means any Equity Interest of any Person that does not by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable or exercisable) or upon the happening of any event (a) provide for scheduled payments of dividends in cash, (b) become mandatorily redeemable (other than pursuant to customary provisions relating to redemption upon a change of control or sale of assets) pursuant to a sinking fund obligation or otherwise prior to the date that is 91 days after the Final Maturity Date, (c) become convertible or exchangeable at the option of the holder thereof for Indebtedness (other than Junior Indebtedness) or Equity Interests that are not Qualified Capital Stock or (d) contain any maintenance covenants, other covenants adverse to the Lenders or remedies (other than voting rights and increases in dividends).

"Refinance" shall have the meaning assigned to such term in the definition of the term "Permitted Refinancing Indebtedness", and "Refinanced" shall have a meaning correlative thereto.

"Regional Advertising Program Trust" means the Regional Advertising Program Trust under Declaration of Trust dated June 6, 2000, as restated effective as of June 17, 2005, as amended effective December 21, 2005, as may be further amended or modified in accordance with its terms.

"Register" shall have the meaning assigned to such term in Section 9.04(b).

"Regulation U" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation X" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Related Parties" shall mean, with respect to any specified person, such person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such person and such person's Affiliates.

"Release" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, emanating or migrating in, into, onto or through the environment.

"Remaining Present Value" shall mean, as of any date with respect to any lease, the present value as of such date of the scheduled future lease payments with respect to such lease, determined with a discount rate equal to a market rate of interest for such lease reasonably determined at the time such lease was entered into.

"Reorganization Plan" shall mean a plan or plans of reorganization filed in any of the Cases.

"Reportable Event" shall mean any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30-day notice period referred to in Section 4043(c) of ERISA has been waived, with respect to a Plan (other than a Plan maintained by an ERISA Affiliate that is considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Section 414 of the Code).

"Required Lenders" shall mean, at any time, Lenders having outstanding Loans and unused Loan Commitments, that, taken together, represent more than 50% of the sum of all Loans outstanding and all unused Loan Commitments at such time.  The Loans and unused Loan Commitment of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Responsible Officer" of any person shall mean any executive officer or Financial Officer of such person and any other officer or similar official thereof responsible for the administration of the obligations of such person in respect of this Agreement.

"Restructuring Support Agreement" shall mean that certain Restructuring Agreement, dated as of March 10, 2014, by and among, Holdco, the Borrower, certain affiliates of Holdco and the Borrower and lenders under the Pre-Petition Credit Agreements party thereto.

"S&P" shall mean Standard & Poor's Ratings Group, Inc.

"SEC" shall mean the Securities and Exchange Commission or any successor thereto.

"Secured Parties" shall mean the "Secured Parties" as defined in the Collateral Agreement.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Security Documents" shall mean the Orders, the Mortgages, the Collateral Agreement, the Foreign Pledge Agreements and each of the security agreements, mortgages and other instruments and documents executed and delivered pursuant to any of the foregoing or pursuant to Section 5.10.  The Security Documents shall supplement, and shall not limit, the grant of Collateral pursuant to the Orders.

"subsidiary" shall mean, with respect to any person (herein referred to as the "parent"), any corporation, partnership, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, directly or indirectly, owned, Controlled or held or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" shall mean, unless the context otherwise requires, a subsidiary of the Borrower.

"Subsidiary Loan Party" shall mean each (i) Subsidiary that is a Debtor under the Cases and (ii) Non-Debtor Subsidiary Loan Party.

"Superpriority Claim" means a claim against any Debtor in any of the Cases which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

"Swap Agreement" shall mean any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions, provided that no phantom stock or other employee benefit plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of Holdco, the Borrower or any of the Subsidiaries shall be a Swap Agreement.

"Taxes" shall mean any and all present or future taxes (including backup withholding), levies, imposts, duties (including stamp duties), deductions, charges (including ad valorem charges) or withholdings imposed by any Governmental Authority and any and all interest and penalties related thereto.

"Termination Declaration Date" shall mean the date that the Administrative Agent (acting at the direction of the Required Lenders) declares by written notice (it being understood and agreed that such date shall be the date such notice is given) to the Borrower that the Debtors' ability to use any Cash Collateral derived solely from the proceeds of Collateral is terminated.

"Test Period" shall mean, subject to adjustment pursuant to the last sentence of Section 5.13(a), the first four-week period set forth in the Approved Budget commencing with the four-week period ending [_____], 2014.

"Transactions" shall mean, collectively, (i) the execution and delivery of the Loan Documents and (ii) the commencement of the Cases.

"Updated Budget" shall have them meaning assigned to such term in Section 5.13.

"USA PATRIOT Act" shall mean The Uniting and Strengthening America by Providing Adequate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"Variance Reporting Date" means the first Wednesday occurring after the Interim Facility Closing Date and the Wednesday occurring each week thereafter.

"Vectra" shall mean Vectra Bank Colorado, National Association.

"Vectra Credit Facility" shall mean that certain Credit Agreement, as dated as of September 26, 2007, among the Marketing Fund Trusts and Vectra, as amended, supplemented (including pursuant to forbearance agreements) or otherwise modified prior to the Petition Date and including all exhibits and other ancillary documentation in respect thereof.

"Vectra Indebtedness" shall mean Indebtedness under the Vectra Credit Facility.

"Voting Stock" shall mean for any person, Equity Interests of that person generally entitled to vote for the election of the Board of Directors of such person.

"Wholly Owned Subsidiary" of any person shall mean a subsidiary of such person, all of the outstanding Equity Interests of which (other than directors' qualifying shares or nominee or other similar shares (including shares issued to foreign nationals) required pursuant to applicable law) are owned by such person or another Wholly Owned Subsidiary of such person.

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02    Terms Generally.  The definitions set forth or referred to in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.  Except as otherwise expressly provided herein, any reference in this Agreement to any Loan Document or other agreement or instrument shall mean such Loan Document, agreement or instrument as amended,

restated, supplemented or otherwise modified from time to time and any reference in this Agreement to any Person shall include a reference to such Person's successors-in-interest. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Interim Facility Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith; provided further that if an amendment is requested by the Borrower, the Administrative Agent or the Required Lenders, then the Borrower, the Administrative Agent and the Lenders shall negotiate in good faith to enter into such an amendment (but without obligation to do so); provided further that, notwithstanding any of the foregoing, all financial statements required to be prepared hereunder, and all financial covenants contained herein or in any other Loan Document shall be calculated, in each case, without giving effect to any election under FASB ASC Topic 825, *Financial Instruments* (or any similar accounting principle) permitting a person to value its eligible financial assets and financial liabilities at the fair value thereof.  If the application of FASB ASC Topic 810, *Consolidation* would require any franchise, franchisee, area director, master franchisee, system supplier or other related or similar interests and reasonable expansions and extensions thereof that have been (i) acquired by any Person (other than Holdco, a Subsidiary, the Borrower or any other Person in which Holdco, the Borrower or a Subsidiary owns (directly or indirectly) an Equity Interest) from any other Person or (ii) otherwise established and maintained by any Person (other than Holdco, a Subsidiary, the Borrower or any other Person in which Holdco, the Borrower or a Subsidiary owns (directly or indirectly) an Equity Interest) (such franchise, franchisee, area director, master franchisee, system supplier or other related or similar interests and reasonable expansions and extensions thereof, "Specified Entities") to be consolidated into the Combined financial statements otherwise required to be delivered hereunder, such provisions of FASB ASC Topic 810, *Consolidation* shall not be given effect.  For the avoidance of doubt, the treatment of such Specified Entities under GAAP for purposes of construing terms of an accounting or financial nature will not cause such Specified Entities to otherwise be deemed to be Holdco, Borrower or a subsidiary or Subsidiary, as the case may be, of Holdco or the Borrower.

SECTION 1.03    Effectuation of Transactions.  Each of the representations and warranties of Holdco and the Borrower contained in this Agreement (and all corresponding definitions) are made after giving effect to the Transactions, unless the context otherwise requires.

## ARTICLE II

### *The Credits*

SECTION 2.01    Commitments.  Subject to the terms and conditions hereof, each Lender severally agrees to make, (i) on the Interim Facility Closing Date, a Loan to the

Borrower in an amount up to, but not exceeding, such Lender's Interim Loan Commitment and (ii) on the Final Facility Closing Date, a Loan to the Borrower in an amount up to, but not exceeding, such Lender's Commitment.  Any amount borrowed under this Section 2.01 and subsequently repaid or prepaid may not be reborrowed.  Each Lender's Commitment shall expire on the earlier of (i) the Final Facility Closing Date and (ii) the date the commitments are terminated by the Lenders in accordance with the terms hereof.  All Loans and all other amounts owed hereunder with respect to the Loans shall be paid in full no later than the Final Maturity Date.

SECTION 2.02    Loans and Borrowings.

(a)    Each Loan shall be made by the Lenders ratably in accordance with their respective Loan Commitments.  The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)    At the time that each Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum.

SECTION 2.03    Requests for Borrowings.    To request a Borrowing, the Borrower shall notify the Administrative Agent of such request by telephone not later than (a) 10:00 a.m., Local Time, on the date of the proposed Borrowing, if such Borrowing is to be made on the Interim Facility Closing Date and (b) 1:00 p.m., Local Time, three Business Days before the date of any proposed Borrowing thereafter.  Each such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery or fax to the Administrative Agent of a written Borrowing Request in a form approved by the Administrative Agent and signed by the Borrower.  Each such telephonic and written Borrowing Request shall specify the following information in compliance with Section 2.02:

(i)    the aggregate amount of the requested Borrowing;

(ii)    the date of such Borrowing, which shall be a Business Day; and

(iii)    the location and number of the Borrower's account to which funds are to be disbursed.

Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.04    [Intentionally Omitted.]

SECTION 2.05    [Intentionally Omitted.]

SECTION 2.06    Funding of Borrowings.

(a)     Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 12:00 p.m., Local Time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders.  The Administrative Agent will make the proceeds of such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account designated by the Borrower in the applicable Borrowing Request.

(b)     Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand (without duplication) such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate applicable to Loans.   If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

SECTION 2.07      [Intentionally Omitted].

SECTION 2.08      Termination and Reduction of Commitments.

(a)     The Borrower may at any time terminate, or from time to time reduce, the Commitments; provided that each reduction of the Commitments shall be in an amount that is an integral multiple of $500,000 and not less than 1,000,000.

(b)     The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Commitments under paragraph (a) of this Section at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Promptly following receipt of any such notice, the Administrative Agent shall advise the applicable Lenders of the contents thereof.   Each notice delivered by the Borrower pursuant to this Section shall be irrevocable.  Any termination or reduction of the Commitments shall be permanent. Each reduction of the Commitments shall be made ratably among the Lenders in accordance with their respective Commitments.  Upon the funding of any Loans by any Lender, such Lender's Loan Commitment shall be automatically reduced in an equal amount.

SECTION 2.09      Evidence of Debt.

25

(a)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(b)     The Administrative Agent (or its agent or sub-agent appointed by it) shall maintain the Register, as set forth in Section 9.04(b)(iv), in which it shall record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) any amount received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(c)     The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement and, provided further that in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(d)     Any Lender may request that Loans made by it be evidenced by a promissory note (a "Note").  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form approved by the Administrative Agent and the Borrower.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the payee named therein.

SECTION 2.10     [Intentionally Omitted].

SECTION 2.11     Prepayment of Loans.

(a)     The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium or penalty, in an aggregate principal amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum or, if less, the amount outstanding.

(b)     Holdco and the Borrower shall apply, without duplication, all Net Proceeds promptly upon receipt thereof to prepay Borrowings on a pro rata basis.

(c)     [Intentionally Omitted].

(d)     [Intentionally Omitted].

(e)     Concurrently with any prepayment pursuant to Section 2.11(b), the Borrower shall deliver to Administrative Agent a certificate of a Financial Officer

26

demonstrating the calculation of the amount of the applicable Net Proceeds.  In the event that the Borrower shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, the Borrower shall promptly make an additional prepayment of the Loans in an amount equal to such excess, and the Borrower shall concurrently therewith deliver to Administrative Agent a certificate of a Financial Officer demonstrating the derivation of such excess.

SECTION 2.12    Fees.

(a)    [Intentionally Omitted].

(b)    [Intentionally Omitted].

(c)    The Borrower agrees to pay each Lender on the Interim Facility Closing Date a commitment fee equal to 3.0% of its pro rata share of the Commitment.

(d)    The Borrower agrees to pay to the Administrative Agent, for the account of the Administrative Agent, the agency fees set forth in the Fee Letter, as amended, restated, supplemented or otherwise modified from time to time, at the times and in the amount specified therein (the "Administrative Agent Fees").

(e)    All Fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, if and as appropriate, among the Lenders.  Once paid, none of the Fees shall be refundable under any circumstances.

SECTION 2.13    Interest.

(a)    The Loans shall bear interest at 15.00% per annum.

(b)    [Intentionally Omitted].

(c)    Notwithstanding the foregoing, if any principal of or interest on any Loan or any Fees or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to 2% plus the rate applicable to the Loans as provided in paragraph (a) of this Section; provided that this paragraph (c) shall not apply to any Event of Default that has been waived by the Lenders pursuant to Section 9.08.

(d)    Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan; provided that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(e)    All interest hereunder shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

SECTION 2.14     [Intentionally Omitted].

SECTION 2.15     Increased Costs.

(a)     If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender; or

(ii)     impose on any Lender any other condition affecting this Agreement or Loans made by such Lender or any participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)     If any Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as applicable, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender, as applicable, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)     Promptly after any Lender has determined that it will make a request for increased compensation pursuant to this Section 2.15, such Lender shall notify the Borrower thereof.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided, further, that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.16     [Intentionally Omitted].

SECTION 2.17    <u>Taxes</u>.

(a)    Any and all payments by or on account of any obligation of any Loan Party hereunder shall be made free and clear of and without deduction or withholding for any Indemnified Taxes or Other Taxes; <u>provided</u> that if a Loan Party shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) by the Administrative Agent or any Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Loan Party shall make such deductions and (iii) such Loan Party shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    In addition, the Loan Parties shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    Each Loan Party shall indemnify the Administrative Agent and each Lender, within 30 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender on or with respect to any payment by or on account of any obligation of such Loan Party hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto.  A certificate as to the amount of such payment or liability, prepared in good faith and delivered to such Loan Party by a Lender, or by the Administrative Agent on its own behalf, on behalf of another Agent or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    As soon as practicable after any payment of Indemnified Taxes or Other Taxes by a Loan Party to a Governmental Authority, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Any Lender that is entitled to an exemption from or reduction of withholding Tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), to the extent such Lender is legally entitled to do so, at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law as may reasonably be requested by the Borrower to permit such payments to be made without such withholding Tax or at a reduced rate; <u>provided</u> that no Lender shall have any obligation under this paragraph (e) with respect to any withholding Tax imposed by any jurisdiction other than the United States if in the reasonable judgment of such Lender such compliance would subject such Lender to any material unreimbursed cost or expense or would otherwise be prejudicial to such Lender in any material respect.

(f)     Each Foreign Lender shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be reasonably requested by the recipient) on the date on which such Foreign Lender becomes a Lender under this Agreement, whichever of the following is applicable:  (i) duly completed copies of Internal Revenue Service Form W-8BEN (or any subsequent versions thereof or successors thereto), claiming eligibility for benefits of an income tax treaty to which the United States of America is a party, (ii) duly completed copies of Internal Revenue Service Form W-8ECI (or any subsequent versions thereof or successors thereto), (iii) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 871(h) or 881(c) of the Code, (x) a certificate (substantially in the form of Exhibits 1-4 (as applicable)) to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of section 871(h)(3) or 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code, and the interest payments in question are not effectively connected with a United States trade or business conducted by the Foreign Lender (a "Tax Compliance Certificate") and (y) duly completed copies of Internal Revenue Service Form W 8BEN or Internal Revenue Service Form W-8IMY accompanied by Internal Revenue Service Forms W-8BEN or W-9, as applicable (or any subsequent versions thereof or successors thereto) or (iv) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower and the Administrative Agent to determine the withholding or deduction required to be made.  Each Foreign Lender shall promptly notify the Borrower and the Administrative Agent at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrower or the Administrative Agent (or any other form of certification adopted by the United States of America or other taxing authorities for such purpose) and shall deliver updated forms and/or certifications promptly upon the inaccuracy or invalidity of any previously delivered form or certificate.  In addition, each Lender that is not a Foreign Lender shall deliver to the Borrower and the Administrative Agent two copies of Internal Revenue Service Form W-9 (or any subsequent versions thereof or successors thereto) on or before the date such Lender becomes a party and upon the expiration or inaccuracy of any form previously delivered by such Lender, and at such other times as may be necessary in the determination of Borrower or Administrative Agent (each in the reasonable exercise of its discretion) and such other documentation required under the Code or reasonably requested by Borrower or the Administrative Agent to establish that such Lender is not subject to backup withholding under Section 3406 of the Code with respect to any payments to such Lender of principal, interest, fees, or other amounts payable under this Agreement or any of the Loan Documents.  Notwithstanding any other provision of this paragraph, a Lender shall not be required to deliver any form pursuant to this paragraph that such Lender is not legally able to deliver.

