## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| QCE FINANCE LLC, *et al.*,[1] | ) | Case No. 14-_____ (   ) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

### DECLARATION OF MATTHEW J. HART IN SUPPORT OF DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING AND TO USE CASH COLLATERAL; (B) GRANTING PRIMING LIENS AND PROVIDING SUPERPRIORITY CLAIMS; (C) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; AND (D) PRESCRIBING THE FORM AND MANNER OF NOTICE AND SETTING THE TIME FOR THE FINAL HEARING

I, Matthew J. Hart, declare under penalty of perjury as follows:

1.      I am a Director in the Restructuring Group of Lazard Frères & Co. LLC

("***Lazard***"), which has its principal office at 30 Rockefeller Plaza, New York, New York 10020.

2.      I submit this declaration (the "***Declaration***") in support of the *Debtors' Motion*

*for Interim and Final Orders (A) Authorizing Debtors to Obtain Postpetition Financing and to*

*Use Cash Collateral; (B) Granting Priming Liens and Providing Superpriority Claims;*

*(C) Granting Adequate Protection to Prepetition Secured Parties; and (D) Prescribing the Form*

*and Manner Of Notice and Setting the Time for the Final Hearing* (the "***DIP Motion***").[2]

3.      In forming the opinions set forth herein, I have relied upon and/or considered,

among other things, the following: (a) my experience in chapter 11 cases, including with debtor-

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: QCE Finance LLC (7897); American Food Distributors LLC (8099); Quiznos Global LLC (2772); QCE LLC (2969); QFA Royalties LLC (2402); QIP Holder LLC (2353); Quiz-CAN LLC (7714); Quizno's Canada Holding LLC (3220); QAFT, Inc. (6947); Restaurant Realty LLC (8293); The Quizno's Master LLC (3148); The Quizno's Operating Company LLC (8945); National Marketing Fund Trust (4951); The Regional Advertising Program Trust (2035); and TQSC II LLC (8683). The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 1001 17th Street, Suite 200, Denver, Colorado 80202.

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the DIP Motion.

in-possession ("*DIP*") financing facilities; (b) the DIP Motion; (c) the Declaration of Suart K. Mathis in Support of First Day Pleadings (the "***First Day Declaration***"); (d) certain of the Debtors' financial statements and reports; (e) documents related to the proposed DIP Financing; (f) Lazard's analyses regarding the proposed DIP Financing; (g) discussions with the Debtors' management concerning the Debtors' business and finances; (i) discussions with prospective sources of financing, including with regard to the proposed DIP Financing; and (j) discussions with certain other professionals at Lazard and other advisors to the Debtors.

4.      I am not being compensated specifically for this testimony other than through payments received by Lazard as a professional proposed to be retained by the Debtors in these chapter 11 cases.  If called upon to testify, I could and would testify to the facts set forth herein.

**A.      Qualifications**

5.      Lazard is the primary U.S. operating subsidiary of an international financial advisory and asset management firm.  Lazard, together with its predecessors and affiliates, has been advising clients around the world for more than 150 years.  The current professionals at Lazard have extensive experience working with financially-troubled companies in complex financial restructurings both out-of-court and in chapter 11 proceedings.  Lazard and its principals have been involved as advisors to debtors, creditors, equity constituencies and government agencies in many reorganization cases.  Since 1990, Lazard's professionals have been involved in over 250 restructurings, representing more than $1 trillion in debtor assets.

6.      These restructurings include numerous large and complex chapter 11 cases, including, among others, recent chapter 11 cases in Delaware such as *In re Savient Pharmaceuticals, Inc.*, No. 13-12680 (Bankr. D.E. filed Oct. 14, 2013); *In re Rural/Metro Corp.*, No. 13-11952 (Bankr. D.E. filed Aug. 4, 2013); *In re Maxcom Telecomunicaciones SAB de CV*, No. 13-11839 (Bankr. D.E. filed Jul. 23, 2013); *In re Exide Technologies*, No. 13-11482 (Bankr.

