**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| QCE FINANCE LLC, *et al.*,[1] | ) Case No. 14-_____ ( ) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

### DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira S. Dizengoff (*pro hac vice* admission pending)
Philip C. Dublin (*pro hac vice* admission pending)
Jason P. Rubin (*pro hac vice* admission pending)
One Bryant Park
New York, New York 10036-6745
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

**RICHARDS LAYTON & FINGER, P.A.**
Mark D. Collins (DE2981)
Amanda R. Steele (DE 5530)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

Dated: March 14, 2014

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: QCE Finance LLC (7897); American Food Distributors LLC (8099); National Marketing Fund Trust (4951); QAFT, Inc. (6947); QCE LLC (2969); QFA Royalties LLC (2402); QIP Holder LLC (2353); Quiz-CAN LLC (7714); Quizno's Canada Holding LLC (3220); Quiznos Global LLC (2772); The Quizno's Master LLC (3148); The Quizno's Operating Company LLC (8945); The Regional Advertising Program Trust (2035); Restaurant Realty LLC (8293); and TQSC II LLC (8683). The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 1001 17th Street, Suite 200, Denver, Colorado 80202.

# <u>TABLE OF CONTENTS</u>

**Page**

ARTICLE I DEFINITIONS AND RULES OF INTERPRETATION ........................................................................1
    A.     Rules of Interpretation and Governing Law .........................................................1
    B.     Definitions.............................................................................................................1

ARTICLE II CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ........................................14
    A.     Unclassified Claims ............................................................................................14
        2.1    Administrative Expense Claims .............................................................14
        2.2    Professional Fee Claims .........................................................................14
        2.3    Priority Tax Claims ................................................................................14
        2.4    DIP Facility Claims ...............................................................................15
    B.     General Rules.......................................................................................................15
        2.5    Substantive Consolidation of the Term Debtors For Plan Purposes Only..........15
        2.6    Classification..........................................................................................15
    C.     Summary of Classification for the Term Loan Debtors .......................................15
    D.     Summary of Classification for the Marketing Fund Trusts Debtors .....................16
    E.     Classified Claims and Interests Against the Term Loan Debtors..........................16
        2.7    Class A1 – First Lien Facility Claims ....................................................16
        2.8    Class A2 – Priority Non-Tax Claims.......................................................16
        2.9    Class A3 – Other Secured Claims ...........................................................17
        2.10   Class A4 – Unsecured Claims ................................................................17
        2.11   Class A5 – Subordinated Claims.............................................................17
        2.12   Class A6(a) – Holdco Interests ..............................................................18
        2.13   Class A6(b) – Intercompany Interests. ...................................................18
    F.     Classified Claims and Interests Against the Marketing Fund Trusts Debtors.......18
        2.14   Class B1 – Marketing Fund Trusts Facility Secured Claim ..................18
        2.15   Class B2 – Priority Non-Tax Claims.......................................................18
        2.16   Class B3 – Other Secured Claims...........................................................19
        2.17   Class B4 – Unsecured Claims .................................................................19
        2.18   Class B5 – Intercompany Interests. ........................................................19
    G.     Additional Provisions Regarding Unimpaired Claims and Subordinated Claims........20
        2.19   Special Provision Regarding Unimpaired Claims ..................................20
        2.20   Subordinated Claims ..............................................................................20

ARTICLE III ACCEPTANCE ..............................................................................................................................20
        3.1    Presumed Acceptance of the Plan ..........................................................20
        3.2    Presumed Rejection of the Plan...............................................................20
        3.3    Voting Classes.........................................................................................20
        3.4    Deemed Acceptance if No Votes Cast.....................................................20
        3.5    Elimination of Vacant Classes.................................................................20
        3.6    Cramdown ...............................................................................................20

ARTICLE IV MEANS FOR IMPLEMENTATION OF PLAN.................................................................................20
        4.1    Restructuring Transactions .....................................................................20
        4.2    Substantive Consolidation for Plan Purposes Only .................................21
        4.3    New Securities.........................................................................................21
        4.4    Plan Funding ...........................................................................................22
        4.5    Specified Litigation Provisions ...............................................................22
        4.6    Corporate Governance, Managers, Officers and Corporate Action....................23
        4.7    Continuation of Reorganized QAFT as Trustee for the Reorganized
               Marketing Fund Trusts............................................................................23
        4.8    New Management Equity Incentive Plan .................................................23

| | | |
|---|---|---|
| 4.9 | Amendment and Restatement of First Lien Credit Agreement and Marketing Fund Trusts Credit Agreement; Continuation of Liens | 23 |
| 4.10 | Termination of DIP Credit Agreement | 24 |
| 4.11 | Cancellation of Notes, Instruments, and Outstanding Equity Interests | 24 |
| 4.12 | Cancellation of Liens | 24 |
| 4.13 | Corporate Action | 24 |
| 4.14 | Effectuating Documents; Further Transactions | 24 |
| 4.15 | Exemption from Certain Transfer Taxes and Recording Fees | 25 |
| 4.16 | No Further Approvals | 25 |
| 4.17 | Dissolution of Committee | 25 |
| 4.18 | Pre-Effective Date Injunctions or Stays | 25 |
| 4.19 | Intercompany Claims | 25 |

ARTICLE V EXECUTORY CONTRACTS AND UNEXPIRED LEASES ... 25

| | | |
|---|---|---|
| 5.1 | Assumption and Rejection of Executory Contracts and Unexpired Leases | 25 |
| 5.2 | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 26 |
| 5.3 | No Change in Control | 26 |
| 5.4 | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 26 |
| 5.5 | Rejection and Repudiation of Executory Contracts and Unexpired Leases | 26 |
| 5.6 | Claims Based on Rejection or Repudiation of Executory Contracts and Unexpired Leases | 26 |
| 5.7 | Limited Extension of Time to Assume or Reject | 27 |
| 5.8 | Employee Compensation and Benefit Programs; Deferred Compensation Programs | 27 |
| 5.9 | Survival of Certain Indemnification and Reimbursement Obligations | 27 |
| 5.10 | Insurance Policies | 27 |

ARTICLE VI PROCEDURES FOR RESOLVING AND TREATING CONTESTED CLAIMS ... 27

| | | |
|---|---|---|
| 6.1 | Objections to, Settlement of and Estimation of Claims | 27 |
| 6.2 | Reserve for Disputed Claims | 28 |
| 6.3 | Disposition of Distribution Reserves | 28 |

ARTICLE VII DISTRIBUTIONS ... 28

| | | |
|---|---|---|
| 7.1 | Manner of Payment and Distributions under the Plan | 28 |
| 7.2 | Interest and Penalties on Claims | 29 |
| 7.3 | Record Date for Distributions | 29 |
| 7.4 | Withholding and Reporting Requirements | 29 |
| 7.5 | Setoffs | 29 |
| 7.6 | Allocation of Plan Distributions Between Principal and Interest | 29 |
| 7.7 | Surrender of Cancelled Instruments or Securities | 30 |
| 7.8 | Undeliverable or Returned Distributions | 30 |
| 7.9 | Fractional Distributions | 30 |
| 7.10 | Distributions to First Lien Agent | 30 |
| 7.11 | Miscellaneous Distribution Provisions | 30 |

ARTICLE VIII CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN ... 31

| | | |
|---|---|---|
| 8.1 | Conditions to the Effective Date | 31 |
| 8.2 | Waiver of Condition | 32 |
| 8.3 | Notice of Effective Date | 32 |
| 8.4 | Order Denying Confirmation | 32 |

ARTICLE IX EFFECT OF THE PLAN ON CLAIMS AND INTERESTS ... 32

| | | |
|---|---|---|
| 9.1 | Discharge of Claims and Termination of Interests | 32 |
| 9.2 | Injunctions | 33 |
| 9.3 | Releases | 33 |

9.4      Exculpation...................................................................................................34
9.5      Retention and Enforcement and Release of Causes of Action ...........................................34

ARTICLE X MISCELLANEOUS PROVISIONS ........................................................................35
10.1     Retention of Jurisdiction...................................................................................35
10.2     Terms Binding................................................................................................36
10.3     Severability..................................................................................................36
10.4     Computation of Time .......................................................................................36
10.5     Confirmation Order and Plan Control ...................................................................36
10.6     Incorporation by Reference ...............................................................................36
10.7     Modifications to the Plan...................................................................................36
10.8     Revocation, Withdrawal or Non-Consummation .....................................................36
10.9     Courts of Competent Jurisdiction ........................................................................37
10.10    Payment of Consenting First Lien Lenders Advisor Fees and Expenses .........................37
10.11    Payment of Agent Fee Claims ............................................................................37
10.12    Payment of the Avenue and Fortress Advisor Fees and Expenses .................................37
10.13    Payment of Statutory Fees.................................................................................37
10.14    Notice .........................................................................................................37
10.15    Reservation of Rights ......................................................................................38
10.16    No Waiver ...................................................................................................39

## INTRODUCTION

QCE Finance LLC and certain of its direct and indirect subsidiaries, as debtors and debtors in possession in the above-captioned cases, propose the following joint plan of reorganization for the resolution of the outstanding Claims against, and Interests in, the Debtors.  Reference is made to the Disclosure Statement (defined below), distributed contemporaneously herewith, for a discussion of (a) the Debtors' history, businesses, properties and operations, and projections for those operations, (b) a summary and analysis of the Plan, (c) the debt instruments, securities and other entitlements to be issued under the Plan and (d) certain matters related to the Confirmation and consummation of the Plan.  Each of the Debtors is a proponent of the Plan within the meaning of Bankruptcy Code section 1129.  Subject to certain restrictions and requirements set forth in Bankruptcy Code section 1127 and Bankruptcy Rule 3019, the Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan, subject to the terms of the Restructuring Support Agreement and the terms of the Plan.

## ARTICLE I
## DEFINITIONS AND RULES OF INTERPRETATION

**A.    Rules of Interpretation and Governing Law.**  For purposes of this document: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words ''herein,'' "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in Bankruptcy Code section 102 shall apply; and (h) any term used in capitalized form herein that is not otherwise defined, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the state of Delaware, without giving effect to the principles of conflict of laws thereof.

**B.    Definitions.**  The following terms (which appear in the Plan as capitalized terms) shall have the meanings set forth below.  A term used in the Plan and not defined in the Plan but that is defined in the Bankruptcy Code shall have the meaning set forth in the Bankruptcy Code.

1.1    "Administrative Expense Claim" means a Claim for costs and expenses of administration of the Chapter 11 Cases that is Allowed under Bankruptcy Code sections 503(b), 507(a), or 1114(e)(2), including, without limitation, (a) any actual and necessary expenses of preserving the Estates; (b) any actual and necessary expenses of operating the Debtors' business; (c) any actual indebtedness or obligations incurred or assumed by the Debtors during the pendency of the Chapter 11 Cases in connection with the conduct of their businesses; (d) any actual expenses necessary or appropriate to facilitate or effectuate the Plan; (e) any amount required to be paid under Bankruptcy Code section 365(b)(1) in connection with the assumption of executory contacts or unexpired leases; (f) all allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under Bankruptcy Code sections 328, 330(a), 331 or 503(b)(2), (3), (4) or (5); (g) Claims arising under Bankruptcy Code section 503(b)(9); and (h) all fees and charges payable pursuant to section 1930 of title 28 of the United States Code.

1.2    "Agent Fee Claims" means unpaid and reasonable and documented fees and expenses incurred through the Effective Date of the First Lien Agent and the Second Lien Agent, including, in both cases, any professional fees.

1.3     "Allowed" means, with reference to any Claim or Interest, or any portion thereof, in any Class or category specified, against or of a Debtor, (a) a Claim or Interest that has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary Proof of Claim has been filed; (b) a Claim or Interest for which a Proof of Claim has been timely filed in a liquidated amount and not contingent and as to which no objection to allowance, to alter priority, or request for estimation has been timely interposed and not withdrawn within the applicable period of limitation fixed by the Plan or applicable law; (c) a Claim or Interest as to which any objection has been settled, waived, withdrawn or denied by a Final Order to the extent such Final Order provides for the allowance of all or a portion of such Claim or Interest; or (d) a Claim or Interest that is expressly allowed (i) pursuant to a Final Order, (ii) pursuant to an agreement between the Holder of such Claim or Interest and the Debtors or the Reorganized Debtors, as applicable or (iii) pursuant to the terms of the Plan.  Unless otherwise specified in the Plan or in an order of the Bankruptcy Court allowing such Claim or Interest, "Allowed" in reference to a Claim shall not include (a) any interest on the amount of such Claim accruing from and after the Petition Date; (b) any punitive or exemplary damages; or (c) any fine, penalty or forfeiture.  Any Claim listed in the Schedules as disputed, contingent, or unliquidated, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order, or approval of the Bankruptcy Court.

1.4     "Allowed Claim" means a Claim or any portion thereof, without duplication, that has been Allowed.

1.5     "Allowed Interest" means an Interest or any portion thereof, without duplication, that has been Allowed.

1.6     "Amended Corporate Governance Documents" means the Amended Operating Agreement and any amended certificates of formation, bylaws, or other operating agreements as may be necessary for the Reorganized Debtors, which shall be in form and substance reasonably acceptable to the Debtors and the Requisite Consenting Parties and substantially final forms of which shall be included in the Plan Supplement.

1.7     "Amended First Lien Credit Agreement" means that certain Amended and Restated Credit Agreement, dated as of the Effective Date (as may be further amended from time to time), among Reorganized Holdco, as borrower, the lenders party thereto, Wilmington Trust, National Association, as administrative agent, and any and all other loan documents evidencing obligations of the Reorganized Debtors and the Non-Debtor Guarantor arising thereunder, including any and all guaranty, security and collateral documents, the terms of which shall be materially consistent with the terms as set forth in the Restructuring Support Agreement, and the form and substance of which shall be acceptable to the Debtors and the Requisite Consenting First Lien Lenders.

1.8     "Amended First Lien Credit Facility" means the First Lien Credit Facility as amended and restated in its entirety as of the Effective Date with an aggregate principal amount outstanding of $200 million on the terms and conditions set forth in the Amended First Lien Credit Agreement.

1.9     "Amended Marketing Fund Trusts Credit Agreement" means that certain Amended and Restated Marketing Fund Trusts Credit Agreement, dated as of the Effective Date (as may be further amended from time to time), among Reorganized QAFT, solely in its capacity as Trustee for the Reorganized Marketing Fund Trusts, as borrower, the lenders party thereto, and Vectra, as administrative agent, and any and all other loan documents evidencing the obligations of the Reorganized Marketing Fund Trust Debtors arising thereunder, including any and all guaranty, security and collateral documents, the terms of which shall be materially consistent with the terms as set forth in Annex A attached hereto and the form and substance of which shall be reasonably acceptable to the Debtors, Vectra and the Requisite Consenting First Lien Lenders.

1.10     "Amended Marketing Fund Trusts Credit Facility" means the Marketing Fund Trusts Credit Facility as it will be amended and restated in its entirety as of the Effective Date, on the terms and conditions set forth in the Amended Marketing Fund Trusts Credit Agreement.

1.11    "Amended Operating Agreement" means the amended and restated limited liability company agreement with respect to Reorganized Holdco, which shall be in form and substance reasonably acceptable to the Debtors and the Requisite Consenting Parties.

1.12    "Article" means any article of the Plan.

1.13    "Avenue" means certain controlled affiliates, managed accounts or funds of Avenue Capital Management II, L.P. that are Holders of Claims against or Interests in the Debtors.

1.14    "Avenue and Fortress Advisor Fee Claims" means unpaid and reasonable and documented fees and expenses incurred through the Effective Date of Skadden Arps Slate Meagher & Flom, O'Melveny & Myers LLP, Rothschild Inc. and one local counsel for the Consenting Avenue and Fortress Entities.

1.15    "Avoidance Actions" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable Bankruptcy Code section, including Bankruptcy Code sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

1.16    "Bankruptcy Code" means title 11 of the United States Code, as now in effect or hereafter amended.

1.17    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent of any withdrawal of the reference made pursuant to section 157 of title 28 of the United States Code, the unit of such District Court pursuant to section 151 of title 28 of the United States Code.

1.18    "Bankruptcy Rules" means (a) the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code and (b) the general and local rules of the Bankruptcy Court, as now in effect or hereafter amended.

1.19    "Business Day" means any day other than a Saturday, Sunday, or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a).

1.20    "Cash" means cash and cash equivalents, in legal tender of the United States of America.

1.21    "Causes of Action" means all actions, causes of action (including Avoidance Actions), liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims whatsoever, in each case held by the Debtors or any of the Debtors, whether disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

1.22    "Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the chapter 11 case filed for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases for all of the Debtors.

1.23    "Claim" means "claim" as defined in Bankruptcy Code section 101(5), as supplemented by Bankruptcy Code section 102(2), against any of the Debtors, whether or not asserted.

1.24    "Claims and Noticing Agent" means Prime Clerk LLC, employed by the Debtors as the official claims, noticing, and balloting agent in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court.

1.25    "Claims Objection Deadline" means the first Business Day that is one hundred and twenty (120) days after the Effective Date, or such other later date that the Bankruptcy Court may establish upon a

motion by the Reorganized Debtors, which motion may be approved without a hearing and without notice to any party.

        1.26    "Class" means each category of Holders of Claims or Interests established under Article II of the Plan pursuant to Bankruptcy Code section 1122.

        1.27    "Company Specified Litigation Claims" means those Specified Litigation Claims held by the Debtors and/or Reorganized Debtors against the Specified Litigation Parties.

        1.28    "Company Specified Litigation Proceeds" means the Specified Litigation Proceeds allocable to the Debtors or Reorganized Debtors in the First Round Specified Litigation Proceeds Distribution and the Second Round Specified Litigation Proceeds Distribution.

        1.29    "Confirmation" means the entry, within the meaning of Bankruptcy Rules 5003 and 9021, of the Confirmation Order by the Bankruptcy Court.

