## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | **Jointly Administered** |
| | : | **Case No. 14-10543-PJW** |
| **QCE Finance LLC, et al.,**[1] | : | |
| | : | **Chapter 11** |
| **Debtors,** | : | |
| | : | Ref. Docket Nos. 14 & 15 |
| | : | |

## <u>FORMER MANAGER CREDITORS' (1) OBJECTION TO THE ADEQUACY OF THE DISCLOSURE STATEMENT FOR THE DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION AND (2) OBJECTION TO CONFIRMATION OF THE DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION</u>

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  QCE Finance LLC (7897); American Food Distributors LLC (8099); Quiznos Global LLC (2772); QCE LLC (2969); QFA Royalties LLC (2402); QIP Holder LLC (2353); Quiz-CAN LLC (7714); Quizno's Canada Holding LLC (3220); QAFT, inc. (6947); Restaurant Realty LLC (8293); The Quizno's Master LLC (3148); The Quizno's Operating Company LLC (8945); National Marketing Fund Trust (4951); The Regional Advertising Program Trust (2035); and TQSC H LLC (8683).  The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 1001 17th Street, Suite 200, Denver, Colorado 80202.

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ................................................................................ 1

II.   BACKGROUND ................................................................................................ 4

      A.    The Former Manager Creditors ........................................................... 4

      B.    The Debtors Have Indemnity Obligations to the Former Manager
            Creditors ................................................................................................ 5

III.  THE DEBTORS' MUST RESOLICIT THEIR PREPACKAGED PLAN
      BECAUSE THE DISCLOSURE STATEMENT WAS INADEQUATE ........................ 7

      A.    The Debtors Failed to Disclose Legal Defenses (Including Releases)
            Covering the Specified Litigation Claims, as well as Material Contract
            Terms and Facts Directly Contradicting Avenue's and Fortress's
            Purported Reliance on Forward Looking Projections ............................ 8

      B.    The Debtors did not Disclose Their Agreement to pay Avenue and
            Fortress' Legal Fees and Expenses ..................................................... 12

IV.   THE PLAN IS NOT CONFIRMABLE ................................................................. 14

      A.    The Plan's Treatment of Former Manager Creditors' Claims is Illegal and
            Requires the Court to Deny Confirmation .......................................... 14

            1.    The Plan cannot be confirmed because it classifies Former D&O
                  Indemnification Claims separately from identical claims ...................... 14

            2.    The Plan cannot be confirmed because it unfairly discriminates
                  against Former D&O Indemnification Claims .................................. 21

            3.    The Plan's unequal treatment of Class A4 claims renders the Plan
                  not confirmable .............................................................................. 27

            4.    The Plan cannot be confirmed because it does not reserve for
                  Former D&O Indemnification Claims ................................................ 29

      B.    The Plan's Release, Exculpation and Injunction Provisions Are
            Overbroad, and Require the Court to Deny Confirmation .................... 31

            1.    If approved, the Plan would bar the Specified Litigation Parties,
                  including the Former Manager Creditors, from asserting setoffs
                  and counterclaims against the Debtors ........................................... 31

            2.    If approved, the Plan's injunction would provide an impermissible,
                  non-consensual third party release .................................................. 33

            3.    The Plan's exculpation provisions extend to non-fiduciaries, and
                  are thus overbroad .......................................................................... 36

## TABLE OF AUTHORITIES

Page

CASES

*Bank of N.Y. v. Becker (In re Lower Bucks Hosp.),*
488 B.R. 303 (E.D. Pa. 2013) ..................................................................35

*In re Adelphia Comm'ns Corp.,*
361 B.R. 337 (S.D.N.Y. 2007)...............................................................29

*In re Adelphia Commc'ns Corp.,*
368 B.R. 140 (Bankr. S.D.N.Y. 2007) .............................................16, 28

*In re Aida's Paradise, LLC,*
485 B.R. 806 (Bankr. M.D. Fla. 2013) .................................................19

*In re AOV Indus., Inc.,*
792 F.2d (D.C. Cir. 1986) ......................................................................27

*In re Armstrong World Indus.,*
348 B.R 111 (D. Del. 2006)...........................................................21, 23, 24

*In re Arn Ltd.,*
140 B.R. 5 (Bankr. D.D.C. 1992) ..........................................................19

*In re Boston Harbor Marina Co.,*
157 B.R. 726 (Bankr. D. Mass. 1993) ..............................................17, 19

*In re Cont'l Airlines,*
203 F.3d 203 (3d Cir. 2000)................................................................34, 35

*In re Coram Healthcare Corp.,*
315 B.R. 321 (Bankr. D. Del. 2004) ................................................16, 20

*In re Curtis Ctr. LP,*
195 B.R. 631 (Bankr. E.D. Pa. 1996) ...................................................17

*In re Dow Corning Corp.,*
244 B.R. 634 (Bankr. E.D. Mich. 1999).............................................23, 24

*In re Dow Corning Corp.,*
244 B.R. 696 (Bankr. E.D. Mich. 1999) ...............................................23

*In re Exide Techs.,*
303 B.R. 48 (Bankr. D. Del. 2003) .......................................................31

*In re Fairfield Exec. Assocs.,*
161 B.R. 595 (D.N.J. 1993) ..................................................................16

*In re FF Holdings Corp.*,
    Nos. 98-37-JJF, 98-38-JJF, 1998 U.S. Dist. LEXIS 10741 (D. Del. Feb. 17, 1998)...............18

*In re Frascella Enters, Inc.*,
    360 B.R. 435 (Bankr. E.D. Pa. 2007) .................................................................................24

*In re Genesis Health Ventures, Inc.*,
    266 B.R. 591 (Bankr. D. Del. 2001) ...............................................26, 34, 35, 36

*In re Global Indus. Techs., Inc.*,
    327 B.R. 230 (Bankr. W.D. Pa. 2005) .................................................................26

*In re Heritage Organization., LLC*,
    375 B.R. 230 (Bankr. N.D. Tex. 2007).................................................................21

*In re Indianapolis Downs, LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) .....................................................................36

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78
    B.R. 407 (S.D.N.Y. 1987), *aff'd Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir.
    1988) ........................................................................................................................23

*In re LaBrum & Doak, LLP*,
    225 B.R. 93 (Bankr. E.D. Pa. 1998) ...................................................................18

*In re Lambert Oil Co.*,
    347 B.R. 508 (W.D. Va. 2006) .............................................................................18

*In re Lernout & Hauspie Speech Prods., N.V.*,
    301 B.R. 651 (Bankr. D. Del. 2003) .............................................................19, 24

*In re MCorp Fin.*,
    160 B.R. 941 (S.D. Tex. 1993) .............................................................................30

*In re N. Am. Refractories Co.*,
    Nos. 02-20198, 02-21626, 2007 Bankr. LEXIS 4721 (Bankr. W.D. Pa. Nov. 13,
    2007) ......................................................................................................................17

*In re Nutritional Sourcing Corp.*,
    398 B.R. 816 (Bankr. D. Del. 2008) .....................................................................21

*In re Phoenix Petroleum Co.*,
    278 B.R. 385 (Bankr. E.D. Pa. 2001) ...................................................................32

*In re Pioneer Fin. Corp.*,
    246 B.R. 626 (Bankr. D. Nev. 2000) ...................................................................13

01:15405138.1

*In re PTL Holdings LLC*,
    No. 11-12676 (BLS), 2011 Bankr. LEXIS 4436 (Bankr. D. Del. Nov. 10, 2011) ................36

*In re Reading Co.*,
    72 B.R. 293 (E.D. Pa. 1987) ........................................................................................32

*In re Red Rock Servs. Co., LLC*,
    480 B.R. 576 (Bankr. E.D. Pa. 2012) ..........................................................................18

*In re Save Our Springs (S.O.S.) Alliance, Inc.*,
    388 B.R. 202 (Bankr. W.D. Tex. 2008) .......................................................................20

*In re Slaw Const. Corp.*,
    17 B.R. 744 (Bankr. E.D. Pa. 1982) ...................................................................31, 32, 33

*In re Southland*,
    124 B.R. 211 (Bankr. N.D. Tex. 1991) ...........................................................................8, 13

*In re Tribune Co.*,
    446 B.R. 126 (Bankr. D. Del. 2011) ..............................................................................36

*In re Tribune Co.*,
    472 B.R. 223 (Bankr. D. Del. 2012) ...................................................................23, 24, 25

*In re Tribune Co.*,
    476 B.R. 843 (Bankr. D. Del. 2012) ...................................................................16, 17, 18

*In re W.R. Grace & Co.*,
    468 B.R. 81 (D. Del. 2010) ..........................................................................................17

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012), *aff'd* 729 F.3d 311 (3d Cir. 2013) .................................16

*In re Washington Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ..............................................................................36

*In re Weiss-Wolf, Inc.*,
    59 B.R. 653 (Bankr. S.D.N.Y. 1986) ............................................................................30

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993) ...............................................................................16, 17, 20

*Krajci v. Mt. Vernon Consumer Disc. Co.*,
    16 B.R. 464 (E.D. Pa. 1981) ........................................................................................32

*Luce v. Edelson*,
    802 F.2d 49 (2d Cir. 1986) ...........................................................................................12

*Primex Int'l Corp. v. Wal-Mart Stores,*
    89 N.Y.2d 594 (N.Y. 1997) ...................................................................12

*Protarga, Inc. v. Webb (In re Protarga, Inc.),*
    329 B.R. 451 (Bankr. D. Del. 2005) .......................................................32

*Rochelle v. United States,*
    521 F.2d 844 (5th Cir. 1975) .................................................................18

*United States v. Cont'l Airlines (In re Cont'l Airlines),*
    134 F.3d 536 (3d Cir. 1998) ..................................................................32

**STATUTES**

11 U.S.C. § 503(b)(3)(D) ..............................................................................27

11 U.S.C. § 510(b) ...........................................................................14, 16, 19

11 U.S.C. § 510(c) ...........................................................................14, 16, 19

11 U.S.C. § 524(e) .......................................................................................26

11 U.S.C. § 553 ..................................................................................... passim

11 U.S.C. § 553(a) ........................................................................................32

11 U.S.C. § 1103 ...........................................................................................31

11 U.S.C. § 1122 ...........................................................................................27

11 U.S.C. § 1122(a) ...................................................................................3, 16

11 U.S.C. § 1123(a)(4) ...................................................................3, 27, 29, 30

11 U.S.C. § 1125(a) .....................................................................................7, 8

11 U.S.C. § 1126(b) ....................................................................................7, 13

11 U.S.C. § 1129 ...........................................................................................21

11 U.S.C. § 1129(a) ......................................................................................21

11 U.S.C. § 1129(a)(1) ..................................................................................23

11 U.S.C. § 1129(a)(8) ..................................................................................21

11 U.S.C. § 1129(a)(11) .................................................................................30

11 U.S.C. § 1129(b) .........................................................................................3

11 U.S.C. § 1129(b)(1) ............................................................................................21, 27

**OTHER AUTHORITIES**

COLLIER ON BANKRUPTCY (16th ed. 2013) ......................................................................7, 23, 27

01:15405138.1

Greg MacDonald, Dennis Smythe, Richard E. Schaden, Richard F. Schaden, Frederick H. Schaden, Andrew R. Lee, Patrick E. Meyers, John M. Moore, Thomas M. Ryan and Cervantes Master LLC, each of whom is a former officer, manager and/or member of some or all of the Debtors[2] and/or their predecessors (collectively, the "Former Manager Creditors") hereby object to the *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* ("Disclosure Statement") and the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (the "Plan").