(g)     If payment made to the Administrative Agent or a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Administrative Agent or Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in

Section 1471(b) or 1472(b) of the Code, as applicable), such Administrative Agent, or Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Administrative Agent or Lender has complied with such Administrative Agent's or Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for the purposes of this subsection (g), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)    If the Administrative Agent or a Lender receives a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by a Loan Party or with respect to which such Loan Party has paid additional amounts pursuant to this Section 2.17, it shall pay over such refund to such Loan Party (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this Section 2.17 with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender (including any Taxes imposed with respect to such refund) as is determined by the Administrative Agent or Lender in good faith and in its sole discretion, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that such Loan Party, upon the request of the Administrative Agent or such Lender, agrees to repay as soon as reasonably practicable the amount paid over to such Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  This Section 2.17(h) shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the Loan Parties or any other person.

SECTION 2.18    Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)    Unless otherwise specified, the Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or of amounts payable under Section 2.15 or 2.17, or otherwise) prior to 2:00 p.m., Local Time, on the date when due, in immediately available funds, without condition or deduction for any defense, recoupment, set-off or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent to the applicable account designated to the Borrower by the Administrative Agent, except that payments pursuant to Sections 2.15, 2.17 and 9.05 shall be made directly to the persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other person to the appropriate recipient promptly following receipt

31

thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in Dollars.  Any payment required to be made by the Administrative Agent hereunder shall be deemed to have been made by the time required if the Administrative Agent shall, at or before such time, have taken the necessary steps to make such payment in accordance with the regulations or operating procedures of the clearing or settlement system used by the Administrative Agent to make such payment.

(b)      If at any time insufficient funds are received by and available to the Administrative Agent from the Borrower to pay fully all amounts of principal, interest and fees then due from the Borrower hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due from the Borrower hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal then due from the Borrower hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)      If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph (c) shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to Holdco, the Borrower or any Subsidiary thereof (as to which the provisions of this paragraph (c) shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)      Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders, the amount due.  In such event, if the Borrower has not in fact made such

payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.06(b) or 2.18(d), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

SECTION 2.19     Mitigation Obligations; Replacement of Lenders.

(a)     If any Lender requests compensation under Section 2.15, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or 2.17, as applicable, in the future and (ii) would not subject such Lender to any material unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material respect.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     If any Lender requests compensation under Section 2.15, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, or is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.15 or payments required to be made pursuant to Section 2.17, such assignment will result in a reduction in such compensation or payments.  Nothing in this Section 2.19 shall be

deemed to prejudice any rights that the Borrower may have against any Lender that is a Defaulting Lender.

(c)     If any Lender (such Lender, a "<u>Non-Consenting Lender</u>") has failed to consent to a proposed amendment, waiver, discharge or termination which pursuant to the terms of Section 9.08 requires the consent of all of the Lenders affected and with respect to which the Required Lenders shall have granted their consent, then the Borrower shall have the right (unless such Non-Consenting Lender grants such consent) to replace such Non-Consenting Lender by requiring such Non-Consenting Lender to assign all or the affected portion of its Loans, and its Commitments hereunder to one or more assignees reasonably acceptable to the Administrative Agent, <u>provided</u> that: (a) all Obligations of the Borrower owing to such Non-Consenting Lender being replaced shall be paid in full to such Non-Consenting Lender concurrently with such assignment, (b) the replacement Lender shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon, (c) in connection with any such assignment the Borrower, Administrative Agent, such Non-Consenting Lender and the replacement Lender shall otherwise comply with Section 9.04, (d) the replacement Lender shall pay any processing and recordation fee referred to in Section 9.04(b)(ii)(B), if applicable in accordance with the terms of such Section and (e) the replacement Lender shall grant its consent with respect to the applicable proposed amendment, waiver, discharge or termination. Each Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender as assignor, any Assignment and Acceptance necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by this Section 2.19(c).

SECTION 2.20     <u>No Discharge; Survival of Claim</u>.  Unless otherwise agreed by the Required Lenders, until the Obligations are satisfied in full and in cash, and all the Commitments have been terminated, the Borrower agrees that (a) its obligations hereunder shall not be discharged by the entry of an order confirming a Reorganization Plan (and the Borrower, pursuant to section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the Superpriority Claim granted to the Administrative Agent and the Lenders pursuant to the Orders and described in Section 2.21 and the Liens granted to the Administrative Agent pursuant to the Orders and described in Section 2.21 shall not be affected in any manner by the entry of an order confirming any Reorganization Plan.

SECTION 2.21     <u>Priority and Liens Applicable to Loan Parties</u>.

(a)     Each of Holdco and the Borrower, on behalf of itself and on behalf of each Subsidiary Loan Party, hereby covenants, represents and warrants that, subject to the Carve-Out Expenses, upon entry of the Interim Order (and the Final Order, as applicable) and the execution of this Agreement, the Obligations of the Borrower and the other Loan Parties:

(i)     pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute joint and several Superpriority Claims in the Cases,

subject to, with respect to the Marketing Fund Trusts only, the Vectra Claim (as defined in the Orders);

(ii)     pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a perfected first priority security interest and Lien on all Collateral of such Loan Party to the extent that such Collateral is not subject to (A) valid, perfected and non-avoidable Liens as of the Petition Date or (B) Avoidance Actions (it being understood that notwithstanding such exclusion of Avoidance Actions, upon entry of the Final Order, to the extent approved by the Bankruptcy Court, such Lien shall attach to any proceeds of successful Avoidance Actions including, without limitation, assets as to which Liens are avoided);

(iii)     pursuant to Section 364(c)(3) of the Bankruptcy Code, shall at all times be secured by a perfected junior security interest and Lien on all Collateral of such Loan Party to the extent that such Collateral is subject to valid, perfected and unavoidable Liens that were in existence immediately prior to the Petition Date, or to valid and unavoidable Liens that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (in each case other than Liens that secure Pre-Petition Indebtedness, which existing Liens will be primed by the Liens described in clause (iv) below); and

(iv)     pursuant to Section 364(d) of the Bankruptcy Code, shall at all times be secured by a perfected first priority priming security interest and Lien on all Collateral of such Loan Party (the "Priming Liens") to the extent that such Collateral is subject to the existing Liens that secure Pre-Petition First Lien Indebtedness (or was subject to Liens securing the Pre-Petition Second Lien Indebtedness immediately prior to the Petition Date) or to a valid and enforceable right of setoff by any lender party to the Pre-Petition First Lien Credit Agreement (collectively, the "Primed Liens").

(b)     The Priming Liens (x) are senior in all respects to the interests in such property of the lenders under the Pre-Petition Credit Agreements and (y) also prime any Liens granted after the Petition Date to provide adequate protection in respect of any of the Primed Liens.  The Primed Liens shall be primed by and made subject and subordinate to the perfected first priority senior Liens to be granted to the Administrative Agent, which senior priming Liens in favor of the Administrative Agent shall also prime any Liens granted after the commencement of the Cases to provide adequate protection in respect of any of the Primed Liens, but shall not prime Liens, if any, to which the Primed Liens are subject at the time of the commencement of the Cases.  For the avoidance of doubt, the Priming Liens shall not prime the Liens on Collateral securing the Vectra Indebtedness.

(c)     All of the Liens described herein shall be effective and perfected on the Interim Order Entry Date.

ARTICLE III

*Representations and Warranties*

Each of Holdco and the Borrower represents and warrants to each of the Lenders that (it being understood and agreed that the representations and warranties made on the Interim Facility Closing Date are deemed to be made after giving effect to the Transactions):

SECTION 3.01    Organization; Powers.    Each of Holdco, the Borrower and each of the Subsidiaries (a) is a limited partnership, limited liability company, corporation or trust duly organized, validly existing and in good standing (or, if applicable in a foreign jurisdiction, enjoys the equivalent status under the laws of any jurisdiction of organization outside the United States) under the laws of the jurisdiction of its organization, (b) subject to the entry by the Bankruptcy Court of the Orders and subject to any restriction arising on account of Holdco's or any of its Subsidiaries' status as a "debtor" under the Bankruptcy Code, has all requisite power and authority to own its property and assets and to carry on its business as now conducted, (c) is qualified to do business in each jurisdiction where such qualification is required, except where the failure so to qualify could not reasonably be expected to have a Material Adverse Effect, and (d) subject to the entry by the Bankruptcy Court of the Orders, has the power and authority to execute, deliver and perform its obligations under each of the Loan Documents and each other agreement or instrument contemplated thereby to which it is or will be a party and, in the case of the Borrower, to borrow and otherwise obtain credit hereunder.

SECTION 3.02    Authorization.    Subject to the entry by the Bankruptcy Court of the Orders, the execution, delivery and performance by Holdco, the Borrower and each of the Subsidiary Loan Parties of each of the Loan Documents to which it is a party, and the borrowings hereunder and the transactions forming a part of the Transactions (a) have been duly authorized by all corporate, stockholder, limited partnership, limited liability company or equivalent action required to be obtained by Holdco, the Borrower and such Subsidiary Loan Parties and (b) will not (i) violate (A) any provision of (x) law, statute, rule or regulation applicable to such party, or (y) of the certificate or articles of incorporation or other constitutive documents or by-laws of Holdco, the Borrower or any such Subsidiary Loan Party, (B) any applicable order of any court or any rule, regulation or order of any Governmental Authority or (C) any provision of any indenture, certificate of designation for preferred stock, agreement or other instrument to which Holdco, the Borrower or any such Subsidiary Loan Party is a party or by which any of them or any of their property is or may be bound (except where the enforcement of which will be stayed by virtue of filing the Cases), (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, give rise to a right of or result in any cancellation or acceleration of any right or obligation (including any payment) or to a loss of a material benefit under any such indenture, certificate of designation for preferred stock, agreement or other instrument, where any such conflict, violation, breach or default referred to in clause (i)(A)(x), (i)(B), (i)(C) or (ii) of this Section 3.02, could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by Holdco, the Borrower or any such Subsidiary Loan Party, other than the Liens created by the Loan Documents and Liens permitted by Section 6.02 hereof.

SECTION 3.03    Enforceability.  Subject to the entry by the Bankruptcy Court of the Orders, this Agreement has been duly executed and delivered by Holdco and the Borrower and constitutes, and each other Loan Document when executed and delivered by each Loan Party that is party thereto will constitute, a legal, valid and binding obligation of such Loan Party enforceable against each such Loan Party in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) implied covenants of good faith and fair dealing.

SECTION 3.04    Governmental Approvals.  Subject to the entry by the Bankruptcy Court of the Orders, and as otherwise required under the Bankruptcy Code, no action, consent or approval of, registration or filing with or any other action by any Governmental Authority is or will be required in connection with the Transactions, except for (a) such as have been made or obtained and are in full force and effect and (b) filings or other actions listed on Schedule 3.04.

SECTION 3.05    Financial Statements.

(a)    The audited consolidated balance sheets of the Borrower as at December 31, 2010, December 31, 2011 and December 31, 2012, and the audited consolidated statements of income and cash flows of the Borrower for such fiscal years, reported on by and accompanied by audit opinions from Grant Thornton LLP, copies of which have heretofore been furnished to each Lender, present fairly in all material respects the consolidated financial position of the Borrower for such periods and as at such dates and the consolidated results of operations and cash flows of the Borrower for the years then ended.

(b)    The unaudited consolidated balance sheet of the Borrower as of December 31, 2013, and the related unaudited statements of income and cash flows for the 12-month period ended December 31, 2013, the unaudited interim consolidated balance sheet of the Borrower as of January 31, 2014, and the related unaudited interim statements of income and cash flows for the 1-month period ended January 31, 2014 (including for the comparable period in fiscal 2013), present fairly in all material respects the consolidated financial condition of the Borrower as at such dates (subject to normal year-end audit adjustments).  All such financial statements have been prepared in accordance with GAAP applied consistently throughout the periods involved (subject to (i) normal year-end adjustments and (ii) the absence of notes), except as approved by the aforementioned firm of accountants and disclosed therein.  Except as disclosed on Schedule 6.01 or as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect, the Borrower does not have any material Guarantees, contingent liabilities and liabilities for taxes, or any long-term leases or unusual forward or long-term commitments, including any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, that are not reflected in the most recent financial statements referred to in this paragraph.

SECTION 3.06     No Material Adverse Effect.  Since December 31, 2012, there has been no event, development or circumstance that has or would reasonably be expected to have a Material Adverse Effect.

SECTION 3.07     Title to Properties; Possession Under Leases.

(a)     Each of Holdco, the Borrower and the Subsidiaries has good and insurable fee simple title to, or valid leasehold interests in, or easements or other limited property interests in, all its real properties (including all Mortgaged Properties) and has good and valid title to its personal property and assets, in each case, except for defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes and except where the failure to have such title could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  All such properties and assets are free and clear of Liens, other than Liens expressly permitted by Section 6.02 or arising by operation of law.

(b)     Except to the extent failure to do so is permitted by Chapter 11 of the Bankruptcy Code, each of Holdco, the Borrower and the Subsidiaries has complied with all obligations under all leases to which it is a party, except where the failure to comply would not reasonably be expected to have Material Adverse Effect, and all such leases are in full force and effect, except leases in respect of which the failure to be in full force and effect could not reasonably be expected to have a Material Adverse Effect.  Except as set forth on Schedule 3.07(b), each of Holdco, the Borrower and each of the Subsidiaries enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)     Each of Holdco, the Borrower and the Subsidiaries owns or possesses, or is licensed or otherwise has the right to use, all patents, trademarks, service marks, trade names and copyrights and all licenses and rights with respect to the foregoing, necessary for the present conduct of its business, without any conflict (of which the Borrower has been notified in writing) with the rights of others, and free from any burdensome restrictions on the present conduct of the business of the Borrower and the Subsidiaries, except where the failure to have such rights or where such conflicts and restrictions could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.08     Subsidiaries.

(a)     Schedule 3.08(a) sets forth as of the Interim Facility Closing Date the name and jurisdiction of incorporation, formation or organization of each Subsidiary of Holdco and, as to each such Subsidiary, the percentage of each class of outstanding Equity Interests owned by Holdco or by any such Subsidiary.

(b)      As of the Interim Facility Closing Date, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than directors' qualifying shares) of any nature relating to any Equity Interests of Holdco, the Borrower or any of the Subsidiaries.

SECTION 3.09      Litigation; Compliance with Laws.

(a)      Other than the Cases, there are no actions, suits, investigations or proceedings at law or in equity or by or on behalf of any Governmental Authority or in arbitration now pending against, or to the knowledge of Holdco or the Borrower threatened in writing against, Holdco or the Borrower or any of the Subsidiaries or any business, property or rights of any such person (i) that involve any Loan Document or the Transactions or (ii) that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)      Subject to the entry by the Bankruptcy Court of the Orders, and subject to the terms thereof, none of Holdco, the Borrower, the Subsidiaries and their respective properties or assets is in violation of (nor will the continued operation of their material properties and assets as currently conducted violate) any law, rule or regulation (including any zoning, building, ordinance, code or approval or any building permit, but excluding any Environmental Laws, which are subject to Section 3.16) or any restriction of record or agreement affecting any Mortgaged Property, or is in default with respect to any judgment, writ, injunction or decree of any Governmental Authority, where such violation or default could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.10      Federal Reserve Regulations.

(a)      None of Holdco, the Borrower and the Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.

(b)      No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, (i) to purchase or carry Margin Stock or to extend credit to others for the purpose of purchasing or carrying Margin Stock or to refund indebtedness originally incurred for such purpose, or (ii) for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation U or Regulation X.

SECTION 3.11      Investment Company Act; Public Utility Holding Company Act.  None of Holdco, the Borrower and the Subsidiaries is (a) an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended, or (b) a "holding company" as defined in, or subject to regulation under, the Public Utility Holding Company Act of 1935, as amended.

SECTION 3.12      Use of Proceeds.  The proceeds of the Loans shall be applied by the Borrower in accordance with the Approved Budget to (A) to pay for the fees, costs and expenses owing to the Administrative Agent and the Lenders in accordance with the Loan

39

Documents, (B) to fund ongoing working capital requirements of the Borrower and its Subsidiaries including, without limitation, payment of the administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code incurred in the ordinary course of business of the Borrower or otherwise approved by the Bankruptcy Court (and not otherwise prohibited under this Agreement), (C) to pay amounts owing on the Obligations as provided herein and for general corporate purposes and (D) to pay for the fees, costs and expenses owing to the Consenting First Lien Lenders.