D.E. filed Jun. 10, 2013); *In re Vertis Holdings, Inc.*, No. 12-12821 (Bankr. D.E. filed Oct. 10, 2012); *In re NewPage Corp.*, No. 11-12804 (Bankr. D.E. filed Sep. 7, 2011); *In re Indianapolis Downs LLC*, No. 11-11046 (Bankr. D.E. filed Apr. 7, 2011); *In re Satélites Mexicanos S.A. de C.V.*, No. 11-11035 (Bankr. D.E. filed Apr. 6, 2011); *In re Cooper-Standard Holdings*, No. 09-12743 (Bankr. D.E. filed Aug. 3, 2009); *In re Nortel Networks*, No. 09-10138 (Bankr. D.E. filed Jan. 14, 2009); *In re Tribune Co.*, No. 08-13141 (Bankr. D.E. filed Dec. 8, 2008); *In re LandSource Communities Development LLC*, No. 08-11111 (Bankr. D.E. filed Jun. 8, 2008); and *In re Tropicana Entertainment*, LCC, No. 08-10856 (Bankr. D.E. filed May. 5, 2008).

7.      I specialize in advising public and private companies and creditor groups in complex financial restructurings and in raising capital for troubled businesses.  Prior to joining Lazard in 2008, I was a Managing Director at Eos Partners and a partner in the firm's credit investment funds, where I invested in distressed companies in the United States and Europe and assisted in the general management of the funds.  From 2001 to 2006, I was employed by Merrill Lynch, most recently as a Vice President and investment analyst in the firm's principal investments area, where I invested in distressed companies on behalf of the firm.  Earlier in my career I was involved in the mortgage-backed and asset-backed securities market as a credit analyst and trader.  I have an M.B.A. in finance and accounting from the University of Chicago Booth School of Business and a B.A. in economics from the University of Michigan.  I am a Certified Insolvency & Restructuring Advisor (CIRA) and a Chartered Financial Analyst (CFA). I hold FINRA Series 7 General Securities and Series 63 State Law licenses.  I am a member of the Association of Insolvency & Restructuring Advisors, the American Bankruptcy Institute, the CFA Institute and the New York Society of Securities Analysts.

8.      I have extensive experience as an advisor and investor in corporate restructurings, as well as public and private debt and equity offerings and mergers and acquisitions. I have advised companies, creditors and investors in connection with numerous in-court and out-of-court restructurings and recapitalizations, including Eastman Kodak, Nortel Networks, Lehman Brothers, AMR Corporation, Cooper Standard Automotive, SiriusXM, OGX Petróleo e Gás Participações, LNR Property Corp., White Birch Paper, Satélites Mexicanos, and Maxcom Telecomunicaciones. I have previously submitted declarations and/or affidavits or have had testimony proffered in Eastman Kodak, White Birch Paper and Satélites Mexicanos.

9.      I have been one of the principal engagement personnel working on Lazard's engagement with Debtors and their non-Debtor affiliates and subsidiaries (collectively, the "***Company***") since July 2013. In connection with the proposed use of cash collateral and DIP financing, I participated directly in discussions, due diligence and negotiations with potential sources of DIP financing, with regard to the proposed DIP Facility. In doing so, I worked closely with the Company's management, outside counsel and other advisors.

**B.      Background on the Debtors' Financing Needs**

10.     As described in detail in the First Day Declaration, in the years since its prior restructuring in January 2012, the Company's financial position has deteriorated significantly and by mid-2013 it had become increasingly clear that its capital structure was no longer sustainable. Most critically, its liquidity was declining significantly because its cash flow was increasingly insufficient to cover its interest expense, and it also faced an impending maturity on December 31, 2013 of the Marketing Fund Trusts Credit Agreement (the "***Vectra Facility***") with Vectra Bank Colorado, National Association ("***Vectra***").