        1.30    "Confirmation Date" means the date upon which Confirmation occurs.

        1.31    "Confirmation Hearing" means the hearing held by the Bankruptcy Court pursuant to Bankruptcy Code section 1128 to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

        1.32    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code section 1129.

        1.33    "Consenting Avenue and Fortress Entities" means the Consenting Second Lien Lenders and the Consenting Existing Equity Holders.

        1.34    "Consenting Existing Equity Holders" means Avenue and Fortress in their capacity as Holders of Holdco Interests.

        1.35    "Consenting First Lien Lenders Advisor Fee Claims" means unpaid and reasonable and documented fees and expenses incurred through the Effective Date of Milbank Tweed Hadley & McCloy LLP, Houlihan Lokey Capital, Inc. and local counsel for the Consenting First Lien Lenders.

        1.36    "Consenting First Lien Lenders" means (a) Oaktree Capital Management L.P , (b) Caspian Capital LP and (c) MSD Credit Opportunity Master Fund, L.P., and each of their respective controlled affiliates, managed accounts or funds that are Holders of First Lien Facility Claims.

        1.37    "Consenting Parties" means the Consenting First Lien Lenders and the Consenting Avenue and Fortress Entities.

        1.38    "Consenting Second Lien Lenders" means Avenue and Fortress in their capacity as Second Lien Lenders.

        1.39    "Creditors Committee" means, if one is appointed, the official committee of unsecured creditors appointed by the U.S. Trustee pursuant to Bankruptcy Code section 1102(a), as it may be reconstituted from time to time.

        1.40    "Debtors" means, collectively, QCE Finance LLC; American Food Distributors LLC; QAFT, Inc.; Quiznos Global LLC; QCE LLC; QFA Royalties LLC; QIP Holder LLC; Quiz-CAN LLC; Quiznos Canada Holding LLC; Restaurant Realty LLC; National Marketing Fund Trust; Regional Advertising Program Trust; The Quizno's Master LLC; The Quizno's Operating Company LLC; and TQSC II LLC.

1.41    "Deferred Compensation Plans" means collectively (a) The QCE LLC Key Management Wealth Building Program, restated effective as of January 1, 2009; (b) The Quizno's Master LLC Amended Director, Advisor and Executive SAR and Deferred Compensation Plan, effective as of December 1, 2000 (as restated January 1, 2003); and (c) The Quizno's Corporation Deferred Bonus Plan, effective as of October 1, 2001, each as may be further amended, restated, supplemented or modified from time to time.

1.42    "DIP Agent" means Wilmington Trust, National Association, in its capacity as administrative agent and collateral agent for the DIP Facility.

1.43    "DIP Credit Agreement" means that certain Debtor In Possession Credit Agreement, dated as of March [  ], 2014, among the Debtors, the DIP Agent, and the DIP Lenders and any and all other loan documents evidencing obligations of the Debtors arising thereunder, including any and all guaranty, security and collateral documents.

1.44    "DIP Facility" means the $15 million debtor in possession credit facility established pursuant to the DIP Credit Agreement.

1.45    "DIP Facility Claims" means the Claims of the DIP Agent and the DIP Lenders arising under the DIP Credit Agreement and the DIP Facility Order.

1.46    "DIP Facility Order" means, as applicable, the interim and final order(s) of the Bankruptcy Court authorizing the Debtors to enter into and make borrowings under the DIP Credit Agreement, and granting certain rights, protections and liens to and for the benefit of the DIP Lenders.

1.47    "DIP Lenders" means the lenders and financial institutions from time to time party to the DIP Facility and defined as "Lenders" thereunder.

1.48    "Disclosure Statement" means the disclosure statement for the Plan, including, without limitation, all exhibits and schedules thereto, as amended, supplemented or modified from time to time, that was prepared and distributed those creditors entitled to vote on the Plan in accordance with Bankruptcy Code section 1126(b), Bankruptcy Rule 3018, and other applicable law.

1.49    "Disputed" means, with respect to any Claim or Interest, any (a) Claim that is listed on the Schedules as unliquidated, disputed or contingent; (b) Claim or Interest as to which the Debtors or any other party in interest have interposed a timely objection or request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules and any orders of the Bankruptcy Court or which is otherwise disputed by the Debtors in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order; (c) any Claim evidenced by a Proof of Claim which amends a Claim scheduled by the Debtors as contingent, unliquidated, or disputed; or (d) any Claim or Interest that is not an Allowed Claim or Allowed Interest.

1.50    "Disputed Agent Fee Claim" means the portion of any Agent Fee Claims that may be disputed by the Debtors or Reorganized Debtors.

1.51    "Disputed Avenue and Fortress Advisor Fee Claim" means the portion of any Avenue and Fortress Advisor Fee Claims that may be disputed by the Debtors or Reorganized Debtors.

1.52    "Disputed Consenting First Lien Lender Advisor Fee Claim" means the portion of any Consenting First Lien Lender Advisor Fee Claim that may be disputed by the Debtors or Reorganized Debtors.

1.53    "Distribution Date" means the date upon which the initial distributions will be made to certain Holders of Allowed Claims pursuant to Article 7.1 of the Plan.

1.54    "Distribution Record Date" means the Confirmation Date.

1.55    "Distribution Reserves" means the Proceeds Distribution Reserve and the Remaining Equity Issuance Reserve.

1.56    "E&O and D&O Insureds" has the meaning set forth in Article 5.9 of the Plan.

1.57    "Effective Date" means the date on which the Plan shall take effect, which date shall be a Business Day on or after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) the conditions to the effectiveness of the Plan specified in Article 8.1 of the Plan have been satisfied, or if capable of being waived, waived in accordance with the terms of the Plan.

1.58    "Employee Benefits Programs" has the meaning set forth in Article 5.8 of the Plan.

1.59    "Estate" means, as to each Debtor, the estate created for that Debtor in its Chapter 11 Case pursuant to Bankruptcy Code section 541.

1.60    "Estimated Amount" has the meaning set forth in Article 6.2 of the Plan.

1.61    "Exculpated Parties" means, collectively:  (a) the Consenting First Lien Lenders; (b) the First Lien Agent; (c) the Consenting Second Lien Lenders; (d) the Second Lien Agent; (e) the Consenting Existing Equity Holders; (f) Vectra; (g) the DIP Agent; (h) the DIP Lenders; and (i) with respect to the foregoing entities in clauses (a) through (h), their respective current and former equityholders, affiliates, subsidiaries, officers, directors, principals, members, managers, employees, funds, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; and (j) the Debtors' and Non-Debtor Affiliates' respective current officers, directors, principals, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals of the Debtors that served in such capacities during the Chapter 11 Cases.

1.62    "Exhibit" means an exhibit annexed to the Plan, to any Plan Supplement, or to the Disclosure Statement.

1.63    "Final Order" means (a) an order or judgment of the Bankruptcy Court or any other court or adjudicative body as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending, or (b) in the event that an appeal, writ of certiorari, reargument, or rehearing thereof has been taken or sought, such order of the Bankruptcy Court or any other court or adjudicative body shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Bankruptcy Code section 502(j), Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order.

1.64    "First Lien Agent" means Wilmington Trust, National Association as successor administrative agent under the First Lien Credit Agreement, and its successors and assigns.

1.65    "First Lien Credit Agreement" means that certain Amended and Restated Credit Agreement, originally dated as of May 5, 2006 and amended and restated as of January 24, 2012, among QCE LLC, as borrower, Holdco, the lenders party thereto, Goldman Sachs Credit Partners L.P., as administrative agent, Deutsche Bank Securities Inc., as syndication agent, and Credit Suisse Securities (USA) LLC, Wachovia Bank, N.A., and BNP Paribas Securities Corp., as co-documentation agents (as amended, supplemented, or modified from time to time) and any and all other loan documents evidencing obligations of the Debtors and the Non-Debtor Guarantor arising thereunder, including any and all guaranty, security and collateral documents.

1.66    "First Lien Credit Facility" means that term loan credit facility provided by the First Lien Credit Agreement.

1.67 "First Lien Distribution" means (i) the rights of the First Lien Lenders under the Amended First Lien Credit Facility and (ii) 100% of the New Common Interests issued as of the Effective Date, subject to dilution by any New Common Interests issued under the New Management Equity Incentive Plan or by the Remaining Equity to be distributed to Holders of Allowed Unsecured Claims that make the Stock in Lieu Election.

1.68 "First Lien Facility Claims" means the First Lien Facility Secured Claims and the First Lien Facility Deficiency Claims.

1.69 "First Lien Facility Guarantor" means any Debtor or Non-Debtor Guarantor that has guaranteed the obligations of QCE LLC under the First Lien Credit Agreement.

1.70 "First Lien Facility Secured Claims" means any and all Secured Claims for principal and interest of the First Lien Lenders against any of the Debtors or the Non-Debtor Guarantor arising under or relating to the First Lien Credit Agreement, including the First Lien Facility Guaranty Secured Claims.

1.71 "First Lien Facility Deficiency Claims" means any and all Unsecured Claims for principal and interest of the First Lien Lenders against any of the Debtors or the Non-Debtor Guarantor, arising under or relating to the First Lien Credit Agreement, including the First Lien Facility Guaranty Deficiency Claims.

1.72 "First Lien Facility Guaranty Secured Claims" means any and all Secured Claims for principal and interest of the First Lien Lenders against any First Lien Facility Guarantor arising under or relating to the First Lien Credit Agreement.

1.73 "First Lien Facility Guaranty Deficiency Claims" means any and all Unsecured Claims for principal and interest of the First Lien Lenders against any First Lien Facility Guarantor arising under or relating to the First Lien Credit Agreement.

1.74 "First Lien Lenders" means the financial institutions or other Persons that are lenders under the First Lien Credit Agreement.

1.75 "First Round Specified Litigation Proceeds Distribution" has the meaning as set forth in Article 4.5(b) of the Plan.

1.76 "Former D&O Indemnification Claim" means any Claim for indemnification, advancement and/or reimbursement of Greg MacDonald, Dennis Smythe and former directors, officers, members, managers or employees and agents of the Debtors, serving only prior to January 24, 2012, arising from indemnification and/or reimbursement provisions in place at the commencement of the Chapter 11 Cases, whether in the certificates of incorporation, codes of regulation, bylaws, limited liability company agreements, operating agreements, limited liability partnership agreements, any other organizational documents, board resolutions, or contracts, or otherwise.

1.77 "Fortress" means certain controlled affiliates, managed accounts or funds of Fortress Investment Group that are Holders of Claims against or Interests in the Debtors.

1.78 "Holdco" means QCE Finance LLC.

1.79 "Holdco Interests" means any and all Interests in Holdco.

1.80 "Holder" means a holder of a Claim against or Interest in a Debtor.

1.81 "Impaired" means impaired within the meaning of Bankruptcy Code section 1124.

1.82 "Indemnity Obligations" has the meaning set forth in Article 5.9 of the Plan.

1.83    "Insurance Coverage" has the meaning set forth in Article 5.9 of the Plan.

1.84    "Intercompany Claim" means any Claim held by a Debtor or any Non-Debtor Affiliate against any Debtor; provided, however, that a Joint Venture Claim is not an Intercompany Claim.

1.85    "Intercompany Interest" means Interests in any Debtor held by another Debtor.

1.86    "Interest" means any equity security in the Debtors represented by any issued outstanding common interests, preferred interests, or other instrument evidencing an ownership interest prior to the Effective Date, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire, sell or subscribe for any such interest and whether certificated or not certificated.

1.87    "Joint Venture Claim" means any Claim held or asserted by or on behalf of Seattle Area Directorship II LLC against any Debtor.

1.88    "Lease Promissory Note" means that certain Subordinated Unsecured Promissory Note, dated January 24, 2012, between QCE LLC, as maker, and MG 1005 LLC, as payee, in the principal amount of $3,625,000.000, with a maturity date of May 31, 2019.

1.89    "Lease Promissory Note Claim" means any Unsecured Claim against QCE LLC arising from or relating to the Lease Promissory Note

1.90    "Legal Expense Reimbursement" has the meaning as set forth in Article 4.5(b) of the Plan.

1.91    "Lien" has the meaning set forth in Bankruptcy Code section 101(37).

1.92    "Marketing Fund Trusts" means the National Marketing Fund Trust and the Regional Advertising Program Trust.

1.93    "Marketing Fund Trusts Credit Agreement" means that certain Credit Agreement, dated as of September 26, 2007, among QAFT, solely in its capacity as Trustee for the Marketing Fund Trusts, as borrowers, the lenders party thereto, and Vectra, as administrative agent (as amended, supplemented, or modified from time to time) and any and all other loan documents evidencing obligations of the Debtors arising thereunder, including any and all guaranty, security and collateral documents.

1.94    "Marketing Fund Trusts Debtors" means QAFT and the Marketing Fund Trusts.

1.95    "Marketing Fund Trusts Facility Claims" means the Marketing Fund Trusts Facility Secured Claim and the Marketing Fund Trusts Facility Guaranty Claim.

1.96    "Marketing Fund Trusts Facility Guarantor" means QCE LLC as guarantor of the obligations of the Marketing Fund Trusts under the Marketing Fund Trusts Credit Agreement.

1.97    "Marketing Fund Trusts Facility Guaranty Claim" means any and all claims of Vectra against the Marketing Fund Trusts Facility Guarantor for obligations arising under or related to the Marketing Fund Trusts Credit Agreement.

1.98    "Marketing Fund Trusts Facility Secured Claim" means the Secured Claim of Vectra against the Marketing Fund Trusts arising under or relating to the Marketing Fund Trusts Credit Agreement.

1.99    "National Marketing Fund Trust" means that certain trust as established pursuant to that certain Restated Declaration of Trust of the National Marketing Fund Trust, effective June 17, 2005, as amended by the Amendment to the Restated Declaration of Trust of the National Marketing Fund Trust.

1.100    "New Board Member" means a member of the New Board of Managers appointed as of the Effective Date.

1.101    "New Board of Managers" means the board of managers of Reorganized Holdco.

1.102    "New Common Interests" means the common interests in Reorganized Holdco which, as of the Effective Date, shall consist of 1,000,000 common interests issued under Article 4.3(a) Plan.

1.103    "New Delayed-Draw Term Facility" means the revolving delayed draw facility on the terms and conditions terms set forth in the New Delayed-Draw Term Facility Agreement.

1.104    "New Delayed-Draw Term Facility Agreement" means that certain credit agreement, dated as of the Effective Date, by and among the Reorganized Debtors and the Consenting First Lien Lenders, together with all documents, instruments and agreements executed in connection therewith or related thereto, for the provision of the New Delayed-Draw Term Facility, the terms of which shall be materially consistent with the terms as set forth in the Restructuring Support Agreement and the form and substance of which shall be acceptable to the Debtors and the Requisite Consenting First Lien Lenders.

1.105    "New Management Equity Incentive Plan" means an equity incentive plan, option plan, unit plan, restricted equity incentive plan or other similar management incentive award plan which shall provide for grants of options and/or restricted units/equity reserved for management, directors, and employees. The amount, form, exercise price, allocation and vesting of such equity-based awards, and any limitations thereon, shall be determined and approved by the New Board of Managers and implemented after the Effective Date; provided, however, that such terms shall be materially consistent with the terms as set forth in the Restructuring Support Agreement.

1.106    "Non-Debtor Affiliates" means Canada Food Distribution Company, the Seattle Area Directorship II LLC, QCE Gift Card LLC, Quizmark LLC, Quiz-DIA LLC, Quizno's Canada Advertising Fund Inc., Quizno's Canada Operating Company Inc., Quizno's Canada Restaurant Corporation and Quizno's Canada Real Estate Corporation.

1.107    "Non-Debtor Guarantor" means Quiz-DIA LLC.

1.108    "Non-Legal Expense Reimbursement" has the meaning as set forth in Article 4.5(b) of the Plan.

1.109    "Officers' Employment Agreements" mean the agreements that govern the terms of the employment relationship between the Debtors and the current officers of the Debtors.

1.110    "Other Secured Claim" means a Claim, other than a First Lien Facility Secured Claim, Marketing Fund Trusts Facility Secured Claim, DIP Facility Claim, or Priority Tax Claim that is secured by a valid, perfected and enforceable Lien on property in which a Debtor's Estate has an interest or that is subject to setoff under Bankruptcy Code section 553, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined by a Final Order of the Bankruptcy Court pursuant to Bankruptcy Code section 506(a).

1.111    "Person" means any person, including, without limitation, any individual, partnership, joint venture, venture capital fund, association, corporation, union, limited liability company, limited liability partnership, unlimited liability company, trust, trustee, executor, administrator, legal personal representative, estate, group, unincorporated association or organization or governmental unit.

1.112    "Petition Date" means March [14], 2014.

1.113    "Plan" means this chapter 11 plan (including the Plan Supplement), either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance herewith, the Bankruptcy Code and the Bankruptcy Rules, subject to the terms of the Restructuring Support Agreement.

1.114    "Plan Supplement" means the compilation of documents and forms of documents, schedules and exhibits to the Plan, to be filed no later than seven (7) days prior to the deadline for objections to the Plan as established by the Bankruptcy Court, as amended, supplemented, or modified from time to time in accordance with the terms of the Plan, the Restructuring Support Agreement, the Bankruptcy Code and the Bankruptcy Rules, including:  (a) to the extent known, the identity of the members of the New Board of Managers and the nature and compensation for any New Board Member who is an "insider" under Bankruptcy Code section 101(31); (b) the Schedule of Rejected Executory Contracts and Unexpired Leases; (c) Schedule of Proposed Cure Amounts; (d) a schedule of the Retained Causes of Action; (e) the applicable Amended Corporate Governance Documents; (f) the Amended First Lien Credit Agreement; (g) the Amended Marketing Fund Trusts Credit Agreement; (h) the New Delayed-Draw Term Facility Agreement and (h) the Specified Litigation Agreement.