## I.    PRELIMINARY STATEMENT

In January 2012, the Former Manager Creditors agreed to the terms of a restructuring with the Debtors and their now-controlling shareholders.  As part of that transaction, the Former Manager Creditors gave up their direct and indirect equity interests in the Debtors.  Some also gave up significant contractual rights, including rights to severance and deferred compensation.  Most resigned their management and/or board positions.  And several gave up area directorships for territories.  In consideration for these concessions, the Debtors agreed to assume all then-existing indemnity obligations owing to the Former Manager Creditors, and to give the Former Manager Creditors broad mutual releases and exculpation for all prior and subsequent acts.

Now more than two years after the 2012 transaction closed, the Debtors are again financially distressed.  Notwithstanding both the passage of substantial time (during which the Debtors' new owners directed their operations) and significant intervening events (including a change to management and marketing advisors), the Debtors claim the Former Manager Creditors are to blame.  They assert that the Former Manager Creditors—as well as, remarkably, *each* of the Debtors' other former officers, directors, managers, members, employees and agents who served at any time before January 24, 2012—provided Avenue and Fortress—two enormous

---

[2] All capitalized terms not otherwise defined or qualified herein shall be as defined in the Plan.

hedge funds who hold themselves out as extremely sophisticated investors—with faulty projections during the 2012 restructuring negotiations, and that these projections (rather than any of the other investment due diligence that Avenue, Fortress or the lawyers (Akin Gump) and financial advisors (Lazard) who assisted them in the 2012 restructuring conducted) caused Avenue and Fortress to invest in an unsustainable capital structure.  The Debtors, Avenue and Fortress plan to sue the Former Manager Creditors on account of these "Specified Litigation Claims" when a plan in this case becomes effective.  A portion of the proceeds of this litigation—if there are any—will be the recovery for unsecured creditors in the case (unless they elect alternative treatment).

For now, though, the Debtors seek approval of their Disclosure Statement and to cram down on the Former Manager Creditors a Chapter 11 plan that violates important statutory mandates.  The Former Manager Creditors' Objection to the Plan and its accompanying Disclosure Statement is threefold.  *First*, the votes cast in response to the Debtors' out-of-court solicitation cannot be counted—and thus Plan confirmation cannot proceed—because the Debtors' Disclosure Statement did not provide adequate disclosure about (among other things) the Specified Litigation Claims.  Most significantly, the Debtors did not disclose that as part of the 2012 restructuring, they and their controlling shareholders, Avenue and Fortress, released all claims against the Former Manager Creditors for any acts or omissions arising out of the restructuring.  The Disclosure Statement also failed to mention that the Debtors, Avenue and Fortress granted the Former Manager Creditors a covenant not to sue, such that none of them "have any right of action" against the Former Manager Creditors with respect to any act or omission in connection with, or arising out of, the 2012 restructuring.

01:15405138.1

Apart from the forgoing, the Debtors did not mention that their fully integrated 2012 restructuring documents contain no representations or warranties regarding the accuracy of—and in fact qualify—the projections prepared in the restructuring process. These facts, all of which can be gleaned from the restructuring agreements themselves, are clearly relevant to all creditors in these cases. The Debtors' failure to reveal them in the Disclosure Statement renders the Disclosure Statement hopelessly inadequate. Consequently, no acceptances solicited based on the Disclosure Statement can be credited, and plan confirmation must be denied.

*Second*, the Debtors improperly classify, disparately treat, and unfairly discriminate against the Former Manager Creditors' claims in violation of sections 1122(a), 1123(a)(4) and 1129(b) of the Bankruptcy Code. To start, the Debtors classify in a single class—Class A4—all of their unsecured claims, save for indemnification claims belonging to Greg MacDonald, Dennis Smythe and all individuals who resigned their positions with the Debtors *before* January 24, 2012. The Debtors then improperly place these segregated indemnification claims (which they define as Former D&O Indemnification Claims, even though they include only a subset of former director and officer indemnification claims) in a separate class. Finally, the Debtors— without seeking or obtaining a ruling that subordination is appropriate—propose to preemptively subordinate this separate class to all other Unsecured Claims, including other similarly situated former director and officer indemnification claims, and to make immediate plan distributions without first reserving for these claims.[3] The Debtors provide no rationale or legal basis for the attempted subordination of the Former Manager Creditors' unsecured indemnification claims. Nor do they provide any basis for treating other, similarly situated unsecured claims— indemnification claims held by other former directors and officers who resigned *after* January

---

[3] For ease of reference, the Former Manager Creditors refer to indemnification claims arising out of an individual's status as a director, officer, member, manager, employee or agent of the Debtors or their predecessors as "director and officer indemnification claims."

24, 2012 but before the petition dates—far better.  In fact, these favored former officer and director claims are paid in full.

   *Third*, the Debtors propose illegal releases, exculpations and injunctions that purportedly bind each of the Former Manager Creditors even though all Former Manager Creditors are conclusively deemed to reject the Plan and thus were not asked to consent to the third party releases or injunctions.  In particular, the Debtors propose, in blatant violation of Section 553 of the Bankruptcy Code, to enjoin creditors from asserting setoffs and counterclaims in future litigation with the Debtors.  Additionally, the Debtors' proposed plan injunction is tantamount to a non-consensual third party release, prohibiting anyone and everyone from asserting against any other non-Debtor party any claim that the plan discharges or releases as to the Debtors.  Finally, the Debtors' proposed exculpation provision improperly exculpates non-fiduciaries, and in doing so itself constitutes a non-consensual third party release.  These provisions are illegal under Third Circuit law.  No plan containing these terms can be confirmed.

## II.    BACKGROUND

### A.    The Former Manager Creditors.

   The Former Manager Creditors served as members, managers or officers of one or more of the Debtors and/or their predecessors for various periods of time, spanning from 1991 through 2012.  Ex. A (Positions Held by Former Manager Creditors).  Most resigned when the 2012 Restructuring closed to make way for the managers and officers selected by the Debtors' new equity holders.[4]  Richard E. Schaden resigned several months before the 2012 Restructuring

---

[4] Ex. B at 8 (Confidential Offering Memorandum) ("Immediately following the Recapitalization, the Board of Managers of Holdings will be comprised of nine members, one of whom will be our Chief Executive Officer, seven of whom will be appointed by Avenue and one of whom will be appointed by Fortress.")

closed.  Greg MacDonald and Dennis Smythe[5] continued to serve as officers of the Debtors for several months after the restructuring was consummated.

The Former Manager Creditors who had direct and indirect equity interests in QCE LLC gave up all of those interests as part of the 2012 Restructuring.  Some also gave up contractual rights to facilitate the transaction, including significant portions of deferred compensation earned over many years prior to the 2012 Restructuring.  Richard E. Schaden gave up more than $1 million in severance that the Debtors owed to him, and several of the Former Manager Creditors forfeited area directorships for territories, including Chicago.

**B.    The Debtors Have Indemnity Obligations to The Former Manager Creditors.**

Before the 2012 Restructuring, the Debtors' direct and indirect entity parents were QCE Incentive LLC ("QCEI") and QCE Holdings LLC ("QCEH"), respectively.  Both QCEI and QCEH terminated their interests in the Debtors as part of the 2012 Restructuring.

In consideration for QCEI's and QCEH's consents to the 2012 Restructuring, QCE LLC, on behalf of itself and its direct and indirect subsidiaries (collectively, "QCE"), assumed and succeeded to all of QCEI's and QCEH's indemnity obligations.  *See* Ex. C (Assignment and Assumption Agmt), at §1.  The assumed indemnity obligations included all indemnification obligations that QCEI and QCEH owed to the Former Manager Creditors pursuant to certificates of incorporation, codes of regulation, by-laws, limited liability company agreements, operating agreements, limited liability partnership agreements or any combination of the foregoing.  *Id.* They also included those indemnification obligations set forth in the Manager Indemnification Agreements between QCEH and certain of the Former Manager Creditors.  *Id.*; Ex. D (Manager Indemnification Agreements).

---

[5] In their *Statement of Financial Affairs*, the Debtors erroneously state that Mr. Smythe began his employment with the Debtors in May 2008.  Mr. Smythe actually began his employment in October 2009.

01:15405138.1

Specifically, QCE's assumption of the indemnity obligations contained in the QCEH and QCEI Operating Agreements entitles the Former Manager Creditors to indemnification from QCE, to the fullest extent permitted under applicable law, on account of claims brought against them relating to their status with the Company. Ex. E, § 8.2 (QCEH Operating Agreement); Ex. F, § 39(b) (QCEI Operating Agreement).[6] This includes the immediate payment of indemnifiable expenses. Ex. E, § 8.2(b) (QCEH Operating Agreement) ("The Company shall pay reasonable, documented expenses incurred by any [i]ndemnitee in defending any [indemnificable] action, suit or proceeding . . . in advance of the final disposition of such action, suit or proceeding, as such expenses are incurred," provided that the indemnitee agrees to repay any advanced amounts that are ultimately not allowable under applicable law); Ex. F, § 39(b) (ii) (QCEI Operating Agreement) (same).

Certain of the Former Manager Creditors are also entitled to indemnification from QCE under Manager Indemnification Agreements, as follows:

- Where an action relating to their status with the Company is not brought by or in the right of the Company, the Former Manager Creditors are entitled to indemnification for their expenses and liabilities unless it is found by a final and non-appealable order that they have failed to act "(i) in good faith and (ii) in a manner [they] reasonably believed to be in the best interests of [QCEH], or, with respect to any criminal action or proceeding, [they] had reasonable cause to believe [their] conduct was unlawful." Ex. D, §§ 3(a), 4(a) (Manager Indemnification Agreements).