SECTION 3.13   Tax Returns.   Except with respect to any Taxes, the nonpayment of which is permitted by the Bankruptcy Code,

(a)   each of Holdco, the Borrower and the Subsidiaries has filed or caused to be filed all U.S. federal, state, local and non-U.S. Tax returns required to have been filed by it that are material to such companies, taken as a whole, and each such Tax return is true and correct in all material respects;

(b)   each of Holdco, the Borrower and the Subsidiaries has timely paid or caused to be timely paid all Taxes shown to be due and payable by it on the returns referred to in clause (a) and all other Taxes or assessments (or made adequate provision (in accordance with GAAP) for the payment of all Taxes due) with respect to all periods or portions thereof ending on or before the Closing Date (except Taxes or assessments that are being contested in good faith by appropriate proceedings in accordance with Section 5.03 and for which Holdco, the Borrower or any of the Subsidiaries (as the case may be) has set aside on its books adequate reserves in accordance with GAAP), which Taxes, if not paid or adequately provided for, could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and

(c)   other than as could not be, individually or in the aggregate, reasonably expected to have a Material Adverse Effect, with respect to each of Holdco, the Borrower and the Subsidiaries, there are no claims being asserted in writing with respect to any Taxes.

SECTION 3.14   No Material Misstatements.

(a)   All written information (other than the projections included in each Approved Budget, estimates and information of a general economic nature) (the "Information") concerning Holdco, the Borrower, the Subsidiaries and the Transactions or otherwise prepared by or on behalf of the foregoing or their representatives and made available to any Lenders or the Administrative Agent in connection with the Transactions or any other transactions contemplated hereby, when taken as a whole, were true and correct in all material respects, as of the date such Information was furnished to the Lenders and as of the Closing Date and does not and did not as of any such date contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements were made.

(b)     The projections prepared as part of, and included in, each Approved Budget have been prepared in good faith based upon assumptions believed by the Borrower to be reasonable at the time made, as of the date such projections were furnished to the Lenders and as of the Closing Date (it being understood that actual results may vary materially from the projections) and do not contain any material assumptions that have not been disclosed in writing to the Lenders.

SECTION 3.15   Employee Benefit Plans.

(a)     Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect:  (i) each of the Borrower, Holdco, the Subsidiaries and the ERISA Affiliates is in compliance with the applicable provisions of ERISA and the provisions of the Code relating to Plans and the regulations and published interpretations thereunder; (ii) no Reportable Event has occurred during the past five years as to which the Borrower, Holdco, any of their Subsidiaries or any ERISA Affiliate was required to file a report with the PBGC, other than reports that have been filed; (iii) the present value of all benefit liabilities under each Plan of the Borrower, Holdco, their Subsidiaries and the ERISA Affiliates (based on those assumptions used to fund such Plan), as of the last annual valuation date applicable thereto for which a valuation is available, does not exceed the value of the assets of such Plan, and the present value of all benefit liabilities of all underfunded Plans (based on those assumptions used to fund each such Plan) as of the last annual valuation dates applicable thereto for which valuations are available, does not exceed the value of the assets of all such underfunded Plans; (iv) no ERISA Event has occurred or is reasonably expected to occur; and (v) none of the Borrower, Holdco, the Subsidiaries and the ERISA Affiliates has received any written notification that any Multiemployer Plan is in reorganization or has been terminated within the meaning of Title IV of ERISA, or has knowledge that any Multiemployer Plan is reasonably expected to be in reorganization or to be terminated.

(b)     Each of Holdco, the Borrower and the Subsidiaries is in compliance (i) with all applicable provisions of law and all applicable regulations and published interpretations thereunder with respect to any employee pension benefit plan or other employee benefit plan governed by the laws of a jurisdiction other than the United States and (ii) with the terms of any such plan, except, in each case, for such noncompliance that could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.16   Environmental Matters.  Except as to matters that could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (i) no written notice of violation, request for information, order, complaint or assertion of penalty has been received by the Borrower or any of its Subsidiaries, and there are no judicial, administrative or other actions, suits or proceedings pending or, to the knowledge of Holdco or the Borrower, threatened which allege a violation of or liability under any Environmental Laws, in each case relating to the Borrower or any of its Subsidiaries, (ii) each of the Borrower and its Subsidiaries has all permits necessary for its operations to comply with all applicable Environmental Laws and is, and during the term of all applicable statutes of limitation, has been, in compliance with the terms of such permits and with all other applicable Environmental Laws, (iii) no Hazardous Material is located at any property currently owned, operated or leased by the

Borrower or any of its Subsidiaries in quantities or concentrations that would reasonably be expected to give rise to any liability or obligation of the Borrower or any of its Subsidiaries under any Environmental Laws, and no Hazardous Material has been generated by or on behalf of the Borrower or any of its Subsidiaries that has been transported to or Released at or from any location in a manner that would reasonably be expected to give rise to any liability or obligation of the Borrower or any of its Subsidiaries under any Environmental Laws, and (iv) there is no material acquisition agreement to which the Borrower or any of its Subsidiaries is a party in which the Borrower or any of its Subsidiaries has assumed or undertaken responsibility for any known or reasonably likely liability or obligation of any other person arising under or relating to Environmental Laws, which in any such case has not been made available to the Administrative Agent prior to the date hereof.

SECTION 3.17    <u>Security Documents</u>.  Notwithstanding anything to the contrary contained herein, upon entry of the Interim Order (or the Final Order, when applicable), the Administrative Agent shall have a fully perfected Lien on, and security interest in, to and under all rights, title and interest of each Loan Party thereunder in such Collateral having the priority as set forth in such Order, and such security interest is in each case prior and superior in right and interest to any other Person, subject to the terms of Section 2.21 and the Orders.

SECTION 3.18    <u>Real Property and Leased Premises</u>.    <u>Schedule 3.18</u>  lists completely and correctly as of the Interim Facility Closing Date all material real property leased by Holdco, the Borrower and the Subsidiary Loan Parties and the addresses thereof.  As of the Interim Facility Closing Date, Holdco, the Borrower and the Subsidiary Loan Parties have valid leases in all the real property set forth as being leased by them in such Section.

SECTION 3.19    <u>Appointment of Trustee or Examiner; Liquidation</u>.  No order has been entered in any Case (a) for the appointment of a Chapter 11 trustee, (b) for the appointment of an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code or (c) to convert any Case to a Chapter 7 case or to dismiss any Case.

SECTION 3.20    <u>Labor Matters</u>.  Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes pending or, to the knowledge of Holdco or the Borrower, threatened against Holdco, the Borrower or any of the Subsidiaries; (b) the hours worked and payments made to employees of Holdco, the Borrower and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable law dealing with such matters; and (c) all payments due from Holdco, the Borrower or any of the Subsidiaries or for which any claim may be made against Holdco, the Borrower or any of the Subsidiaries, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of Holdco, the Borrower or such Subsidiary to the extent required by GAAP.  Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect, the consummation of the Transactions will not give rise to a right of termination or right of renegotiation on the part of any union under any material collective bargaining agreement to which Holdco, the Borrower or any of the Subsidiaries (or any predecessor) is a party or by which Holdco, the Borrower or any of the Subsidiaries (or any predecessor) is bound.

SECTION 3.21   Insurance.   Schedule 3.21 sets forth a true, complete and correct description of all material insurance maintained by or on behalf of Holdco, the Borrower or the Subsidiaries as of the Interim Facility Closing Date.  As of such date, such insurance is in full force and effect.  The Borrower believes that the insurance maintained by or on behalf of Holdco, the Borrower and the Subsidiaries is adequate.

SECTION 3.22   Patriot Act.  To the extent applicable, each Loan Party is in compliance, in all material respects, with the (i) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001).  To the knowledge of the Borrower, no part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

ARTICLE IV

*Conditions of Lending*

SECTION 4.01   Conditions to Interim Facility.  The obligations of the Lenders to make Loans on the Interim Facility Closing Date are subject to the satisfaction, or waiver in accordance with Section 9.08, of the following conditions:

(a)      The Administrative Agent and the Lenders (or their respective counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include fax transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement.

(b)      The Lenders (or their counsel) shall have received in the case of each Loan Party each of the items referred to in clauses (i), (ii) and (iii) below:

(i)      a copy of the certificate or articles of incorporation, certificate of limited partnership, certificate of formation or equivalent governing document, including all amendments thereto, of such Loan Party, certified as of a recent date by the Secretary of State (or other similar official) of the jurisdiction of its organization, and a certificate as to the good standing (to the extent such concept or a similar concept exists under the laws of such jurisdiction) of each such Loan Party as of a recent date from such Secretary of State (or other similar official);

(ii)      a certificate of the secretary or assistant secretary or similar officer or trustee of such Loan Party dated the Interim Facility Closing Date and certifying

43

(A)     that attached thereto is a true and complete copy of the by-laws (or limited partnership agreement, limited liability company agreement or other equivalent governing documents) of such Loan Party as in effect on the Interim Facility Closing Date and at all times since March 10, 2014,

(B)     that the certificate or articles of incorporation, certificate of limited partnership, certificate of formation or equivalent governing document of such Loan Party has not been amended since the date of the last amendment thereto disclosed pursuant to clause (i) above,

(C)     as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party and

(D)     as to the absence of any pending proceeding for the dissolution or liquidation of such Loan Party or, to the knowledge of such person, threatening the existence of such Loan Party; and

(iii)     a certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary or similar officer executing the certificate pursuant to clause (ii) above.

(c)     (i) Each applicable Collateral and Guarantee Requirement shall have been satisfied, (ii) the Administrative Agent and the Lenders (or their respective counsel) shall have received the results of (x) a search of the Uniform Commercial Code (or equivalent) filings made with respect to the Loan Parties and copies of the financing statements (or similar documents) disclosed by such search, (y) tax and judgment lien searches and (z) real estate title searches and (iii) the Lenders (or their counsel) shall have received evidence reasonably satisfactory to the Required Lenders that the Liens indicated by such financing statements (or similar documents) or searches are either permitted by Section 6.02 or have been released (or authorized for release in a manner satisfactory to the Required Lenders) or terminated by the Orders; *provided* that the Required Lenders, in their sole discretion, may waive receipt of such evidence.

(d)     The Lenders (or their counsel) shall have received the financial statements and other financial information referred to in Sections 3.05.

(e)     The Administrative Agent and the Lenders shall have received all fees payable thereto or to any Lender on or prior to the Interim Facility Closing Date and, to the extent invoiced, all other amounts due and payable pursuant to the Loan Documents on or prior to the Interim Facility Closing Date, including, to the extent invoiced, reimbursement or payment of all reasonable out-of-pocket expenses required to be reimbursed or paid by the Loan Parties hereunder or under any Loan Document.

(f)     The Administrative Agent and the Lenders (or their respective counsel) shall have received a copy of, or a certificate as to coverage under, the insurance

44

policies required by Section 5.02 and the applicable provisions of the Security Documents, each of which shall be endorsed or otherwise amended to include a customary lender's loss payable endorsement and to name the Secured Parties as additional insured, in form and substance reasonably satisfactory to the Required Lenders; *provided* that the Required Lenders, in their sole discretion, may waive receipt of such certificates and endorsements.

(g)     The Administrative Agent shall have received, at least five Business Days prior to the Interim Facility Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act.

(h)     The Interim Order, which shall be in form and substance satisfactory to the Required Lenders and the Debtors, shall be in full force and effect and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge in any respect without the prior written consent of the Required Lenders.  The Loan Parties shall be in compliance in all respects with the Interim Order.

(i)     The Lenders (or their counsel) shall have received the Initial Approved Budget, which Initial Approved Budget shall be in form and substance satisfactory to the Required Lenders in their sole discretion.

(j)     The Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Cases or shortly thereafter shall have been reviewed in advance by the Required Lenders and shall be in form and substance acceptable to the Required Lenders and the Debtors.

(k)     All orders entered by the Bankruptcy Court pertaining to cash management and adequate protection, shall, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the Required Lenders and the Debtors.

(l)     No (i) trustee, (ii) examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code or (iii) receiver shall have been appointed or designated with respect to any Debtor's or its Subsidiaries' business, properties or assets and no motion shall be pending seeking any such relief or seeking any other relief in the Bankruptcy Court to exercise control over Collateral.

(m)     The administrative agent and the lenders under the Pre-Petition First Lien Credit Agreement shall have received adequate protection in respect of the Liens securing the Pre-Petition First Lien Indebtedness as set forth in the Interim Order.

(n)     The Interim Facility Closing Date shall have occurred no later than 2 Business Days after the Interim Order Entry Date.

The Administrative Agent and each Lender, by delivering its signature page to this Agreement and funding a Loan on the Interim Facility Closing Date shall be deemed to have acknowledged receipt of and consented to and approved each Loan Document and each other document required to be approved by the Administrative Agent or such Lender, as applicable, on the Interim Facility Closing Date.

SECTION 4.02    Conditions to Final Facility.  The obligations of the Lenders to make Loans on the Final Facility Closing Date are subject to the satisfaction, or waiver in accordance with Section 9.08, of the following conditions:

(a)    The Final Order Entry Date shall occur not later than 30 days following the Interim Order Entry Date and the Final Order shall be in form and substance satisfactory to the Required Lenders and the Debtors.

(b)    The Final Order shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge.

(c)    The Debtors shall be in compliance in all respects with the Final Order.

(d)    No (i) trustee, (ii) examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code or (iii) receiver shall have been appointed or designated with respect to any Loan Party's or its Subsidiaries' business, properties or assets and no motion shall be pending seeking any such relief or seeking any other relief in the Bankruptcy Court to exercise control over Collateral.

SECTION 4.03    Conditions to Each Loan.  The obligations of the Lenders to make Loans on either Closing Date are subject to the satisfaction, or waiver in accordance with Section 9.08, of the following conditions:

(a)    The Administrative Agent shall have received a Borrowing Request as required by Section 2.03.

(b)    The Debtors shall be in compliance with each Order and the cash management order, as applicable.

(c)    The representations and warranties set forth in Article III hereof shall be true and correct in all material respects as of such date, with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects as of such earlier date); provided, that, if a representation and warranty is qualified as to materiality, the materiality qualifier set forth above shall be disregarded with respect to such representation and warranty for purposes of this condition.

46

(d)     At the time of, and immediately after, such Borrowing, no Event of Default shall have occurred and be continuing.

(e)     The Lenders (or their counsel) shall have received all periodic updates required under the Approved Budget and any variance reports, each in form and substance satisfactory to the Lenders and the Borrower shall be in compliance with the Approved Budget.

(f)     All fees, costs and charges due and payable by the Loan Parties under the Loan Documents, including Section 9.05 hereof, and the Interim Order or Final Order, as applicable, shall have been paid.

(g)     There shall exist no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality which relates to this Agreement or the transactions contemplated hereby, except for claims, actions, suits, investigations, litigation or proceedings (i) disclosed in Schedule 4.03 or (ii) otherwise stayed by 11 U.S.C. § 362.

(h)     Since the Petition Date, except as disclosed in writing by any Loan Party to the Lenders, no Material Adverse Effect, other than by virtue, or as a result, of the commencement of the Cases, shall have occurred.


Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower on the date of such Borrowing, issuance, amendment, extension or renewal as applicable, that the conditions specified in paragraphs (b), (c), (d), (g) and (h) of this Section 4.03 shall have been satisfied on such date in accordance with the terms of such paragraphs.

ARTICLE V

*Affirmative Covenants*

Each of Holdco and the Borrower covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document (other than obligations for taxes, costs, indemnifications, reimbursements, damages and other contingent liabilities in respect of which no claim or demand for payment has been made or, in the case of indemnifications, no notice been given) shall have been paid in full, unless the Required Lenders shall otherwise consent in writing, the Borrower (and Holdco to the extent applicable to it) will, and the Borrower will cause each of the Subsidiaries to:

SECTION 5.01     Existence; Businesses and Properties.

(a)     Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except, in the case of a Subsidiary of the Borrower, where the failure to do so would not reasonably be expected to have a Material

Adverse Effect, and except as otherwise expressly permitted under Section 6.05, and except for the liquidation or dissolution of Subsidiaries if the assets of such Subsidiaries to the extent they exceed estimated liabilities are acquired by the Borrower or a Wholly Owned Subsidiary of the Borrower in such liquidation or dissolution; provided that Subsidiary Loan Parties may not be liquidated into Subsidiaries that are not Loan Parties and Domestic Subsidiaries may not be liquidated into Foreign Subsidiaries.

(b)    Except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, do or cause to be done all things necessary to (i) lawfully obtain, preserve, renew, extend and keep in full force and effect the permits, franchises, authorizations, patents, trademarks, service marks, trade names, copyrights, licenses and rights with respect thereto necessary to the normal conduct of its business, and (ii) at all times maintain and preserve all property necessary to the normal conduct of its business and keep such property in satisfactory repair, working order and condition and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith, if any, may be properly conducted at all times (in each case except as expressly permitted by this Agreement).

SECTION 5.02    Insurance.