11.     In response to these developments, beginning in the summer of 2013 the Company, with the assistance of Lazard, began to explore various financing and strategic

alternatives which might reduce the Company's interest burden, enhance its liquidity, and address the Vectra maturity.  By the fall of 2013, however, it had become increasingly clear that a comprehensive balance sheet restructuring would be required to meet these objectives, and hence the Company, along with Lazard and its other advisors, commenced negotiations with the Consenting First Lien Lenders, the Consenting Avenue and Fortress Entities and Vectra, as well as their respective advisors, regarding the terms of a potential restructuring of the Company's obligations.  In parallel, Lazard also contacted over twenty parties regarding a potential refinancing of the Vectra Facility, as a component of such a balance sheet restructuring.  While four of these parties elected to proceed to the secondary stage of executing a non-disclosure agreement ("**NDA**") and receive certain confidential information, all of them declined to proceed further.

12.     After months of negotiations, the Debtors recently reached an agreement with the Consenting First Lien Lenders and the Consenting Avenue and Fortress Entities with respect to a consensual restructuring on the terms set forth in the Plan, and formalized by the Restructuring Support Agreement ("**RSA**").  The Plan embodies a settlement among the Debtors and the majority of its key stakeholders on a consensual de-leveraging transaction that will reduce the Company's total indebtedness by over $400 million, or approximately two-thirds.  Importantly, while not a party to the RSA, I have been advised that the Plan also enjoys the support of Vectra, who has agreed to extend the maturity of its debt and be repaid over the course of the coming year.

13.     Notwithstanding these fruitful discussions with their significant stakeholders, however, the Company's liquidity has continued to decline due to several factors discussed at length in the First Day Declaration and has recently reached a critical level.

**C.      The Debtors' Efforts to Obtain Postpetition Financing**

14.      As part of the restructuring transactions embodied in the Plan and the RSA, the Consenting First Lien Lenders offered to provide the proposed DIP Facility.  Thereafter, the Debtors and their advisors engaged in active negotiations with the Consenting First Lien Lenders regarding the terms of the proposed DIP Facility, arriving at the terms described in the DIP Motion and in the DIP Loan Documents.  Importantly, during these negotiations the Consenting First Lien Lenders also made it clear, via their advisors, that they would object to any alterative proposed DIP financing provided by a third party, thereby eliminating the possibility of a swift and consensual restructuring, as offered by the Plan and RSA.

15.      Despite the likely objection of the Consenting First Lien Lenders and precipitation of a more risky and damaging "free-fall" chapter 11 filing, Lazard nonetheless approached five (5) other potential DIP lenders, all of whom have both significant experience in providing such financings and some familiarity with the Company.  All of these parties declined to provide DIP financing to the Debtors.

**D.      Benefits of the Proposed DIP Facility**

16.      I believe that, considering the facts and circumstances of these cases, (i) the size of the proposed DIP Facility is both necessary and sufficient to meet the Debtors' immediate and projected liquidity needs through emergence, without which the Debtors and their stakeholders would suffer irreparable harm, (ii) that there are no feasible alternatives to the proposed DIP Facility at this time on terms more attractive to the Debtors and (iii) that through negotiation the Debtors obtained the best available terms the Consenting First Lien lenders were willing to provide.

17.      I believe that the size of the proposed DIP Facility is both necessary and sufficient to meet the Debtors' immediate and projected liquidity needs through emergence, without which

the Debtors and their stakeholders would suffer irreparable harm.  It is my understanding that the proceeds of the proposed DIP Facility will be used to (i) pay related transaction costs, fees and expenses, (ii) make adequate protection payments with respect to the Prepetition Lenders and any other adequate protection payments permitted by the proposed DIP Facility, (iii) provide working capital and be used for other general corporate purposes of the Debtors and (iv) pay administrative expenses attendant with the Debtors' chapter 11 cases.  I also believe that the Debtors' request for interim authority is appropriately sized and tailored to cover their projected liquidity needs pending a final hearing.  The Debtors have sought the authority, in the Motion, to immediately draw $10 million under the proposed DIP Facility.  Based on my discussions with the Company's management and my review of the weekly cash projections prepared by the Company and its advisors, I believe this is an appropriate amount to allow the Debtors to stabilize their operations, establish prudent cash balances and meet their liquidity needs for next four weeks.  Similarly, the $15 million total availability under the proposed DIP Facility appears sufficient to meet these needs through the anticipated date of emergence, with appropriate cushion.  Absent prompt interim approval of the proposed DIP Facility, the Debtors may have to curtail or even terminate their business operations, to the material detriment of all stakeholders.