1.115    "Plan Support Releasing Parties" means, collectively, (a) the Consenting First Lien Lenders; (b) the First Lien Agent; (c) the Consenting Second Lien Lenders; (d) the Second Lien Agent; (e) the Consenting Existing Equity Holders; (f) Vectra; (g) the DIP Agent; (h) the DIP Lenders; and (i) the Creditors Committee and the members of the Creditors Committee.

1.116    "Priority Non-Tax Claims" means a Claim to the extent that it is of the kind described in, and entitled to priority under, Bankruptcy Code section 507(a)(3), (4), (5) or (6), but other than any Priority Tax Claim.

1.117    "Priority Tax Claim" means a Claim to the extent that it is of the kind described in, and entitled to priority under, Bankruptcy Code section 507(a)(8).

1.118    "Proceeds Distribution Reserve" has the meaning set forth in Article 6.2 of the Plan.

1.119    "Professional" means (a) any professional employed in these Chapter 11 Cases pursuant to Bankruptcy Code sections 327, 328 or 1103 and (b) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to Bankruptcy Code section 503(b)(4).

1.120    "Professional Fee Claims" means Administrative Expense Claims of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred on or after the Petition Date and prior to and including the Effective Date.

1.121    "Proof of Claim" means a proof of claim filed by a Holder of a Claim against any Debtor (as may be amended and supplemented from time to time pursuant to the Bankruptcy Code or Bankruptcy Rules) on or before the applicable Claims bar date, or such other time as may be permitted by the Bankruptcy Court or agreed to by the Debtors.

1.122    "Pro Rata" means the proportion by dollar amount that an Allowed Claim in a particular Class bears to the aggregate dollar amount of Allowed Claims in that Class, or the proportion by dollar amount that an Allowed Claim entitled to share in the same recovery as other Allowed Claims bears to the aggregate dollar amount of Allowed Claims entitled to share in that same recovery under the Plan.

1.123    "QAFT" means QAFT, Inc.

1.124    "Regional Advertising Program Trust" means that certain trust as established pursuant to the Restated Declaration of Trust of the Regional Advertising Program Trust, effective June 17, 2005, as amended by the Amendment to the Restated Declaration of Trust of the Regional Advertising Program Trust.

1.125    "Reinstated" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest so as to leave such Claim or Interest

Unimpaired, or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Bankruptcy Code section 365(b)(2), (ii) reinstating the maturity of such Claim or Interest as such maturity existed before such default, (iii) compensating the Holder of a Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder of a Claim or Interest on such contractual provision or such applicable law, and (iv) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Interest entitles the Holder of such Claim or Interest.

      1.126    "Released Party" means, each of: (a) the Consenting First Lien Lenders; (b) the First Lien Agent; (c) the Consenting Second Lien Lenders; (d) the Second Lien Agent; (e) the Consenting Existing Equity Holders; (f) Vectra; (g) the DIP Agent; (h) the DIP Lenders; (i) with respect to the foregoing entities in clauses (a) through (h), their respective current and former equityholders, affiliates, subsidiaries, officers, directors, principals, members, managers, employees, funds, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (j) the Non-Debtors Affiliates and (k) the Debtors' and the Non-Debtor Affiliates' respective current and former officers, directors, principals, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals that served in such capacities during the Chapter 11 Cases; provided, however, that no Specified Litigation Party shall constitute a Released Party, nor shall any Holder of a Former D&O Indemnification Claim constitute a Released Party.

      1.127    "Remaining Equity" means 30% of the New Common Interests reserved as of the Effective Date (subject to dilution by any New Common Interests issued under the New Management Equity Incentive Plan) that shall be distributable to the Holders of Allowed Unsecured Claims that make the Stock in Lieu Election.

      1.128    "Remaining Equity Issuance Reserve" has the meaning set forth in Article 6.2 of the Plan.

      1.129    "Reorganized Debtors" means, on and after the Effective Date, collectively, all of the Debtors that are reorganized under and pursuant to the Plan.

      1.130    "Reorganized Holdco" means, on and after the Effective Date, Holdco as reorganized under and pursuant to the Plan.

      1.131    "Reorganized Marketing Fund Trusts" means, on and after the Effective Date, the Marketing Fund Trusts as reorganized under and pursuant to the Plan.

      1.132    "Reorganized QAFT" means, on and after the Effective Date, QAFT as reorganized under and pursuant to the Plan.

      1.133    "Requisite Consenting Existing Equity Holders" has the meaning set forth in the Restructuring Term Sheet.

      1.134    "Requisite Consenting First Lien Lenders" has the meaning set forth in the Restructuring Support Agreement.

      1.135    "Requisite Consenting Lenders" has the meaning set forth in the Restructuring Support Agreement.

      1.136    "Requisite Consenting Parties" has the meaning set forth in the Restructuring Support Agreement.

      1.137    "Requisite Consenting Second Lien Lenders" has the meaning set forth in the Restructuring Agreement.

1.138    "Restructuring Support Agreement" means the agreement, including all exhibits and supplements annexed thereto, dated as of March 11, 2014 (as it may be amended, supplemented or otherwise modified from time to time, both as to substance and parties thereto) among the Debtors and the Consenting Parties, a copy of which is attached as Exhibit B to the Disclosure Statement.

1.139    "Retained Causes of Action" has the meaning set forth in Article 9.5 of the Plan.

1.140    "SARs Claims" means Unsecured Claims arising under the Deferred Compensation Plans and the SARs Settlement Agreements.

1.141    "SARs Settlement Agreements" means those certain amended and restated deferred compensation settlement agreements, executed in or around January 2012, as between certain participants in the Deferred Compensation Plans, QCE LLC and The Quiznos Master LLC.

1.142    "Schedule of Proposed Cure Amounts" means the schedule listing those executory contracts and unexpired leases to be assumed by the Debtors pursuant to the Plan, with respect which the proposed cure amount is greater than zero, and which identifies such proposed cure amount.

1.143    "Schedule of Rejected Executory Contracts and Unexpired Leases" means the schedule of contracts and/or leases to be rejected or repudiated by the Debtors pursuant to the Plan in the form filed as part of the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

1.144    "Schedules" means the schedules of assets and liabilities, schedules of executory contracts, and the statement of financial affairs filed by the Debtors pursuant to Bankruptcy Code section 521, the Official Bankruptcy Forms and the Bankruptcy Rules, and any and all amendments thereto.

1.145    "Second Lien Agent" means U.S. Bank National Association, as administrative agent under the Second Lien Credit Agreement, and is successors and assigns.

1.146    "Second Lien Credit Agreement" means that certain Credit Agreement, dated as of January 24, 2012, among QCE LLC, as borrower, Holdco, the lenders party thereto, and U.S. Bank National Association, as administrative agent (as amended, supplemented, or modified from time to time), and any and all other loan documents evidencing obligations of the Debtors and the Non-Debtor Guarantor arising thereunder, including any and all guaranty, security and collateral documents.

1.147    "Second Lien Credit Facility Guarantor" means any Debtor or Non-Debtor Guarantor that has guaranteed the obligations of QCE LLC under the Second Lien Credit Agreement.

1.148    "Second Lien Facility Claims" means any and all Claims for principal and interest of the Second Lien Lenders, all of which shall be Unsecured Claims, against any of the Debtors or the Non-Debtor Guarantor arising under or relating to the Second Lien Credit Agreement, including the Second Lien Credit Facility Guaranty Claims.

1.149    "Second Lien Facility Guaranty Claims" mean any and all Claims for principal and interest of the Second Lien Lenders, all of which shall be Unsecured Claims, against any Second Lien Credit Facility Guarantor, arising under or related to the Second Lien Credit Agreement.

1.150    "Second Lien Lenders" means the financial institutions or other Persons that are lenders under the Second Lien Credit Agreement.

1.151    "Second Round Specified Litigation Proceeds Distribution" has the meaning as set forth in Article 4.5(b) of the Plan.

1.152    "Secured" means when referring to a Claim: (a) secured by a Lien on property in which an Estate has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a

Bankruptcy Court order, or that is subject to setoff pursuant to Bankruptcy Code section 553, to the extent of the value of the creditor's interest in an Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code section 506(a) or (b) Allowed as such pursuant to the Plan.

1.153    "Securities" means any instruments that qualify under section 2(a)(1) of the Securities Act, including the New Common Interests.

1.154    "Securities Act" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as now in effect or hereafter amended.

1.155    "Specified Litigation Agreement" means that certain agreement entered into between the Reorganized Debtors, Avenue and Fortress, the terms of which shall be consistent with the terms as set forth in the Restructuring Support Agreement and the form and substance of which shall be acceptable to the Debtors, Avenue and Fortress and included in the Plan Supplement.

1.156    "Specified Litigation Claims" means all claims and causes of action made, or which could be made, on behalf of the Debtors, Avenue and/or Fortress against the Specified Litigation Parties.

1.157    "Specified Litigation Parties" means Greg MacDonald, Dennis Smythe, Richard E. Schaden, Richard F. Schaden, Frederick H. Schaden, Andrew R. Lee, Patrick E. Meyers, John M. Moore, Thomas M. Ryan, and/or any other former directors, officers, managers, equity owners, agents and/or employees of the Debtors that served in any such capacities only prior to January 24, 2012, and any entities related to or affiliated with any of the foregoing, including, but not limited to, Cervantes Capital LLC and Consumer Capital Partners.

1.158    "Specified Litigation Proceeds" means any proceeds recovered in connection with the Specified Litigation Claims.

1.159    "Specified Litigation Waterfall" has the meaning set forth in the Specified Litigation Agreement, as described in Article 4.5(b) of the Plan.

1.160    "Stock in Lieu Election" has the meaning set forth in Article 2.10 of the Plan.

1.161    "Stock in Lieu Election Deadline" means the deadline for Holders of Unsecured Claims entitled to make the Stock in Lieu Election to make such election.

1.162    "Stock in Lieu Election Notice" means that notice which provides Holders of Unsecured Claims with no less than thirty (30) days' notice of (a) their right submit written notice of their Stock in Lieu Election and (b) the Stock in Lieu Election Deadline, the form of which shall be reasonably acceptable to the Debtors and the Requisite Consenting Parties and approved by an order of the Bankruptcy Court.

1.163    "Subordinated Claims" means the Former D&O Indemnification Claims and any other Claim that is subject to contractual, legal and/or equitable subordination, whether arising under general principles of equitable subordination, Bankruptcy Code sections 510(b) or 510(c), or otherwise.

1.164    "Taxes" means any federal, state, county or local taxes, charges, fees, levies, other assessments, or withholding taxes or charges imposed by any governmental unit, and includes any interest and penalties (civil or criminal) on or additions to any such taxes and any expenses incurred in connection with the determination, settlement or litigation of any tax liability.

1.165    "Term Loan Debtors" means, collectively, all Debtors that are not Marketing Fund Trusts Debtors.

1.166    "Unclassified Claims" means Administrative Expense Claims, Priority Tax Claims and DIP Facility Claims.

1.167    "Unimpaired" means, with respect to a Claim, Interest, or Class of Claims or Class of Interests, not "impaired" within the meaning of Bankruptcy Code sections 1123(a)(4) and 1124.

1.168    "U.S. Trustee" means the United States Trustee for the District of Delaware.

1.169    "Unsecured Claim" means any First Lien Facility Deficiency Claim, Second Lien Facility Claim, the Marketing Fund Trusts Facility Guaranty Claim, SARs Claim, Lease Promissory Note Claim and any other Claim that is not an Administrative Expense, Intercompany Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a First Lien Facility Secured Claim, a Marketing Fund Trusts Facility Secured Claim, or an Other Secured Claim.

1.170    "Unsecured Creditor Company Specified Litigation Proceeds Distribution Date" means the date, pursuant to Article 7.1 of the Plan, upon which the initial distributions of Company Specified Litigation Proceeds will be made to those Holders of Allowed Unsecured Claims entitled to make the Stock in Lieu Election that did not make such election.

1.171    "Unsecured Creditor Remaining Equity Distribution Date" means the date, pursuant to Article 7.1 of the Plan, upon which the initial distributions of Remaining Equity will be made to those Holders of Allowed Unsecured Claims that have made the Stock in Lieu Election.

1.172    "Vectra" means Vectra Bank Colorado, National Association.

1.173    "Voting Deadline" means 12:00 p.m., prevailing Eastern Time, on March 14, 2014.

**ARTICLE II**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.    **Unclassified Claims**.

2.1    **Administrative Expense Claims**.  Except to the extent that a holder of an Allowed Administrative Expense Claim and the Debtors or the Reorganized Debtors agree in writing to less favorable treatment for such Claim, the Debtors (or the Reorganized Debtors, as the case may be) shall pay to each holder, as applicable, of an Allowed Administrative Expense Claim, in full and final satisfaction of its Administrative Expense Claim, Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors or liabilities arising under loans or advances to or other obligations incurred by the Debtors, whether or not incurred in the ordinary course of business, shall be paid by the Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

2.2    **Professional Fee Claims**.  All entities seeking allowance by the Bankruptcy Court of Professional Fee Claims shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date. Allowed Professional Fee Claims shall be paid in full (i) upon the later of (A) the Effective Date and (B) the date upon which the order relating to any such Allowed Professional Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Professional Fee Claim and the Debtors or, on and after the Effective Date, the Reorganized Debtors.  The Reorganized Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

2.3    **Priority Tax Claims**.  Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement release and discharge of each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or before

the Effective Date shall receive, at the option of the Debtors or Reorganized Debtors, one of the following treatments: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus interest at the rate determined under applicable nonbankruptcy law and to the extent provided for by Bankruptcy Code section 511, payable on or as soon as practicable following the Effective Date; (b) Cash in an aggregate amount of such allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to Bankruptcy Code section 1129(a)(9)(C), plus interest at the rate determined under applicable nonbankruptcy law and to the extent provided for by Bankruptcy Code section 511; or (c) such other treatment as may be agreed upon by such Holder and the Debtors or Reorganized Debtors, as applicable, or otherwise determined by an order of the Bankruptcy Court.

2.4    **DIP Facility Claims**.  As of the Effective Date, the DIP Facility Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Facility Credit Agreement, including principal, interest, fees and expenses.  On the Effective Date all DIP Facility Claims shall be paid in full in Cash, unless previously paid or otherwise agreed to by the Debtors and the Holder of such DIP Facility Claim.

B.    **General Rules**.

2.5    **Substantive Consolidation of the Term Debtors For Plan Purposes Only.**  Pursuant to Article 4.2, the Plan provides for the substantive consolidation of the Term Loan Debtors' Estates into a single Estate for Plan purposes only and matters associated with Confirmation and consummation of the Plan.  As a result of the substantive consolidation of the Term Loan Debtors' Estates for these limited purposes, each Class of Claims against and Interests in the Term Loan Debtors will be treated as against a single consolidated Estate for Plan purposes without regard to the corporate separateness of the Term Loan Debtors.

2.6    **Classification**.  Pursuant to Bankruptcy Code sections 1122 and 1123, the following designates the Classes of Claims and Interests under the Plan.  A Claim or Interest is in a particular Class for purposes of voting on, and of receiving distributions pursuant to, the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.

C.    **Summary of Classification for the Term Loan Debtors**.

| **Class** | **Designation** | **Impairment** | **Entitled to Vote** |
|---|---|---|---|
| Class A1 | First Lien Facility Claims | Impaired | Yes |
| Class A2 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class A3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class A4 | Unsecured Claims | Impaired | No (deemed to reject) |
| Class A5 | Subordinated Claims | Impaired | No (deemed to reject) |
| Class A6(a) | Holdco Interests | Impaired | No (deemed to reject) |

| **Class** | **Designation** | **Impairment** | **Entitled to Vote** |
|---|---|---|---|
| Class A6(b) | Intercompany Interests | Unimpaired | No (deemed to accept) |

D.    **Summary of Classification for the Marketing Fund Trusts Debtors**.

| **Class** | **Designation** | **Impairment** | **Entitled to Vote** |
|---|---|---|---|
| Class B1 | Marketing Fund Trusts Facility Secured Claim | Impaired | Yes |
| Class B2 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class B3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class B4 | Unsecured Claims | Impaired | No (deemed to reject) |
| Class B5 | Interests in the Marketing Fund Trusts Debtors | Unimpaired | No (deemed to accept) |

E.    **Classified Claims and Interests Against the Term Loan Debtors**.

2.7    **Class A1 – First Lien Facility Claims**.

(a)    <u>Classification</u>.  Class A1 consists of all First Lien Facility Claims against the Term Loan Debtors.

(b)    <u>Allowance</u>.  Class A1 Claims shall be Allowed Claims pursuant to the Plan in the aggregate principal amount of $444,695,086.92, plus accrued and unpaid interest as of the Petition Date.

(c)    <u>Treatment</u>.  Holders of Class A1 Claims, in full and complete satisfaction, discharge and release of such Claims shall receive their Pro Rata share of the First Lien Distribution.  Upon acceptance of the Plan by Class A1, all Holders of Class A1 Claims shall be deemed to have agreed to forgo any distribution in respect of their First Lien Facility Deficiency Claims.

(d)    <u>Impairment and Voting</u>.  Class A1 Claims are Impaired and the Holders thereof are entitled to vote on the Plan.

2.8    **Class A2 – Priority Non-Tax Claims**.

(a)    <u>Classification</u>.  Class A2 consists of all Priority Non-Tax Claims against the Term Loan Debtors.

(b)    <u>Treatment</u>.  Except to the extent that a Holder of an Allowed Class A2 Claim agrees to less favorable treatment with the Debtors or Reorganized Debtors, each Holder of an Allowed Class A2 Claim, in full and complete satisfaction, discharge and release of such Claim, shall be paid in full in Cash on the later of the Distribution Date and that date that is as soon as practicable after the date upon which such Claim becomes an Allowed Class A2 Claim.

16

(c)        Impairment and Voting.  Class A2 Claims are Unimpaired and the Holders thereof are not entitled to vote on the Plan.