---

[6] The QCEH Operating Agreement and the QCEI Operating Agreement each provide, in pertinent part, that to the fullest extent permitted by applicable law, "the Company shall indemnify and hold harmless each of the Members, Protected Persons and officers of the Company (including Members when acting in the capacity as an officer of the Company), the Managers, their respective Affiliates . . . from and against any and all claims, liabilities, damages, losses, costs and expenses (including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and reasonable expenses of investigating or defending against any claim or alleged claim) of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any [i]ndemnitee and arise out of or in connection with (i) the affairs of the Company or the performance by such [i]ndemnitee of any of the [i]ndemnitee's responsibilities hereunder, (ii) the service at the request of the Company by such [i]ndemnitee as a partner, member, director, officer, trustee, employee or agent of any other Person or (iii) the matters contemplated herein; provided, however, that an [i]ndemnitee shall not be entitled to indemnification hereunder if indemnification is prohibited by applicable law." Ex. E, § 8.2 (QCEH Operating Agreement); Ex. F § 39(b) (QCEI Operating Agreement).

- Where an action relating to their status with the Company is brought by or in the right of the Company, the Former Manager Creditors are entitled to indemnification for their expenses if they prevail. If the Former Manager Creditors are found liable, unless they are also found by a final, non-appealable court order to have not acted "(i) in good faith and (ii) in a manner [they] reasonably believed to be in the best interests of [QCEH]," they are entitled to indemnification for their expenses if they obtain a ruling that "despite the adjudication of liability, but in view of all the circumstances of the case, [they are] fairly and reasonably entitled to indemnity for [expenses] which such court shall deem proper." Ex. D, §§ 3(b), 4(b) (Manager Indemnification Agreements).

Collectively the Operating Agreements and the Manager Indemnification Agreements afford the Former Manager Creditors extensive rights to indemnification from the Debtors. Some claims for indemnification have already been liquidated. Richard E. Schaden, Richard F. Schaden and Patrick E. Meyers collectively hold approximately $3.3 million of liquidated claims against QCE, which claims arise out of recently resolved litigation with former Company franchisees (the "Liquidated Indemnity Claims"). Additionally, each of the Former Manager Creditors holds contingent indemnification claims against QCE on account of expenses and liabilities they may incur in the future, including but not limited to those arising out of the "Specified Litigation Claims" the Debtors and their controlling shareholders threaten to assert against them (the "Contingent Indemnity Claims").

## III.    THE DEBTORS' MUST RESOLICIT THEIR PREPACKAGED PLAN BECAUSE THE DISCLOSURE STATEMENT WAS INADEQUATE.

The Debtors solicited their Plan before filing these cases. Prepetition solicitations are governed by Section 1126(b) of the Bankruptcy Code. Section 1126(b) requires that out of court solicitations comply with generally applicable federal or state securities laws, rules and regulations. 11 U.S.C. §1126(b). If no such laws, rules or regulations apply, Section 1126(b) provides that votes may only be counted if they were solicited after disclosure of "adequate information," as defined in Section 1125(a) of the Bankruptcy Code. 11 U.S.C. §1126(b); COLLIER ON BANKRUPTCY 1126.03[2][d] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

The Debtors contend, and the Former Manger Creditors do not dispute, that there are no securities laws, rules or regulations applicable to their prepetition solicitation. D.I. 13 at ¶¶ 41-42 (Disclosure Statement Motion). Thus, the Debtors' solicitation—and the votes cast in response thereto—can only be recognized if the Court determines that creditors cast their votes after disclosure of adequate information, as defined in Section 1125(a).

Section 1125(a) of the Bankruptcy Code defines adequate information as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. §1125(a). As discussed below, the Debtors' Disclosure Statement did not provide adequate information. Not only did the Debtors fail to disclose highly relevant information about the Specified Litigation Claims, but they also failed to disclose their agreement to pay, in full, in Cash, on the Effective Date and without a Court order, an undisclosed amount of legal fees and expenses on behalf of their controlling shareholders. Because the Disclosure Statement did not provide adequate information, the votes cast in response thereto cannot be counted. The Debtors must revise their Disclosure Statement and resolicit their Plan before confirmation proceedings can proceed. *E.g., In re Southland*, 124 B.R. 211 (Bankr. N.D. Tex. 1991) (court required re-vote in prepackaged Chapter 11 case because it was unclear whether solicitation was adequate).

**A.    The Debtors Failed to Disclose Legal Defenses (Including Releases) Covering the Specified Litigation Claims, as well as Material Contract Terms and Facts Directly Contradicting Avenue's and Fortress's Purported Reliance on Forward Looking Projections.**

The Disclosure Statement's discussion of the "Specified Litigation Claims" was little more than propaganda. The Debtors told creditors the Specified Litigation Claims would be

based on allegations that (1) the Company,[7] at the direction of the Specified Litigation Parties, provided Avenue and Fortress with unreasonable financial projections as part of the 2012 Restructuring, (2) the Company's projections "influenced Avenue and Fortress' decision to support the 2012 Restructuring and invest in what was an unsustainable capital structure," (3) the Debtors' allegedly unsustainable debt burden and capital structure harmed the Debtors in the form of lost opportunities, harm to their business and brand, and "other losses," and (4) Avenue and Fortress suffered what could be "hundreds of millions of dollars" of damages on account of their investments.[8] *See* Discl. Stat. at 19; Plan Supp. at Ex. E. They did not, however, disclose to creditors vital information regarding substantial legal and factual defenses to these claims that are material to creditors' consideration of the Plan.

Most significantly, the Debtors did not reveal to creditors that the parties to the 2012 Restructuring—including the Debtors, Avenue, Fortress and the Specified Litigation Parties— exchanged at closing broad mutual releases, which releases were given to the full extent permitted by applicable law and extended to all claims other than unlawful acts. Ex. C, ¶ 3(a) (Assumption, Assignment and Release). Nor did the Debtors disclose that they, Avenue, Fortress and the Specified Litigation Parties each exculpated one another from liability on account of "*any act or omission in connection with or arising out of, the Restructuring and the transactions contemplated by the RSA*," which exculpations were not limited or qualified in any way. Ex. C, ¶ 3(b) (Assumption, Assignment and Release) (emphasis added).

---

[7] As used herein, Company refers to the Debtors, their affiliates and subsidiaries as they existed before the 2012 Restructuring.

[8] The Debtors did admit in their Disclosure Statement that "the Specified Litigation Claims held by the Debtors may be subject to different, and potentially stronger, defenses than the Specified Litigation Claims held by Avenue and Fortress, and damages may be more difficult to quantify for the Company Specified Litigation Claims as compared to the Specified Litigation Claims held by Avenue and Fortress." *See* Discl. Stmt. at 21.

The Debtors similarly failed to advise creditors that as part of the 2012 Restructuring, the parties agreed to a covenant not to sue, providing that neither the Debtors, nor Avenue, nor Fortress, nor the Specified Litigation Parties "shall have any right of action" against each other with respect to "any act or omission in connection with, or arising out of, the Restructuring and the transactions contemplated by the RSA.  Ex. C, ¶ 3(b) (Assumption, Assignment and Release).  Having failed to reveal the existence of the covenant not to sue, it is not surprising that the Debtors also failed to caution creditors that their pursuit of the Specified Litigation Claims would constitute a breach of that covenant, exposing the Debtors, Avenue, and Fortress to what may be significant counterclaims, setoffs and/or monetary damages.

Additionally, while the Debtors claim that the Specified Litigation Claims include claims the Debtors hold against the Former Manager Creditors for breach of fiduciary duty, they did not disclose that the QCEH Operating Agreement (which governed the Former Manager Creditors' conduct as both managers, members and officers of the Company) eliminated the fiduciary duties that the members and managers might otherwise have owed to the Company to the fullest extent permissible under law. Ex. E, § 8.3 (QCEH Operating Agreement);[9] *see also* DLLCA § 18-1101(c), (e) (providing that a limited liability company agreement can eliminate contractual and fiduciary duties other than the implied contractual covenant of good faith and fair dealing).  The Debtors also failed to disclose that the QCEH Operating Agreement contains a broad limitation of liability, providing that no member, manager or officer will be liable to the Company or its

---

[9] Section 8.3 provides:

> No Member or Manager shall be personally liable for any indebtedness, liability or obligation of the Company, except as specifically provided for in this Agreement or required pursuant to the Act or any other applicable law.  To the fullest extent permitted by Delaware law, except as specifically provided to the contrary in this Agreement, each Member agrees that any fiduciary or other duties imposed under Delaware law (including the duty of loyalty and the duty of care) on the Members and/or Managers are hereby eliminated.  The Members acknowledge and agree that the foregoing is intended to comply with the provisions of the Act (including Section 18-1101 of the Act) permitting members and managers of a limited liability company to eliminate fiduciary duties.

members for any loss sustained except where it is established, by a final non-appealable order,

that the member, manager or officer acted in bad faith or engaged in intentional misconduct or a

willful violation of law or the Operating Agreement. *Id.* §8.1(a).[10]

In addition to these legal defenses, the Debtors omitted highly material facts

contradicting the assertion in their Disclosure Statement that "unreasonable" financial

projections created by the Specified Litigation Parties induced Avenue and Fortress, to their

detriment, to support the 2012 Restructuring. In particular, the Debtors failed to reveal that the

2012 Restructuring Support Agreement and its exhibits (the "RSA Documents") expressly and

repeatedly disclosed that any projections were subject to numerous risk factors and uncertainties

and that the Company made no representations or warranties as to the accuracy of any such

forward looking statements. *See, e.g.*, Ex. B at 146-147 (Confidential Offering Memorandum)

(stating that "no assurance can be made that the Company will achieve the operating or financial

results set forth in the Summary Financial Projections, nor can there be any assurance that results

will not vary, perhaps materially and/or adversely" and that "[t]he Company makes no

representation or warranty as to the accuracy or completeness of any of the [projections

---

[10] Section 8.1(a) provides, in relevant part:

> . . . To the fullest extent permitted by applicable law, none of the Members, the officers, the Managers, any of their respective Affiliates, nor any of their respective officers, directors, employees, partners, members or shareholders (each, a "Protected Person") will be liable to the Company or any Member for any loss or damage sustained by the Company or any Member except as specifically provided to the contrary in the immediately following sentence. None of the Protected Persons shall be liable to the Company or its Members for any loss or damage resulting from any act or omission taken or suffered by such Protected Person in connection with the conduct of the affairs of the Company or otherwise in connection with this Agreement or the matters contemplated hereby, *unless a final, non-appealable judgment or other final adjudication adverse to such Protected Person establishes that such Protected Person's acts or omissions were in bad faith or involved intentional misconduct or a willful violation of law or this Agreement*. Any Protected Person may consult with legal counsel and accountants with respect to the Company's affairs and shall be fully protected and justified in any action or inaction that is taken or omitted in good faith, in reliance upon and in accord with the opinion or advice of such counsel or accountants, provided they shall have been selected in good faith.