(a)    Maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by similarly situated companies engaged in the same or similar businesses operating in the same or similar locations and shall cause the Administrative Agent to be listed as a co-loss payee on property and casualty policies and the Secured Parties as additional insured on liability policies.

(b)    If at any time the area in which the Premises (as defined in the Mortgages) are located is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such reasonable total amount as the Administrative Agent may from time to time reasonably require, and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as it may be amended from time to time.

SECTION 5.03    Taxes.  In accordance with the Bankruptcy Code and subject to any required approval by an applicable order of the Bankruptcy Court, pay and discharge promptly when due all material Taxes, imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, as well as all lawful claims which, if unpaid, might give rise to a Lien (other than a Lien permitted under Section 6.02) upon such properties or any part thereof; provided, however, that such payment and discharge shall not be required with respect to any such Tax or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings, and Holdco, the Borrower or the affected Subsidiary, as applicable, shall have set aside on its books reserves in accordance with GAAP with respect thereto.

SECTION 5.04   Financial Statements, Reports, etc.   Furnish to the Administrative Agent and each Lender:

(a)     Not later than April 21, 2014, (x) a consolidated balance sheet and related statements of operations, cash flows and owners' equity showing the financial position of the Borrower and its Subsidiaries as of the close of the fiscal year ending December 31, 2013 and the consolidated results of its operations during such year and setting forth in comparative form the corresponding figures for the prior fiscal year, which consolidated balance sheet and related statements of operations, cash flows and owners' equity shall be audited by Grant Thornton LLP or other independent public accountants of recognized national standing and accompanied by an opinion of such accountants to the effect that such consolidated financial statements fairly present, in all material respects, the financial position and results of operations of the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP (it being understood that the delivery by the Borrower of annual reports on Form 10-K of the Borrower and its consolidated Subsidiaries shall satisfy the requirements of this Section 5.04(a) to the extent such annual reports include the information specified herein) and (y) supporting schedules reconciling such consolidated balance sheet and related statements of operations, cash flows and owners' equity with the Combined financial position and results of operations of the Borrower for the relevant period;

(b)     within 45 days after the end of each fiscal quarter of each fiscal year (commencing with the [first] fiscal quarter of 2014 ending March 31, 2014), (x) a consolidated balance sheet and related statements of operations and cash flows showing the financial position of the Borrower and its Subsidiaries as of the close of such fiscal quarter and the consolidated results of its operations during such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year, all of which shall be in reasonable detail and which consolidated balance sheet and related statements of operations and cash flows shall be certified by a Financial Officer of the Borrower on behalf of the Borrower as fairly presenting, in all material respects, the financial position and results of operations of the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes) (it being understood that the delivery by the Borrower of quarterly reports on Form 10-Q of the Borrower and its consolidated Subsidiaries shall satisfy the requirements of this Section 5.04(b) to the extent such quarterly reports include the information specified herein) and (y) supporting schedules reconciling such consolidated balance sheet and related statements of operations, cash flows and owners' equity with the Combined financial position and results of operations of the Borrower for the relevant period;

(c)     within 30 days after the end of each month (commencing with the first month ending following the Interim Facility Closing Date), (x) a consolidated balance sheet and related statements of operations and cash flows showing the financial position of the Borrower and its Subsidiaries as of the close of such month and the consolidated results of its operations during such month and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for such

month from the Approved Budget and the corresponding periods of the prior fiscal year, all of which shall be in reasonable detail and which consolidated balance sheet and related statements of operations and cash flows shall be certified by a Financial Officer of the Borrower on behalf of the Borrower as fairly presenting, in all material respects, the financial position and results of operations of the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes); provided that, for purposes of this section, the first "month" ending following the Interim Facility Closing Date shall be the period beginning March 16, 2014 and ending April 30, 2014, and the only corresponding period from the prior fiscal year shall be the then-elapsed portion of such fiscal year;

(d)  concurrently with any delivery of financial statements under paragraphs (a), (b) or (c) above, a certificate of a Financial Officer of the Borrower certifying that no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto;

(e)  promptly after the same become publicly available, copies of all periodic and other publicly available reports, proxy statements and, to the extent requested by the Required Lenders, other materials filed by Holdco, the Borrower or any of the Subsidiaries with the SEC;

(f)  promptly, a copy of all final reports of independent accountants submitted to the board of directors (or equivalent governing body) or any committee thereof of any of the Borrower or any Subsidiary in connection with any material interim or special audit made by independent accountants of the books of the Borrower or any such Subsidiary;

(g)  promptly following a request therefor, all documentation and other information that the Administrative Agent reasonably requests on its behalf or on behalf of any Lender in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

(h)  [Intentionally Omitted];

(i)  promptly, from time to time, such other information regarding the operations, business affairs and financial condition of Holdco, the Borrower or any of the Subsidiaries, or compliance with the terms of any Loan Document, as in each case the Administrative Agent may reasonably request (for itself or on behalf of any Lender);

(j)  within 30 calendar days after the end of each fiscal month, a monthly report setting forth key operating metrics in the form attached as Exhibit F;

(k)  promptly after the filing thereof, copies of all pleadings, motions, applications, judicial information, financial information and other papers and documents filed by or on behalf of any Debtor in the Cases; and

50

(l)      any materials regarding the operations, business affairs or financial condition of Holdco, the Borrower or any of the Subsidiaries that is delivered to the Board of Directors of Holdco or the Borrower in connection with a meeting of the Board of Directors of Holdco or the Borrower, as applicable, promptly after such delivery. Notwithstanding anything in this clause (l) to the contrary, any such materials may be redacted or excluded from the materials distributed to the Administrative Agent and the Lenders to the extent that the Board of Directors of Holdco or the Borrower reasonably determines that such exclusion or redaction is required, necessary or desirable (i) to preserve attorney-client privilege, accountant-client privilege, or any other available privilege, (ii) to avoid a conflict of interest between the interests of the Holdco, the Borrower and their Subsidiaries on one hand and those of the Administrative Agent or any Lender, or (iii) to avoid any circumstance where such delivery could reasonably be deemed to violate applicable confidentiality provisions, applicable law or regulations.

Documents required to be delivered pursuant to Section 5.04 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that (x) upon written request by the Administrative Agent or any Lender, the Borrower shall deliver paper copies of such documents (which may be electronic copies delivered via electronic mail) to the Administrative Agent or such Lender and (y) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent and each Lender of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Borrower or the Administrative Agent and maintaining its copies of such documents.

Each party hereto hereby acknowledges that materials and/or information ("Borrower Materials") may be provided on the IntraLinks/IntraAgency or another similar electronic system (the "Platform") and that certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive Material Non-Public Information, and who may be engaged in investment and other market-related activities. Each party hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any Material Non-Public Information (although it may be sensitive and proprietary) with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (provided, however, that the Administrative Agent and the Lenders shall treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information"). Notwithstanding the foregoing, the Borrower shall be under no obligation to mark the Borrower Materials "PUBLIC."

SECTION 5.05   <u>Litigation and Other Notices</u>.  Furnish to the Administrative Agent written notice of the following promptly after any Responsible Officer of Holdco or the Borrower obtains actual knowledge thereof:

(a)      any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) proposed to be taken with respect thereto;

(b)      the filing or commencement of, or any written threat or notice of intention of any person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority or in arbitration, against Holdco, the Borrower or any of the Subsidiaries as to which an adverse determination is reasonably probable and which, if adversely determined, could reasonably be expected to have a Material Adverse Effect;

(c)      the occurrence of any ERISA Event that, together with all other ERISA Events that have occurred, could reasonably be expected to have a Material Adverse Effect; and

(d)      any other development specific to Holdco, the Borrower or any of the Subsidiaries that is not a matter of general public knowledge and that has had, or could reasonably be expected to have, a Material Adverse Effect.

SECTION 5.06   <u>Compliance with Laws</u>.  Except as otherwise excused by the Bankruptcy Code, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; <u>provided</u> that this Section 5.06 shall not apply to Environmental Laws, which are the subject of Section 5.09, or to laws related to Taxes, which are the subject of Section 5.03.

SECTION 5.07   <u>Maintaining Records; Access to Properties and Inspections</u>. Maintain all financial records in a manner sufficient to permit the preparation of consolidated financial statements in accordance with GAAP and permit any persons designated by any Lender to visit and inspect the financial records and the properties of Holdco, the Borrower or any of the Subsidiaries at reasonable times during normal business hours, upon reasonable prior notice to Holdco or the Borrower, and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any persons designated by any Lender upon reasonable prior notice to Holdco or the Borrower to discuss the affairs, finances and condition of Holdco, the Borrower or any of the Subsidiaries with the officers thereof and independent accountants therefor (subject to reasonable requirements of confidentiality, including requirements imposed by law or by contract); provided, that the Borrower shall have the right to have one or more of its designees present during any discussions with its independent accountants.

SECTION 5.08   <u>Use of Proceeds</u>.  Use the proceeds of the Loans only for the purposes set forth in Section 3.12 and in compliance with the Approved Budget.

SECTION 5.09   <u>Compliance with Environmental Laws</u>.  Comply, and make reasonable efforts to cause all lessees and other persons occupying its properties to comply, with

all Environmental Laws applicable to its operations and properties; and obtain and renew all authorizations and permits required pursuant to Environmental Law for its operations and properties, in each case in accordance with Environmental Laws, except, in each case with respect to this Section 5.09, to the extent the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.10    Further Assurances; Mortgages.

(a)    Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, Mortgages and other documents and recordings of Liens in stock registries), that may be required under any applicable law, or that the Administrative Agent or the Required Lenders may reasonably request, to cause the Collateral and Guarantee Requirement to be and remain satisfied, all at the expense of the Loan Parties and provide to the Administrative Agent, from time to time upon reasonable request, evidence reasonably satisfactory to the Required Lenders as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)    If any asset (including any real property (other than real property covered by paragraph (c) below) or improvements thereto or any interest therein) that has an individual fair market value in an amount greater than $1.0 million is acquired by Holdco, the Borrower or any other Loan Party after the Interim Facility Closing Date or owned by an entity at the time it becomes a Subsidiary Loan Party (in each case other than assets constituting Collateral under a Security Document that become subject to the Lien of such Security Document upon acquisition thereof), cause such asset to be subjected to a Lien securing the Obligations and take, and cause the Subsidiary Loan Parties to take, such actions as shall be necessary or reasonably requested by the Administrative Agent or the Required Lenders to grant and perfect such Liens, including actions described in paragraph (a) of this Section, all at the expense of the Loan Parties.

(c)    Grant and cause each of the Subsidiary Loan Parties to grant to the Administrative Agent security interests and mortgages in such owned real property of the Borrower or any such Subsidiary Loan Parties acquired after the Interim Facility Closing Date and having a value at the time of acquisition in excess of $1.0 million pursuant to documentation in such form as is reasonably satisfactory to the Required Lenders (each, a "Mortgage") and constituting valid and enforceable Liens subject to no other Liens except as are permitted by Section 6.02, at the time of perfection thereof, record or file, and cause each such Subsidiary to record or file, the Mortgage or instruments related thereto in such manner and in such places as is required by law to establish, perfect, preserve and protect the Liens in favor of the Administrative Agent required to be granted pursuant to the Mortgages and pay, and cause each such Subsidiary to pay, in full, all Taxes, fees and other charges payable in connection therewith. Unless otherwise waived by the Required Lenders, with respect to each such Mortgage, the Borrower shall deliver to the Administrative Agent contemporaneously therewith (i) a policy or policies or marked-up unconditional binder of title insurance or foreign equivalent thereof, as applicable, paid for by the Borrower, issued by a nationally recognized title insurance

company insuring the Lien of each such Mortgage as a valid first Lien on the Mortgaged Property described therein, free of any other Liens except as permitted by Section 6.02, together with such endorsements, coinsurance and reinsurance as the Required Lenders may reasonably request, (ii) a survey of any Mortgaged Property (and all improvements thereon), or foreign equivalent thereof, as applicable, which is (1) dated (or redated) not earlier than six months prior to the date of delivery thereof unless there shall have occurred within six months prior to such date of delivery any exterior construction on the site of such Mortgaged Property, in which event such survey shall be dated (or redated) after the completion of such construction or if such construction shall not have been completed as of such date of delivery, not earlier than 20 days prior to such date of delivery, (2) certified by the surveyor (in a manner reasonably acceptable to the Required Lenders) to the Administrative Agent and the title insurance company insuring the Mortgage, (3) complying in all respects with the minimum detail requirements of the American Land Title Association as such requirements are in effect on the date of preparation of such survey and (4) sufficient for such title insurance company to remove all standard survey exceptions from the title insurance policy relating to such Mortgaged Property or otherwise reasonably acceptable to the Required Lenders (iii) the legal opinions of local U.S. counsel in the state where such real property is located, in form and substance reasonably satisfactory to the Required Lenders.

(d)     Subject to Bankruptcy Court approval, if any additional direct or indirect Subsidiary of Holdco is formed or acquired after the Interim Facility Closing Date and if such Subsidiary is a Subsidiary Loan Party or any Subsidiary becomes a Debtor under the Cases, within five Business Days after the date such Subsidiary is formed or acquired or becomes a Debtor, notify the Administrative Agent and the Lenders thereof and, within 20 Business Days after the date such Subsidiary is formed or acquired or such longer period as the Required Lenders shall agree, cause the Collateral and Guarantee Requirement to be satisfied with respect to such Subsidiary and with respect to any Equity Interest in or Indebtedness of such Subsidiary owned by or on behalf of any Loan Party.

(e)     If any additional Foreign Subsidiary of Holdco is formed or acquired after the Interim Facility Closing Date and if such Subsidiary is a "first tier" Foreign Subsidiary, within five Business Days after the date such Foreign Subsidiary is formed or acquired, notify the Administrative Agent and the Lenders thereof and, within 20 Business Days after the date such Foreign Subsidiary is formed or acquired or such longer period as the Required Lenders shall reasonably agree, cause the Collateral and Guarantee Requirement to be satisfied with respect to any Equity Interest in such Foreign Subsidiary owned by or on behalf of any Loan Party.

(f)     (i) Furnish to the Administrative Agent prompt written notice of any change in (A) any Loan Party's corporate or organization name, (B) any Loan Party's organizational form or (C) any Loan Party's organizational identification number; provided that the Borrower shall not effect or permit any such change unless all filings have been made, or will have been made within any applicable statutory period, under the Uniform Commercial Code or otherwise that are required in order for the Administrative Agent to continue at all times following such change to have a valid, legal and perfected

54

security interest in all the Collateral for the benefit of the Secured Parties and (ii) promptly notify the Administrative Agent if any material portion of the Collateral is damaged or destroyed.

SECTION 5.11   Fiscal Year; Accounting.   In the case of Holdco and the Borrower, cause its fiscal year to end on December 31.

SECTION 5.12   Cash Management Systems.   Establish and maintain cash management systems in accordance with the "first day orders" and the Orders.

SECTION 5.13   Budget; Variance Reports.   Deliver to the Administrative Agent and the Lenders:

(a)   On or prior to the last Business Day of the first four week period covered in an Approved Budget, commencing on [_____], 2014, an update and extension of the Initial Approved Budget in substantially the same form (including the assumptions and methodology made or used therein) as the Initial Approved Budget covering the following 13-week period (each such update and extension, an "Updated Budget").   For purposes of this Agreement, each of the Initial Approved Budget and the Updated Budgets is referred to herein as an "Approved Budget" and, with respect to any week, the Approved Budget that is applicable to such week for purposes of Section 6.10 shall be the Approved Budget commencing on the first day of the applicable Test Period.   It is hereby understood and agreed that (1) the Lenders shall be deemed to have consented to such Updated Budget unless any Lender submits to the Administrative Agent a written objection to such Updated Budget by 5:00 p.m., Local Time, within 5 Business Days after receipt of such Updated Budget; provided that the Borrower delivers the Updated Budget in a timely manner in accordance with the first sentence of this clause (a) and (2) such Updated Budget shall not become the Approved Budget until the Administrative Agent shall have delivered a notice of approval of such Updated Budget to the Borrower once agreed to by the Required Lenders; provided further that if the Administrative Agent does not deliver a notice of approval to the Borrower, the previously delivered Approved Budget shall continue to constitute the Approved Budget until an Updated Budget is agreed to among the Required Lenders provided that, the Test Period will be reset to begin on the first day of the proposed Updated Budget delivered by the Borrower, notwithstanding the failure of the Required Lenders to approve each Updated Budget; and

(b)   By 12 p.m. Local Time on each Variance Reporting Date, (i) a variance report certified by a Financial Officer of the Borrower, in form acceptable to the Required Lenders in their sole discretion, setting forth (x) the actual cash receipts, expenditures and disbursements for the immediately preceding calendar week (e.g. the calendar week ending on [_____], 2014 with respect to the report delivered on [_____], 2014) on a line-item basis and the aggregate liquidity as of the end of such calendar week and (ii) the variance in dollar amounts of the actual expenditures and disbursements (including debt service, professional fees and capital expenditures) for each weekly period from those reflected for the corresponding period in the then-effective Approved Budget and (y) an analysis, certified by a Responsible Officer of the Borrower, demonstrating compliance with Section 6.10 for such week (if applicable).