18.     I also believe that there were no feasible alternatives to the proposed DIP Facility that were more attractive to the Debtors.  The Consenting First Lien Lenders are willing to provide the proposed DIP Facility as part of the overall restructuring contemplated by the Plan and to fund the Debtors' operations and the expenses attendant with these chapter 11 cases as a bridge to confirmation of the Plan.  In light of the negotiations regarding the restructuring and the Consenting First Lien Lenders' familiarity with the Debtors and their business, the Consenting First Lien Lenders had the ability to move quickly to propose, diligence and

ultimately commit to provide the proposed DIP Facility.  Indeed, although the Consenting First
Lien Lenders indicated they were unwilling to lend to the Debtors unless they received a priming
security interest in and lien on the Prepetition Collateral, I believe that (i) the Debtors' familiarity
and prior experience with the Consenting First Lien Lenders, (ii) the Consenting First Lien
Lenders' ability and willingness to provide funding in tight timeframes on favorable terms and
(iii) the reduced execution risk and increased certainty of closing offered by the Consenting First
Lien Lenders, support the Debtors' determination to enter into the proposed DIP Facility.  Given
the Debtors' need for immediate liquidity, time was of the essence and avoiding a long and
drawn out diligence process was a benefit.  While all of the potential lenders Lazard approached
regarding an alternate DIP financing declined, it is likely that any third party lender would have
required a priming security interest in and lien upon the Prepetition Lenders' collateral, which
would have given rise to a "priming fight".  Putting aside the risk that the Debtors would be
unlikely to win a "priming fight" and therefore be left without any DIP Financing (which is a
serious risk in light of the financial position of the Debtors and the estimated value of the
Debtors' business), the costs and expenses – as well as potential damage to the Debtors' business
– of a "priming fight" would have been very difficult for the Debtors to endure.  In addition, as
previously discussed, the Consenting First Lien Lenders made it clear that any such attempt
would have been opposed and hence foreclose the possibility of a swift and consensual
restructuring, as offered by the Plan and RSA.  Finally, as part of the Plan and the RSA, the
Second Lien Lenders, who are bound by the Intercreditor Agreement, consented to the proposed
DIP Facility and are not objecting to the proposed DIP Facility or the adequate protection to be
provided in connection therewith.  In summary, not only were none of the other potential lenders
Lazard approached willing to provide an alternate DIP financing, but I also believe that the

proposed DIP Facility provides the best means to avoid a costly and damaging "priming fight" and facilitate the consensual, swift and hence, value-maximizing, Plan, to the significant benefit of the Debtors and all of their stakeholders.

19.     I also believe that the Debtors obtained the best available terms the Consenting First Lien lenders were willing to provide.  The Debtors and their advisors actively negotiated with the Consenting First Lien Lenders and their advisors regarding the terms of the proposed DIP Financing, and as a result were able to improve several of the terms before eventually reaching the point where the Consenting First Lien Lenders indicated they were unwilling to make any further concessions.

**E.     Conclusion**

20.     Based upon the facts and circumstances of this case, I believe that the proposed DIP Facility is the best financing that is currently available to Debtors, and the size of the proposed DIP Facility is both necessary and sufficient to meet the Debtors' immediate and projected liquidity needs through emergence.  I believe that immediate availability of $10 million of borrowings under the proposed DIP Facility upon the interim order, and additional $5 million upon entry of a final order, is critical to the Debtors' continued operation and their ability to effectuate their balance sheet restructuring through the confirmation of the Plan.  Without immediate access to the proposed DIP Facility, I believe that the Debtors – and hence their stakeholders – will be irreparably harmed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on March 14, 2014

Matthew J. Hart
Director
Lazard Frères & Co. LLC