2.9        **Class A3 – Other Secured Claims**.

(a)        Classification.  Class A3 consists of all Other Secured Claims against the Term Loan Debtors.

(b)        Treatment.  Except to the extent a Holder of an Allowed Class A3 Claim agrees to less favorable treatment with the Debtors or Reorganized Debtors, as applicable, each Holder of an Allowed Class A3 Claim, in full and complete satisfaction, discharge and release of such Claim shall be (i) paid in full in Cash on the later of the Distribution Date and a date that is as soon as practicable after the date upon which such Claim becomes an Allowed Class A3 Claim or (ii) otherwise Unimpaired within the meaning of Bankruptcy Code section 1124.

(c)        Impairment and Voting.  Class A3 Claims are Unimpaired and the Holders thereof are not entitled to vote on the Plan.

2.10        **Class A4 – Unsecured Claims**.

(a)        Classification.  Class A4 consists of all Unsecured Claims against the Term Loan Debtors.

(b)        Treatment.  Except to the extent a Holder of an Allowed Class A4 Claim agrees to less favorable treatment with the Debtors or Reorganized Debtors, as applicable, in full and complete satisfaction, discharge and release of such Claims, Holders of Allowed Class A4 Claims shall receive their Pro Rata share of the Company Specified Litigation Proceeds, unless such Holder elects to receive its Pro Rata share of the Remaining Equity (the "Stock in Lieu Election"), following receipt of the Stock in Lieu Election Notice.  The Second Lien Lenders shall be deemed to have Allowed Class A4 Claims in the aggregate principal amount of $173,828,686.23, plus accrued and unpaid interest as of the Petition Date, and the Consenting Second Lien Lenders, with aggregate claims in the aggregate principal amount of $173,742,275.38, plus accrued and unpaid interest as of the Petition Date, have committed to make the Stock in Lieu Election.  For the avoidance of doubt (i) the Pro Rata share due to a Holder of an Allowed Class A4 Claim that has not made the Stock in Lieu Election shall be determined by dividing the amount of such Holder's Allowed Class A4 Claim by the aggregate amount of Allowed Class A4 Claims and Allowed Class B4 Claims of all Holders that have not made the Stock in Lieu Election and (ii) the Pro Rata share due to a Holder of an Allowed Class A4 Claim that has made the Stock in Lieu Election shall be determined by dividing the amount of such Holder's Allowed Class A4 Claim by the aggregate amount of Allowed Class A4 Claims and Allowed Class B4 Claims of all Holders that have made the Stock in Lieu Election.  For the avoidance of doubt, pursuant to Article 2.7 of the Plan, because Holders of Allowed Class A1 Claims are deemed to forego distributions on account of the First Lien Facility Deficiency Claims, Holders of First Lien Deficiency Claims will not participate in the treatment provided in this Article 2.10(b).

(c)        Impairment and Voting.  Class A4 Claims are Impaired and the Holders thereof are deemed to reject the Plan and are not entitled to vote on the Plan.

2.11        **Class A5 – Subordinated Claims**.

(a)        Classification.  Class A5 consists of any and all Subordinated Claims against the Term Loan Debtors.

(b)        Treatment.  Holders of Class A5 Claims shall not receive or retain any property on account of such Class A5 Claims and all such Claims shall be cancelled and discharged.

(c)        Impairment and Voting.  Class A5 Claims are Impaired and are deemed to reject the Plan and the Holders thereof are not entitled to vote to accept or reject the Plan.

2.12    **Class A6(a) – Holdco Interests**.

(a)    <u>Classification</u>.  Class A6(a) consists of any and all Holdco Interests, and all Claims arising from or related to Interests in Holdco that are subject to subordination under Bankruptcy Code section 510.

(b)    <u>Treatment</u>.  Holders of Class A6(a) Claims and Interests shall not receive or retain any property on account of such Class A6(a) Claims and Interests and all such Claims and Interests shall be cancelled and discharged.

(c)    <u>Impairment and Voting</u>.  Class A6(a) Claims and Interests are Impaired and the Holders thereof are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

2.13    **Class A6(b) – Intercompany Interests.**

(a)    <u>Classification</u>.  Class A6(b) Interests consists of any and all Intercompany Interests in the Term Loan Debtors other than Holdco.

(b)    <u>Treatment</u>.  Class A6(b) Interests shall be Reinstated and the legal, equitable and contractual rights to which Holders of such Allowed Interests are entitled shall remain unaltered so as to maintain the organizational structure of the Debtors as such structure existed on the Petition Date.

(c)    <u>Impairment and Voting</u>.  Class A6(b) Interests are Unimpaired and the Holders thereof are not entitled to vote on the Plan.

F.    **Classified Claims and Interests Against the Marketing Fund Trusts Debtors**.

2.14    **Class B1 – Marketing Fund Trusts Facility Secured Claim**.

(a)    <u>Classification</u>.  Class B1 consists of the Marketing Fund Trusts Facility Secured Claim held by Vectra against the Marketing Fund Trusts Debtors.

(b)    <u>Allowance</u>.  The Class B1 Claim shall be an Allowed Claim pursuant to the Plan in the aggregate principal amount of $7,351,872.27, plus (i) accrued and unpaid interest under the Marketing Fund Trusts Credit Agreement, regardless of whether incurred prepetition or postpetition; (ii) all unpaid reasonable and documented fees and expenses of Vectra; and (iii) any other amounts incurred and outstanding, under the Marketing Trust Credit Facility as of the Effective Date; <u>provided</u>, <u>however</u>, the Allowed Claim shall be reduced by any principal repayments made to Vectra during the Chapter 11 Cases prior to the Effective Date.

(c)    <u>Treatment</u>.  In full and complete satisfaction of the Class B1 Claim (i) Reorganized QAFT, solely as trustee for the Reorganized Marketing Fund Trusts, and Vectra shall enter into the Amended Marketing Fund Trusts Credit Agreement and (ii) Vectra shall forgo any distribution on account of its Marketing Fund Trusts Facility Guaranty Claim.

(d)    <u>Impairment and Voting</u>.  The Class B1 Claims are Impaired and the Holder thereof is entitled to vote on the Plan.

2.15    **Class B2 – Priority Non-Tax Claims** .

(a)    <u>Classification</u>.  Class B2 consists of all Priority Non-Tax Claims against the Marketing Fund Trusts Debtors.

(b)    <u>Treatment</u>.  Except to the extent that a Holder of an Allowed Class B2 Claim agrees to less favorable treatment with the Debtors or Reorganized Debtors, each Holder of an Allowed Class B2 Claim, in full and complete satisfaction, discharge and release of such Claim, shall be paid in full in Cash on the

later of the Distribution Date and a date that is as soon as practicable after the date upon which such Claim becomes an Class B2 Claim.

(c)    Impairment and Voting.  Class B2 Claims are Unimpaired and the Holders thereof are not entitled to vote on the Plan.

2.16    **Class B3 – Other Secured Claims.**

(a)    Classification.  Class B3 consists of all Other Secured Claims against the Marketing Fund Trusts Debtors.

(b)    Treatment.  Except to the extent that a Holder of an Allowed Class B3 Claim agrees to less favorable treatment with the Debtors or Reorganized Debtors, as applicable, each Holder of an Allowed Class B3 Claim, in full and complete satisfaction, discharge and release of such Claim shall be (i) paid in full in Cash on the later of the Distribution Date and a date that is as soon as practicable after the date upon which such Claim becomes an Allowed Class B3 Claim or (ii) otherwise Unimpaired within the meaning of Bankruptcy Code section 1124.

(c)    Impairment and Voting.  Class B3 Claims are Unimpaired and the Holders thereof are not entitled to vote on the Plan.

2.17    **Class B4 – Unsecured Claims**.

(a)    Classification.  Class B4 consists of all Unsecured Claims against the Marketing Fund Trusts Debtors.

(b)    Treatment.  Except to the extent a Holder of an Allowed Class B4 Claim agrees to less favorable treatment with the Debtors or Reorganized Debtors, as applicable, in full and complete satisfaction, discharge and release of such Claims, Holders of Allowed Class B4 Claims shall receive their Pro Rata share of the Company Specified Litigation Proceeds, unless such Holder elects to receive its Pro Rata share of the Remaining Equity (the "Stock in Lieu Election"), following receipt of the Stock in Lieu Election Notice.  For the avoidance of doubt (i) the Pro Rata share due to a Holder of an Allowed Class B4 Claim that has not made the Stock in Lieu Election shall be determined by dividing the amount of such Holder's Allowed Class B4 Claim by the aggregate amount of Allowed Class A4 Claims and Allowed Class B4 Claims of all Holders that have not made the Stock in Lieu Election and (ii) the Pro Rata share due to a Holder of an Allowed Class B4 Claim that has made the Stock in Lieu Election shall be determined by dividing the amount of such Holder's Allowed Class B4 Claim by the aggregate amount of Allowed Class A4 Claims and Allowed Class B4 Claims of all Holders that have made the Stock in Lieu Election.

(c)    Impairment and Voting.  Class B4 Claims are Impaired and are deemed to reject the Plan and the Holders thereof are not entitled to vote to accept or reject the Plan.

2.18    **Class B5 – Intercompany Interests.**

(a)    Classification.  Class B6 Interests consists of any and all Intercompany Interests in the Marketing Fund Trusts Debtors.

(b)    Allowance and Treatment.  Class B6 Interests shall be Reinstated and the legal, equitable and contractual rights to which Holders of such Allowed Interests are entitled shall remain unaltered so as to maintain the organizational structure of the Debtors as such structure existed on the Petition Date.

(c)    Impairment and Voting.  Class B6 Interests are Unimpaired and the Holders thereof are not entitled to vote on the Plan.

G.    **Additional Provisions Regarding Unimpaired Claims and Subordinated Claims**.

2.19    **Special Provision Regarding Unimpaired Claims**.  Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments asserted against Unimpaired Claims.

2.20    **Subordinated Claims**.  The allowance, classification and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, Bankruptcy Code section 510(b), or otherwise.  Pursuant to Bankruptcy Code section 510, the Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE III
## ACCEPTANCE

3.1    **Presumed Acceptance of the Plan**.  Classes A2, A3, A6(b), B2, B3 and B5 are Unimpaired under the Plan, and are therefore conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).

3.2    **Presumed Rejection of the Plan**.  Classes A4, A5, A6(a), and B4 are Impaired under the Plan, and are conclusively presumed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g).

3.3    **Voting Classes**.  Classes A1 and B1 are Impaired Under the Plan, and holders of Claims in Classes A1 and B1 shall be entitled to vote to accept or reject the Plan.

3.4    **Deemed Acceptance if No Votes Cast**.  If no Holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the Holders of such Claims in such Class.

3.5    **Elimination of Vacant Classes**.  Any Class of Claims that does not have a holder of an Allowed Claim or a Claim temporarily allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to Bankruptcy Code section 1129(a)(8).

3.6    **Cramdown**.  The Debtors shall request confirmation of the Plan, as it may be modified from time to time, under Bankruptcy Code section 1129(b).  The Debtors reserve the right to modify the Plan in consultation with the Consenting Parties and subject to the terms of the Restructuring Support Agreement to the extent, if any, that confirmation pursuant to Bankruptcy Code section 1129(b) requires modification to the Plan.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF PLAN

4.1    **Restructuring Transactions**.

(a)    Transactions.  The Plan contemplates, among other things (i) the amendment and restatement of the First Lien Credit Agreement by the Amended First Lien Credit Agreement; (ii) the execution of the New Delayed-Draw Term Facility Agreement; (iii) the amendment and restatement of the Marketing Fund Trusts Credit Agreement by the Amended Marketing Fund Trusts Credit Agreement; (iv) the issuance of New Common Interests; (v) the procurement of the Insurance Coverage; (vi) the adoption of the Amended Corporate Governance Documents and (where required by applicable law) the filing of the Amended Corporate Governance Documents with the applicable authorities of the relevant jurisdictions of organization and (vii) the execution of the Specified Litigation Agreement.

20

(b)        **Continued Corporate Existence; Vesting of Assets in the Reorganized Debtors.**
On and after the Effective Date, each of the Reorganized Debtors shall continue to exist as a separate entity in accordance with applicable law in the respective jurisdiction in which it is organized and pursuant to its constituent documents in effect prior to the Effective Date.  Notwithstanding anything to the contrary in the Plan, the Unimpaired Claims against a Debtor shall remain the obligations solely of such Debtor or such Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of the Plan, the Chapter 11 Cases, or otherwise.  Except as otherwise provided in the Plan, on and after the Effective Date, all property of the Estates of the Debtors, including all claims, rights and causes of action and any property acquired by the Debtors or the Reorganized Debtors under or in connection with the Plan, shall vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, other encumbrances and Interests.  On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and compromise or settle any Claims without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.

4.2        **Substantive Consolidation for Plan Purposes Only**.  The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order substantively consolidating the Term Loan Debtors' Estates into a single consolidated Estate, solely for all purposes associated with Confirmation and consummation of the Plan.  Upon Confirmation, for Plan purposes only, on the Effective Date, the Term Loan Debtors shall be deemed merged into Holdco, and (a) all assets and liabilities of the Term Loan Debtors shall be deemed merged into Holdco, (b) all guaranties of any Term Loan Debtor of the payment, performance, or collection of the obligations of another Term Loan Debtor shall be eliminated and cancelled, (c) any obligation of any Term Loan Debtor and all guaranties thereof executed by one or more of the other Term Loan Debtors shall be treated as a single obligation, and such guaranties shall be deemed a single Claim against the consolidated Term Loan Debtors, (d) all joint obligations of two or more Term Loan Debtors, and all multiple Claims against such entities on account of such joint obligations shall be treated and allowed only as a single Claim against the consolidated Term Loan Debtors, and (e) each Claim filed in the Chapter 11 Cases of any Term Loan Debtor shall be deemed filed against the consolidated Term Loan Debtors and a single obligation of the Term Loan Debtors on and after the Effective Date.  Entry of the Confirmation Order will constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the deemed substantive consolidation of the Chapter 11 Cases of the Term Loan Debtors for purposes of voting on, confirmation of, and distributions under the Plan.

Notwithstanding the foregoing, the deemed consolidation and substantive consolidation (each for Plan purposes only) shall not (other than for purposes related to funding distributions under the Plan) affect (a) the legal and organizational structure of the Debtors or the Reorganized Debtors, (b) pre- and post-Petition Date guaranties, Liens and security interests that were required to be maintained (i) in connection with any executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed by the Term Loan Debtors or (ii) pursuant to the Plan, (c) distributions out of any insurance policies or proceeds of such policies, and (d) the tax treatment of the Term Loan Debtors.  Furthermore, notwithstanding the foregoing, the deemed consolidation and substantive consolidation (each for Plan purposes only), shall not affect the statutory obligation of each and every Term Loan Debtor to pay quarterly fees to the U.S. Trustee pursuant to 28 U.S.C. §1903(a)(6) and Article 10.15 of the Plan.

In the event that the Bankruptcy Court does not order such deemed substantive consolidation of the Term Loan Debtors, then except as specifically set forth in the Plan (a) nothing in the Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that one of the Term Loan Debtors is subject to or liable for any Claim against any other Term Loan Debtor, (b) Claims against multiple Term Loan Debtors shall be treated as separate Claims against each applicable Term Loan Debtor for all purposes (including, without limitation, distributions and voting) and such Claims shall be administered as provided in the Plan, (c) the Term Loan Debtors shall not, nor shall they be required to, resolicit votes with respect to the Plan and (d) the Term Loan Debtors may seek confirmation of the Plan as if the Plan is a separate Plan for each of the Term Loan Debtor.

4.3        **New Securities.**

(a)        Issuance of New Common Interests.  On the Effective Date, Reorganized Holdco shall issue 700,000 New Common Interests to the Holders of First Lien Facility Claims on a Pro Rata basis

in accordance with Article 2.7 of the Plan and 300,000 New Common Interests shall be reserved by the Reorganized Debtors for distribution to those Holders of Allowed Unsecured Claims that make the Stock in Lieu Election, in each case, subject to dilution by any New Common Interests issued pursuant to the New Management Equity Incentive Plan.  Distribution of such New Common Interests hereunder shall together constitute the issuance of 100% of the New Common Interests issued as of, and shall be deemed issued or reserved for issuance on, the Effective Date pursuant to the Plan.

(b)     Section 1145 Exemption.  Pursuant to Bankruptcy Code section 1145, the offering, issuance and distribution of any New Common Interests to the Holders of First Lien Facility Claims and the Holders of Allowed Unsecured Claims that make the Stock in Lieu Election shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act to the maximum extent permitted thereunder and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of securities.  In addition, except as otherwise provided in the Plan, to the maximum extent provided under Bankruptcy Code section 1145, any and all New Common Interests issued to the Holders of First Lien Facility Claims and Holders of Allowed Unsecured Claims that make the Stock in Lieu Election contemplated by the Plan will be freely tradable by the recipients thereof, subject to: (i) the provisions of Bankruptcy Code section 1145(b)(1) relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (ii) the restrictions, if any, on the transferability of such Securities and instruments; and (iii) applicable regulatory approval.

4.4     **Plan Funding**.

(a)     Amended First Lien Credit Facility.  On the Effective Date, the Reorganized Debtors will enter into the Amended First Lien Credit Agreement, with respect to the Amended First Lien Credit Facility in an aggregate amount of $200 million.

(b)     New Delayed-Draw Term Facility.  On the Effective Date, the Reorganized Debtors will enter into the New Delayed-Draw Term Facility Agreement, with respect to the New Delayed-Draw Term Facility in an aggregate amount of up to $25 million.

(c)     Amended Marketing Fund Trusts Credit Facility.  On the Effective Date, Reorganized QAFT, solely in its capacity as trustee for the Reorganized Marketing Fund Trusts, will enter into the Amended Marketing Fund Trusts Credit Agreement.