01:15405138.1

contained therein]").[11]  Indeed, far from relying on the Company's predictions of future events,

Avenue and Fortress (with assistance from their legal and financial advisors)[12] engaged in

extensive due diligence and expressly confirmed that their decisions and actions were based on

their own independent analyses.  *See, e.g.*, Ex. G at C-18, §10 (RSA) ("Each Participating

Lender hereby confirms that it has made its own decision to execute this Agreement based on its

own independent assessment of documents and information available to it, as it has deemed

appropriate.").  These disclosures and representations simply gut any claim that sophisticated

investors like Avenue and Fortress could have "reasonably relied" on the Company's forward

looking statements.  *See, e.g., Luce v. Edelson*, 802 F.2d 49. 56 (2d Cir. 1986) ("We are not

inclined to impose liability on the basis of statements that clearly 'bespeak caution.'").

Finally, the Debtors failed to alert creditors that some or all of the Specified Litigation

Claims will trigger indemnification claims by Former Manager Creditors that will dilute

recoveries to unsecured creditors.  *See, supra,* § II.B.

The foregoing information is clearly relevant and material to every creditor, including

holders of Class A4 general unsecured claims that must decide whether to receive an interest in

the Specified Litigation Claims or make the Stock in Lieu Election.

**B.     The Debtors did not Disclose Their Agreement to pay Avenue and Fortress'
        Legal Fees and Expenses.**

The Plan—on page 37 of 39, in an Article entitled "Miscellaneous Provisions"—provides

that the Debtors will pay their controlling shareholders' unpaid legal fees and expenses in full, in

---

[11] The RSA was a fully integrated agreement precluding any additional or contrary representations.  Ex. G at C-20 ("This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations but shall not supersede the Approved Transaction Documents . . .."); *see also Primex Int'l Corp. v. Wal-Mart Stores*, 89 N.Y.2d 594 (N.Y. 1997) ("A completely integrated contract precludes extrinsic proof to add to or vary its terms.").

[12] In fact, the Debtors' legal and financial advisors (Akin Gump and Lazard) served as Avenue's advisors during the 2012 Restructuring.

01:15405138.1

Cash, on the Effective Date, without any need for Court review or approval.  Plan § 10.12

(providing for payment of "Avenue and Fortress Advisor Fees and Expenses"); § 1.14 (defining

Avenue and Fortress Advisor Fees and Expenses as "unpaid and reasonable and documented fees

and expenses incurred through the Effective Date of Skadden Arps Slate Meagher & Flom,

O'Melveny & Myers LLP, Rothschild Inc. and one local counsel for the Consenting Avenue and

Fortress Entities").  The Debtors made no mention of this obligation in their Disclosure

Statement, save to say that payment of the "Avenue and Fortress Advisor Fees and Expenses" is

a condition to the Plan's consummation.  Discl. Stmt. at 34.  Nor did they provide any estimate

of the amount of fees and expenses they have agreed to pay.  The fact that the Debtors will pay

their controlling shareholders' legal fees and expenses would certainly be relevant to creditors in

this case, particularly where payment of these fees will dilute the recoveries of other creditors.

In the face of these glaring omissions, the Court cannot approve the Disclosure

Statement, and any acceptances solicited through the use of the Disclosure Statement must be

disregarded.  Before confirmation can proceed, the Debtors must prepare and obtain approval of

a revised disclosure statement containing sufficient detail about all relevant facts, and resolicit

that revised disclosure statement in accordance with the Bankruptcy Code.  *In re Southland*, 124

B.R. at 225-26 (Bankr. N.D. Tex. 1991) ("Any shortcoming [in prepetition solicitation] would

require going back to the drawing board for a bankruptcy regulated disclosure statement hearing

with notice, and the usual bankruptcy process toward a hearing on confirmation."); *City of Colo.*

*Springs Spring Creek Gen. Improvement Dist.*, 177 B.R. 684, 691 (Bankr. D. Colo. 1995)

(confirmation denied where prepetition solicitation deemed inadequate); *In re Pioneer Fin.*

*Corp.*, 246 B.R. 626 (Bankr. D. Nev. 2000) (ruling a plan was not accepted under section

1126(b) of the Bankruptcy Code where prepetition solicitation was inadequate).  Confirmation must be denied.

## IV.    THE PLAN IS NOT CONFIRMABLE.

### A.    The Plan's Treatment of Former Manager Creditors' Claims is Illegal and Requires the Court to Deny Confirmation.

The Plan treats the Former Manager Creditors' Claims inequitably.  First, the Plan classifies Former D&O Indemnification Claims separately from other similarly situated claims, without any basis.  Second, the Plan unfairly discriminates against the Former Manager Creditors' Claims.  Third, the Plan affords unequal recoveries among holders of Class A4 Unsecured Claims, in all cases to the Former Manager Creditors' detriment.  And finally, the Plan permits the Debtors to make plan distributions without first reserving for the Former D&O Indemnification Claims.  For each of these reasons, the Court cannot confirm the Plan.

### 1.    The Plan cannot be confirmed because it classifies Former D&O Indemnification Claims separately from identical claims.

It is unclear whether the Plan's definition of Subordinated Claims—i.e., those claims included in Class A5—should be read as "(1) the Former D&O Indemnification Claims, and (2) any other Claim that is subject to contractual, legal and/or equitable subordination, whether arising under general principles of equitable subordination, Bankruptcy Code sections 510(b) or 510(c) or otherwise" *or* "the Former D&O Indemnification Claims and any other Claim, *each to the extent* they are subject to contractual, legal and/or equitable subordination, whether arising under general principles of equitable subordination, Bankruptcy Code sections 510(b) or 510(c) or otherwise."  If the Debtors intended the latter reading, a clarification of the definition would cure the Former Manager Creditors' objections to the classification of and discrimination against their indemnification claims.  In that case, the Former D&O Indemnification Claims would be

01:15405138.1

14

classified in Class A4 unless and until they were actually subordinated pursuant to an order of this Court.

If, however, the Debtors intended the former reading of "Subordinated Claims," their Plan cannot be confirmed. In that case, the Plan would not treat equally the indemnification claims of their former directors, officers, members, managers, employees and agents. Rather, and although all such indemnification claims fall easily within the Plan's definition of Unsecured Claims,[13] the Plan would segregate indemnification claims into two classes, based almost exclusively on the holder's resignation or termination date. Class A4 would include all indemnification claims held by individuals who resigned on or after January 24, 2012, but before the bankruptcy filing, with the exception of Greg MacDonald and Dennis Smythe (the "Former Favored D&O Claims").[14] Class A4 indemnity claims would be classified with and treated like all other unsecured claims. Class A5 would include the Former D&O Indemnification Claims held by Greg MacDonald, Dennis Smythe and individuals who resigned before January 24, 2012. The Plan subordinates indemnification claims in Class A5 to all Unsecured Claims. Holders of Class A5 indemnity claims will not receive any distribution under the Plan.

This Objection assumes that the Debtors intended to place the Former Manager Creditors' indemnification claims in Class A5. The Debtors have provided no explanation or justification for classifying former director and officer indemnification claims differently based on whether a holder's separation date was before or after a date more than two years before their

---

[13] The Plan defines Unsecured Claims to include "any First Lien Facility Deficiency Claim, Second Lien Facility Claim, the Marketing Fund Trusts Facility Guaranty Claim, SARs Claim, Lease Promissory Note Claim and any other Claim that is not an Administrative Expense, Intercompany Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a First Lien Facility Secured Claim, a Marketing Fund Trusts Facility Secured Claim or an Other Secured Claim." Plan § 1.169.

[14] The Debtors explain in the Disclosure Statement that in July 2012—six months after the 2012 Restructuring closed—they "almost entirely replaced" their then-existing management. Discl. Stat. at 18. Each of these replaced individuals, none of whom had any role in the restructuring, resigned after January 24, 2012, and thus holds a claim that fall within the definition of Favored Former D&O Claims.

01:15405138.1

bankruptcy filing. And there is no explanation that supports any distinction. Because substantially similar claims must be classified together unless there is a reasonable basis for doing otherwise, the Plan's classification scheme is illegal and confirmation must be denied.

> **(a)  Substantially similar claims should normally be classified together.**

Substantially similar claims should ordinarily be classified together unless a debtor provides a reasonable basis for treating them separately.[15] *E.g., John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993) (holding a classification scheme must be reasonable and that "the Code was not meant to allow a debtor complete freedom to place substantially similar claims in separate classes"); *In re W.R. Grace & Co.*, 475 B.R. 34, 110 (D. Del. 2012), *aff'd*, 729 F.3d 311 (3d Cir. 2013) ("[S]ubstantially similar claims may not be classified separately when it is done for an illegitimate reason."), *quoting In re Dow Corning Corp.*, 244 B.R. 634, 644 (Bankr. E.D. Mich. 1999)).

Claims are deemed "substantially similar" if they share the same rights of recovery against the same debtor. *E.g., W.R. Grace & Co.*, 729 F.3d at 326. This analysis focuses on whether claims themselves have the same or similar legal status in relation to the assets of the debtor. *In re Tribune Co.*, 476 B.R. 843, 855 (Bankr. D. Del. 2012). The identity of the claimholder is not relevant to this analysis. *Id.*; *see also In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004) (recognizing that the emphasis is not upon the holder so much as it is upon the claim that is held). Nor is the way in which a claim arises. *In re Fairfield Exec. Assocs.*, 161 B.R. 595, 602 (D.N.J. 1993) (finding that distinguishing between the secured

---

[15] The converse is also true: claims that are not substantially similar should not be classified together. 11 U.S.C. §1122(a) (only substantially similar claims may be grouped together). Thus, to the extent that some or all of the Former D&O Indemnification Claims are not subject to subordination under 11 U.S.C. §510(b), 11 U.S.C. §510(c), or otherwise, such claims are inappropriately placed in Class A5. *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 246-47 (Bankr. S.D.N.Y. 2007). This fact, too, renders the Plan not confirmable.

creditor with a deficiency claim and other trade creditors would improperly focus on the motives

and agenda of the claim holder rather than on the nature of the underlying claim); *In re W.R.*

*Grace & Co.*, 468 B.R. 81, 155 (D. Del. 2010) (recognizing that claims are substantially similar

if they "relate to the assets of the debtor" in substantially the same way, regardless of their

underlying legal theories).