# ARTICLE VI

## *Negative Covenants*

Each of Holdco and the Borrower covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document (other than obligations for taxes, costs, indemnifications, reimbursements, damages and other contingent liabilities in respect of which no claim or demand for payment or has been made or, in the case of indemnifications, no notice been given) have been paid in full, unless the Required Lenders shall otherwise consent in writing, neither Holdco nor the Borrower will, nor will they permit any of the Subsidiaries to:

SECTION 6.01    Indebtedness.    Incur, create, assume or permit to exist any Indebtedness, except:

(a)    Indebtedness existing on the Interim Facility Closing Date and set forth on Schedule 6.01 (other than intercompany indebtedness Refinanced with Indebtedness owed to a Person not affiliated with the Borrower or any Subsidiary), provided, that no such Indebtedness shall be permitted to be Refinanced;

(b)    Indebtedness created hereunder and under the other Loan Documents;

(c)    [Intentionally Omitted];

(d)    Indebtedness owed to (including obligations in respect of letters of credit or bank guarantees or similar instruments for the benefit of) any person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance to the Borrower or any Subsidiary, pursuant to reimbursement or indemnification obligations to such person, provided that upon the incurrence of Indebtedness with respect to reimbursement obligations regarding workers' compensation claims, such obligations are reimbursed not later than 60 days following such incurrence;

(e)    Intercompany Indebtedness permitted pursuant to Section 6.04(b);

(f)    Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds, financial assurances and completion guarantees and similar obligations, in each case provided in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(g)    Indebtedness in respect of netting services, overdraft protection and similar arrangements, in each case, in connection with cash management and deposit accounts;

(h)    [Intentionally Omitted];

(i)     [Intentionally Omitted];

(j)     [Intentionally Omitted];

(k)     [Intentionally Omitted];

(l)     Guarantees (i) by Holdco, the Borrower or any Subsidiary Loan Party of any Indebtedness of the Borrower or any Subsidiary Loan Party permitted to be incurred under this Agreement and (ii) by any Foreign Subsidiary of Indebtedness of another Foreign Subsidiary;

(m)     Indebtedness arising from agreements of the Borrower or any Subsidiary providing for indemnification, adjustment of purchase or acquisition price or similar obligations, in each case, incurred or assumed in connection with the acquisition or disposition of any business, assets (including Equity Interests of Subsidiaries) of the Borrower or any Subsidiary permitted by Section 6.05, other than Guarantees of Indebtedness incurred by any person acquiring all or any portion of such business or assets for the purpose of financing such acquisition;

(n)     [Intentionally Omitted];

(o)     [Intentionally Omitted];

(p)     Indebtedness consisting of (x) the financing of insurance premiums or (y) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(q)     [Intentionally Omitted];

(r)     [Intentionally Omitted];

(s)     [Intentionally Omitted];

(t)     [Intentionally Omitted];

(u)     unsecured Indebtedness owed to vendors under vendor agreements which can be satisfied though delivery of product rather than cash payments in a manner substantially consistent with the past practice of the Borrower;

(v)     [Intentionally Omitted];

(w)     [Intentionally Omitted];

(x)     other Indebtedness of the Borrower or any Subsidiary, in an aggregate principal amount that at the time of, and after giving effect to, the incurrence thereof, would not exceed $250,000; and

(y)     all premium (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on Indebtedness described in

paragraphs (a) through (x) above, other than such amounts that are capitalized (i.e. added to principal).

SECTION 6.02    Liens.  Create, incur, assume or permit to exist any Lien on any property or assets (including Equity Interests, evidences of Indebtedness or other securities of any person, including the Borrower and any Subsidiary) at the time owned by it or on any income or revenues or rights in respect of any thereof, except:

(a)    Liens on property or assets of the Borrower and the Subsidiaries existing on the Interim Facility Closing Date and set forth on Schedule 6.02(a); provided that such Liens shall secure only those obligations that they secure on the Interim Facility Closing Date and shall not subsequently apply to any other property or assets of the Borrower or any Subsidiary;

(b)    any Lien created under the Loan Documents or permitted in respect of any Mortgaged Property by the terms of the applicable Mortgage;

(c)    [Intentionally Omitted];

(d)    Liens for Taxes, assessments or other governmental charges or levies not yet delinquent or that are being contested in compliance with Section 5.03;

(e)    landlord's, carriers', warehousemen's, mechanics', materialmen's, repairmen's, construction or other like Liens arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or that are being contested in good faith by appropriate proceedings and in respect of which, if applicable, the Borrower or any Subsidiary shall have set aside on its books reserves in accordance with GAAP;

(f)    (i) pledges and deposits made in the ordinary course of business in compliance with the Federal Employers Liability Act or any other workers' compensation, unemployment insurance and other social security laws or regulations and deposits securing liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations and (ii) pledges and deposits securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit, bank guarantees or similar instruments for the benefit of) insurance carriers in respect of property, casualty or liability insurance to the Borrower or any Subsidiary provided by such insurance carriers;

(g)    deposits to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance and return of money bonds, bids, leases, government contracts, and other obligations of a like nature (including letters of credit, bank guarantees or similar instruments in lieu of any such bonds or to support the issuance thereof) incurred in the ordinary course of business, including those incurred pursuant to Environmental Law in the ordinary course of business;

(h)      zoning restrictions, easements, trackage rights, leases (other than Capital Lease Obligations), licenses, special assessments, rights-of-way, restrictions on use of real property and other similar encumbrances incurred in the ordinary course of business that, in the aggregate, do not interfere in any material respect with the ordinary conduct of the business of the Borrower or any Subsidiary;

(i)      [Intentionally Omitted];

(j)      [Intentionally Omitted];

(k)      [Intentionally Omitted];

(l)      Liens disclosed by the title insurance policies delivered pursuant to Section 5.10 and any replacement, extension or renewal of any such Lien; provided that such replacement, extension or renewal Lien shall not cover any property other than the property that was subject to such Lien prior to such replacement, extension or renewal; provided, further, that the Indebtedness and other obligations secured by such replacement, extension or renewal Lien are permitted by this Agreement;

(m)      any interest or title of a lessor or sublessor under any leases or subleases entered into by the Borrower or any Subsidiary in the ordinary course of business;

(n)      Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or any Subsidiary or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any Subsidiary in the ordinary course of business;

(o)      Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(p)      Liens securing obligations in respect of trade-related letters of credit permitted under Section 6.01(f) and covering the goods (or the documents of title in respect of such goods) financed by such letters of credit and the proceeds and products thereof;

(q)      licenses or sublicenses of intellectual property granted in the ordinary course of business;

(r)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(s)      [Intentionally Omitted];

(t)      Liens with respect to property or assets of any Foreign Subsidiary securing Indebtedness of a Foreign Subsidiary permitted under Section 6.01;

(u)      Liens arising from precautionary UCC financing statements regarding operating leases;

(v)      [Intentionally Omitted];

(w)      Liens on securities that are the subject of repurchase agreements constituting Permitted Investments under clause (c) of the definition thereof arising out of such repurchase transaction;

(x)      [Intentionally Omitted];

(y)      [Intentionally Omitted]; and

(z)      other Liens with respect to property or assets of the Borrower or any Subsidiary; provided that the amount of the Indebtedness or other obligations secured by such Liens does not exceed $250,000 at any time.

SECTION 6.03    Sale and Lease-Back Transactions.    Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and substantially contemporaneously rent or lease from the transferee such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

SECTION 6.04    Investments, Loans and Advances.    Purchase, hold or acquire any Equity Interests, evidences of Indebtedness or other securities of, make or permit to exist any loans or advances to or Guarantees of the obligations of, or make or permit to exist any investment or any other interest in (each, an "Investment"), any other person, except:

(a)      [Intentionally Omitted];

(b)      (i) Investments by Holdco, the Borrower or any Subsidiary in the Equity Interests of the Borrower or any Subsidiary Loan Party; (ii) intercompany loans from Holdco, the Borrower or any Subsidiary to the Borrower or any Subsidiary Loan Party; and (iii) Guarantees by Holdco, the Borrower or any Subsidiary Loan Party of Indebtedness otherwise expressly permitted hereunder of Holdco, the Borrower or any Subsidiary Loan Party;

(c)      Permitted Investments and investments that were Permitted Investments when made;

(d)      Investments arising out of the receipt by the Borrower or any Subsidiary of non-cash consideration for the sale of assets permitted under Section 6.05 (excluding Section 6.05(e));

(e)        [Intentionally Omitted];

(f)        accounts receivable, security deposits and prepayments arising and trade credit granted in the ordinary course of business and any assets or securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss and any prepayments and other credits to suppliers made in the ordinary course of business;

(g)        [Intentionally Omitted];

(h)        Investments existing on the Interim Facility Closing Date and set forth on <u>Schedule 6.04</u>;

(i)        Investments resulting from pledges and deposits permitted by Section 6.02(f) and (g);

(j)        [Intentionally Omitted];

(k)        intercompany loans between Foreign Subsidiaries and Guarantees permitted by Sections 6.01(l);

(l)        Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers, in each case in the ordinary course of business;

(m)        Investments of a Subsidiary acquired after the Interim Facility Closing Date or of a person merged into the Borrower or merged into or consolidated with a Subsidiary, in each case, in accordance with Section 6.05 (other than Section 6.05(e)), after the Interim Facility Closing Date to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(n)        [Intentionally Omitted];

(o)        [Intentionally Omitted];

(p)        [Intentionally Omitted];

(q)        [Intentionally Omitted];

(r)        Loans to franchisees in accordance with the Approved Budget and the Permitted Variance Amount for the applicable Test Period in an aggregate amount not to exceed $100,000 at any time;

(s)        Investments by the Borrower or any Subsidiary in Quiz-DIA LLC to the extent the proceeds of such Investments are used by Quiz-DIA LLC in compliance

with the Approved Budget and the Permitted Variance Amount for the applicable Test Period; and

(t)    Investments in the form of notes received as consideration for the sale of Equity Interests permitted by Section 6.05(h);

For the avoidance of doubt, any payments made by the Borrower or any Subsidiary to or through the Marketing Fund Trusts that are classified as operating expenses in the Combined financial statements of the Borrower shall not constitute Investments.

SECTION 6.05    Mergers, Consolidations, Sales of Assets and Acquisitions. Merge into or consolidate with any other person, or permit any other person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of related transactions) all or any part of its assets (whether now owned or hereafter acquired), or issue, sell, transfer or otherwise dispose of any Equity Interests of the Borrower or any Subsidiary (other than by the Borrower to Holdco, by the Borrower (of Equity Interests of a Subsidiary) or a Subsidiary to the Borrower or any Subsidiary Loan Party or by any Foreign Subsidiary to another Foreign Subsidiary), or purchase, lease or otherwise acquire (in one transaction or a series of related transactions) all or substantially all of the assets of any other person, or a division or line of business of any other person, except that this Section shall not prohibit:

(a)    (i) the purchase and sale of inventory in the ordinary course of business by the Borrower or any Subsidiary, (ii) the acquisition or lease of any other asset in the ordinary course of business by the Borrower or any Subsidiary, (iii) the sale of surplus, obsolete or worn out equipment or other property in the ordinary course of business by the Borrower or any Subsidiary, (iv) the leasing or subleasing of real property in the ordinary course of business by the Borrower or any Subsidiary or (v) the sale of or other disposition of Permitted Investments in the ordinary course of business;

(b)    if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing, (i) the merger of any Subsidiary into the Borrower in a transaction in which the Borrower is the surviving or resulting entity, (ii) the merger or consolidation of any Subsidiary into or with any Subsidiary Loan Party in a transaction in which the surviving or resulting entity is a Subsidiary Loan Party and, in the case of each of clauses (i) and (ii), no person other than the Borrower or Subsidiary Loan Party receives any consideration pursuant thereto except to the extent otherwise permitted by this Agreement, (iii) the merger or consolidation of any Subsidiary that is not a Subsidiary Loan Party into or with any other Subsidiary that is not a Subsidiary Loan Party or (iv) the liquidation or dissolution or change in form of entity of any Subsidiary (other than the Borrower) if the Borrower determines in good faith that such liquidation, dissolution or change in form is in the best interests of the Borrower and is not materially disadvantageous to the Lenders and no person other than the Borrower or any Subsidiary receives any consideration pursuant thereto except to the extent otherwise permitted by this Agreement;

(c)      sales, transfers, leases or other dispositions to the Borrower or a Subsidiary (upon voluntary liquidation or otherwise); provided that any sales, transfers, leases or other dispositions by a Loan Party to a Subsidiary that is not a Subsidiary Loan Party shall be made in compliance with Section 6.07 and Section 6.04;

(d)      [Intentionally Omitted];

(e)      Investments permitted by Section 6.04, Liens permitted by Section 6.02, and dividends, distributions, redemptions and repurchases permitted by Section 6.06;

(f)      the sale of defaulted receivables in the ordinary course of business and not as part of an accounts receivables financing transaction;

(g)      [Intentionally Omitted];

(h)      the sale of 6.67% of the Equity Interests in Quiz-DIA LLC for a purchase price of not more than $500,000;

(i)      [Intentionally Omitted];

(j)      licensing and cross-licensing arrangements involving any technology or other intellectual property of the Borrower or any Subsidiary in the ordinary course of business;

(k)      sales, leases or other dispositions of inventory of the Borrower and its Subsidiaries determined by the management of the Borrower to be no longer useful or necessary in the operation of the business of the Borrower or any of the Subsidiaries;

(l)      [Intentionally Omitted];

(m)      contributions, assignments or other transfers of the right of the Borrower or any Subsidiary to receive advertising fees from franchisees, or of such advertising fees or proceeds thereof, to the Marketing Fund Trusts;

(n)      [Intentionally Omitted]; and

(o)      sales, transfers, leases or other dispositions of vendor-supplied equipment as required by the vendor contract(s) pursuant to which such equipment was supplied.

Notwithstanding anything to the contrary contained in this Section 6.05, (i) no sale, transfer or other disposition of assets shall be permitted by this Section 6.05 (other than sales, transfers, leases or other dispositions pursuant to clause (c) or (m)) unless such disposition is for fair market value and (ii) no sale, transfer or other disposition of assets shall be permitted by paragraph (a) or (k) of this Section 6.05 unless such disposition is for at least 75% cash consideration (other than resales of area directorships or master franchisees, which shall be for at least 50% cash consideration); provided that for purposes of the 75% cash consideration

requirement in the foregoing clause (ii), (x) the amount of any Indebtedness of the Borrower or any Subsidiary Loan Party (as shown on the Borrower's or such Subsidiary's most recent balance sheet or in the notes thereto) that is assumed by the transferee of any such assets and (y) the amount of any trade-in value applied to the purchase price of any replacement assets acquired in connection with such sale, transfer or disposition shall be deemed to be cash.

SECTION 6.06    Dividends and Distributions.    Declare or pay, directly or indirectly, any dividend or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of its Equity Interests (other than dividends and distributions on Equity Interests payable solely by the issuance of additional Equity Interests of the person paying such dividends or distributions) or directly or indirectly redeem, purchase, retire or otherwise acquire for value (or permit any Subsidiary to purchase or acquire) any of its Equity Interests or set aside any amount for any such purpose (other than through the issuance of additional Equity Interests of the person redeeming, purchasing, retiring or acquiring such shares); provided, however, that:

(a)    any Subsidiary of the Borrower may declare and pay dividends to, repurchase its Equity Interests from or make other distributions to the Borrower or to any Wholly Owned Subsidiary of the Borrower; and

(b)    the Borrower may declare and pay dividends or make other distributions in compliance with the Approved Budget and the Permitted Variance Amount for the applicable Test Period as shall be necessary to allow Holdco to pay overhead, legal, accounting and other professional fees and expenses and other fees and expenses reasonably required in connection with the maintenance of its existence and its ownership of the Borrower.

SECTION 6.07    Transactions with Affiliates.

(a)    Sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transaction with, any of its Affiliates or any known direct or indirect holder of 10% or more of the Equity Interests in Holdco, unless such transaction is (i) otherwise permitted (or required) under this Agreement or (ii) upon terms no less favorable to Holdco, the Borrower or such Subsidiary, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an Affiliate; provided that this clause (ii) shall not apply to the indemnification of directors of any Parent Entity, the Borrower and the Subsidiaries in accordance with customary practice.  Any transaction or series of related transactions involving the payment of less than $50,000 with any such Affiliate or 10% holder shall be deemed to have satisfied the standard set forth in clause (ii) above if such transaction is approved by a majority of the Disinterested Directors of the board of managers (or equivalent governing body) of any Parent Entity, the Borrower or such Subsidiary.