(d)     Other Plan Funding.  Other than as set forth in Article 4.4(a), (b) and (c) of the Plan, all Cash necessary for the Reorganized Debtors to make payments required by the Plan shall be obtained from the Debtors' Cash balances then on hand, after giving effect to the transactions contemplated herein.

4.5     **Specified Litigation Provisions**.

(a)     Specified Litigation Agreement.  On the Effective Date, the Reorganized Debtors, Avenue and Fortress will enter into the Specified Litigation Agreement.  Pursuant to the Specified Litigation Agreement (i) the Reorganized Debtors, Avenue and Fortress will jointly pursue the Specified Litigation Claims; (ii) the Avenue and Fortress will provide any necessary Cash for the pursuit of the Specified Litigation and (iii) the Specified Litigation Proceeds shall be distributed pursuant to the Specified Litigation Waterfall.

(b)     Specified Litigation Waterfall.  The Specified Litigation Proceeds shall be distributed as follows (the "Specified Litigation Waterfall"):  (i) the first $1,600,000 of Specified Litigation Proceeds shall be distributed to the Reorganized Debtors for reimbursement of fees and expenses incurred by the Debtors prepetition in connection with the Specified Litigation (the "Legal Expense Reimbursement"); (ii) any Specified Litigation Proceeds available after payment of the Legal Expense Reimbursement shall be used to reimburse Avenue and Fortress for payment of any actual out of pocket non-legal expenses (the "Non-Legal Expense Reimbursement"); (iii) the next $16,000,000 of Specified Litigation Proceeds available after payment of the Legal Expense Reimbursement and the Non-Legal Expense Reimbursement shall be distributed 75% to Avenue

and Fortress and 25% to the Reorganized Debtors (the "<u>First Round Specified Litigation Proceeds Distribution</u>"); and (iv) any Specified Litigation Proceeds available after payment of the Legal Expense Reimbursement, the Non-Legal Expense Reimbursement and the First Round Specified Litigation Proceeds Distribution shall be distributed 95% to the Avenue and Fortress and 5% to the Reorganized Debtors (the "<u>Second Round Specified Litigation Proceeds Distribution</u>").

(c)    <u>Use of Company Specified Litigation Proceeds</u>.  Subject to the Specified Litigation Waterfall, the Reorganized Debtors shall use the Company Specified Litigation Proceeds (i) for Pro Rata distribution to those Holders of Allowed Unsecured Claims (other than First Lien Deficiency Claims) that have not made the Stock in Lieu Election, until such Holders have been paid in full and (ii) thereafter, for uses to be determined by the New Board of Managers, subject to any applicable requirements or restrictions as may be included in the Amended First Lien Credit Agreement.

4.6    **Corporate Governance, Managers, Officers and Corporate Action**.

(a)    <u>Amended Corporate Governance Documents</u>.  On the Effective Date, the Amended Corporate Governance Documents, substantially in forms to be filed with the Plan Supplement, shall be deemed to be valid, binding, and enforceable in accordance with their terms.

(b)    <u>New Board of Managers</u>.  Subject to any requirement of Bankruptcy Court approval pursuant to Bankruptcy Code section 1129(a)(5), as of the Effective Date, the New Board of Managers shall be the persons identified in the Plan Supplement, who will be designated pursuant to the terms of the Amended Operating Agreement and will be initially chosen as follows:  (i) four managers will be appointed by the Consenting First Lien Lenders, one of which will be Douglas Benham, (ii) one manager will be appointed by Fortress in its capacity as a Second Lien Lender, (iii) one manager will be appointed by Avenue in its capacity as a Second Lien Lender and (iv) the remaining manager will be the chief executive officer of Reorganized Holdco.  Pursuant to Bankruptcy Code section 1129(a)(5), the Debtors shall disclose the identity and affiliations of any person proposed to serve on the New Board of Managers after the Confirmation Date, and to the extent such person is an insider other than by virtue of being a New Board Member, the nature of any compensation for such person.  From and after the Effective Date, the members of the board of managers of Reorganized Holdco shall be selected and determined in accordance with the provisions of the Amended Corporate Governance Documents.

(c)    <u>Officers, Managers and Directors of the Reorganized Debtors</u>.  On and after the Effective Date (i) the current managers and directors of the Debtors, other than the current managers of Holdco, shall continue to serve in such capacities with respect to such Reorganized Debtors and (ii) the officers of the Debtors shall continue to serve in their same capacity with the Reorganized Debtors in accordance with the Officers' Employment Agreements, which shall be assumed under the Plan in their current form, or as amended in a manner satisfactory to the Debtors or Reorganized Debtors, such officer and the Requisite Consenting Parties.

4.7    **Continuation of Reorganized QAFT as Trustee for the Reorganized Marketing Fund Trusts**.  On and after the Effective Date, Reorganized QAFT shall continue to act as trustee for the Reorganized Marketing Fund Trusts, pursuant to the applicable declarations of trust for the National Marketing Fund Trust and the Regional Advertising Program Trust, respectively.

4.8    **New Management Equity Incentive Plan**.  On or as soon as practicable after the Effective Date, Reorganized Holdco shall adopt and implement (as applicable) the New Management Equity Incentive Plan.

4.9    **Amendment and Restatement of First Lien Credit Agreement and Marketing Fund Trusts Credit Agreement; Continuation of Liens**.  On the Effective Date, (i) the First Lien Credit Agreement shall be deemed amended and restated in its entirety by the Amended First Lien Credit Agreement, and all Liens securing First Lien Facility Claims including, for the avoidance of doubt, any Liens against the assets of the Non-Debtor Guarantor, shall continue uninterrupted in existence to secure the obligations under the Amended First Lien Credit Agreement in the amount and according to the terms of the Amended First Lien Credit Agreement and (ii) the Marketing Fund Trusts Credit Agreement shall be deemed amended and restated in its entirety by the Amended Marketing Fund Trusts Credit Agreement, and all Liens securing the Marketing Fund Trusts Facility Claims shall

23

continue uninterrupted in existence to secure the Amended Marketing Fund Trusts Credit Agreement in the amount and according to the terms of the Amended Marketing Fund Trusts Credit Agreement.

4.10    **Termination of DIP Credit Agreement**.  On the Effective Date, (a) the Reorganized Debtors shall pay, in full, in Cash by wire transfer or immediately available funds, all DIP Facility Claims, unless otherwise agreed to by the Debtors or Reorganized Debtors, as applicable, and the Holder of a DIP Facility Claim and (b) the commitments under the DIP Credit Agreement shall be terminated.  Upon payment or satisfaction of all DIP Facility Claims in accordance with the terms thereof, all Liens and security interests granted to secure such obligations shall be deemed terminated and shall be of no further force and effect.  Notwithstanding the foregoing, all obligations of the Debtors (if any) to the DIP Agent and the DIP Lenders under the DIP Credit Agreement which are expressly stated in the DIP Credit Agreement as surviving such agreement's termination (including, without limitation, indemnification and expense reimbursement obligations) shall, as so specified, survive without prejudice and remain in full force and effect.

4.11    **Cancellation of Notes, Instruments, and Outstanding Equity Interests**.  On the Effective Date, except as otherwise provided for in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, all agreements, stock, instruments, certificates and other documents in respect of the Second Lien Facility Claims, the DIP Facility Claims and the Holdco Interests shall be cancelled, and the obligations of the Debtors or Reorganized Debtors thereunder or in any way related thereto shall be fully released and discharged; provided, however, that the First Lien Credit Agreement, Second Lien Credit Agreement and the DIP Facility Agreement shall continue in effect solely for the purposes of allowing holders of Claims arising therefrom to receive distributions under the Plan.

4.12    **Cancellation of Liens**.  Except as expressly provided in Article 4.10 of the Plan, on the Effective Date, any Lien securing any Claim shall be deemed released, and the Holder of such Claim shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral) held by such Holder and to take such actions as may be requested by the Debtors (or the Reorganized Debtors, as the case may be) to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Debtors (or the Reorganized Debtors, as the case may be).

4.13    **Corporate Action**.  On and after the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transactions described in, approved by, contemplated by, or necessary to effectuate the Plan, including:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution and the Amended Corporate Governance Documents pursuant to applicable state law; and (d) all other actions that the applicable entities that may be required by applicable law, subject, in each case, to the Amended Corporate Governance Documents.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons or officers of the Debtors.  The authorizations and approvals contemplated by this Article 4.14 shall be effective notwithstanding any requirements under nonbankruptcy law.

4.14    **Effectuating Documents; Further Transactions**.  On and after the Effective Date, the Reorganized Debtors and the officers and members of the boards of mangers or directors thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

4.15 **Exemption from Certain Transfer Taxes and Recording Fees**. To the fullest extent permitted by Bankruptcy Code section 1146(a), any transfer from a Debtor to a Reorganized Debtor or to any entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

4.16 **No Further Approvals**. The transactions contemplated by the Plan shall be approved and effective as of the Effective Date without the need for any further state or local regulatory approvals or approvals by any non-Debtor parties, and without any requirement for further action by the Debtors, Reorganized Debtors, or any entity created to effectuate the provisions of the Plan.

4.17 **Dissolution of Committee**. A Creditors Committee, if appointed, shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in Bankruptcy Code section 1103 and shall perform such other duties as it may have been assigned by the Bankruptcy Court prior to the Effective Date. On the Effective Date, the Creditors Committee, if appointed, shall be dissolved and the Creditors Committee's members shall be deemed released of all their duties, responsibilities, and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Creditors Committee's Professionals shall terminate, except with respect to (a) any Professional Fee Claims and (b) any appeals of the Confirmation Order.

4.18 **Pre-Effective Date Injunctions or Stays**. All injunctions or stays, whether by operation of law or by order of the Bankruptcy Court, provided for in the Chapter 11 Cases pursuant to Bankruptcy Code sections 105 or 362 or otherwise that are in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

4.19 **Intercompany Claims**. Notwithstanding anything to the contrary herein, Intercompany Claims will be adjusted, continued or discharged to the extent determined appropriate by the Debtors, subject to the consent of the Requisite Consenting Parties, which consent shall not be unreasonably withheld, or, after the Effective Date, the Reorganized Debtors in their sole discretion. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Debtors or the Reorganized Debtors. Each Debtor that holds an Intercompany Claim shall be entitled to account for such Intercompany Claim in its books and records as an asset of such Debtor. The Debtors, with the consent of the Requisite Consenting Parties, which consent shall not be unreasonably withheld, and, after the Effective Date, the Reorganized Debtors, shall have the right to retain any Intercompany Claim, or effect such transfers and setoffs with respect to Intercompany Claims and Intercompany Interests as they may deem appropriate for accounting, tax and commercial business purposes, to the fullest extent permitted by applicable law.

## ARTICLE V
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

5.1 **Assumption and Rejection of Executory Contracts and Unexpired Leases**. Except as otherwise set forth herein, all executory contracts or unexpired leases of the Debtors shall be deemed assumed in accordance with the provisions and requirements of Bankruptcy Code sections 365 and 1123 as of the Effective Date, unless such executory contract or unexpired lease (a) was previously assumed or rejected by the Debtors; (b) previously expired or terminated pursuant to its terms; (c) is the subject of a motion to assume or reject filed by the Debtors under Bankruptcy Code section 365 pending as of the Effective Date; or (d) is specifically designated on the

Schedule of Rejected Executory Contracts and Unexpired Leases.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to Bankruptcy Code sections 365(a) and 1123.

       5.2    **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**.  The proposed cure amount for an executory contract or unexpired lease that is assumed pursuant to this Plan shall be zero dollars unless otherwise indicated in a Schedule of Cure Amounts.  Cure obligations shall be satisfied, pursuant to Bankruptcy Code section 356(b)(1), by payment of the cure amount in Cash on the Effective Date or on such other terms as the parties to such executory contract or unexpired lease may otherwise agree.  In the event of a dispute regarding (a) the amount of any cure payments, (b) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of Bankruptcy Code section 365) under the executory contract or unexpired lease to be assumed, or (c) any other matter pertaining to assumption, any cure payments required by Bankruptcy Code section 365(b)(1) shall be made following entry of a Final Order resolving the dispute and approving the assumption; provided, however, that following the resolution of any such dispute, the Debtors or Reorganized Debtors reserve the right to reject such executory contract or unexpired lease.

       5.3    **No Change in Control**.  To the extent applicable, any executory contracts or unexpired leases, including related instruments and agreements, assumed or deemed assumed during the Chapter 11 Cases, including those assumed pursuant to Article 5 of the Plan, shall be deemed modified such that the transactions contemplated by the Plan shall not constitute a "change of control" (or terms with similar effect) under the applicable executory contract or unexpired lease, regardless of how such term may be defined herein, and any consent or advance notice required under such executory contract or unexpired lease shall be deemed satisfied by Confirmation of the Plan.

       5.4    **Modifications, Amendments, Supplements, Restatements, or Other Agreements**.  Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and all executory contracts and unexpired leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.  Except to the extent a Final Order provides otherwise, modifications, amendments, supplements and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

       5.5    **Rejection and Repudiation of Executory Contracts and Unexpired Leases**.  On the Effective Date, each executory contract and unexpired lease that is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases shall be deemed rejected or repudiated pursuant to Bankruptcy Code section 365.  Each contract or lease listed on the Schedule of Rejected Executory Contracts and Unexpired Leases shall be rejected only to the extent that such contract or lease constitutes an executory contract or unexpired lease.  Until the Effective Date, the Debtors expressly reserve their right to amend the Schedule of Rejected Executory Contracts and Unexpired Leases to delete any executory contract or unexpired lease therefrom or to add any executory contract or unexpired lease thereto.  Listing a contract or lease on the Schedule of Rejected Executory Contracts and Unexpired Leases shall not constitute an admission by the Debtors or Reorganized Debtors that such contract or lease is an executory contract or unexpired lease or that such Debtor or Reorganized Debtor has any liability thereunder.

       5.6    **Claims Based on Rejection or Repudiation of Executory Contracts and Unexpired Leases**.  If the rejection or repudiation of an executory contract or unexpired lease pursuant to the Plan results in a Claim, then such Claim shall be forever barred and shall not be enforceable against the Debtors or Reorganized Debtors or their properties, or any of their interests in properties as agent, successor or assign, unless a Proof of Claim is filed with the Claims and Noticing Agent and served upon counsel to the Reorganized Debtors within thirty (30) days after the later of (i) entry of the Confirmation Order and (ii) the effective date of rejection or repudiation of the executory contract or unexpired lease.  The Debtors shall give notice of the bar date established by this Article 5.6 to the non-Debtor counterparties to the executory contracts and unexpired leases identified in the Schedule of Rejected Executory Contracts and Unexpired Leases by service of the Plan, the Confirmation Order, or otherwise.

Unless otherwise provided herein, the Reorganized Debtors shall object to such Claims within sixty (60) days of the filing of such Proofs of Claim.

           5.7      **Limited Extension of Time to Assume or Reject**. In the event of a dispute as to whether a contract or lease is executory or unexpired, the right of the Debtors or Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the entry of a Final Order by the Bankruptcy Court determining that the contract or lease is executory or unexpired. The deemed assumptions and rejections provided for in this Article V of the Plan shall not apply to such contract or lease.

           5.8      **Employee Compensation and Benefit Programs; Deferred Compensation Programs**. The Debtors' ordinary course employee benefit programs, including, without limitation, its savings plans, retirement plans, healthcare plans, disability plans, severance obligations, incentive plans, and life, accidental death and dismemberment insurance plans (collectively, the "Employee Benefits Programs"), entered into before the Petition Date and not since terminated, shall survive Confirmation of the Plan and will be fulfilled in the ordinary course of business. For the avoidance of doubt, the Deferred Compensation Plans are not Employee Benefit Programs. To the extent the Deferred Compensation Programs are deemed executory contracts, the Deferred Compensation Programs shall be rejected, effective as of the Petition Date.

           5.9      **Survival of Certain Indemnification and Reimbursement Obligations**. Except as otherwise provided by the Plan, any and all respective obligations, whether pursuant to certificates of incorporation, codes of regulation, by-laws, limited liability company agreements, operating agreements, limited liability partnership agreements, or any combination of the foregoing, of the Debtors and Reorganized Debtors for indemnification, advancement and/or reimbursement of persons who are current or former directors, officers, members, managers, managing members, employees or agents of any of the Debtors (collectively, the "Indemnity Obligations") shall survive confirmation of the Plan and are Reinstated, shall remain unaffected by the Plan, and shall not be discharged or Impaired by the Plan, irrespective of whether the indemnification, advancement or reimbursement obligation is owed in connection with any event occurring before, on or after the Petition Date, it being understood that all indemnification provisions in place on and prior to the Effective Date for directors, officers, members, managers or employees and agents of the Debtors shall survive the effectiveness of the Plan for claims related to or in connection with any actions, omissions or transactions prior to the Effective Date (including prior to the Petition Date); provided, however, that the foregoing shall not apply to any Specified Litigation Party with respect to any Specified Litigation Claims or to the Former D&O Indemnification Claims.

           In addition, the Debtors or Reorganized Debtors, as applicable, shall obtain and maintain directors', managing members' and officers' insurance, providing coverage for those indemnitees currently covered by such policies (collectively, the "E&O and D&O Insureds") for the remaining term of such policy and shall maintain tail coverage under policies in existence as of the Effective Date for a period of at least six (6) years after the Effective Date (the "Insurance Coverage"), and consistent with historical practice, hereby further additionally indemnify the E&O and D&O Insureds solely to pay for any deductible or retention amount that may be payable in connection with any claim covered under either the foregoing Insurance Coverage or any prior similar policy.

           5.10      **Insurance Policies**. All insurance policies pursuant to which the Debtors have any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Debtors and shall continue in full force and effect. All other insurance policies shall revest in the Reorganized Debtors.