Once it is determined that claims are substantially similar, they may be separately

classified only where the debtor can show a reasonable basis for doing so. *John Hancock Mut.*

*Life Ins. Co.*, 987 F.2d at 159.  Essentially, the debtor must demonstrate that the separate

classification results in a class that "represent[s] a voting interest that is sufficiently distinct and

weighty to merit a separate voice in the decision whether the proposed reorganization should

proceed." *Id.*  This requirement may be deemed satisfied where a debtor proposes to treat

unsecured noteholder claims separate from unsecured trade claims. *See Tribune Co.*, 476 B.R. at

857.  On the other hand, courts often reject a debtor's attempt to separately classify claims where

the classification is intended to facilitate disparate treatment of similar claims, or where the

classification is premised upon the fact that a creditor's claims are disputed or the subject of

litigation. *See, e.g., In re Boston Harbor Marina Co.*, 157 B.R. 726, 739 (Bankr. D. Mass. 1993)

(holding that a debtor cannot equitably subordinate a claim merely by classifying it separately in

a plan); *In re N. Am. Refractories Co.,* Nos. 02-20198, 02-21626, 2007 Bankr. LEXIS 4721, at

*71 (Bankr. W.D. Pa. Nov. 13, 2007) (claims were substantially similar and must be classified

together where they involved the same types of injuries from the same cause, regardless of

whether they involved different defenses or likelihoods of success); *see also, e.g., In re Curtis*

*Ctr. LP*, 195 B.R. 631, 642 (Bankr. E.D. Pa. 1996) (existence of lender liability claims against a

creditor was not a sufficient basis to separately classify creditor's deficiency claim from other general unsecured creditors).

**(b)      There is no reasonable basis to separately classify Former D&O Indemnification Claims.**

The Debtors have separately classified Former D&O Indemnification Claims from all other Unsecured Claims, including the Favored Former D&O Claims. As such, the Debtors have the burden to show that these claims are not substantially similar, or alternatively that there is a reasonable justification for their separate classification. They can do neither.

**(i)      The Former D&O Indemnification Claims are substantially similar to Class A4 Unsecured Claims, including the Favored D&O Claims.**

The Former D&O Indemnification Claims are substantially similar to Unsecured Claims generally, and Favored Former D&O Claims specifically. All lie against one or more of the Term Loan Debtors. All are unsecured.[16] And as a result of their unsecured status, all have equal rights of payment from the Debtors' assets. There is no meaningful distinction between the claims. *See In re FF Holdings Corp.*, Nos. 98-37-JJF, 98-38-JJF, 1998 U.S. Dist. LEXIS 10741, at *13 (D. Del. Feb. 17, 1998) (finding that a proper determination of what claims are substantially similar focuses on the nature and legal attributes of the claim, not upon the status or circumstances of the claimant). Whether a holder of an indemnification claim resigned before or

---

[16] To the extent that the Debtors obtain an affirmative award against some of the Former Manager Creditors, the Former Manager Creditors' indemnification claims (and any other claims or counterclaims the Former Manager Creditors hold against the Debtors) would be secured by the right of setoff. 11 U.S.C. §553; *see also infra* at § IV.B. The claims then would fall within Class A3, and would be immune from subordination. *E.g., Rochelle v. United States*, 521 F.2d 844, 855 (5th Cir. 1975) (under the Bankruptcy Act, permitting setoff by the IRS against claims that were subordinated to general unsecured creditors); *In re Lambert Oil Co.*, 347 B.R. 508, 519 (W.D. Va. 2006) (subordination of former insider's claims was irrelevant to setoff rights); *In re LaBrum & Doak, LLP*, 225 B.R. 93, 102 (Bankr. E.D. Pa. 1998) ("[T]he general rule is that subordinate claims are eligible for setoff."); *but see In re Red Rock Servs. Co., LLC*, 480 B.R. 576 (Bankr. E.D. Pa. 2012) (assuming that setoff rights may be equitably subordinated, but declining to do so).

01:15405138.1

after January 24, 2012 is of no consequence. *See Tribune Co.*, 476 B.R. at 855 (identity of claimholder is irrelevant).

The Debtors will presumably argue that the Former D&O Indemnification Claims are dissimilar to Unsecured Claims generally, and the Favored Former D&O Claims specifically, because the Former D&O Indemnification Claims may be subject to subordination. While actually subordinated claims would be dissimilar to Unsecured Claims and Favored Former D&O Claims—as their legal rights against the Debtors' assets would differ—the Former D&O Indemnification Claims have not been subordinated under Section 510(b) of the Bankruptcy Code, Section 510(c) of the Bankruptcy Code, or otherwise. And to the extent the Debtors are seeking to subordinate some or all of the Former D&O Indemnification Claims under Sections 510(b) or 510(c) of the Bankruptcy Code, or the common law doctrine of equitable subordination, they must first obtain a final, non-appealable ruling that subordination is appropriate under the circumstances.[17] *In re Arn Ltd.*, 140 B.R. 5, 13 (Bankr. D.D.C. 1992); *see also In re Boston Harbor Marina Co.*, 157 B.R. at 739 (a claim may not be classified separately as a subordinated claim "unless and until" the court issues a judgment ordering equitable subordination); *In re Aida's Paradise, LLC*, 485 B.R. 806, 811 (Bankr. M.D. Fla. 2013) (debtor's ability to confirm a plan separately classifying secured creditor's deficiency claim from other unsecured claims "floats on the viability" of successfully obtaining an order for equitable subordination); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (permitting the separate classification of claims subordinated under Section 510(b) only

---

[17] The Former Manager Creditors anticipate that the Debtors may seek to subordinate under Section 510(b) of the Bankruptcy Code their contingent indemnification claims relating to the 2012 Restructuring. Even if the Debtors were to obtain a final, non-appealable order that indemnification claims relating to the 2012 Restructuring are subject to subordination under Section 510(b) of the Bankruptcy Code—and the Former Manager Creditors will oppose any action seeking that result—indemnification claims unrelated to the 2012 Restructuring (e.g., the Liquidated Indemnity Claims and contingent indemnity claims not arising out of the 2012 Restructuring) would not be subject to subordination. Thus, the Debtors must do more than simply seek and obtain an order subordinating Former D&O Indemnification Claims  under Section 510(b) to remedy their improper classification scheme.

01:15405138.1

where the debtor obtained a declaratory judgment subordinating those claims, and where that judgment was a final order not subject to appeal).  As things stand today, however, there is no difference at all among Former D&O Indemnification Claims, Unsecured Claims or Former Favored D&O Claims.  They are all substantially similar.

(ii)    **There is no reasonable basis for separately classifying the Former D&O Indemnification Claims.**

Because the Former D&O Indemnification Claims are substantially similar to Unsecured Claims generally, and Favored Former D&O Claims specifically, the Debtors must show that there is a reasonable basis for classifying the claims separately.  They have not, and they cannot.

Separate classification is only justified where the separate class is so "distinct and weighty" from an otherwise similar class that it "merit[s] a separate voice" in connection with confirmation.  *John Hancock Mut. Life Ins. Co.*, 987 F.2d at 159.  The fact that holders of the Former D&O Indemnification Claims may be named as defendants in future litigation does not make the class "distinct and weighty."  Nor is it sufficient that the holders of Former D&O Indemnification Claims were once insiders, that most resigned before January 24, 2012 or that the Debtors may later attempt to subordinate their claims.  *See, e.g., Coram Healthcare Corp.*, 315 B.R. at 350 (rejecting argument that insider claims should be separately classified because of superior knowledge of risk); *see also In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202, 246 (Bankr. W.D. Tex. 2008) (separate classification of insider claims was inappropriate where objector has not objected to the claims or "initiated any action to equitably subordinate any claim").  In fact, given that all Unsecured Claims and Former D&O Indemnification Claims are deemed to reject the Plan, it is hard to fathom why it would ever be necessary to give the voiceless Former D&O Indemnification Claims a "separate voice" from the already voiceless

01:15405138.1

Unsecured Claims.  There is no reasonable justification for the Plan's separate classification of

Former D&O Indemnification Claims.[18]

The Debtors' attempt to use the Plan's classification scheme to subordinate and

discriminate against the Former Manager Creditors must be rejected, and Plan confirmation must

be denied.

### 2.    The Plan cannot be confirmed because it unfairly discriminates against Former D&O Indemnification Claims.

A plan must meet the requirements of Section 1129 of the Bankruptcy Code.  *In re*

*Armstrong World Indus.*, 348 B.R 111, 119-120 (D. Del. 2006).  Section 1129(a) requires that all

impaired classes accept the plan.  *Id.* at 120.  If any impaired class does not accept the plan, the

plan may not be confirmed unless the debtor meets the "cram down" standards and proves,

among other things, that the plan does not unfairly discriminate with respect to any non-

accepting impaired class.  11 U.S.C. § 1129(a)(8); § 1129(b)(1); *see also In re Nutritional*

*Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008); *In re Armstrong World Indus.,* 348

B.R. at 122 (D. Del. 2006) (debtor carries the burden to prove the absence of unfair

discrimination).  The Debtors cannot satisfy their burden.

As shown in the table below, the Debtors propose to make grossly divergent and

discriminatory distributions to holders of Unsecured Claims, both within and between classes.

| Table 1:  Distributions on General Unsecured Claims Against Term Loan Debtors | | |
|---|---|---|
| *Class* | *Claimant* | *Recovery on Prepetition Claim* |
| Class A4 | Holders of Unsecured Claims, generally | • Distribution from the Specified Litigation Waterfall or reorganized equity (Plan §2.10(b)) |

---

[18] The Debtors may point to *In re Heritage Organization, LLC*, 375 B.R. 230 (Bankr. N.D. Tex. 2007), wherein a court approved separate classification of former employee and insider claims because the chapter 11 trustee in that case intended to seek to equitably subordinate their claims.  That case is not applicable here because the plan in *Heritage* specifically provided that if the former insiders' claims were not subordinated, the insiders would receive the same treatment as afforded to other general unsecured claims.