(b)    The foregoing paragraph (a) shall not prohibit, to the extent otherwise permitted under this Agreement,

(i)    any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock options and stock ownership plans approved by the board of directors (or equivalent governing body) of any Parent Entity,

(ii)    [Intentionally Omitted],

(iii)    transactions among Holdco, the Borrower and the Subsidiary Loan Parties and transactions among the Subsidiary Loan Parties otherwise permitted by this Agreement,

(iv)    the payment of fees and indemnities to directors, officers, consultants and employees of Holdco, the Borrower and the Subsidiaries in the ordinary course of business,

(v)    transactions pursuant to the permitted agreements in existence on the Interim Facility Closing Date and set forth on Schedule 6.07 or any amendment thereto to the extent such amendment is not adverse to the Lenders in any material respect,

(vi)    (A) any employment or severance agreements or arrangements entered into by the Borrower or any of the Subsidiaries in the ordinary course of business, (B) any subscription agreement or similar agreement pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with employees, officers or directors, and (C) any employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers employees, and any reasonable employment contract or arrangement and transactions pursuant thereto,

(vii)    dividends, distributions and repurchases permitted under Section 6.06,

(viii)    any purchase by Holdco of or contributions to, the equity capital of the Borrower; provided that all Equity Interests of the Borrower shall be pledged to the Administrative Agent on behalf of the Secured Parties pursuant to the Collateral Agreement,

(ix)    [Intentionally Omitted],

(x)    transactions with Subsidiary Loan Parties for the purchase or sale of goods, products, parts and services entered into in the ordinary course of business in a manner consistent with past practice,

(xi)    [Intentionally Omitted],

(xii)    [Intentionally Omitted],

(xiii)    [Intentionally Omitted],

(xiv)    [Intentionally Omitted],

(xv)    transfers permitted by Section 6.05(m),

(xvi)    [Intentionally Omitted] or

(xvii)    [Intentionally Omitted].

Neither Holdco, the Borrower nor any Subsidiary shall engage in any transaction with an Affiliate consisting of the payment of monitoring, management or similar fees even if such transaction would otherwise be permitted under this Section 6.07.

SECTION 6.08    Business of Holdco, the Borrower and the Subsidiaries.

(a)    Notwithstanding any other provisions hereof, except as required by the Bankruptcy Code or any order of the Bankruptcy Court, engage at any time in any business or business activity other than:

(i)    in the case of Holdco, (A) ownership and acquisition of Equity Interests in the Borrower, together with activities directly related thereto, (B) performance of its obligations under and in connection with the Loan Documents, the Pre-Petition Indebtedness and the other agreements contemplated hereby and thereby, (C) actions incidental to the consummation of the Transactions, (D) the incurrence of and performance of its obligations related to Indebtedness and Guarantees incurred by Holdco after the Interim Facility Closing Date and permitted hereunder, (E) actions required by law to maintain its existence, (F) the payment of dividends permitted hereunder and taxes, (G) the issuance of Equity Interests and other Junior Capital and (H) activities incidental to its maintenance and continuance and to the foregoing activities, or

(ii)    in the case of the Borrower and any Subsidiary, any business or business activity conducted by any of them on the Interim Facility Closing Date and any business or business activities incidental or related thereto, or any business or activity that is reasonably similar thereto or a reasonable extension, development or expansion thereof or ancillary thereto.

(b)    Permit the Marketing Fund Trusts or the trustees thereof to engage at any time in any business or business activity other than those permitted under the applicable trust agreement as in effect on the date hereof, reasonable extensions thereof and activities relating to the foregoing.

Notwithstanding anything to the contrary contained in herein, (i) Holdco shall at all times own directly 100% of the Equity Interests of the Borrower and (ii) Holdco shall not sell, dispose of,

grant a Lien on or otherwise transfer such Equity Interests in the Borrower (other than Liens created by the Collateral Documents and the documents governing the Pre-Petition Indebtedness).

SECTION 6.09    Limitation on Modifications of Indebtedness; Modifications of Certificate of Incorporation, By-Laws and Certain Other Agreements;  etc.

(a)    (i) Except as required by the Bankruptcy Code or any order of the Bankruptcy Court, amend, modify, grant any waiver or release under, or terminate in any manner, the articles or certificate of incorporation or by-laws or limited liability company operating agreement or similar governing documents of Holdco, the Borrower or any of the Subsidiary Loan Parties or (ii) amend the subordination terms of The Quizno's Master LLC Key Management Wealth Building Program as in effect on the date hereof.

(b)    (i) Other than (x) adequate protection payments with Cash Collateral of the Marketing Fund Trusts to Vectra as set forth in the Orders or (y) payments authorized by the Bankruptcy Court and in accordance with the Approved Budget, make, or agree to make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Junior Indebtedness, Pre-Petition Indebtedness, the Vectra Indebtedness or other Indebtedness incurred prior to the Petition Date, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Junior Indebtedness, Pre-Petition Indebtedness, the Vectra Indebtedness or other Indebtedness incurred prior to the Petition Date; or (ii) amend or modify, or permit the amendment or modification of, any provision of any Junior Indebtedness, Pre-Petition Indebtedness, the Vectra Indebtedness or any agreement (including any document relating to any Junior Indebtedness, Pre-Petition Indebtedness) relating thereto, other than amendments or modifications that are not materially adverse to Lenders and that do not affect the subordination provisions thereof (if any) in a manner adverse to the Lenders.

(c)    Permit the Borrower or any Subsidiary to enter into any agreement or instrument that by its terms restricts (i) the payment of dividends or distributions or the making of cash advances to (or the repayment of cash advances from) the Borrower or any Subsidiary that is a direct or indirect parent of any Subsidiary or (ii) the granting of Liens pursuant to the Security Documents, in each case other than those arising under any Loan Document, except, in each case, restrictions existing by reason of:

(A)    restrictions imposed by applicable law;

(B)    contractual encumbrances or restrictions in effect on the Interim Facility Closing Date (including under the Pre-Petition Indebtedness or the Vectra Indebtedness), or any agreement (regardless of whether such agreement is in effect on the Interim Facility Closing Date) providing for the subordination of Subordinated Intercompany Debt;

(C)      any restriction on a Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of all or substantially all the Equity Interests or assets of a Subsidiary pending the closing of such sale or disposition;

(D)      customary provisions in joint venture agreements and other similar agreements applicable to joint ventures entered into in the ordinary course of business;

(E)      any restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent that such restrictions apply only to the property or assets securing such Indebtedness;

(F)      customary provisions contained in leases or licenses of intellectual property and other similar agreements entered into in the ordinary course of business;

(G)      customary provisions restricting subletting or assignment of any lease governing a leasehold interest;

(H)      customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

(I)      customary restrictions and conditions contained in any agreement relating to the sale of any asset permitted under Section 6.05 pending the consummation of such sale;

(J)      customary restrictions and conditions contained in the document relating to any Lien, so long as (1) such Lien is permitted under Section 6.02 and such restrictions or conditions relate only to the specific asset subject to such Lien, and (2) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 6.09;

(K)      customary net worth provisions contained in real property leases entered into by Subsidiaries of the Borrower, so long as the Borrower has determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of the Borrower and its Subsidiaries to meet their ongoing obligations;

(L)      any agreement in effect at the time such subsidiary becomes a Subsidiary, so long as such agreement was not entered into in contemplation of such person becoming a Subsidiary; or

(M)      restrictions contained in any documents documenting Indebtedness of any Foreign Subsidiary permitted hereunder.

SECTION 6.10   <u>Financial Covenant</u>.   Commencing on the Petition Date and continuing for each week thereafter, permit operating cash flow (as defined in the Approved Budget) (excluding (i) any proceeds of the Loans and (ii) payment of (w) allowed professional fees and expenses of Estate Professionals and Creditors Committee Professionals, (x) fees and expenses of the Administrative Agent and the Lenders, (y) interest and fees payable relating to the Loans and (z) cash collateral required to be provided by Quiz-DIA LLC to bond issuers in support of construction bonds issued on behalf of Quiz-DIA LLC) to have a negative variance of greater than the Permitted Variance Amount for the applicable week(s) of any Test Period.

SECTION 6.11   <u>Orders; Administrative Priority; Lien Priority; Payment of Claims</u>.

(a)   at any time, create or permit to exist (i) subject to the Carve-Out Expenses and the Liens securing the Vectra Indebtedness, any administrative expense, unsecured claim or other Superpriority Claim against any of the Loan Parties or their Subsidiaries (now existing or hereafter arising) of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in, or arising or ordered under, the Bankruptcy Code equal or superior to the priority of the administrative priority granted herein (and under the other Loan Documents) and pursuant to the Orders to the Administrative Agent and the Lenders in respect of the Obligations or apply to the Bankruptcy Court for authority to do so, or (ii) any obligation to make adequate protection payments, or otherwise provide adequate protection, other than pursuant to the Orders;

(b)   without the prior written consent of the Required Lenders, make, or permit to be made, any change, amendment or modification, or any application or motion for any change, amendment or modification, to any Order;

(c)   (i) assume or reject any executory contract or unexpired lease without the consent of the Required Lenders, which consent will not be unreasonably withheld, or (ii) consent to termination or reduction of the Exclusivity Period or fail to object to any motion seeking to terminate or reduce the Exclusivity Period other than a motion filed by or with the consent of the Required Lenders, which consent will not be unreasonably withheld;

(d)   create or permit to exist any Liens or encumbrances on any assets, other than liens securing this Agreement and any Liens permitted pursuant to Section 6.02 (which Liens shall include Liens securing the Vectra Indebtedness and scheduled Liens in existence on the Interim Facility Closing Date which shall be subordinated to the extent required pursuant to the Orders); or

(e)   assert any right of subrogation or contribution against any other Debtor until all Obligations under this Agreement are paid in full and the Commitments are terminated.

SECTION 6.12   <u>Use of Cash Collateral</u>.   No Cash Collateral, the Loans or the Collateral shall be used:

(a)   in connection with, subject to the Debtors' right to seek an emergency hearing, preventing, hindering, or delaying any of the Administrative Agent's, the Lenders', the Prepetition First Lien Agent's (as defined in the Orders), or the Prepetition First Lien Lenders'

(as defined in the Orders) enforcement or realization upon any of the Collateral once an Event of Default has occurred;

(b)     in connection with using or seeking to use Cash Collateral or selling or otherwise disposing of Collateral without the consent of the Required Lenders;

(c)     for any purpose that is prohibited under the Bankruptcy Code, the Orders or the Loan Documents;

(d)     to finance in any way any adversary action, suit, arbitration, proceeding, application, motion or other litigation or challenge of any type adverse to the interests of any or all of (i) the Administrative Agent, the Lenders, any agent under the Pre-Petition First Lien Credit Agreement or any lender under the Pre-Petition First Lien Credit Agreement or their respective rights and remedies under the Loan Documents, the Orders or the Pre-Petition First Lien Credit Agreement and related documents; (ii) the lenders under the Pre-Petition Second Lien Credit Agreement, any agent under the Pre-Petition Second Lien Credit Agreement or their respective rights and remedies under the Orders or the Pre-Petition Second Lien Credit Agreement and all instruments and documents executed at any time in connection therewith; and (iii) Vectra or its respective rights and remedies under the Orders or the Vectra Credit Agreement (as defined in the Orders) and all instruments and documents executed at any time in connection therewith; provided that, notwithstanding the foregoing, no more than $25,000 in the aggregate of the Cash Collateral, the Loans, the Collateral or the Carve-Out Expenses may be used by any statutory committee of unsecured creditors appointed in the Cases to investigate the validity, enforceability or priority of the obligations under the Pre-Petition First Lien Credit Agreement, the Pre-Petition Second Lien Credit Agreement or the Vectra Credit Agreement or the Liens securing the Pre-Petition First Lien Indebtedness, Pre-Petition Second Lien Indebtedness or the Vectra Indebtedness, or investigate any claims and defenses or other causes of action against the administrative agent or lenders under the Pre-Petition First Lien Credit Agreement, the Pre-Petition Second Lien Credit Agreement or the Vectra Credit Agreement;

(e)     for the payment of fees, expenses, interest or principal under the Pre-Petition First Lien Credit Agreement or the Vectra Credit Facility, except as set forth in the Orders;

(f)     to make any distribution under a Reorganization Plan except as agreed in writing by the Required Lenders; or

(g)     to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other Governmental Authority without the prior written consent of the Administrative Agent acting at the direction of the Required Lenders.

ARTICLE VII

*Events of Default*

SECTION 7.01    <u>Events of Default</u>.  In case of the happening of any of the following events (each, an "<u>Event of Default</u>"):

(a) any representation or warranty made or deemed made by Holdco, the Borrower or any other Loan Party in any Loan Document, or in any certificate or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made pursuant to the terms of the Loan Documents or furnished by Holdco, the Borrower or any other Loan Party;

(b) default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c) default shall be made in the payment of any interest on any Loan or in the payment of any Fee or any other amount (other than an amount referred to in (b) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of three Business Days;

(d) default shall be made in the due observance or performance by Holdco, the Borrower or any of the Subsidiaries of any covenant, condition or agreement contained in Section 5.01(a) (with respect to Holdco or the Borrower), 5.04(a), 5.04(b) 5.04(c), 5.04(d), 5.05(a), 5.07, 5.08, 5.13 or in Article VI and, in the case of a default under Section 5.04(a), 5.04(b) 5.04(c), 5.04(d) or 5.13, such default shall continue unremedied for a period of two Business Days after the earlier of (i) notice thereof from the Administrative Agent or any Lender to the Borrower and (ii) the date on which such default shall first become known to any officer of the Borrower;

(e) default shall be made in the due observance or performance by Holdco, the Borrower or any of the Subsidiaries of any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraphs (b), (c) and (d) above) and such default shall continue unremedied for a period of 30 days after notice thereof from the Administrative Agent or the Required Lenders to the Borrower;

(f) except to the extent resulting or arising from the Cases, (i) any event or condition occurs that (A) results in any Material Indebtedness becoming due prior to its scheduled maturity or (B) enables or permits (with all applicable grace periods having expired) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity or (ii) Holdco, the Borrower or any of the Subsidiaries shall fail to pay the principal of any Material Indebtedness at the stated final maturity thereof; provided that this paragraph (f) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness if such sale or transfer is permitted hereunder;

(g) there shall have occurred a Change in Control;

(h) an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of

71

any Non-Debtor Subsidiary, or of a substantial part of the property or assets of any Non-Debtor Subsidiary, under Title 11 of the United States Code, as now constituted or hereafter amended, or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Non-Debtor Subsidiary or for a substantial part of the property or assets of any Non-Debtor Subsidiary or (iii) the winding-up or liquidation of any Non-Debtor Subsidiary (except in a transaction permitted by Section 6.05); and such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)        any Non-Debtor Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended, or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in paragraph (h) above, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Non-Debtor Subsidiary or for a substantial part of the property or assets of any Non-Debtor Subsidiary, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) become unable or admit in writing its inability or fail generally to pay its debts as they become due;

(j)        the failure by Holdco, the Borrower or any Subsidiary to pay one or more final judgments aggregating in excess of $500,000 (to the extent not covered by third-party insurance as to which the insurer has been notified of such judgment and does not deny coverage), which judgments are not discharged or effectively waived or stayed for a period of 30 consecutive days, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of Holdco, the Borrower or any Subsidiary to enforce any such judgment;

(k)        (i) a Reportable Event or Reportable Events shall have occurred with respect to any Plan or a trustee shall be appointed by a United States district court to administer any Plan, (ii) the PBGC shall institute proceedings (including giving notice of intent thereof) to terminate any Plan or Plans, (iii) Holdco, the Borrower or any Subsidiary or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such person does not have reasonable grounds for contesting such Withdrawal Liability or is not contesting such Withdrawal Liability in a timely and appropriate manner, (iv) Holdco, the Borrower or any Subsidiary or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA or (v) Holdco, the Borrower or any Subsidiary shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan; and in each case in clauses (i) through (v) above, such event or condition,

together with all other such events or conditions, if any, could reasonably be expected to have a Material Adverse Effect;

(l)     (i) any Loan Document shall for any reason cease to be, or shall be asserted in writing by Holdco, the Borrower or any Subsidiary not to be, a legal, valid and binding obligation of any party thereto, (ii) the Guarantees pursuant to the Security Documents by Holdco, the Borrower or the Subsidiary Loan Parties of any of the Obligations shall cease to be in full force and effect (other than in accordance with the terms thereof), or shall be asserted in writing by Holdco or the Borrower or any Subsidiary Loan Party not to be in effect or not to be legal, valid and binding obligations or (iii) the Obligations of the Borrower or the Guarantees pursuant to the Security Documents by Holdco, the Borrower or the Subsidiary Loan Parties shall cease to constitute senior indebtedness under the subordination provisions of any indenture or other instruments, agreements and documents evidencing or governing any Junior Indebtedness or such subordination provisions shall be invalidated or otherwise cease (in each case so long as such indenture, instrument, agreement or document is then in effect), or shall be asserted in writing by Holdco, the Borrower or any Subsidiary Loan Party to be invalid or to cease to be legal, valid and binding obligations of the parties thereto, enforceable in accordance with their terms;

(m)     The Final Order Entry Date shall not have occurred within 30 days after the Interim Order Entry Date;

(n)     (i) Any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, (ii) any Debtor shall file a motion or other pleading seeking the dismissal of any of the Cases under Section 1112 of the Bankruptcy Code or otherwise or (iii) the Borrower's Board of Directors shall authorize a liquidation of the Borrower's business;

(o)     Any Debtor files a motion in the Cases without the express written consent of the Required Lenders, to obtain additional financing from a party other than Lenders under Section 364(d) of the Bankruptcy Code or to use cash collateral of a Lender under Section 363(c) of the Bankruptcy Code;

(p)     Any Debtor shall file a motion seeking, or the Bankruptcy Court shall enter an order (i) approving any payment on obligations incurred before the Petition Date other than payments authorized by the Bankruptcy Court in accordance with "first day" orders and included in the Approved Budget or otherwise consented to by the Required Lenders in writing, (ii) granting relief from the automatic stay to any holder of any Lien to permit foreclosure on any assets having a book value in excess of $500,000 in the aggregate or permit other actions that would have a Material Adverse Effect on the Debtors or their estates or (iii) approving any settlement or other stipulation not approved by the Required Lenders and not included in the Approved Budget with any secured creditor of any Debtor providing for payments as adequate protection or otherwise to such secured creditor;

(q)     Any Order shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or any Debtor shall apply for authority to do so) without the written consent of the Required Lenders or any Order shall cease to be in full force and effect;

(r)     Any of the Debtors shall fail to comply with the terms and conditions of any Order in any material respect;

(s)     An order with respect to any of the Cases shall be entered by the Bankruptcy Court appointing or designating (i) a trustee under Section 1104 of the Bankruptcy Code, (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code or (iii) a receiver;

(t)     Entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of the Borrower to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code (the "Exclusivity Period"), without the prior written consent of the Required Lenders, which consent will not be unreasonably withheld;

(u)     Any Debtor shall support any other Person's opposition of any motion made in the Bankruptcy Court by the Lenders seeking confirmation of the amount of the Lenders' claim or the validity and enforceability of the Liens in favor of the Administrative Agent.