**ARTICLE VI**
**PROCEDURES FOR RESOLVING AND TREATING CONTESTED CLAIMS**

           6.1      **Objections to, Settlement of and Estimation of Claims**. After the Effective Date, only the Reorganized Debtors may object to the allowance of any Claim or Administrative Expense Claim. After the Effective Date, the Reorganized Debtors shall have the sole power and authority, but shall have no obligation, to object to, allow or settle and compromise any Claim without notice to any other party, or approval of, or notice to the Bankruptcy Court. In addition, the Debtors or the Reorganized Debtors may at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Bankruptcy Code section 502(c) regardless of whether any party has previously objected to such Claim.

6.2    **Reserve for Disputed Claims**.  The Reorganized Debtors shall maintain Company Specified Litigation Proceeds in an amount equal to one hundred percent (100%) of the amount that the Holders of Disputed Claims would be entitled to receive under the Plan if such Disputed Claims were Allowed Claims in the full amount asserted by the Holders of such Claims, or with respect to any particular Disputed Claim, such other amount agreed to by the Debtors and the Holder of such Disputed Claim (the "Proceeds Distribution Reserve").  The Reorganized Debtors shall reserve, pending allowance or disallowance of the Disputed Claims, issuance of the Remaining Equity, based upon the Stock in Lieu Election, in an amount equal to one hundred percent (100%) of the amount that the Holders of Disputed Claims would be entitled to receive under the Plan if such Disputed Claims were Allowed Claims in the full amount asserted by the Holders of such Claims, or with respect to any particular Disputed Claim, such other amount agreed to by the Debtors and the Holder of such Disputed Claim (the "Remaining Equity Issuance Reserve").  Subject to the Reorganized Debtors establishing adequate reserves as set forth in this Article 6.2, all Remaining Equity other than the Remaining Equity Issuance Reserve shall be distributed to holders of Allowed Class A4 Claims and Class B4 Claims that have made the Stock In Lieu Election as soon as reasonably practicable after the deadline for submitting Proofs of Claim.  For the avoidance of doubt, in no event shall the Reorganized Debtors maintain any amounts in the Proceeds Distribution Reserve or the Remaining Equity Issuance Reserve for Holders of Claims in Classes A5, or for any other Class or Claim that is not entitled to any distributions under the Plan.  Upon the request of the Debtors or Reorganized Debtors at any time, the Bankruptcy Court may estimate and determine the estimated amount (the "Estimated Amount") of any Disputed Claim as of the Effective Date and the expected recovery under the Plan with respect to such Estimated Amount shall be the amount reserved in the Proceeds Distribution Reserve or the Remaining Equity Issuance Reserve, as applicable, for such Disputed Claim.  Any claimant holding a Disputed Claim so estimated will receive no more than the Estimated Amount from the Proceeds Distribution Reserve or Remaining Equity Issuance Reserve and will not have recourse to the Debtors, the Reorganized Debtors, or other property transferred pursuant to the Plan should the Allowed Claim of such claimant exceed such Estimated Amount.

6.3    **Disposition of Distribution Reserves**  Assets held in the Distribution Reserves shall be distributed by the Reorganized Debtors to a Holder of a Disputed Claim when, and to the extent that, such Disputed Claim becomes Allowed pursuant to a Final Order.  Once such Disputed Claim is Allowed, distribution shall be made to the Holder of such Claim in an amount equal to the amount to which the Holder of such Claim is entitled pursuant to Article II hereof, without interest thereon.  If a Disputed Claim is disallowed or Allowed by Final Order in an amount that is less than the amount of the Disputed Claim, the resulting surplus shall be released from the Distribution Reserves and shall be distributed Pro Rata to the Holders of Allowed Claims in the applicable Class in accordance with the terms of Article II of the Plan.  Notwithstanding the foregoing, and for the avoidance of doubt, distributions to those Holders of Disputed Claims that become Allowed pursuant to a Final Order which have not made the Stock in Lieu Election will not receive any distributions unless and until the Reorganized Debtors recover such Company Specified Litigation Proceeds.

**ARTICLE VII**
**DISTRIBUTIONS**

7.1    **Manner of Payment and Distributions under the Plan**.  All distributions under the Plan shall be made by the Reorganized Debtors or a distribution agent selected by the Reorganized Debtors.

(a)    Distributions to Holders of Allowed Claims Other Than Allowed Unsecured Claims.  The Reorganized Debtors or the distribution agent will make distributions on account of Allowed Claims other than Allowed Unsecured Claims as of the Effective Date as soon as reasonably practicable after the Effective Date (the "Distribution Date").  The Reorganized Debtors or such distribution agent will make subsequent distributions to a Holder of such Allowed Claim within a reasonable period of time after such Claim becomes Allowed.  Payments of Cash by the Reorganized Debtors pursuant to the Plan may be by check drawn on a domestic bank and shall be made to the address of the Holder of such Claim as most recently indicated on or prior to the Effective Date on the Debtors' records.  At the option of the Reorganized Debtors, payments may be made by wire transfer from a bank.

(b)    Distributions to Holders of Allowed Unsecured Claims.  The Reorganized Debtors or the distribution agent will make distributions on account of Allowed Unsecured Claims as follows: (i) for those Holders of Allowed Unsecured Claims who make the Stock in Lieu Election, distributions shall be made as

soon as reasonably practicable after the Stock in Lieu Election Deadline (the "Unsecured Creditor Remaining Equity Distribution Date") and (ii) for those Holders of Allowed Unsecured Claims who do not make the Stock in Lieu Election, distributions shall be made as soon as reasonably practicable after the Reorganized Debtors recover the Company Specified Litigation Proceeds (the "Unsecured Creditor Company Specified Litigation Proceeds Distribution Date").  Pending allowance or disallowance of Unsecured Claims, the Reorganized Debtors are authorized, but shall not be required, to make preliminary distributions of Remaining Equity to those Holders of Allowed Unsecured Claims that have made the Stock in Lieu Election; provided, however, if the Reorganized Debtors determine to make such preliminary distributions, such distributions shall be made following the entry of an order of the Bankruptcy Court approving the size of the Remaining Equity Issuance Reserve.  The Reorganized Debtors or such distribution agent will make subsequent distributions to a Holder of such Allowed Unsecured Claims within a reasonable period of time after such Claim becomes Allowed.  Payments of Cash by the Reorganized Debtors pursuant to the Plan may be by check drawn on a domestic bank and shall be made to the address of the Holder of such Claim as most recently indicated on or prior to the Effective Date on the Debtors' records.  At the option of the Reorganized Debtors, payments may be made by wire transfer from a bank.

7.2    **Interest and Penalties on Claims**.  Unless otherwise specifically provided for in the Plan or the Confirmation Order, required by applicable bankruptcy law or necessary to render a Claim Unimpaired, postpetition interest and penalties shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim is satisfied in accordance with the terms of the Plan.

7.3    **Record Date for Distributions**.  Under the terms of the Plan, the Distribution Record Date shall be the Confirmation Date.  None of the Debtors or Reorganized Debtors will have any obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and make distributions only to those Holders of Allowed Claims that are Holders of such Claims as of the close of business on the Distribution Record Date.  The Debtors and Reorganized Debtors shall be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date.

7.4    **Withholding and Reporting Requirements**.  In connection with the Plan, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities and all distributions hereunder shall be subject to such withholding and reporting requirements.  The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  Notwithstanding the foregoing, each Holder of an Allowed Claim that is to receive a distribution hereunder shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, including income, withholding and other tax obligations, on account of such distribution.  The Reorganized Debtors have the right, but not the obligation, not to make a distribution until such Holder has made arrangements satisfactory to the Reorganized Debtors for payment of any such tax obligations.  The Reorganized Debtors may require, as a condition to the receipt of a distribution, that the Holder of an Allowed Claim complete the appropriate Form W-8 or Form W-9, as applicable to each holder.  If such Holder fails to comply with such request within one year, such distribution shall be deemed an unclaimed distribution.

7.5    **Setoffs**.  Except as provided under the Plan, the Debtors and/or Reorganized Debtors may, but shall not be required to, set off against any Claim and the payments to be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever that the Debtors may have against the Holder of a Claim, but neither the Debtors' or Reorganized Debtors' failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such claim the Debtors or Reorganized Debtors may have against such Holder of a Claim.  Notwithstanding anything contained herein to the contrary, neither the Debtors nor the Reorganized Debtors shall be permitted to set off against any DIP Facility Claim, First Lien Facility Claim, Second Lien Facility Claim or Marketing Fund Trusts Facility Claim.

7.6    **Allocation of Plan Distributions Between Principal and Interest**.  To the extent that any Allowed Claim entitled to distribution under the Plan consists of indebtedness and accrued but unpaid interest thereon, such distributions shall, for all income tax purposes, be allocated first to the principal amount of the Claim

(as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

    7.7  **Surrender of Cancelled Instruments or Securities**.  Except as otherwise provided herein, as a condition precedent to receiving any distribution on account of its Allowed Claim, each Holder of an Allowed Claim based upon an instrument or other security shall be deemed to have surrendered such instrument, security or other documentation underlying such Claim and all such surrendered instruments, securities and other documentation shall be deemed cancelled pursuant to this Article 7.7.

    7.8  **Undeliverable or Returned Distributions**.  If any Allowed Claim distribution is returned to the Reorganized Debtors as undeliverable, the Reorganized Debtors shall use reasonable efforts to determine the correct address of the Holder of such Claim.  If such reasonable efforts are unsuccessful, no further distributions shall be made to the Holder of such Claim unless and until the Reorganized Debtors are notified in writing of such Holder's then current address.  Upon receipt by the Reorganized Debtors, returned Cash shall not earn any interest or be entitled to any dividends or other accruals of any kind.  Any Holder of an Allowed Claim, other than an Allowed Unsecured Claim, that does not assert a Claim pursuant to this Article 7.8 for a returned distribution within one (1) year after the Effective Date shall be forever barred from asserting any such Claim against the Debtors or their property, the Reorganized Debtors or their property or other property transferred pursuant to the Plan.  Any Holder of an Allowed Unsecured Claim that does not assert a Claim pursuant to this Article 7.8 for a returned distribution within one (1) year after (a) the Unsecured Creditor Company Specified Litigation Proceeds Distribution Date for those Holders that do not make the Stock in Lieu Election or (b) the Unsecured Creditor Remaining Equity Distribution Date for those Holders that make the Stock in Lieu Election, shall be forever barred from asserting any such Claim against the Debtors or their property, the Reorganized Debtors or their property or other property transferred pursuant to the Plan.  In such cases, any Cash held for distribution on account of such Allowed Claim shall re-vest in the Reorganized Debtors.  Except as provided therein, nothing contained in the Plan shall require the Debtors or the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

    7.9  **Fractional Distributions**.  No fractional interests of New Common Interests or fractional dollars shall be distributed.  Where a fractional interest would otherwise be called for, the actual issuance shall reflect a rounding up (in the case of more than .50) of such fraction to the nearest whole interest of New Common Interests or a rounding down of such fraction (in the case of .50 or less than .50) to the nearest whole interest of New Common Interests.  Where fractional dollars would otherwise be called for, the actual issuance shall reflect a rounding up (in the case of more than .50) of such fraction to the nearest whole dollar or a rounding down of such fraction (in the case of .50 or less than .50) to the nearest whole dollar.

    7.10  **Distributions to First Lien Agent and Second Lien Agent**.  Distributions under the Plan to Holders of First Lien Facility Claims and Second Lien Facility Claims shall be made by the Reorganized Debtors to the First Lien Agent and Second Lien Agent, respectively, which, in turn, shall make the distributions to the First Lien Lenders and Second Lien Lenders, respectively.

    7.11  **Miscellaneous Distribution Provisions**.

      (a)  Foreign Currency Exchange Rate.  Except as specifically provided for in the Plan or an order of the Bankruptcy Court, as of the Effective Date, any Claim asserted in currency other than U.S. dollars automatically shall be deemed converted to the equivalent U.S. dollar value using Bank of America's noon spot rate as of the Petition Date for all purposes under the Plan, including voting, allowance and distribution.

      (b)  Distributions on Non-Business Days.  Any payment or distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

      (c)  Partial Distributions on Disputed Claims.  The Debtors or the Reorganized Debtors as applicable may, but are not required to, make partial distributions to Holders of Disputed Claims for the amount of the undisputed portion of such Holder's Disputed Claim.

(d)      Disputed Payments.  If any dispute arises as to the identity of the Holder of an Allowed Claim entitled to receive any distribution under the Plan, the Reorganized Debtors may retain such distribution until its disposition is determined by a Final Order or written agreement among the interested parties to such dispute.

(e)      Post-Consummation Effect of Evidence of Claims or Interests.  Except as otherwise provided herein, notes, stock certificates, membership certificates, unit certificates, and other evidence of Claims against or Interests in the Debtors shall, effective on the Effective Date, represent only the right to participate in the distributions contemplated by the Plan and shall not be valid or effective for any other purpose.

(f)      Disgorgement.  To the extent that any property, including Cash, is distributed to a Person on account of a Claim that is not an Allowed Claim, such property shall be held in trust for and shall promptly be returned to the Reorganized Debtors.

## ARTICLE VIII
## CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN

8.1      **Conditions to the Effective Date**.  Consummation of the Plan and the occurrence of the Effective Date are subject to satisfaction of the following conditions:

(a)      The Bankruptcy Court shall have entered the Confirmation Order, in form and substance consistent with the Restructuring Support Agreement and reasonably acceptable to the Debtors and the Requisite Consenting Parties, and such Confirmation Order shall have become a Final Order.

(b)      The Restructuring Support Agreement shall not have been terminated in accordance with the terms thereof, and such Restructuring Support Agreement shall be in full force and effect.

(c)      The Specified Litigation Agreement shall have been executed.

(d)      The Amended First Lien Credit Agreement, and all related documents provided for therein or contemplated thereby, in each case, the final form and substance of which shall be acceptable to the Debtors and the Consenting First Lien Lenders, shall have been executed and delivered by all parties thereto, and all conditions precedent thereto shall have been satisfied.

(e)      The Amended Marketing Fund Trusts Credit Agreement, and all related documents provided for therein or contemplated thereby, in each case, the final form and substance of which shall be acceptable to the Debtors, Vectra and the Requisite Consenting First Lien lenders, shall have been executed and delivered by all parties thereto, and all conditions precedent thereto shall have been satisfied.

(f)      The New Delayed-Draw Term Facility Agreement, and all related documents provided for therein or contemplated thereby, in each case, the final form and substance of which shall be acceptable to the Debtors and the Requisite Consenting First Lien Lenders, shall have been executed and delivered by all parties thereto, and all conditions precedent thereto shall have been satisfied.

(g)      Insurance Coverage shall have been obtained for the Reorganized Debtors.

(h)      The Amended Corporate Governance Documents shall have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization and shall have become effective in accordance with such jurisdictions' corporation or limited liability company laws.

(i)      All authorizations, consents, certifications, approvals, rulings, no-action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement the Plan on the Effective Date shall have been obtained or shall have occurred unless failure to do so will not have a material adverse effect on the Reorganized Debtors.

(j)      In accordance with Article 4.6(b) of the Plan, the New Board of Managers shall have been selected and shall have agreed to serve in such capacity.

(k)      All other documents and agreements necessary to implement the Plan on the Effective Date, in form and substance reasonably acceptable to the Debtors and the Requisite Consenting Parties, to the extent required herein or in the Restructuring Support Agreement, and consistent with the Restructuring Support Agreement, shall have been executed and delivered and all other actions required to be taken in connection with the Effective Date shall have occurred.

(l)      All statutory fees and obligations then due and payable to the Office of the U.S. Trustee shall have been paid and satisfied in full.

(m)      Subject to Article 10.10 of the Plan, the Consenting First Lien Lender Advisor Fee Claims that remain unpaid as of the Effective Date shall have been paid.

(n)      Subject to Article 10.11 of the Plan, the Agent Fee Claims that remain unpaid as of the Effective Date shall have been paid.

(o)      Subject to Article 10.12 of the Plan, the Avenue and Fortress Advisor Fee Claims that remain unpaid as of the Effective Date shall have been paid.

8.2      **Waiver of Condition**.  The conditions set forth in Article 8.1 of the Plan, other than the condition requiring that the Confirmation Order shall have been entered by the Bankruptcy Court, may be waived in whole or in part by the Debtors, subject to the consent of the Requisite Consenting Parties, which shall not be unreasonably withheld.

8.3      **Notice of Effective Date**.  The Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in Article 8.1 of the Plan have been satisfied or waived pursuant to Article 8.2 of the Plan.

8.4      **Order Denying Confirmation**.  If the Plan is not consummated, then nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Holder of any Claim against, or Interest in, the Debtors; (c) prejudice in any manner any right, remedy or Claim of the Debtors; (d) be deemed an admission against interest by the Debtors; or (e) constitute a settlement, implicit or otherwise, of any kind whatsoever.

**ARTICLE IX**
**EFFECT OF THE PLAN ON CLAIMS AND INTERESTS**

9.1      **Discharge of Claims and Termination of Interests**.

(a)      **As of the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims and satisfaction or termination of all Interests, including any Claims arising under the First Lien Credit Agreement to the extent not reduced and modified by the Amended First Lien Credit Agreement, the Second Lien Credit Agreement, the Marketing Fund Trusts Credit Agreement to the extent not reduced and modified by the Amended Marketing Fund Trusts Credit Agreement, the DIP Facility and the DIP Facility Order.  Except as otherwise provided in the Plan or the Confirmation Order, Confirmation shall, as of the Effective Date: (i) discharge the Debtors from all Claims or other debts that arose before the Effective Date, including SARs Claims and Former D&O Indemnification Claims, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, and all debts of the kind specified in Bankruptcy Code sections 502(g), 502(h) or 502(i), in each case whether or not (w) a Proof of Claim is filed or deemed filed pursuant to Bankruptcy Code section 501, (x) a Claim based on such debt is Allowed pursuant to Bankruptcy Code section 502, (y) the Holder of a Claim based on such debt has accepted the Plan or (z) such Claim is listed in the Schedules; and**

(ii) satisfy, terminate or cancel all Interests and other rights of equity security holders in the Debtors other than the Intercompany Interests.