01:15405138.1

| Class | Claimant | Recovery on Prepetition Claim |
|-------|----------|-------------------------------|
| **Table 1:  Distributions on General Unsecured Claims Against Term Loan Debtors** | | |
| Class A4 | Consenting Second Lien Lenders (Avenue and Fortress) | • Reorganized equity (Plan § 2.10(b))<br>• Payment of attorneys' fees in an unspecified amount (Plan § 10.12)[19]<br>• Debtor releases (Plan § 9.3(a))<br>• Exculpations (Plan § 9.4)<br>• Third party releases (Plan §§ 9.2(b), 9.3(b), 9.4) |
| Class A4 | Second Lien Agent | • Distribution from the Specified Litigation Waterfall or reorganized equity (Plan §2.10(b))<br>• Debtor releases (Plan § 9.3)<br>• Exculpations (Plan §9.4)<br>• Third party releases (Plan §§9.2(b), 9.3(b), 9.4) |
| Class A4 | Holders of Favored Former D&O Claims | • Reinstatement of indemnity claims (Plan § 5.9)<br>• Additional insurance with the right to be indemnified for any deductible amounts owing under any applicable insurance policy (Plan § 5.9)<br>• Debtor releases (Plan § 9.3(a))<br>• Third party releases (Plan §§ 9.2(b), 9.3(b)) |
| Class A4 | Current Directors and Officers | • Reinstatement of indemnity claims (Plan § 5.9)<br>• Additional insurance with the right to be indemnified for any deductible amounts owing under any applicable insurance policy (Plan § 5.9)<br>• Debtor releases (Plan § 9.3(a))<br>• Exculpations (Plan § 9.4)<br>• Third party releases (Plan §§ 9.2(b), 9.3(b), 9.4) |
| Class A4 | Current Directors and Officers of Non-Debtor Affiliates | • Reinstatement of indemnity claims (Plan § 5.9)<br>• Additional insurance with the right to be indemnified for any deductible amounts owing under any applicable insurance |

---

[19] The Plan is not clear whether Avenue and Fortress are receiving payment of their attorneys fees on account of their positions as Consenting Second Lien Lenders, Consenting Existing Equity, or otherwise. Regardless of the justification, the payment is illegal under the Bankruptcy Code.

01:15405138.1

| Class | Claimant | Recovery on Prepetition Claim |
|-------|----------|------------------------------|
| | | policy (Plan § 5.9) <br> • Debtor releases (Plan § 9.3(a)) <br> • Exculpations (Plan §9.4) <br> • Third party releases (Plan §§ 9.2(b), 9.3(b), 9.4) |
| Class A5 | Holders of Former D&O Indemnification Claims | • No distribution (Plan § 2.11) <br> • Possibly additional insurance with the right to be indemnified for any deductible amounts owing under any applicable insurance policy, although the Plan is not clear on this point (Plan § 5.9) <br> • Third party releases (Plan § 9.2(b)) |

**Table 1: Distributions on General Unsecured Claims Against Term Loan Debtors**

The proposed distributions are patently unfair, and violate Section 1129(a)(1)'s prohibition on

unfair discrimination.

The Bankruptcy Code's prohibition against unfair discrimination is intended to ensure

that "a dissenting class will receive relative value equal to the value given to all other similarly

situated classes." *In re Armstrong World Indus.*, 348 B.R at 121 (internal quotations omitted);

*see also In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part,*

*rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd, Kane v. Johns-Manville*

*Corp.*, 843 F.2d 636 (2d Cir. 1988) (finding that a "plan proponent may not segregate two similar

claims or groups of claims into separate classes and provide disparate treatment for those

classes). To determine whether a plan unfairly discriminates, courts in this circuit and elsewhere

apply the "rebuttable presumption" test first adopted in the *Dow Corning* case.[20]  *In re Dow*

*Corning Corp.*, 244 B.R. 696, 701 (Bankr. E.D. Mich. 1999); *In re Tribune Co.*, 472 B.R. 223,

---

[20] Before the widespread adoption of the *Dow Corning* test, courts generally applied a four-factor test to determine whether a plan unfairly discriminates. *In re Armstrong World Indus.*, 348 B.R. at 122. The factors considered include (1) whether the discrimination is supported by a reasonable basis, (2) whether the debtor could consummate the plan without the discrimination, (3) whether the discrimination is proposed in good faith, and (4) whether the degree of discrimination is in direct proportion to its rationale. *Id.* Regardless of the formulation, the inquiry centers on "the disparity of treatment proposed in the plan, and whether such disparity can be justified under the Code." 7 COLLIER, *supra*, ¶ 1129.03[3][a].

01:15405138.1

241-42 (Bankr. D. Del. 2012) (adopting rebuttable presumption test and collecting cases doing

the same).  Under *Dow Corning*, a rebuttable presumption of unfair discrimination arises where

three factors are met:

> (1)   there is a dissenting class;
>
> (2)   there is another class of the same priority; and
>
> (3)   there is a difference in the plan's treatment of the two classes that results in either (a) a ***materially lower percentage recovery for the dissenting class*** (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of ***materially greater risk to the dissenting class*** in connection with its proposed distribution.

*See, e.g., Tribune Co.*, 472 B.R. at 241-42.  Once a rebuttable presumption of unfair

discrimination arises, a debtor may rebut the presumption "by showing that, outside of

bankruptcy, the dissenting class would similarly receive less than the class receiving a greater

recovery, or that the alleged preferred class had infused new value into the reorganization which

offset its gain."  *In re Armstrong World Indus.*, 348 B.R at 121; *In re Lernout & Hauspie Speech

Prods., N.V.*, 301 B.R. at 661.

The Plan establishes a rebuttable presumption of unfair discrimination.  ***First***, Class A5,

which is comprised largely (if not solely) of the non-subordinated, unsecured Former D&O

Indemnification Claims, is a dissenting class.  *See* Plan §2.11(b) (Class A5 Claims will "not

receive or retain any property on account of such Class A5 Claims and all such Claims shall be

cancelled and discharged").  ***Second***, the Plan creates a separate class (Class A4) for Unsecured

Claims, the claims in which have the same legal rights and priority against the Debtors as the

Former D&O Indemnification Claims.  *See, e.g., In re Frascella Enters, Inc.*, 360 B.R. 435, 442-

43 (Bankr. E.D. Pa. 2007) (recognizing that it is only the legal nature of the claims, not the

identity of the claim holder or that the claim holder is an insider, which is relevant in determining claim priority).

*Third*, there is a material difference between the Plan's treatment of Former D&O Indemnification Claims and the Unsecured Claims placed in Class A4, resulting in a materially lower percentage recovery for Former D&O Indemnification Claims. The Debtors propose to cancel and discharge Former D&O Indemnification Claims while paying other similarly-situated general unsecured claims far more. To take the most straightforward example, the Debtors propose to reinstate Favored Former D&O Claims, paying them 100 cents on the dollar, while also providing their holders with continued insurance, Debtor releases and third party releases. Plan §§ 5.9, 9.2(b), 9.3(b). These claims, however, are indistinguishable from the Former D&O Indemnification Claims, save for the prepetition date on which their holders resigned. Paying 100 cents on the dollar to holders of Favored Former D&O Claims while providing no recovery to holders of Former D&O Indemnification Claims is the epitome of unfair discrimination.[21] *Tribune Co.*, 472 B.R. at 243 ("Courts considering the issue of unfair discrimination have roundly rejected plans proposing grossly disparate treatment (50% or more) to similarly situated creditors, while at least two courts decided that unfair discrimination did not exist when the difference in recoveries was 4% or less.").

With the presumption of unfair discrimination established, the Debtors must prove either that (1) the Former D&O Indemnification Claims would similarly receive less than all other Unsecured Claims outside of bankruptcy, or (2) that each holder of an Unsecured Claim has infused new value into the reorganization which offsets their gain. They cannot.

---

[21] The fact that the Debtors threaten to subordinate the Former D&O Indemnification Claims is of no consequence. In fact, all claims against the Debtors carry a risk of subordination until Allowed as non-subordinated claims.

01:15405138.1

First, outside of bankruptcy, Unsecured Claims and the Former D&O Indemnification Claims are all unsecured, entitled to the exact same right of payment from the Debtors. In fact, outside of bankruptcy, the Debtors would not even have the threat of equitably subordinating the Former D&O Indemnification Claims, as that remedy exists only within the context of bankruptcy.

Second, the Debtors have not even attempted to establish that holders of Unsecured Claims infused new value into the reorganization that offsets their respective gains. It is implausible, in fact, that the Debtors could make this showing for holders of Unsecured Claims generally, as they were not involved in negotiating the prepackaged Plan and, in fact, are deemed to reject it. It is similarly implausible that the Debtors could make this showing for each holder of a Favored Former D&O Claim because, by definition, these claimants include *former* directors, officers, members, managers, employees or agents who are no longer associated with the Debtors and who thus had no part in the proposed reorganization. *See, e.g., In re Genesis Health Ventures, Inc.,* 266 B.R. 591, 606-07 (Bankr. D. Del. 2001) (rejecting prepetition director and officer releases where there was no showing that the individual officer and director releases had made a substantial contribution of assets to the reorganization).[22] And while Avenue and Fortress have apparently played a significant role in the current reorganization process, the appropriate means for them to recover their fees, if such fees are recoverable at all, is through application to the Court for a substantial contribution claim—not through a discriminatory plan distribution. *See, e.g., In re Global Indus. Techs., Inc.,* 327 B.R. 230, 240 (Bankr. W.D. Pa.

---

[22] In fact, it is far from clear that current directors and officers would be entitled to the broad prepetition releases that the Debtors, as these releases violate Section 524(e) and are not permissible in this circuit. *In re Genesis Health Ventures, Inc.,* 266 B.R. at 606-07 (finding that while the debtor's officers, directors and employees no doubt contributed to the debtor's reorganization efforts, these individuals "have been otherwise compensated for their contributions, and the management functions they performed do not constitute contributions of 'assets' to the reorganization").

2005) ("[I]t is inequitable to allow certain unsecured creditors to recover postpetition attorneys'

fees at the expense of similarly situated claimants."); *see also* 11 U.S.C. §503(b)(3)(D).  To the

extent the Debtors attempt to make a case for preferential treatment of any particular subclass of

unsecured creditors, the Former Manager Creditors reserve their rights to respond.

The Plan is replete with the type of blatant unfair discrimination that the Bankruptcy

Code specifically prohibits.  The Plan is unconfirmable under Section 1129(b)(1) of the

Bankruptcy Code.