(v)     (i) The Debtors shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Debtors) any other Person's motion to, disallow in whole or in part the Lenders' claim in respect of the Obligations under the Loan Documents or to challenge the validity and enforceability of the Liens in favor of the Administrative Agent or contest any material provision of any Loan Document or (ii) such Liens and/or Superpriority Claims shall otherwise cease to be valid, perfected and enforceable in all respects;

(w)     (i) The Debtors or any of their Subsidiaries shall file any pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or (ii) entry of an order of the Bankruptcy Court with respect to any pleading or proceeding brought by any other Person which results in such a material impairment of the rights or interests of the Lenders;

(x)     Any Obligor shall fail to promptly execute and deliver to the Administrative Agent any agreement, financing statement, trademark filing, copyright filing, mortgages, notices of lien or similar instruments or other documents that the Administrative Agent may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the Liens created in favor of the Administrative Agent;

(y)     The Reorganization Plan filed on the Petition Date is (i) amended, supplemented or otherwise modified in a manner adverse to the Lenders without the prior

written consent of the Required Lenders, which consent will not be unreasonably withheld or (ii) withdrawn without the prior written consent of the Required Lenders;

(z)    The confirmation order is (i) not in form and substance satisfactory to the Required Lenders; (ii) not entered by the Bankruptcy Court on or before 11:59 p.m. Local Time on the date that is 80 days after the Petition Date, or such later date to which the Required Lenders have consented in writing or (iii) amended, supplemented, reversed, vacated or otherwise modified without the prior written consent of the Required Lenders, which consent will not be unreasonably withheld;

(aa)    The effective date of the Reorganization Plan shall not have occurred on or before 11:59 p.m. Local Time on the date that is 100 days after the Petition Date, or such later date to which the Required Lenders have consented in writing; or

(bb)    The occurrence of a Termination Event (as defined in the Restructuring Support Agreement);

then, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent, at the request of the Required Lenders, shall, upon notice to the Borrower, take any or all of the following actions,, in each case, without further order of, or application to the Bankruptcy Court, at the same or different times:  (i) terminate forthwith the Commitments and (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding.

## ARTICLE VIII

### The Administrative Agent

SECTION 8.01    <u>Appointment</u>.  Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.  Without limiting the generality of the foregoing, the Administrative Agent is hereby expressly authorized to execute any and all

documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents. Notwithstanding anything to the contrary herein, express or implied, the Administrative Agent shall have no duty to take any discretionary action or exercise any discretionary powers (including making any determination or deeming any matter appropriate, necessary or satisfactory) unless it first receives written direction from the Required Lenders.

SECTION 8.02    Delegation of Duties.   The Administrative Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care. The exculpatory provisions of this Article VIII shall apply to any such agent and attorney-in-fact and to the Related Parties of the Administrative Agent and any such agent or attorney-in-fact.

SECTION 8.03    Exculpatory Provisions.   The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents.  Neither the Administrative Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such person's own gross negligence or willful misconduct), (ii) responsible in any manner to any of the Lenders for (or have any duty to ascertain or inquire into any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party a party thereto to perform its obligations hereunder or thereunder.  The Administrative Agent shall not (x) be subject to any fiduciary or other implied duties regardless of whether a Default has occurred and is continuing (y) except as expressly set forth in the Loan Documents, have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to Holdco, the Borrower or any Subsidiary that is communicated to or obtained by the bank serving as Administrative Agent or any of its affiliates in any capacity.  The Administrative Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.  The Administrative Agent or its directors, officers, employees, or agents shall not be: (i) except for the safe custody of any physical Collateral in its possession, responsible to any other Secured Party for the state or condition of any properties of the Loan Parties or any other obligor hereunder constituting Collateral for the Obligations or any information contained in the books or records of the Loan Parties or (ii) responsible to any other Secured Party for the validity, creation, maintenance, priority or perfection (including, without limitation, the continuation of such perfection) of any Lien securing or purporting to secure the Obligations or for the value or sufficiency of any of the Collateral.

SECTION 8.04    <u>Reliance by Administrative Agent</u> .The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, fax, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper person or persons and upon advice and statements of legal counsel (including counsel to Holdco or the Borrower), independent accountants and other experts selected by the Administrative Agent.  The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.   The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.   The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

SECTION 8.05    <u>Notice of Default</u>.   The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Administrative Agent has received notice from a Lender, Holdco or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".   In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders.  The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders); <u>provided</u> that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

SECTION 8.06    <u>Non-Reliance on the Administrative Agent and Other Lenders</u>. Each Lender expressly acknowledges that neither the Administrative Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates has made any representations or warranties to it and that no act by the Administrative Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by the Administrative Agent to any Lender.   Each Lender represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates and made its own decision to make its Loans hereunder and enter into this Agreement.   Each Lender also represents that it will, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis,

appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any affiliate of a Loan Party that may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, attorneys-in-fact or affiliates.

SECTION 8.07    <u>Indemnification</u>.    The Lenders agree to indemnify the Administrative Agent in its capacity as such (to the extent not reimbursed by Holdco or the Borrower and without limiting the obligation of Holdco or the Borrower to do so), each in an amount equal to its pro rata share (based on its Commitments hereunder (or if such Commitments shall have expired or been terminated, in accordance with the respective principal amounts of its applicable outstanding Loans)) thereof, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against the Administrative Agent  in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Administrative Agent under or in connection with any of the foregoing; <u>provided</u> that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the Administrative Agent's gross negligence or willful misconduct.  The agreements in this Section shall survive the payment of the Loans and all other amounts payable hereunder.

SECTION 8.08    <u>Agent in Its Individual Capacity</u>.    The Administrative Agent and its affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though the Administrative Agent  were not an Agent.  With respect to its Loans made or renewed by it, the Administrative Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not the Administrative Agent, and the terms "<u>Lender</u>" and "<u>Lenders</u>" shall include the Administrative Agent in its individual capacity.

SECTION 8.09    <u>Successor Administrative Agent</u>.    The Administrative Agent may resign as Administrative Agent upon 30 days' notice to the Lenders and the Borrower.  If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "<u>Administrative Agent</u>" shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any

of the parties to this Agreement or any holders of the Loans.  If no successor agent has accepted appointment as Administrative Agent by the date that is 30 days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above; provided that until a successor Administrative Agent is so appointed by the Required Lenders or Administrative Agent, any collateral security held by the Administrative Agent in its role as collateral agent on behalf of the Lenders under any of the Loan Documents shall continue to be held by the retiring collateral agent as nominee until such time as a successor collateral agent is appointed.  After any retiring Administrative Agent's resignation as Administrative Agent, the provisions of this Article VIII shall inure to its benefit and to the benefit of its officers, directors, employees, agents, attorneys-in-fact and affiliates as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement and the other Loan Documents.  Any successor Administrative Agent appointed pursuant to this Section shall, upon its acceptance of such appointment, become the successor collateral agent for all purposes hereunder.

SECTION 8.10     [Intentionally Omitted].

SECTION 8.11     Withholding Tax.  To the extent required by any applicable law, the Administrative Agent may withhold from any interest payment to any Lender an amount equivalent to any applicable withholding tax.  If the Internal Revenue Service or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding tax ineffective or for any other reason, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.

SECTION 8.12     Administrative Agent Authorized Actions.  Each of the Lenders authorize the Administrative Agent to take all actions described in Section 9.17 below.

SECTION 8.13     Administrative Agent May File Proofs of Claim. In case of the pendency of any proceeding under the Bankruptcy Code or any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the

Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, and the Administrative Agent under Section 2.12) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and their respective agents and counsel, and any other amounts due the Administrative Agent under Section 2.12.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any Reorganization Plan, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

## ARTICLE IX

### *Miscellaneous*

SECTION 9.01     Notices.

(a)     Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, as follows:

(i)     if to any Loan Party, to QCE LLC, 1001 17th Street, Ste S-175, Denver, CO, 80202-1475, Attention:  Chief Financial Officer, Telephone: 303-573-4560, Facsimile:  866-587-5011, with a copy to General Counsel, Telephone:  303-573-2307;

(ii)     if to the Administrative Agent, to Wilmington Trust, National Association, 50 South Sixth Street, Suite 1290, Minneapolis, Minnesota 55402, Attention: Jeffrey T. Rose, Telephone:  612-217-5630, Facsimile:  612-217-5651, with a contemporaneous copy to Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036, Attention: Mark R. Somerstein, Telephone:  212-596-9000, Facsimile:  212-596-9090; and

(iii)     if to a Lender, to it at the address or fax number set forth on Schedule 2.01 or in the Assignment and Acceptance pursuant to which such Lender becomes a party hereto.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Administrative Agent and the applicable Lender.  Each of the Administrative Agent and the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided, further, that approval of such procedures may be limited to particular notices or communications.

(c)    All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service, sent by fax or (to the extent permitted by paragraph (b) above) electronic means or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01.

(d)    Any party hereto may change its address or fax number for notices and other communications hereunder by notice to the other parties hereto.

SECTION 9.02    Survival of Agreement.    All covenants, agreements, representations and warranties made by the Loan Parties herein, in the other Loan Documents and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loans, the execution and delivery of the Loan Documents, regardless of any investigation made by such persons or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any Fee or any other amount payable under this Agreement or any other Loan Document is outstanding and unpaid and so long as the Commitments have not been terminated. Without prejudice to the survival of any other agreements contained herein, obligations for taxes, costs, indemnifications, reimbursements, damages and other contingent liabilities contained herein (including pursuant to Sections 2.15, 2.17 and 9.05) shall survive the payment in full of the principal and interest hereunder, the termination of the Commitments or this Agreement, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, or any Lender.

SECTION 9.03    Binding Effect.  This Agreement shall become effective when it shall have been executed by Holdco, the Borrower and the Administrative Agent and when the Administrative Agent shall have received copies hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of Holdco, the Borrower, the Administrative Agent and each Lender and their respective permitted successors and assigns.

SECTION 9.04    Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 9.04.   Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section 9.04), and, to the extent expressly contemplated hereby, the Related Parties of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees other than a natural person (each, an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A)     the Borrower with respect to unfunded Commitments, provided that no consent of the Borrower shall be required for an assignment to a Lender, an affiliate of a Lender, an Approved Fund (as defined below) or if an Event of Default has occurred and is continuing and provided further that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 5 Business Days after having received notice thereof; and

(B)     the Administrative Agent, provided that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Loan to a Lender, an Affiliate of a Lender or an Approved Fund.

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender, an affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitments or Loans, the amount of the Commitments or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1.0 million, unless the Administrative Agent and, solely in the case of unfunded Commitments, the Borrower, otherwise consent, provided that (1) no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing and (2) such

amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any.

(B)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee of $3,500; and

(C)    the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and all applicable tax forms.

For the purposes of this Section 9.04, "Approved Fund" means any person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(v) below, from and after the effective date specified in each Assignment and Acceptance the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.15, 2.17 and 9.05, as well as any Fees accrued for its account and not yet paid).   Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section 9.04.

(iv)    The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders may treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.   The Register shall be available for inspection by the Borrower and any Lender (with respect to any entry related to such Lender's Loans), at any reasonable time and from time to time upon reasonable prior notice.

(v)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an Assignee, the Assignee's completed Administrative Questionnaire (unless the Assignee shall already be a Lender hereunder) and any applicable tax forms, and any written consent to such assignment required by paragraph (b)(i) of this Section, the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register.  No assignment, whether or not evidenced by a promissory note, shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph (b)(v).

(c)     (i) Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.   Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and the other Loan Documents; provided that such loan agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that requires the consent of each Lender directly affected thereby pursuant to Section 9.04(a)(i) or clauses (i), (ii), (iii), (iv), (v) or (vi) of the first proviso to Section 9.08(b).  Subject to paragraph (c)(ii) of this Section 9.04, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.15 and 2.17 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 9.04.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.06 as though it were a Lender, provided such Participant shall be subject to Section 2.18(c) as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.  103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(ii)     A Participant shall not be entitled to receive any greater payment under Section 2.15 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 2.17 to the extent such Participant fails to comply with Section 2.17(e), (f) and (g) as though it were a Lender.

(d)     Any Lender may at any time, without the consent of or notice to the Administrative Agent or the Borrower, pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 9.04 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(e)     The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in paragraph (d) above.

(f)     Notwithstanding the foregoing, any Conduit Lender may assign any or all of the Loans it may have funded hereunder to its designating Lender without the consent of the Borrower or the Administrative Agent.  Each of Holdco, the Borrower, each Lender and the Administrative Agent hereby confirms that it will not institute against a Conduit Lender or join any other person in instituting against a Conduit Lender any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under any state bankruptcy or similar law, for one year and one day after the payment in full of the latest maturing commercial paper note issued by such Conduit Lender; provided, however, that each Lender designating any Conduit Lender hereby agrees to indemnify, save and hold harmless each other party hereto and each Loan Party for any loss, cost, damage or expense arising out of its inability to institute such a proceeding against such Conduit Lender during such period of forbearance.

SECTION 9.05     Expenses; Indemnity.

(a)     The Borrower agrees to pay (i) all reasonable out-of-pocket expenses (including Other Taxes) incurred by the Administrative Agent and the Lenders in connection with the preparation of this Agreement and the other Loan Documents, or by the Administrative Agent in connection with the syndication of the Commitments or the administration of this Agreement (including expenses incurred in connection with due diligence and initial and ongoing Collateral examination and the reasonable fees, disbursements and charges for one counsel for the Administrative Agent, one counsel for the Lenders, no more than one additional local counsel in each jurisdiction where Collateral is located and one financial advisor to the Lenders) or in connection with the administration of this Agreement and any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the Transactions hereby contemplated shall

be consummated), (ii) all reasonable out-of-pocket expenses incurred by the Administrative Agent or any Lender in connection with the enforcement or protection of their rights in connection with this Agreement and the other Loan Documents, in connection with the Loans made, including the reasonable fees, charges and disbursements of one counsel for the Administrative Agent, one counsel for the Lenders, one financial advisor for the Lenders and, if necessary, the reasonable fees, charges and disbursements of one local counsel per jurisdiction for each of the Administrative Agent and the Lenders, (iii) all reasonable out-of-pocket expenses relating to the Orders or the Cases incurred by the Administrative Agent or any Lender, including, without limitation, attendance at hearings or other proceedings and the on-going review of documents filed with the Bankruptcy Court (including the reasonable fees, disbursements and charges for one counsel for the Administrative Agent, one counsel for the Lenders, no more than one additional local counsel for each of the Administrative Agent and the Lenders in each jurisdiction where Collateral is located and one financial advisor to the Lenders) and (iv) all reasonable out-of-pocket fees and expenses incurred by the Consenting First Lien Lenders in accordance with the Restructuring Support Agreement.