(b)    As of the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, or their respective successors or property, any other or further Claims, demands, debts, rights, causes of action, liabilities or equity interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all such Claims and other debts and liabilities against the Debtors and satisfaction, termination or cancellation of all Interests and other rights of equity security holders in the Debtors, pursuant to Bankruptcy Code sections 524 and 1141, and such discharge will void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.

9.2    **Injunctions**.

(a)    Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold or may hold a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions on account of any such discharged Claims, debts or liabilities or terminated Interests or rights:  (i) commencing or continuing in any manner any action or other proceeding against the Debtors or the Reorganized Debtors or their respective property; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors or the Reorganized Debtors or their respective property; (iii) creating, perfecting or enforcing any lien or encumbrance against the Debtors or the Reorganized Debtors or their respective property; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or the Reorganized Debtors or their respective property; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

(b)    Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold or may hold a Claim, demand, debt, right, cause of action or liability that is released pursuant to the Plan are permanently enjoined from taking any of the following actions on account of such released Claims, demands, debts, rights, causes of action or liabilities: (i) commencing or continuing in any manner any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released Person; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

(c)    In exchange for the distributions pursuant to the Plan, each Holder of an Allowed Claim receiving such distribution pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in this Article 9.2.

9.3    **Releases**.

(a)    **Debtor Releases.**  Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, the Released Parties are deemed released and discharged by the Debtors and their Estates from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11

33

Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or during the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Support Agreement, or any related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations arising on or after the Effective Date of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.  For the avoidance of doubt, the Specified Litigation Claims shall not be released pursuant to the Plan, and the Specified Litigation Parties are not Released Parties.

(b)    **Releases by Plan Support Releasing Parties.**  Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable law, the Plan Support Releasing Parties are deemed to have released and discharged the Debtors and their Estates and the Released Parties from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of any Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Support Agreement, or any related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations arising on or after the Effective Date of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.  For the avoidance of doubt, the Specified Litigation Claims shall not be released pursuant to the Plan, and the Specified Litigation Parties are not Released Parties.

9.4    **Exculpation**.  Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable law, none of the Exculpated Parties, shall have or incur any liability for any claim, cause of action, or other assertion of liability for any act taken or omitted in connection with, or arising out of, the Chapter 11 Cases or the negotiation, formulation, preparation, administration, consummation and/or implementation of the Plan, or any contract, instrument, document, or other agreement entered into pursuant thereto including, without limitation, the Restructuring Support Agreement, through the Effective Date; provided that the foregoing shall not affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.  The Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan and administration thereof.  For the avoidance of doubt, the Specified Litigation Parties are not Exculpated Parties.

9.5    **Retention and Enforcement and Release of Causes of Action**.  Except as otherwise provided in the Plan, or in any document, instrument, release or other agreement entered into in connection with the Plan, in accordance with Bankruptcy Code section 1123(b), the Debtors and their Estates shall retain the Causes of Action including, without limitation, the Causes of Action identified in the Plan Supplement (the "Retained Causes of Action").  The Reorganized Debtors, as the successors in interest to the Debtors and their Estates, may enforce,

sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Retained Causes of Action. The Debtors or the Reorganized Debtors expressly reserve all rights to prosecute any and all Retained Causes of Action against any Person, except as otherwise expressly provided in the Plan, and no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Retained Cause of Action upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.  For the avoidance of doubt, the rights of the Debtors and Reorganized Debtors with respect to the Company Specified Litigation Claims shall be as set forth in the Specified Litigation Agreement and Article 4.5 of the Plan.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

      10.1    **Retention of Jurisdiction**.  Following the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising from or relating to the Chapter 11 Cases to the fullest extent of applicable law, including, without limitation:

      (a)    To determine the validity under any applicable law, allowability, classification and priority of Claims and Interests upon objection, or to estimate, pursuant to Bankruptcy Code section 502(c), the amount of any Claim that is, or is anticipated to be, contingent or unliquidated as of the Effective Date;

      (b)    To construe and to take any action authorized by the Bankruptcy Code and requested by the Reorganized Debtors or any other party in interest to enforce the Plan and the documents and agreements filed and/or executed in connection with the Plan, issue such orders as may be necessary for the implementation, execution and consummation of the Plan, and to ensure conformity with the terms and conditions of the Plan, such documents and agreements and other orders of the Bankruptcy Court, notwithstanding any otherwise applicable non-bankruptcy law;

      (c)    To determine any and all applications for allowance of Professional Fee Claims, and to determine any other request for payment of Administrative Expense Claims;

      (d)    To determine all matters that may be pending before the Bankruptcy Court on or before the Effective Date;

      (e)    To resolve any dispute regarding the implementation or interpretation of the Plan, or any related agreement or document that arises at any time before the Chapter 11 Cases are closed, including the determination, to the extent a dispute arises, of the entities entitled to a distribution within any particular Class of Claims and of the scope and nature of the Reorganized Debtors' obligations to cure defaults under assumed contracts, leases and permits;

      (f)    To determine any and all matters relating to the rejection, assumption or assignment of executory contracts or unexpired leases entered into prior to the Petition Date, the nature and amount of any cure required for the assumption of any executory contract or unexpired lease, and the allowance of any Claim resulting therefrom;

      (g)    To determine all applications, adversary proceedings, contested matters and other litigated matters, that were brought or that could have been brought in the Bankruptcy Court on or before the Effective Date over which this Bankruptcy Court otherwise has jurisdiction;

      (h)    To determine matters concerning local, state and federal taxes in accordance with Bankruptcy Code sections 346, 505 and 1146, and to determine any tax claims that may arise against the Debtors or the Reorganized Debtors as a result of the transactions contemplated by the Plan;

      (i)    To modify the Plan pursuant to Bankruptcy Code section 1127 or to remedy any apparent nonmaterial defect or omission in the Plan, or to reconcile any nonmaterial inconsistency in the Plan so as to carry out its intent and purposes; and

(j)       To hear any other matter not inconsistent with the Bankruptcy Code.

10.2    **Terms Binding**.  Upon the occurrence of the Effective Date, all provisions of the Plan, including all agreements, instruments and other documents filed in connection with the Plan and executed by the Debtors or the Reorganized Debtors in connection with the Plan, shall be binding upon the Debtors, the Reorganized Debtors, all Holders of Claims and Interests and all other Persons that are affected in any manner by the Plan.  All agreements, instruments and other documents filed in connection with the Plan shall have full force and effect, and shall bind all parties thereto, subject to the occurrence of the Effective Date, upon the entry of the Confirmation Order, whether or not such exhibits actually shall be executed by parties other than the Debtors or the Reorganized Debtors, or shall be issued, delivered or recorded on the Effective Date or thereafter. The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity.

10.3    **Severability**.  If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, but subject to the consent of the Requisite Consenting Parties, which consent shall not be unreasonably withheld, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (c) non-severable and mutually dependent.

10.4    **Computation of Time**.  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

10.5    **Confirmation Order and Plan Control**.  Except as otherwise provided in the Plan, in the event of any inconsistency between the Plan and the Disclosure Statement, any exhibit to the Plan or any other instrument or document created or executed pursuant to the Plan, the Plan shall control.  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

10.6    **Incorporation by Reference**.  The Plan Supplement is incorporated herein by reference.

10.7    **Modifications to the Plan**.  Subject to the terms of the Restructuring Support Agreement, the Debtors, with the consent of the Requisite Consenting Parties, may amend or modify the Plan, the Plan Supplement, and any schedule or supplement hereto, at any time prior to the Effective Date in accordance with the Bankruptcy Code, Bankruptcy Rules and any applicable court order, provided, however, that the Debtors may make technical amendments or modifications upon two (2) days advance notice to the Consenting Parties.  Subject to certain restrictions and requirements set forth in Bankruptcy Code section 1127 and Bankruptcy Rule 3019 and those restrictions on modification set forth in the Plan and the Restructuring Support Agreement, the Debtors, subject to the reasonable consent of the Requisite Consenting Parties, expressly reserve their rights to alter, amend or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  A Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or supplemented, if the proposed alteration, amendment, modification or supplement does not materially and adversely change the treatment of the Claim or Interest of such Holder.

10.8    **Revocation, Withdrawal or Non-Consummation**.  The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date, with the consent of the Requisite Consenting Parties.  If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the

Effective Date does not occur, then the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), the assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be null and void; provided, however, that all orders of the Bankruptcy Court and all documents executed pursuant thereto, except the Confirmation Order, shall remain in full force and effect.  In such event, nothing contained herein, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any Claims by or against any of the Debtors or any other Person, to prejudice in any manner the rights of any of the Debtors or any Person in any further proceedings or to constitute an admission of any sort by any of the Debtors or any other Person.

   10.9   **Courts of Competent Jurisdiction**.  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan or in the Chapter 11 Cases, such abstention, refusal or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

   10.10   **Payment of Consenting First Lien Lenders Advisor Fees and Expenses**.  Subject to and in accordance with the Restructuring Support Agreement, on the Effective Date or as soon as reasonably practicable thereafter, or at another time as may otherwise be provided for in any prepetition engagement letters, the Debtors or Reorganized Debtors, as the case may be, shall pay in Cash, without the need for the filing of any fee or retention applications in the Chapter 11 Cases, the Consenting First Lien Lender Advisor Fee Claims.

   10.11   **Payment of Agent Fee Claims**.  On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as the case may be, shall pay in Cash, without the need for the filing of any fee or retention applications in the Chapter 11 Cases, the Agent Fee Claims.

   10.12   **Payment of the Avenue and Fortress Advisor Fees and Expenses**.  Subject to and in accordance with the Restructuring Support Agreement, on the Effective Date or as soon as reasonably practicable thereafter, or at another time as may otherwise be provided for in any prepetition engagement letters, the Debtors or Reorganized Debtors, as the case may be, shall pay in Cash, without the need for the filing of any fee or retention applications in the Chapter 11 Cases, the Avenue and Fortress Advisor Fee Claims.

   10.13   **Payment of Statutory Fees**.  All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date, and as appropriate, thereafter.

   10.14   **Notice**.  All notices, requests and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

   If to the Debtors or to the Reorganized Debtors, or to any one of them:

    Akin Gump Strauss Hauer & Feld LLP
    One Bryant Park
    New York, New York 10036-6745
    Telephone: (212) 872-1000
    Facsimile:  (212) 872-1002
    Attention:  Ira S. Dizengoff, Esq.
       Philip C. Dublin, Esq.

    and

Richards, Layton & Finger, P.A.
920 N. King Street
Wilmington, Delaware  19801
Telephone: (302) 651-7531
Facsimile:   (302) 498-7531
<u>Attention</u>:  Mark Collins, Esq.

If to the Consenting First Lien Lenders, or to any one of them:

Milbank, Tweed, Hadley & McCloy LLP
601 S. Figueroa Street, 30th Floor
Los Angeles, California  90017
Telephone: (213) 892-4000
Facsimile:   (213) 892-4000
<u>Attention</u>:   Paul Aronzon, Esq.
                  Tom Kreller, Esq.
                  David B. Zolkin, Esq.

If to Avenue:

O'Melveny & Myers LLP
7 Times Square
New York, New York 10036
Telephone: (212) 326-2158
Facsimile:   (213) 326-2061
<u>Attention</u>:   John J. Rapisardi, Esq.
                  Joseph Zujkowski, Esq.

If to Fortress:

Skadden Arps Slate Meagher & Flom LLP
300 South Grand Avenue
Los Angeles, California 90071-3144
Telephone: (213) 687-5200
Facsimile:   (213) 621-5200
<u>Attention</u>:    Van C. Durrer, II, Esq.

10.15   **<u>Reservation of Rights</u>**.  The filing of the Plan, the Disclosure Statement, any statement or provision contained in the Plan, or the taking of any action by the Debtors or Reorganized Debtors with respect to the Plan, shall not be deemed to be an admission or waiver of any rights of the Debtors or Reorganized Debtors with respect to any Holders of Claims against or Interests in the Debtors.

10.16   **No Waiver**.  Neither the failure of a Debtor to list a Claim or Interest in the Debtors' Schedules, the failure of a Debtor to object to any Claim, Administrative Expense Claim or Interest for purposes of voting, the failure of a Debtor to object to a Claim, Administrative Expense Claim or Interest prior to the Confirmation Date or the Effective Date, nor the failure of a Debtor to assert a Retained Cause of Action prior to the Confirmation Date or the Effective Date shall, in the absence of a legally-effective express waiver or release executed by the Debtor with the approval of the Bankruptcy Court, if required, and with any other consents or approvals required under the Plan, be deemed a waiver or release of the right of a Debtor or a Reorganized Debtor or their respective successors, either before or after solicitation of votes on the Plan, the Confirmation Date or the Effective Date, to (a) object to or examine such Claim, Administrative Expense Claim or Interest, in whole or in part, or (b) retain or either assign or exclusively assert, pursue, prosecute, utilize, or otherwise act or enforce any Retained Cause of Action against the Holder of such Claim, Administrative Expense Claim or Interest.

Dated:  March 14, 2014

> QCE Finance LLC
> American Food Distributors LLC
> National Marketing Fund Trust
> QAFT, Inc.
> QCE LLC
> QFA Royalties LLC
> QIP Holder LLC
> Quiz-CAN LLC
> Quizno's Canada Holding LLC
> Quiznos Global LLC
> Restaurant Realty LLC
> The Quizno's Master LLC
> The Quizno's Operating Company LLC
> TQSC II LLC
> The Regional Advertising Program Trust

> By:   */s/  Stuart K. Mathis*
>        Name:  Stuart K. Mathis
>        Title:  Chief Executive Officer

**ANNEX A**

**TERMS OF AMENDED MARKETING FUND TRUSTS CREDIT AGREEMENT**

| | |
|---|---|
| **Principal** | The principal amount of the Amended Marketing Fund Trusts Credit Agreement shall be equal to the Allowed amount of the Marketing Fund Trusts Facility Secured Claim as of the Effective Date. |
| **Obligors** | Reorganized QAFT, solely in its capacity as trustee for the Reorganized Marketing Fund Trusts. |
| **Guarantor** | Reorganized QCE, LLC on an unsecured basis. |
| **Maturity** | First anniversary of the Effective Date. |
| **Interest Rate** | No change in rate from current rate in Marketing Fund Trusts Credit Agreement.  Payable in cash on a monthly basis. |
| **Principal Repayment Schedule** | $150,000 per week. |
| **Collateral** | No change from Marketing Fund Trusts Credit Agreement. |
| **Covenants** | Consistent with existing covenants in the Marketing Fund Trusts Credit Agreement, except with such changes necessary given the conversion of the existing Marketing Fund Trusts Credit Agreement into a term loan. |
| **Events of Default** | No change from Marketing Fund Trusts Credit Agreement, except with such changes necessary given the conversion of the existing Marketing Fund Trusts Credit Agreement into a term loan. |
| **Survival** | All other terms of the Marketing Fund Trusts Credit Agreement, including payment of fees and expenses and applicability of Colorado law, shall survive and be incorporated into the Amended Marketing Fund Trusts Credit Agreement. |
| **Conditions** | Execution and Court approval, if necessary, of a subordination agreement in all respects acceptable to Vectra and the Requisite Consenting First Lien Lenders.  Such subordination agreement shall provide that (i) any liens or claims granted to the lenders under the Amended First Lien Credit Agreement shall be subordinate in all respects to the liens and claims of Vectra, solely with respect to the assets of the Marketing Fund Trusts, and (ii) the lenders under the Amended First Lien Credit Agreement shall have subordinated rights with respect to the assets of the Marketing Fund Trusts, including with respect to payment or remedies, until the Amended Marketing Fund Trusts Credit Facility is paid in full. |

## **Annex B**

**Changes to Plan since Solicitation**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| QCE FINANCE, LLC, *et al.*,[1] | ) | Case No. 14-_____ (   ) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

### DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira S. Dizengoff (*pro hac vice* admission pending)
Philip C. Dublin (*pro hac vice* admission pending)
Jason P. Rubin (*pro hac vice* admission pending)
One Bryant Park
New York, New York  10036-6745
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

**RICHARDS LAYTON & FINGER, P.A.**
Mark D. Collins (DE2981)
Amanda R. Steele (DE 5530)
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

Dated:  March 1114, 2014

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  QCE Finance LLC (7897); American Food Distributors LLC (8099); National Marketing Fund Trust (4951); QAFT, Inc. (6947); QCE LLC (2969); QFA Royalties LLC (2402); QIP Holder LLC (2353); Quiz-CAN LLC (7714); Quizno's Canada Holding LLC (3220); Quiznos Global LLC (2772); The Quizno's Master LLC (3148); The Quizno's Operating Company LLC (8945); The Regional Advertising Program Trust (2035); Restaurant Realty LLC (8293); and TQSC II LLC (8683).   The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 1001 17th Street, Suite 200, Denver, Colorado 80202.

1.2 "Agent Fee Claims" means unpaid and reasonable and documented fees and expenses incurred through the Effective Date of the First Lien Agent and the Second Lien Agent, including, in both cases, any professional fees.

1.3 "Allowed" means, with reference to any Claim or Interest, or any portion thereof, in any Class or category specified, against or of a Debtor, (a) a Claim or Interest that has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary Proof of Claim has been filed; (b) a Claim or Interest for which a Proof of Claim has been timely filed in a liquidated amount and not contingent and as to which no objection to allowance, to alter priority, or request for estimation has been timely interposed and not withdrawn within the applicable period of limitation fixed by the Plan or applicable law; (c) a Claim or Interest as to which any objection has been settled, waived, withdrawn or denied by a Final Order to the extent such Final Order provides for the allowance of all or a portion of such Claim or Interest; or (d) a Claim or Interest that is expressly allowed (i) pursuant to a Final Order, (ii) pursuant to an agreement between the Holder of such Claim or Interest and the Debtors or the Reorganized Debtors, as applicable or (iii) pursuant to the terms of the Plan.  Unless otherwise specified in the Plan or in an order of the Bankruptcy Court allowing such Claim or Interest, "Allowed" in reference to a Claim shall not include (a) any interest on the amount of such Claim accruing from and after the Petition Date; (b) any punitive or exemplary damages; or (c) any fine, penalty or forfeiture.  Any Claim listed in the Schedules as disputed, contingent, or unliquidated, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order, or approval of the Bankruptcy Court.