### 3.    The Plan's unequal treatment of Class A4 claims renders the Plan not confirmable.

Section 1123(a)(4) requires that a plan "provide the same treatment for each claim or

interest of a particular class." 11 U.S.C. §1123(a)(4); *In re AOV Indus., Inc.*, 792 F.2d 1140,

1151 (D.C. Cir. 1986) (recognizing that "[o]nce a plan has classified creditors, it must provide

the same treatment for each claim or interest of a particular class, unless the holder of a particular

claim or interest agrees to a less favorable treatment")(internal quotations omitted).  This

provision provides "[a]n important corollary to section 1122" and is yet another way in which

the Bankruptcy Code operates to prohibit unfair discrimination against dissenting creditors.

COLLIER ON BANKRUPTCY ¶ 1122.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  The

Debtors' grossly disparate treatment of holders in Class A4 violates Section 1123(a)(4)'s basic

statutory command. [23]

While the Plan's treatment of Class A4 Claims is superficially the same, some creditors

in the class stand to receive far superior treatment.  Table 1, *supra*, shows that holders of Class

A4 Unsecured Claims generally will receive either an interest in the Specified Litigation Claims

---

[23] The Former Manager Creditors hold contingent claims against the Debtors for, among other things, breach of the 2012 Restructuring Documents.  These claims are Class A4 Unsecured Claims.  Thus, even if the Court upholds the Debtors' classification scheme with respect to Former D&O Indemnification Claims, the Former Manager Creditors would still be harmed by the unequal treatment of Class A4 claims.

01:15405138.1

or reorganized equity (as well as possibly a third party release, to the extent the Court does not strike it down). Those who negotiated and supported the prepackaged plan, however, will receive significantly more. Avenue and Fortress, for example, stand to receive not only reorganized equity, but also broad Debtor releases, third party releases and exculpations, and the payment of their "unpaid" attorneys' fees in an unspecified amount and without Court oversight.

The benefits afforded to those Class A4 claimholders like Avenue and Fortress who wielded significant leverage in prepetition negotiations raises the "very real possibility" that the benefits were given in exchange for their votes (or, in this case, consents) in support of the Plan and Restructuring Support Agreement. This is not permissible. The *Adelphia* district court, for example, held that there was a substantial possibility that the bankruptcy court had erred in confirming a plan providing for a class of bondholders to receive specified *pro rata* distributions, and for certain bondholders in that class who voted to approve the plan to receive other, additional consideration (including releases and exculpations):

> There is no doubt here that in return for approving the Plan, some claimants will receive a more valuable settlement than others (*i.e.*, additional benefits on top of their pro rata distributions). While such an outcome may be permissible where the added benefit is given for truly collateral reasons (*i.e.*, independent from their status as claimants), here the benefit is given in exchange for the claimant's affirmative vote for the Plan – an added benefit that is tied directly to the Plan itself and given to some claimants in a class, but not all. Such an inducement may well have led some claimants to approve the Plan when they otherwise may have rejected it. As a result, creditors opposing the Plan may have been prejudiced by a quid pro quo exchange of Plan approval for valuable releases and exculpations.

> Section 1123(a)(4) guarantees that each class member will be treated equally, regardless of how it votes on a proposed plan. Where the receipt of valuable benefits in a plan is conditioned on a vote to accept *that plan*, there is a very real possibility of dissuading or silencing opposition to the plan. In this context, ***the Bankruptcy Court's semantic distinction between the treatment of claims and claimants goes against the spirit of section 1123(a)(4) and what it seeks to protect***. If an appeal of that issue is heard, there is a substantial possibility that Appellants will succeed in their argument that the distribution of certain benefits to some claimants but not others within a class violates section 1123(a)(4).

*In re Adelphia Comm'ns Corp.*, 361 B.R. 337, 363-64 (S.D.N.Y. 2007) (emphasis added). Although members of Class A4 were not entitled to vote on the Plan, some—including most notably Avenue and Fortress—had the right to "vote" by supporting or rejecting the Restructuring Support Agreement upon which the Plan was founded. *See* Discl. Stmt. at 1 (stating that 99% of the Holders of Second Lien Facility Claims executed the Restructuring Support Agreement, evidencing their support of the Debtors' Plan). As Avenue and Fortress are both majority owners and the most significant second lien holders, their rejection of the Restructuring Support Agreement in all likelihood would have doomed the Debtors' prepackaged plan efforts. Thus, the Debtors' provision of releases, exculpations and/or payment of attorneys' fees to these creditors created a "very real possibility of dissuading or silencing opposition to the plan." *In re Adelphia Comm'ns Corp.*, 361 B.R. at 363.

Regardless of the Debtors' rationale for providing disparate benefits to holders of Class A4 Claims, the result is the same. The inequitable treatment of Class A4 creditors violates the equal treatment mandate of Section 1123(a)(4). This is yet another reason the Plan is unconfirmable.

### 4.    The Plan cannot be confirmed because it does not reserve for Former D&O Indemnification Claims.

The Plan requires that before making any distributions of Company Specified Litigation Proceeds or Remaining Equity, the Debtors must reserve for disputed Unsecured Claims. *See* Plan § 6.2. Specifically, the Debtors must reserve Company Specified Litigation Proceeds, or at a claim holders' election Remaining Equity, in an amount equal to 100 percent of the asserted value of each disputed claim (or in such other agreed to amount). *Id.* Subject to the creation of necessary reserves, the Plan permits the Debtors to distribute all unreserved Remaining Equity to holders that made the Stock in Lieu Election "as soon as reasonably practicable after the deadline

for submitting Proofs of Claim."[24]  *Id.*  The Former Manager Creditors will elect to receive Stock in Lieu.

Remarkably, the Plan does not require the Debtors to reserve for Former D&O Indemnification Claims (or any other claims that "may" be subordinated), seemingly based on the Debtors' unproven view that these claims will "not [be] entitled to any distributions under the Plan." *Id.* (providing that the Debtors need not reserve for Class A5 Claims)  But until the Debtors obtain a final, non-appealable order subordinating the Former D&O Indemnification Claims (and any other claims it "may" seek to subordinate in Class A5), the Debtors' view is irrelevant, and the claims are Unsecured Claims entitled to both a distribution under the Plan and inclusion in the disputed reserves.  To allow the Debtors to distribute Remaining Equity "as soon as reasonably practicable after the deadline for submitting claims" without reserving for the Former D&O Indemnification Claims (or any other claims it "may" subordinate) is improper, and renders the Plan not confirmable.[25]  *See, e.g., In re Weiss-Wolf, Inc.*, 59 B.R. 653, 656 (Bankr. S.D.N.Y. 1986) ("[A] debtor must make provision for payment of disputed claims so that if and when allowed the claims have reasonable assurance that they will receive identical treatment."); *In re MCorp Fin.*, 160 B.R. 941, 962 (S.D. Tex. 1993) ("A contingent claim is entitled to a reserve for its full amount.").

---

[24] The Plan does not provide any timetable for the distribution of Company Specified Litigation Proceeds.

[25] To the extent the Debtors continue to advance a Plan that would reinstate the Favored Former D&O Claims, the Former Manager Creditors' identical indemnification claims should be reinstated as well.  The Debtors must then either reserve Cash sufficient to satisfy the Former Manager Creditors' claims when they arise (which claims, according to the Debtors, could exceed hundreds of millions of dollars), or demonstrate that the Debtors can pay them in the ordinary course post-Effective Date. *See* 11 U.S.C. § 1129(a)(11) (feasibility requirement); *see also* Discl. Stmt. at 19 (stating that Avenue and Fortress' claims against the Former Manager Creditors may be worth "hundreds of millions of dollars.").

01:15405138.1

**B.      The Plan's Release, Exculpation and Injunction Provisions Are Overbroad, and Require the Court to Deny Confirmation.**

**1.      If approved, the Plan would bar the Specified Litigation Parties, including the Former Manager Creditors, from asserting setoffs and counterclaims against the Debtors.**

The Plan impermissibly attempts to discharge and enjoin the Former Manager Creditors'

prepetition setoff rights.[26]  *See* Plan § 9.1(a) (providing for the release and discharge of "all

Claims," including "Former D&O Indemnification Claims, whether liquidated or unliquidated,

fixed or contingent, matured or unmatured"); § 9.1(b) (precluding all Persons from asserting pre-

Effective Date claims); § 9.2(a) (enjoining all Persons from, among other things, "asserting a

setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation

due to the Debtors or the Reorganized Debtors or their respective property.").  Section 553 of the

Bankruptcy Code, however, strictly forbids the discharge and injunction of these rights.  Because

a plan's discharge and injunction provisions may not exceed the Bankruptcy Code's legal

boundaries—here, those boundaries set by Section 553—the Plan cannot be confirmed.  *See,*

*e.g., In re Slaw Const. Corp.*, 17 B.R. 744, 748 (Bankr. E.D. Pa. 1982) (recognizing that Section

553 is clear that "the right of setoff is preserved notwithstanding any other section of the Code

except for certain limited exceptions"); *In re Exide Techs.*, 303 B.R. 48, 75 (Bankr. D. Del.

2003) (refusing to approve an exculpation provision that "goes beyond the applicable standard of

liability that could be read into § 1103.").

Section 553 of the Bankruptcy Code provides in relevant part:

> (a) *Except as otherwise provided in this section and in sections 362 and 363 of this title*, this title *does not affect any right of a creditor to offset a mutual debt* owing by such creditor to the

---

[26] The Former Manager Creditors may have a variety of different rights, counterclaims, and defenses that could result in a reduction of any amounts owed to the Debtors following litigation.  The Former Manager Creditors are not seeking to litigate the contours of those rights here.  Whatever those rights are, however, they should be preserved under the Plan.

01:15405138.1

debtor that ***arose before the commencement of the case*** under this
title against a claim of such creditor against the debtor that ***arose
before the commencement of the case***, . . .

11 U.S.C. § 553(a) (emphasis added).  In other words, Section 553 requires that where a debtor

and creditor have prepetition claims against one another, a creditor's right to setoff will survive

confirmation and cannot be effectively discharged or enjoined.  *In re Reading Co.,* 72 B.R. 293,

295 (E.D. Pa. 1987) (recognizing that even though "discharge bars affirmative recovery, it does

not bar the use of setoff as a defense to a pre-petition claim"); *Krajci v. Mt. Vernon Consumer

Disc. Co.,* 16 B.R. 464, 466 (E.D. Pa. 1981) (acknowledging that "[t]he allowance of a set-off

here merely recognizes the injustice resulting from compelling a creditor to pay the bankrupt

estate the full value of a claim owed while, at the same time, requiring the creditor to forfeit a

claim due from the debtor").