(b)    The Borrower agrees to indemnify the Administrative Agent, each Lender and each of their respective Affiliates, successors and assigns and the directors, trustees, officers, employees, advisors, controlling persons and agents of each of the foregoing (each such person being called an "Indemnitee") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable counsel fees, charges and disbursements, incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto and thereto of their respective obligations thereunder or the consummation of the Transactions and the other transactions contemplated hereby, (ii) the use of the proceeds of the Loans or (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted by reason of the gross negligence or willful misconduct of such Indemnitee, (y) arise out of any claim, litigation, investigation or proceeding brought by such Indemnitee against another Indemnitee (other than any such claim, litigation, investigation or proceeding brought by or against the Administrative Agent, acting in its capacity as Administrative Agent) that does not involve any act or omission of the Borrower or any of its Affiliates and arises out of disputes among the Lenders and/or their transferees.  Subject to and without limiting the generality of the foregoing sentence, the Borrower agrees to indemnify each Indemnitee against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable counsel or consultant fees, charges and disbursements (limited to one counsel unless any Indemnitee has been advised by such counsel that there exists actual or potential conflicting interests, plus, if reasonably required, local and specialist counsel), incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (A) any claim related in any way to Environmental Laws and Holdco, the Borrower or any of their

Subsidiaries, or (B) any actual or alleged presence, Release or threatened Release of Hazardous Materials at, under, on or from any Property, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or any of its Related Parties.  The Borrower shall not be liable for any settlement of any proceeding referred to in this Section 9.05 effected without the Borrower's written consent (such consent not to be unreasonably withheld or delayed); provided, however, that the Borrower shall indemnify the Indemnitees from and against any loss or liability by reason of such settlement if the Borrower was offered the right to assume the defense of such proceeding and did not assume such defense or such proceeding was settled with the written consent of the Borrower, subject to, in each case, the Borrower's right in this Section 9.05 to claim an exemption from such indemnity obligations.    The Borrower shall indemnify the Indemnitees from and against any final judgment for the plaintiff in any proceeding referred to in this Section 9.05, subject to the Borrower's right in this Section 9.05 to claim an exemption from such indemnity obligations.  The Borrower shall not, without the prior written consent of any Indemnitee, effect any settlement of any pending or threatened proceeding in respect of which such Indemnitee is or could have been a party and indemnity could have been sought hereunder by such Indemnitee unless such settlement (i) includes an unconditional release of such Indemnitee from all liability or claims that are the subject matter of such proceeding and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of any Indemnitee.  To the extent permitted by applicable law, no Loan Party shall assert, and each of Holdco and the Borrower hereby waive for themselves and each other Loan Party any claim against each Lender, the Administrative Agent and their respective affiliates, directors, employees, attorneys, agents or sub-agents, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any Loan Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each of Holdco and Borrower hereby waive, release and agree not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.  The provisions of this Section 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Obligations, the termination of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent or any Lender.  All amounts due under this Section 9.05 shall be payable on written demand therefor accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested.

(c)      Except as expressly provided in Section 9.05(a) with respect to Other Taxes, which shall not be duplicative with any amounts paid pursuant to Section 2.17, this Section 9.05 shall not apply to Taxes.

SECTION 9.06      Right of Set-off.   If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of Holdco, the Borrower or any Subsidiary against any of and all the obligations of Holdco or the Borrower now or hereafter existing under this Agreement or any other Loan Document held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although the obligations may be unmatured.   The rights of each Lender under this Section 9.06 are in addition to other rights and remedies (including other rights of set-off) that such Lender may have.

SECTION 9.07      Applicable Law.   THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF TO THE EXTENT THE APPLICATION OF SUCH PRINCIPLES WOULD PROVIDE THAT THE LAWS OF ANOTHER JURISDICTION WOULD GOVERN, EXCEPT TO THE EXTENT NEW YORK LAW IS SUPERSEDED BY THE BANKRUPTCY CODE.

SECTION 9.08      Waivers; Amendment.

(a)      No failure or delay of the Administrative Agent or any Lender in exercising any right or power hereunder or under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.   The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.   No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by Holdco, the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.   No notice or demand on Holdco, the Borrower or any other Loan Party in any case shall entitle such person to any other or further notice or demand in similar or other circumstances.

(b)      Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (x) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by Holdco, the Borrower, the Administrative Agent and the Required Lenders and (y) in the case of any other Loan Document, pursuant to an agreement or agreements in writing

entered into by each party thereto and the Administrative Agent and consented to by the Required Lenders; provided, however, that no such agreement shall

>    (i)    decrease or forgive the principal amount of, or extend the final maturity of, or decrease the rate of interest on, any Loan, without the prior written consent of each Lender directly affected thereby,

>    (ii)    increase or extend the Commitment of any Lender or decrease the fees of any Lender without the prior written consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the aggregate Commitments shall not constitute an increase of the Commitments of any Lender),

>    (iii)    extend any date on which payment of interest on any Loan or any Fees is due, without the prior written consent of each Lender adversely affected thereby,

>    (iv)    amend or modify the provisions of Section 2.18(b) or (c) or Section 6.5 of the Collateral Agreement in a manner that would by its terms alter the pro rata sharing of payments required thereby, without the prior written consent of each Lender adversely affected thereby,

>    (v)    amend or modify the provisions of this Section 9.08, Section 9.04(a)(i) or the definition of the terms "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the prior written consent of each Lender adversely affected thereby (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the Loans and Commitments are included on the Interim Facility Closing Date), or

>    (vi)    release all or substantially all the Collateral or release any of Holdco or any Subsidiary Loan Party from their respective Guarantees under the Collateral Agreement, unless, in the case of a Subsidiary Loan Party, all or substantially all the Equity Interests of such Subsidiary Loan Party is sold or otherwise disposed of in a transaction permitted by this Agreement, without the prior written consent of each Lender;

provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder without the prior written consent of the Administrative Agent acting as such at the effective date of such agreement.  Each Lender shall be bound by any waiver, amendment or modification authorized by this Section 9.08 and any consent by any Lender pursuant to this Section 9.08 shall bind any assignee of such Lender.

(c)    Without the consent of any Lender, the Loan Parties and the Administrative Agent may (in their respective sole discretion, or shall, to the extent required by any Loan Document) enter into any amendment, modification or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable law.

SECTION 9.09    <u>Interest Rate Limitation</u>.  Notwithstanding anything herein to the contrary, if at any time the applicable interest rate on any Loan, together with all fees and charges that are treated as interest under applicable law (collectively, the "<u>Charges</u>"), as provided for herein or in any other document executed in connection herewith, or otherwise contracted for, charged, received, taken or reserved by any Lender, shall exceed the maximum lawful rate (the "<u>Maximum Rate</u>") that may be contracted for, charged, taken, received or reserved by such Lender in accordance with applicable law, the rate of interest payable hereunder, together with all Charges payable to such Lender, shall be limited to the Maximum Rate, <u>provided</u> that such excess amount shall be paid to such Lender on subsequent payment dates to the extent not exceeding the legal limitation.

SECTION 9.10    <u>Entire Agreement</u>.  This Agreement, the other Loan Documents and the agreements regarding certain Fees referred to herein constitute the entire contract between the parties relative to the subject matter hereof.  Any previous agreement among or representations from the parties or their Affiliates with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents.  Notwithstanding the foregoing, the Fee Letter shall survive the execution and delivery of this Agreement and remain in full force and effect.  Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any party other than the parties hereto and thereto, and their respective successors and assigns permitted hereunder, any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.  Notwithstanding anything to the contrary contained herein, the terms and conditions hereunder shall be subject to the terms and conditions of the Orders.

SECTION 9.11    <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN

ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.  EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 9.11 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER CREDIT DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

SECTION 9.12    <u>Severability</u>.  In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 9.13    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original but all of which, when taken together, shall constitute but one contract, and shall become effective as provided in Section 9.03.  Delivery of an executed counterpart to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed original.

SECTION 9.14    <u>Headings</u>.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 9.15    <u>Jurisdiction; Consent to Service of Process</u>.

(a)    Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Bankruptcy Court, or in the event the Bankruptcy Court does not have, or does not exercise, jurisdiction, any New York State court or federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in the Bankruptcy Court, such New York State or, to the extent permitted by law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be

enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.   Nothing in this Agreement shall affect any right that any Lender or the Administrative Agent may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against Holdco, the Borrower or any Loan Party or their properties in the courts of any jurisdiction.

(b)     Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in the Bankruptcy Court, any New York State or federal court.   Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)     Each of the parties hereto agrees that service of all process in any such proceeding in any such court may be made by registered or certified mail, return receipt requested at its address provided in Section 9.01, agrees that service as so provided is sufficient to confer personal jurisdiction over the applicable Loan Party in any such proceeding in any such court, and otherwise constitutes effective and binding service in every respect and agrees that the Administrative Agent and the Lenders retain the right to serve process in any other manner permitted by law or to bring proceedings against any Loan Party in the courts of any other jurisdiction.

SECTION 9.16   Confidentiality.   Each of the Lenders and the Administrative Agent agrees that it shall maintain in confidence any information relating to Holdco, the Borrower and the other Loan Parties furnished to it by or on behalf of Holdco, the Borrower or the other Loan Parties (other than information that (a) has become generally available to the public other than as a result of a disclosure by such party, (b) has been independently developed by such Lender or the Administrative Agent without violating this Section 9.16 or (c) was available to such Lender or the Administrative Agent from a third party having, to such person's knowledge, no obligations of confidentiality to Holdco, the Borrower or any other Loan Party) and shall not reveal the same other than to its directors, trustees, officers, employees and advisors with a need to know or to any person that approves or administers the Loans on behalf of such Lender (so long as each such person shall have been instructed to keep the same confidential in accordance with this Section 9.16), except:  (A) to the extent necessary to comply with law or any legal process or the requirements of any Governmental Authority, self-regulatory authorities (including the National Association of Insurance Commissioners) or of any securities exchange on which securities of the disclosing party or any affiliate of the disclosing party are listed or traded, (B) as part of the reporting or review procedures to, or examinations by, Governmental Authorities or self-regulatory authorities, including the National Association of Insurance Commissioners or the National Association of Securities Dealers, Inc., (C) to its parent companies, affiliates or auditors (so long as each such person shall have been instructed to keep the same confidential in accordance with this Section 9.16), (D) in order to enforce its rights under any Loan Document in a legal proceeding, (E) to any pledgee under Section 9.04(d) or any other prospective assignee of, or prospective Participant in, any of its rights under this Agreement (so long as such person shall have been instructed to keep the same confidential in accordance with this Section 9.16), (F) to any direct or indirect contractual counterparty in Swap

Agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by the provisions of this Section 9.16), (G) disclosure to any rating agency when required by it (so long as such person shall have been instructed to keep the same confidential in accordance with this Section 9.16) and (H) with the consent of the Borrower.

SECTION 9.17    Release of Liens and Guarantees.    In the event that any Loan Party conveys, sells, leases, assigns, transfers or otherwise disposes of all or any portion of any of the Equity Interests or assets of any Subsidiary Loan Party to a person that is not (and is not required to become) a Loan Party in a transaction not prohibited by Section 6.05, the Administrative Agent shall promptly (and the Lenders hereby authorize the Administrative Agent to) take such action and execute any such documents as may be reasonably requested by Holdco or the Borrower and at the Borrower's expense to release any Liens created by any Loan Document in respect of such Equity Interests or assets, and, in the case of a disposition of the Equity Interests of any Subsidiary Loan Party in a transaction permitted by Section 6.05 and as a result of which such Subsidiary Loan Party would cease to be a Subsidiary, terminate such Subsidiary Loan Party's obligations under its Guarantee under the Collateral Agreement.    Any representation, warranty or covenant contained in any Loan Document relating to any such Equity Interests, asset or subsidiary of Holdco shall no longer be deemed to be made once such Equity Interests or asset is so conveyed, sold, leased, assigned, transferred or disposed of.

SECTION 9.18    USA Patriot Act.    Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the USA PATRIOT Act.

SECTION 9.19    Marshalling; Payments Set Aside.    Neither the Administrative Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Loan Party or any other Person or against or in payment of any or all of the Obligations.    To the extent that any Loan Party makes a payment or payments to Administrative Agent or Lenders (or to Administrative Agent, on behalf of Lenders), or the Administrative Agent or Lenders enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

SECTION 9.20    Independence of Covenants.    All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

SECTION 9.21    Obligations Several; Independent Nature of Lenders' Rights. The obligations of Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitment of any other Lender hereunder.  Nothing contained herein or in any other Loan Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a joint venture or any other kind of entity.   The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

SECTION 9.22    Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Acceptance shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 9.23    Releases and Validation of Pre-Petition Debt and Liens.

(a)     Subject to the provisions of the Interim Order and, if applicable, the Final Order, each of Holdco and the Borrower, on behalf of itself and the other Debtors, hereby (i) releases and discharges each Lender, the Administrative Agent and their respective Related Parties from any and all claims and causes of action arising under any of the Pre-Petition First Lien Indebtedness, any aspect of the pre-petition relationship between the Lenders, the Administrative Agent and the Borrower, Holdco or any Subsidiary Loan Party (including, without limitation, any Subsidiaries that are Debtors) or any other acts or omissions of the Lenders or the Administrative Agent arising from or under any of the Pre-Petition First Lien Indebtedness or their pre-petition relationship with the Borrower, Holdco or any Subsidiary Loan Party (including, without limitation, any Subsidiaries that are Debtors); (ii) waives any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the amount, validity, perfection, priority, enforceability and nonavoidability (under the Bankruptcy Code or otherwise) of the Indebtedness and other obligations and liabilities under any of the Pre-Petition First Lien Indebtedness and the security interests in and liens on the collateral securing such Indebtedness; and (iii) agrees, without further Bankruptcy Court order and without the need for filing of any proof of claim, to the allowance of the pre-petition claims of the Administrative Agent and the Lenders pursuant to Sections 502 and 506 of the Bankruptcy Code on account of such Indebtedness as fully secured claims for principal, plus accrued pre-petition and post-petition interest, fees, prepayment premiums, expenses and other amounts, to the extent payable, under any of the Pre-Petition First Lien Indebtedness.

(b)     Each of Holdco and the Borrower understands, acknowledges and agrees, on its own behalf and on behalf of the other Debtors, that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an

injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

(c)      Each of Holdco and the Borrower agrees, on its own behalf and on behalf of the other Debtors, that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final, absolute and unconditional nature of the release set forth above.

(d)      Each of Holdco and the Borrower, on behalf of itself, the other Debtors, and their respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with and in favor of any Lender, the Administrative Agent and their respective Related Parties that it and each such Person will not sue (at law, in equity, in any regulatory proceeding or otherwise) any such Lender, the Administrative Agent or their respective Related Parties on the basis of any claim or cause of action released, remised and discharged by Borrower on its own behalf and on behalf of the other Debtors pursuant to this Section 9.23.  If Holdco, the Borrower, the other Debtors or any of their respective successors, assigns or other legal representatives violate the foregoing covenant, each of Holdco and the Borrower, for itself, the other Debtors and their respective successors, assigns and legal representatives, agrees to pay, in addition to such other damages as any Lender, the Administrative Agent or their respective Related Parties may sustain as a result of such violation, all attorneys' fees and costs incurred by any such Lender, the Administrative Agent and their respective Related Parties as a result of such violation.

SECTION 9.24    No Fiduciary Duty.    Each Agent, each Lender and their Affiliates (collectively, solely for purposes of this paragraph, the "Lenders"), may have economic interests that conflict with those of the Loan Parties, their stockholders and/or their affiliates.  Each Loan Party agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Loan Party, its stockholders or its affiliates, on the other.  The Loan Parties acknowledge and agree that (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Loan Parties, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Loan Party, its stockholders or its affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Loan Party, its stockholders or its Affiliates on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of any Loan Party, its management, stockholders, creditors or any other Person.  Each Loan Party acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. Each Loan Party agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Loan Party, in connection with such transaction or the process leading thereto.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first written above.

QCE FINANCE LLC


by _____
    Name:
    Title:


QCE LLC


by _____
    Name:
    Title:

WILMINGTON TRUST, NATIONAL
ASSOCIATION, as Administrative Agent


by   _____
      Name:
      Title:

XXX, as a Lender

by  _____
      Name:
      Title:

<u>SCHEDULE 2.01</u>

**Loan Commitments**

| Lender | Interim Loan Commitment | Loan Commitment | Pro Rata Share |
|--------|------------------------|-----------------|----------------|
|        |                        |                 |                |
|        |                        |                 |                |
|        |                        |                 |                |
|        |                        |                 |                |
|        |                        |                 |                |
|        |                        |                 |                |
| **Total** |                     |                 | **100%**       |

**Lender Notice Information**

**[To Be Inserted]**