1.4 "Allowed Claim" means a Claim or any portion thereof, without duplication, that has been Allowed.

1.5 "Allowed Interest" means an Interest or any portion thereof, without duplication, that has been Allowed.

1.6 "Amended Corporate Governance Documents" means the Amended Operating Agreement and any amended certificates of formation, bylaws, or other operating agreements as may be necessary for the Reorganized Debtors, which shall be in form and substance reasonably acceptable to the Debtors and the Requisite Consenting Parties and substantially final forms of which shall be included in the Plan Supplement.

1.7 "Amended First Lien Credit Agreement" means that certain Amended and Restated Credit Agreement, dated as of the Effective Date (as may be further amended from time to time), among Reorganized Holdco, as borrower, the lenders party thereto, Wilmington Trust, National Association, as administrative agent, and any and all other loan documents evidencing obligations of the Reorganized Debtors and the Non-Debtor Guarantor arising thereunder, including any and all guaranty, security and collateral documents, the terms of which shall be materially consistent with the terms as set forth in the Restructuring Support Agreement, and the form and substance of which shall be acceptable to the Debtors and the Requisite Consenting First Lien Lenders.

1.8 "Amended First Lien Credit Facility" means the First Lien Credit Facility as amended and restated in its entirety as of the Effective Date with an aggregate principal amount outstanding of $200 million on the terms and conditions set forth in the Amended First Lien Credit Agreement.

1.9 "Amended Marketing Fund Trusts Credit Agreement" means that certain Amended and Restated Marketing Fund Trusts Credit Agreement, dated as of the Effective Date (as may be further amended from time to time), among Reorganized QAFT, solely in its capacity as Trustee for the Reorganized Marketing Fund Trusts, as borrower, the lenders party thereto, and Vectra, as administrative agent, and any and all other loan documents evidencing the obligations of the Reorganized Marketing Fund Trust Debtors arising thereunder, including any and all guaranty, security and collateral documents, the terms of which shall be materially consistent with the terms as set forth in ~~the Vectra Restructuring Support Agreement~~Annex A attached hereto

1.95    "Marketing Fund Trusts Facility Claims" means the Marketing Fund Trusts Facility Secured Claim and the Marketing Fund Trusts Facility Guaranty Claim.

1.96    "Marketing Fund Trusts Facility Guarantor" means QCE LLC as guarantor of the obligations of the Marketing Fund Trusts under the Marketing Fund Trusts Credit Agreement.

1.97    "Marketing Fund Trusts Facility Guaranty Claim" means any and all claims of Vectra against the Marketing Fund Trusts Facility Guarantor for obligations arising under or related to the Marketing Fund Trusts Credit Agreement.

1.98    "Marketing Fund Trusts Facility Secured Claim" means any and all~~the~~ Secured ~~Claims~~Claim of Vectra against the Marketing Fund Trusts arising under or relating to the Marketing Fund Trusts Credit Agreement.

1.99    "National Marketing Fund Trust" means that certain trust as established pursuant to that certain Restated Declaration of Trust of the National Marketing Fund Trust, effective June 17, 2005, as amended by the Amendment to the Restated Declaration of Trust of the National Marketing Fund Trust.

1.100   "New Board Member" means a member of the New Board of Managers appointed as of the Effective Date.

1.101   "New Board of Managers" means the board of managers of Reorganized Holdco.

1.102   "New Common Interests" means the common interests in Reorganized Holdco which, as of the Effective Date, shall consist of 1,000,000 common interests issued under Article 4.3(a) Plan.

1.103   "New Delayed-Draw Term Facility" means the revolving delayed draw facility on the terms and conditions terms set forth in the New Delayed-Draw Term Facility Agreement.

1.104   "New Delayed-Draw Term Facility Agreement" means that certain credit agreement, dated as of the Effective Date, by and among the Reorganized Debtors and the Consenting First Lien Lenders, together with all documents, instruments and agreements executed in connection therewith or related thereto, for the provision of the New Delayed-Draw Term Facility, the terms of which shall be materially consistent with the terms as set forth in the Restructuring Support Agreement and the form and substance of which shall be acceptable to the Debtors and the Requisite Consenting First Lien Lenders.

1.105   "New Management Equity Incentive Plan" means an equity incentive plan, option plan, unit plan, restricted equity incentive plan or other similar management incentive award plan which shall provide for grants of options and/or restricted units/equity reserved for management, directors, and employees. The amount, form, exercise price, allocation and vesting of such equity-based awards, and any limitations thereon, shall be determined and approved by the New Board of Managers and implemented after the Effective Date; provided, however, that such terms shall be materially consistent with the terms as set forth in the Restructuring Support Agreement.

1.106   "Non-Debtor Affiliates" means Canada Food Distribution Company, the Seattle Area Directorship II LLC, QCE Gift Card LLC, Quizmark LLC, Quiz-DIA LLC, Quizno's Canada Advertising Fund Inc., Quizno's Canada Operating Company Inc., Quizno's Canada Restaurant Corporation and Quizno's Canada Real Estate Corporation.

1.107   "Non-Debtor Guarantor" means Quiz-DIA LLC.

1.108   "Non-Legal Expense Reimbursement" has the meaning as set forth in Article 4.5(b) of the Plan.

Class of Claims against and Interests in the Term Loan Debtors will be treated as against a single consolidated Estate for Plan purposes without regard to the corporate separateness of the Term Loan Debtors.

       2.6    **Classification**.  Pursuant to Bankruptcy Code sections 1122 and 1123, the following designates the Classes of Claims and Interests under the Plan.  A Claim or Interest is in a particular Class for purposes of voting on, and of receiving distributions pursuant to, the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.

      C.     **Summary of Classification for the Term Loan Debtors**.

| **Class** | **Designation** | **Impairment** | **Entitled to Vote** |
|---|---|---|---|
| Class A1 | First Lien Facility Claims | Impaired | Yes |
| Class A2 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class A3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class A4 | Unsecured Claims | Impaired | No (deemed to reject) |
| Class A5 | Subordinated Claims | Impaired | No (deemed to reject) |
| Class A6(a) | Holdco Interests | Impaired | No (deemed to reject) |
| Class A6(b) | Intercompany Interests | Unimpaired | No (deemed to accept) |

      D.     **Summary of Classification for the Marketing Fund Trusts Debtors**.

| **Class** | **Designation** | **Impairment** | **Entitled to Vote** |
|---|---|---|---|
| Class B1 | Marketing Fund ~~Trust~~Trusts Facility Secured ~~Claims~~Claim | Impaired | Yes |
| Class B2 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class B3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class B4 | Unsecured Claims | Impaired | No (deemed to reject) |
| Class B5 | Interests in the Marketing Fund Trusts Debtors | Unimpaired | No (deemed to accept) |

(c)    *Impairment and Voting*.  Class A6(b) Interests are Unimpaired and the Holders thereof are not entitled to vote on the Plan.

**F.    Classified Claims and Interests Against the Marketing Fund Trusts Debtors**.

2.14    **Class B1 – Marketing Fund Trusts Facility Secured Claim~~s~~**.

(a)    *Classification*.  Class B1 consists of the Marketing Fund Trusts Facility Secured ~~Claims~~Claim held by Vectra against the Marketing Fund Trusts Debtors.

(b)    *Allowance*.  ~~The~~ Class B1 ~~Claims~~Claim shall be ~~an~~ Allowed ~~Claims~~Claim pursuant to the Plan in the aggregate principal amount of $7,351,872.27, plus (i) accrued and unpaid interest ~~as of the Petition Date, outstanding~~ under the Marketing Fund Trusts Credit Agreement, regardless of whether incurred prepetition or postpetition; (ii) all unpaid reasonable and documented fees and expenses of Vectra; and (iii) any other amounts incurred and outstanding, under the Marketing Trust Credit Facility as of the ~~Petition~~Effective Date; provided, however, the Allowed Claim shall be reduced by any principal repayments made to Vectra during the Chapter 11 Cases prior to the Effective Date.

(c)    *Treatment*.  In full and complete satisfaction of the Class B1 ~~Claims~~Claim (i) Reorganized QAFT, solely as trustee for the Reorganized Marketing Fund Trusts, and Vectra shall enter into the Amended Marketing Fund Trusts Credit Agreement and (ii) Vectra shall forgo any distribution on account of its Marketing Fund Trusts Facility Guaranty Claim.

(d)    *Impairment and Voting*.  The Class B1 Claims are Impaired and the Holder thereof is entitled to vote on the Plan.

2.15    **Class B2 – Priority Non-Tax Claims** .

(a)    *Classification*.  Class B2 consists of all Priority Non-Tax Claims against the Marketing Fund Trusts Debtors.

(b)    *Treatment*.  Except to the extent that a Holder of an Allowed Class B2 Claim agrees to less favorable treatment with the Debtors or Reorganized Debtors, each Holder of an Allowed Class B2 Claim, in full and complete satisfaction, discharge and release of such Claim, shall be paid in full in Cash on the later of the Distribution Date and a date that is as soon as practicable after the date upon which such Claim becomes an Class B2 Claim.

(c)    *Impairment and Voting*.  Class B2 Claims are Unimpaired and the Holders thereof are not entitled to vote on the Plan.

2.16    **Class B3 – Other Secured Claims.**

(a)    *Classification*.  Class B3 consists of all Other Secured Claims against the Marketing Fund Trusts Debtors.

(b)    *Treatment*.  Except to the extent that a Holder of an Allowed Class B3 Claim agrees to less favorable treatment with the Debtors or Reorganized Debtors, as applicable, each Holder of an Allowed Class B3 Claim, in full and complete satisfaction, discharge and release of such Claim shall be (i) paid in full in Cash on the later of the Distribution Date and a date that is as soon as practicable after the date upon which such Claim becomes an Allowed Class B3 Claim or (ii) otherwise Unimpaired within the meaning of Bankruptcy Code section 1124.

(c)    *Impairment and Voting*.  Class B3 Claims are Unimpaired and the Holders thereof are not entitled to vote on the Plan.

cause of action or liability that is released pursuant to the Plan are permanently enjoined from taking any of the following actions on account of such released Claims, demands, debts, rights, causes of action or liabilities:  (i) commencing or continuing in any manner any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released Person; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

(c)    **In exchange for the distributions pursuant to the Plan, each Holder of an Allowed Claim receiving such distribution pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in this Article 9.2.**

9.76    **Releases**.

(a)    **Debtor Releases.**  Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, the Released Parties are deemed released and discharged by the Debtors and their Estates from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or during the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Support Agreement, ~~the Vectra Restructuring Support Agreement,~~ or any related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations arising on or after the Effective Date of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.  For the avoidance of doubt, the Specified Litigation Claims shall not be released pursuant to the Plan, and the Specified Litigation Parties are not Released Parties.

(b)    **Releases by Plan Support Releasing Parties.**  Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable law, the Plan Support Releasing Parties are deemed to have released and discharged the Debtors and their Estates and the Released Parties from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of any Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Support Agreement, ~~the Vectra Restructuring Support Agreement~~ or any related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence.  Notwithstanding

35

**anything to the contrary in the foregoing, the release set forth above does not release any obligations arising on or after the Effective Date of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.  For the avoidance of doubt, the Specified Litigation Claims shall not be released pursuant to the Plan, and the Specified Litigation Parties are not Released Parties.**

**9.77**     **Exculpation**.  **Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date and to the fullest extent authorized by applicable law, none of the Exculpated Parties, shall have or incur any liability for any claim, cause of action, or other assertion of liability for any act taken or omitted in connection with, or arising out of, the Chapter 11 Cases or the negotiation, formulation, preparation, administration, consummation and/or implementation of the Plan, or any contract, instrument, document, or other agreement entered into pursuant thereto including, without limitation, the Restructuring Support Agreement and the Vectra Restructuring Support Agreement, through the Effective Date; provided that the foregoing shall not affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.  The Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan and administration thereof.  For the avoidance of doubt, the Specified Litigation Parties are not Exculpated Parties.**

9.78     **Retention and Enforcement and Release of Causes of Action**.  Except as otherwise provided in the Plan, or in any document, instrument, release or other agreement entered into in connection with the Plan, in accordance with Bankruptcy Code section 1123(b), the Debtors and their Estates shall retain the Causes of Action including, without limitation, the Causes of Action identified in the Plan Supplement (the "Retained Causes of Action").  The Reorganized Debtors, as the successors in interest to the Debtors and their Estates, may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Retained Causes of Action.  The Debtors or the Reorganized Debtors expressly reserve all rights to prosecute any and all Retained Causes of Action against any Person, except as otherwise expressly provided in the Plan, and no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Retained Cause of Action upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.  For the avoidance of doubt, the rights of the Debtors and Reorganized Debtors with respect to the Company Specified Litigation Claims shall be as set forth in the Specified Litigation Agreement and Article 4.5 of the Plan.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

10.79     **Retention of Jurisdiction**.  Following the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising from or relating to the Chapter 11 Cases to the fullest extent of applicable law, including, without limitation:

(a)     To determine the validity under any applicable law, allowability, classification and priority of Claims and Interests upon objection, or to estimate, pursuant to Bankruptcy Code section 502(c), the amount of any Claim that is, or is anticipated to be, contingent or unliquidated as of the Effective Date;

(b)     To construe and to take any action authorized by the Bankruptcy Code and requested by the Reorganized Debtors or any other party in interest to enforce the Plan and the documents and agreements filed and/or executed in connection with the Plan, issue such orders as may be necessary for the implementation, execution and consummation of the Plan, and to ensure conformity with the terms and conditions of the Plan, such documents and agreements and other orders of the Bankruptcy Court, notwithstanding any otherwise applicable non-bankruptcy law;

10.94   **No Waiver**.  Neither the failure of a Debtor to list a Claim or Interest in the Debtors' Schedules, the failure of a Debtor to object to any Claim, Administrative Expense Claim or Interest for purposes of voting, the failure of a Debtor to object to a Claim, Administrative Expense Claim or Interest prior to the Confirmation Date or the Effective Date, nor the failure of a Debtor to assert a Retained Cause of Action prior to the Confirmation Date or the Effective Date shall, in the absence of a legally-effective express waiver or release executed by the Debtor with the approval of the Bankruptcy Court, if required, and with any other consents or approvals required under the Plan, be deemed a waiver or release of the right of a Debtor or a Reorganized Debtor or their respective successors, either before or after solicitation of votes on the Plan, the Confirmation Date or the Effective Date, to (a) object to or examine such Claim, Administrative Expense Claim or Interest, in whole or in part, or (b) retain or either assign or exclusively assert, pursue, prosecute, utilize, or otherwise act or enforce any Retained Cause of Action against the Holder of such Claim, Administrative Expense Claim or Interest.

Dated:  March 11̶14, 2014

> QCE Finance LLC
> American Food Distributors LLC
> National Marketing Fund Trust
> QAFT, Inc.
> QCE LLC
> QFA Royalties LLC
> QIP Holder LLC
> Quiz-CAN LLC
> Quizno's Canada Holding LLC
> Quiznos Global LLC
> Restaurant Realty LLC
> The Quizno's Master LLC
> The Quizno's Operating Company LLC
> TQSC II LLC
> The Regional Advertising Program Trust
>
>
> By:   _/s/  Stuart K. Mathis_____
>     Name:  Stuart K. Mathis
>     Title:  Chief Executive Officer

**ANNEX A**

**TERMS OF AMENDED MARKETING FUND TRUSTS CREDIT AGREEMENT**

| | |
|---|---|
| **Principal** | The principal amount of the Amended Marketing Fund Trusts Credit Agreement shall be equal to the Allowed amount of the Marketing Fund Trusts Facility Secured Claim as of the Effective Date. |
| **Obligors** | Reorganized QAFT, solely in its capacity as trustee for the Reorganized Marketing Fund Trusts. |
| **Guarantor** | Reorganized QCE, LLC on an unsecured basis. |
| **Maturity** | First anniversary of the Effective Date. |
| **Interest Rate** | No change in rate from current rate in Marketing Fund Trusts Credit Agreement.  Payable in cash on a monthly basis. |
| **Principal Repayment Schedule** | $150,000 per week. |
| **Collateral** | No change from Marketing Fund Trusts Credit Agreement. |
| **Covenants** | Consistent with existing covenants in the Marketing Fund Trusts Credit Agreement, except with such changes necessary given the conversion of the existing Marketing Fund Trusts Credit Agreement into a term loan. |
| **Events of Default** | No change from Marketing Fund Trusts Credit Agreement, except with such changes necessary given the conversion of the existing Marketing Fund Trusts Credit Agreement into a term loan. |
| **Survival** | All other terms of the Marketing Fund Trusts Credit Agreement, including payment of fees and expenses and applicability of Colorado law, shall survive and be incorporated into the Amended Marketing Fund Trusts Credit Agreement. |
| **Conditions** | Execution and Court approval, if necessary, of a subordination agreement in all respects acceptable to Vectra and the Requisite Consenting First Lien Lenders.  Such subordination agreement shall provide that (i) any liens or claims granted to the lenders under the Amended First Lien Credit Agreement shall be subordinate in all respects to the liens and claims of Vectra, solely with respect to the assets of the Marketing Fund Trusts, and (ii) the lenders under the Amended First Lien Credit Agreement shall have subordinated rights with respect to the assets of the Marketing Fund Trusts, including with respect to payment or remedies, until the Amended Marketing Fund Trusts Credit Facility is paid in full. |