The fact that a debtor tactically delays its litigation against a creditor until after plan

confirmation (as the Debtors plan to do here) does not impact the applicability of Section 553.[27]

In fact, case law is clear that Section 553 allows the setoff of mutual, pre-bankruptcy debts

regardless of when suit thereon is commenced.  The decision in *Slaw Construction Corporation*

is illustrative.  17 B.R. at 748.  In that case, the debtor—after confirming its plan of

reorganization—sued for breach of contract.  The defendant in the action, a former creditor in the

debtor's bankruptcy case, asserted a counterclaim arising under the breached contract.  The

debtor attempted to dismiss the counterclaim, arguing that it was discharged by the confirmed

plan.  The court disagreed, recognizing that if discharge were allowed, a debtor "could prevent a

---

[27] Had the Former Manager Creditors failed to assert this Objection and affirmatively assert their setoff
rights, their rights to setoff could arguably be discharged by the Plan.  *United States v. Cont'l Airlines (In re Cont'l
Airlines),* 134 F.3d 536, 541-42 (3d Cir. 1998); *Protarga, Inc. v. Webb (In re Protarga, Inc.),* 329 B.R. 451, 475
(Bankr. D. Del. 2005) those cases are readily distinguishable.  However, "*a creditor does not lose its setoff rights
when it properly asserts that right prior to confirmation.*"  *In re Phoenix Petroleum Co.,* 278 B.R. 385, 400 (Bankr.
E.D. Pa. 2001) (citing *Cont'l Airlines,* 134 F.3d at 542) (emphasis added).  For the avoidance of doubt, the Former
Manager Creditors hereby assert and reserve all of their rights to assert counterclaims, setoffs, subrogations, and
recoupments, and reserve the right to further assert such rights.

01:15405138.1

creditor from effecting a setoff by waiting to file suit on a prepetition transaction until after he had filed a petition for relief." *Id.* The court thus ruled that a creditor may "raise a discharged debt as a defense to an action brought by the debtor, regardless of when that action is instituted, if that action is based on a claim or cause of action which arose before bankruptcy." *Id.*

The Former Manager Creditors have what may be significant claims, counterclaims and cross claims against the Debtors, including but not limited to the Former D&O Indemnification Claims and claims for breach of the covenant not to sue granted to them in the 2012 Restructuring.[28] *See, infra,* § II.B (setting forth the existence of liquidated and contingent indemnification claims). Thus, to the extent the Debtors ultimately pursue the Specified Litigation Claims—or any other prepetition claims—against the Former Manager Creditors, the Former Manager Creditors will be entitled to assert these claims and counterclaims as setoffs under Section 553 of the Bankruptcy Code. Despite the Debtors' impermissible attempt to obtain an overly broad plan injunction, this remains true as a matter of law even if the Debtors elect not to file suit on the Specified Litigation Claims until after the Effective Date.

The Debtors' attempt to enjoin the Former Director and Officers' setoff rights is impermissible. Plan confirmation must be denied.

### 2. If approved, the Plan's injunction would provide an impermissible, non-consensual third party release.

The Plan's injunction provides that "all Persons that have held, currently hold or may hold a Claim, demand, debt, right, cause of action or liability that is released pursuant to the Plan are permanently enjoined from taking any of the following actions on account of such released Claims . . . (i) commencing or continuing in any manner any action or other proceeding; . . . (iv) asserting a setoff . . . against any . . . released Person." Plan § 9.2(b). As drafted, this provision

---

[28] The Former Manager Creditors do not herein release or waive any rights they may have to assert and litigate against the Debtors or Reorganized Debtors claims that arise post-petition.

would not only bar the Former Manager Creditors from asserting a Claim, demand, right, cause of action or liability that the Plan releases against the Debtors, but would also bar the Former Manager Creditors from asserting such Claim, demand, right, cause of action or liability against *any* third party.[29] The provision is a third party release. As the Former Manager Creditors have not consented to the release, it is impermissible under Third Circuit law.

The Third Circuit has "warned against the exercise of 'unfettered discretion to discharge non-debtors from liability,' and explained 'that a permanent injunction limiting the liability of non-debtor parties is 'a rare thing' that should not be considered absent 'a showing of exceptional circumstances.'"" *In re Genesis Health Ventures, Inc.*, 266 B.R. at 608 (quoting *In re Cont'l Airlines*, 203 F.3d 203, 213 n.9 (3d Cir. 2000)). A non-consensual release may be approved only in "extraordinary cases" where "exceptional circumstances" are present, and then only if it meets the "hallmarks of permissible non-consensual releases—fairness, necessity to the reorganization, and specific factual findings to support these conclusions." *Cont'l Airlines*, 203 F.3d at 214, 219 n.9; *In re Genesis Health Ventures, Inc.*, 266 B.R. at 608.

To demonstrate necessity with respect to a non-consensual release, a plan proponent must show that (i) the releasees have provided a critical financial contribution to the debtors' plan that is necessary to make the plan feasible in exchange for receiving a release of liability and (ii) the success of the debtors' reorganization bears a relationship to the release of the non-consensual parties. *In re Genesis Health Ventures, Inc.*, 266 B.R. at 608. To demonstrate fairness, a proponent must show that non-consenting creditors were given reasonable consideration in

---

[29] For example, Section 9.2(b) of the Plan would permanently enjoin the Former Manager Creditors from asserting a claim or counterclaim for breach of the 2012 Restructuring Documents not just against the Debtors, but also against any other party to the transaction against whom the same Claim, demand, right, cause of action or liability may lie.

34

exchange for the release. *Id.*; *see Bank of N.Y. v. Becker (In re Lower Bucks Hosp.)*, 488 B.R. 303, 323 (E.D. Pa. 2013) (same, citing *Genesis*, 266 B.R. at 608).

Here, the proposed third party injunction does not meet any of the hallmarks of permissible non-consensual releases. Perhaps most obviously, the Debtors have not demonstrated, and cannot demonstrate, that the proposed third party injunction is necessary to their reorganization. The Disclosure Statement does not describe any financial contribution made by any third party in exchange for this extraordinary injunction and, indeed, the Plan does not contemplate the investment of any new money by anyone. *In re Genesis Health Ventures, Inc.*, 266 B.R. at 608. The Debtors similarly fail to give any explanation—in their Disclosure Statement or otherwise—of how this aspect of the injunction has anything to do with the reorganization, much less an explanation of how the success of their reorganization is dependent upon its inclusion. *Id.*

Moreover, the proposed releases do not meet the hallmark of fairness, as the Former Manager Creditors will not receive *any* consideration—much less reasonable consideration—in exchange therefor. *See In re Cont'l Airlines*, 203 F.3d at 213 (citing *In re AOV Indus., Inc.*, 792 F.2d 1140, 1154 (D.C. Cir. 1986) for the proposition that "it is necessary to provide adequate consideration to a claimholder being forced to release claims against non-debtors"). Instead, were the Plan confirmed as filed, the Former Manager Creditors' indemnification claims would be subordinated, their setoff rights against the Debtors would be extinguished, their unsecured claims would be subject to unfair discrimination and unequal treatment, and their ability to defend themselves in any litigation surrounding the 2012 Restructuring would be compromised.

Finally, the facts and circumstances of this prepackaged retail restaurant bankruptcy are hardly exceptional, and do not justify non-consensual, third party releases. *See In re Genesis*

*Health Ventures, Inc.*, 266 B.R. at 608.  The third party release contained in Section 9.2(b) of the

Plan renders the Plan not confirmable.

> **3.    The Plan's exculpation provisions extend to non-fiduciaries, and are thus overbroad.**

The Plan provides that none of the "Exculpated Parties"—which include, among others,

Avenue, Fortress and their respective directors, officers, managers and agents—can "have or

incur any liability for any claim, cause of action, or other assertion of liability for any act taken

or omitted in connection with, or arising out of, the Chapter 11 Cases or the negotiation,

formulation, preparation, administration, consummation and/or implementation of the Plan, or

any contract, instrument, document, or other agreement entered into pursuant thereto . . . through

the Effective Date."  Plan § 9.4.  The Plan provides limited exceptions to this broad exculpation,

namely for actions that constitute actual fraud, willful misconduct or gross negligence.  *Id.*

The exculpation clause is overbroad and thus impermissible.  The scope of an exculpation

clause "must be limited to the fiduciaries who have served during the chapter 11 proceeding:

estate professionals, the Committees and their members, and the Debtors' directors and officers."

*In re Washington Mut., Inc.*, 442 B.R. 314, 350-51 (Bankr. D. Del. 2011); *In re Indianapolis

Downs, LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013) (same (citing *In re Washington Mut., Inc.*,

442 B.R. at 350-51)); *In re Tribune Co.*, 446 B.R. 126, 189 (Bankr. D. Del. 2011) (requiring

exculpation clause to exclude non-fiduciaries); *In re PTL Holdings LLC*, No. 11-12676 (BLS),

2011 Bankr. LEXIS 4436, at *36-*37 (Bankr. D. Del. Nov. 10, 2011) (limiting exculpation

clause to include "only those parties who have acted as estate fiduciaries and their

professionals").  The proposed exculpated parties, however, include (among others) Avenue and

Fortress.  Because Avenue and Fortress are not estate fiduciaries—but are rather self-interested

01:15405138.1

36

creditors and equity holders in the estates—they are not entitled to exculpation and must be deleted from the definition of "Exculpated Parties."[30]

Moreover, to the extent that the exculpation provision constitutes a back-door third party release that would prevent the Former Manager Creditors from bringing suit against Avenue and Fortress (or any other third party), it is impermissible. The Debtors can demonstrate no basis for non-consensual third party releases in this case. *See, infra,* § IV.B (discussing applicable case law and concluding that third party releases are not justified in this case). The Plan cannot be confirmed.

Dated: April 29, 2014
      Wilmington, Delaware

JONES DAY
Bruce S. Bennett
Erin N. Brady
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071-2300
Telephone: (213) 489-3939
Facsimile: (213) 243-2539

- and -

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Matthew B. Lunn*
Robert S. Brady (No. 2847)
Matthew B. Lunn (No. 4119)
Rodney Square, 1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Attorneys for Former Manager Creditors

---

[30] The Plan further attempts to exculpate Avenue's and Fortress' "current and former equityholders, affiliates, subsidiaries, officers, directors, principals, members, managers, employees, funds, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals." Plan § 1.61. Given that the Plan may not exculpate the prepetition lenders, it certainly may not exculpate this sweeping class of persons and entities.

01:15405138.1